UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CHRISTOPHER D. LESTER AND                           3:16-cv-00909-JAM
MONICA G. LESTER                    :

v.                                       :

LIBERTY MUTUAL FIRE INSURANCE
COMPANY                      :           OCTOBER 25, 2017

<u>**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**</u>

The defendant, Liberty Mutual Fire Insurance Company ("Liberty"), hereby submits this

memorandum of law in support of its motion for summary judgment.

## I.     <u>**BACKGROUND AND FACTS:**</u>

This is an action against Liberty for breach of an insurance contract, bad faith, and unfair and

deceptive practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA")

and the Connecticut Unfair Trade Practices Act ("CUTPA"). Liberty issued a homeowners

policy, Policy Number H32-218-074339-70 (hereinafter the "Policy"), to the plaintiffs,

Christopher and Monica Lester, to insure the property located at 24 Laurel Drive, Willington, CT

06279 ("Property"). **Ex. 1**. The Policy had effective dates of June 1, 2015 to June 1, 2016. **Ex.
1**, p. 2. Liberty first insured the Property on June 1, 2007. **Ex. 2**, ¶5.

The claim was reported to Liberty on October 16, 2015. **Ex. 2**, ¶6. The plaintiffs submitted

a foundation evaluation report by William Neal, P.E. in connection with their claim. **Ex. 3**. In

response to the claim, Liberty retained Paul Cianci, P.E. to conduct a structural evaluation. **Ex. 2**, ¶7.   Mr. Cianci inspected the property on November 19, 2015 and prepared a report detailing his findings. **Ex. 2**, ¶8; **Ex. 4**. Mr. Cianci opined in his report that the property had not suffered a substantial impairment to the structural integrity of a building. **Ex. 4**, p. 6. He opined that the property was not in any imminent danger of collapsing. **Ex. 4**, p. 6. Liberty denied the claim via April 12, 2016 correspondence wherein it relied on Mr. Cianci's structural evaluation. **Ex. 4**, p. 6; **Ex. 5**, p. 1.   In the denial letter, Liberty cited exclusions which are directly applicable to the claim presented, including, but not limited to, faulty materials and cracking. **Ex. 5**, pp. 2-3.

The plaintiffs initiated this action by way of summons and complaint dated May 2, 2016. The plaintiffs seek coverage pursuant to the "collapse" provision in the Policy because they have cracks in their foundation.  **Complaint**, ¶6 and ¶11.  The basement has never been finished. **Ex. 6**, pp. 17-18.   There has never been any siding or obstruction over the exterior concrete foundation.  **Ex. 6**, p. 18.  Mr. Neal first visited the Property on October 5, 2015.  **Ex. 7**, p. 5. The plaintiffs first noticed cracks in their foundation in September or October of 2015 after neighbors informed them of foundation problems in the area. **Ex. 6**, pp. 32-33, 35.

Mr. Neal observed "three hairline cracks visible on the exterior of the foundation." **Ex. 7**, p. 7. Mr. Neal believes "spider web cracks" are the type of cracks that are typically found when concrete is defective.  **Ex. 7**, p. 19.  However, he readily admits that he is "not a concrete expert." **Ex. 8**, p. 35. Mr. Neal did not note any "spider web cracks" on the exterior foundation.  **Ex. 7**, p. 20.  He does not know if these hairline cracks have gotten worse since 2015.  **Ex. 7**, p. 21.

Mr. Neal observed hairline spider web cracks on the interior foundation.  **Ex. 7**, p. 19. "Hairline" is the least significant term that Mr. Neal would use to describe cracking.  **Ex. 7**, pp. 19-20.  Mr. Neal did not measure any of the cracks, but guessed that they would be a thirty-second of an inch or less. **Ex. 7**, p. 20.  He has not been back to the Property since October 5, 2015. **Ex. 7**, p. 16.  Mr. Neal has no plans to return to the Property. **Ex. 7**, p. 17.  The Lesters do not know if the cracks have gotten any worse since 2015.  **Ex. 6**, p. 37; **Ex. 9**, p. 17.

Mr. Neal testified that there is no bowing in any of the foundation walls.  **Ex. 7**, p. 22.  He did not inspect the living space and, thus, noted no damage to it.  **Ex. 7**, pp. 30-31.  The foundation was holding up the above structure and retaining soil on the exterior at the time of Mr. Neal's visit.  **Ex. 7**, pp. 33.  The home is safe to live in.  **Ex. 7**, p. 38. The plaintiffs still live in the home. **Ex. 6**, p. 40. The Property has not been condemned by a building inspector and Mr. Neal does not believe that it should be condemned. **Ex.** 9, p. 20; **Ex. 7**, p. 32.  Nobody has told the plaintiffs to relocate for safety reasons. **Ex. 6**, pp. 38-39.  The foundation walls are not in imminent danger of falling down.  **Ex. 7**, p. 38.   No part of the home is in imminent danger of falling down.  **Ex. 7**, p. 38.  The walls do not even need to be shored, much less replaced.  **Ex. 7**, p. 32

Mr. Neal does not have an opinion as to when the foundation walls will fall down or become unsafe absent their replacement. **Ex. 7**, p. 41.  He cannot testify to a reasonable degree of engineering probability that the foundation walls will become structurally dangerous within the next ***one thousand years***. **Ex. 7**, p. 28.  He expects that they may become structurally dangerous

sometime between the next one thousand and one million years.  **Ex. 7**, p. 28.  However, he is uncertain whether the foundation will ever structurally fail.  **Ex. 7**, p. 24.

There are properties that Mr. Neal has inspected that have foundations which are bowing by as much as five inches.  **Ex. 7**, p. 23.  Even at those properties the walls have not fallen down and the homeowners are still living there.  **Ex. 7**, p. 23.  Mr. Neal has inspected around 800 properties with cracked foundations.  **Ex. 7**, p. 34.  He is unaware of a single foundation which has fallen down.  **Ex. 7**, pp. 34-35.

Mr. Neal testified that the phrase "substantial impairment of structural integrity" is not an engineering term of art.  **Ex. 7**, p. 34.  It is not a phrase utilized by him.  **Ex. 10**, p. 35. Nevertheless, Mr. Neal testified that his inclination is that it means that the "structure's ability to carry the loads it was intended to carry has been reduced" in a substantial manner.  **Ex. 11** p. 39. According to Mr. Neal, indicia of such a condition would be walls which are bowing inward and movement and damage to the above structure.  **Ex. 11**, p. 39.  These conditions are not present at the Property.  **Ex. 7**, pp. 22, 30-31.

The plaintiffs allege that Liberty has breached its contract by not providing coverage.  The extra-contractual allegations are that Liberty has a general business practice of denying cracking foundation claims for which liability is reasonably clear and that Liberty intentionally and in bad faith denied the claim based upon clearly inapplicable policy provisions.

The Policy, as modified by its various endorsements, states in relevant part:

---

## SECTION I—PERILS INSURED AGAINST

**COVERAGE A—DWELLING and COVERAGE B—OTHER STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do not insure, however, for loss:

**1.** Involving collapse, other than as provided in Additional Coverage 8.;

**2.** Caused by:

. . . .

    **b.** Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

    . . . .

    **(2)** Foundation, retaining wall, or bulkhead; or

    . . . .

    **(4)** Footing(s)

    . . . .

    **e.** Any of the following:

    **(1)** Wear and tear, marring, deterioration;

    **(2)** Inherent vice, latent defect, mechanical breakdown;

    **(3)** Smog, rust or other corrosion;

    . . . .

    **(6)** Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

. . . .

**ADDITIONAL COVERAGES**

. . . .

**8.** **Collapse**.  We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a.    Perils Insured Against in COVERAGE C—PERSONAL PROPERTY.  These perils apply to covered buildings and personal property for loss insured by this additional coverage:

b.    Hidden decay;

c.    Hidden insect or vermin damage;

d.    Weight of contents, equipment, animals or people;

e.    Weight of rain which collects on a roof; or

f.    Use of defective material or methods in construction, remodeling or renovation;

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

. . . .

## SECTION I—EXCLUSIONS

1.    We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

. . . .

b.    **Earth Movement**, meaning movement of the earth, whether combined with water or not, in any direction, including but not limited to:

a.    Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

b.    Landslide, mud slide, or mud flow;

      **c.**      Subsidence or sinkhole; or

      **d.**      Any other earth movement, including earth sinking, rising, shifting, expanding, contracting, or eroding

caused by or resulting from manmade, animal, or natural actions, events, or conditions.

      **c.**      **Water Damage**, meaning:

      (1)      Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

      (2)      Water which backs up through sewers or drains or which overflows from a sump; or

      (3)      Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

. . . .

**2.**      We do not insure for loss to property described in Coverages A and B caused by any of the following.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

. . . .

      c.      **Faulty, inadequate or defective**:

      (1)      Planning, zoning, development, surveying, siting;

      (2)      Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3)      Materials used in repair, construction, renovation or remodeling; or

(4)     Maintenance;

of part or all of any property whether on or off the "residence premises."

. . . .
**Ex. 1**

---

<div align="center">

**SECTIONS I AND II—CONDITIONS**

</div>

---

1.     **Policy Period**.  This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

**Ex. 1.**

. . . .

Liberty moves for summary judgment on the grounds that the Policy does not provide coverage.  There is no evidence that any loss occurred during the Policy.  Liberty evaluated and denied the claim in good faith, and the allegations of a general business practice of denying cracking foundation claims is not an allegation of a wrongful business practice because this claim was evaluated on its own merits and liability is not reasonably clear.

## II.     LAW AND ARGUMENT:

### A.     Standard Of Review:

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 247-48.  A "material fact" is

one whose resolution would affect the ultimate determination in the case. *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims… and it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

A non-movant may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings. *Celotex Corp.*, 477 U.S. at 327. "[A] plaintiff must do more than whet the curiosity of the court; he must support vague accusation and surmise with concrete particulars." *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 96 (2nd Cir. 1970). The opposing party is entitled to the benefit of all favorable inferences which can be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326 (7th Cir. 1987). "[T]he inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind…." *NLRB v. Martin A Gleason, Inc.*, 534 F.2d 466, 474 (2nd Cir. 1976).

Issues of insurance coverage are particularly well suited to resolution by summary judgment as they typically involve questions of law. See, e.g., *Interface Flooring Systems, Inc. v. Aetna Casualty and Surety Co.*, 261 Conn. 601 (2002).

**B. There Is No Coverage For The Claim:**

**1. No Substantial Impairment Of The Structural Integrity Of A Building Has Occurred.**

### a. *Beach* is not binding authority and "substantial impairment of structural integrity" is not the applicable standard:

*Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246 (1987) is <u>not</u> binding authority.  The policy at issue in *Beach* had a markedly different collapse provision. *Id.* at fn. 1.  *Beach* noted that "[i]f the defendant wished to rely on a single facial meaning of the term 'collapse'…it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended."  *Id.* at 251.  *Beach* cited as an example *Nida v. State Farm Fire & Cas. Co.*, 454 So. 2d 328, 334 (La.App. 1984), wherein the policy at issue—like Liberty's here—defined collapse in the negative; namely, that it does not include settling, cracking, shrinking bulging or expansion.  *Id.*

*Nida* noted that "property insurance policies extending coverage to direct loss caused by 'collapse' of the insured building but excluding loss from settling, cracking, bulging, and the like, have generally been held not to encompass damage to…foundations which have in fact settled, cracked, or bulged."  *Id.* at 334.  *Nida* cited with approval *Krug v. Millers Mut. Ins. Ass'n*, 495 P.2d 949 (Kan. 1972), wherein the Kansas Supreme Court rejected a "collapse" claim and contentions that "cracking" referred to only supposedly "normal" cracking. It is clear from *Beach*'s reference to *Nida* that this is not a "collapse" under Connecticut law. Instead, the Connecticut Supreme Court has already held that this claim is not covered.

That leads us to the recent, well-reasoned decision in *Tustin Field Gas & Food, Inc. v. Mid-Century Ins. Co.*, 13 Cal.App. 5th 220, 228 (CA 2d DCA 2017), wherein a California appellate

10

court held that under the Policy language at issue here, a "substantial impairment of structural integrity" is _not_ a "collapse" because "collapse" excludes settling, cracking, shrinkage, bulging or expansion:

> "When a policy excludes from coverage 'settling,' 'cracking,', 'shrinkage,' or 'expansion,' the policy will not cover a collapse—whether actual or imminent—based solely on a 'substantial impairment of structural integrity'; to do otherwise would negate the exclusionary clause for settling and the like.

> "These undisputed facts show that the damage to UST-1 constitutes at most a 'substantial impairment of [its] structural integrity.'  However, because the Policy excludes 'settling' and the like, a 'substantial impairment of structural integrity' is not a 'collapse' as a matter of law."
> *Id.*

*Beach* implored insurers to utilize the Policy language at issue in *Nida* if it wished to exclude a loss which was far greater than the claimed loss here. Liberty followed suit.  It is clear from the reference in *Beach* to *Nida* that "substantial impairment of structural integrity" is not the standard for "collapse" when that provision excludes settling, cracking, shrinkage, or expansion.  To rule otherwise would negate this exclusion. The plaintiffs cannot show that there was an actual or imminent collapse at their Property.  Instead, they seek to show that there was at most a "substantial impairment of structural integrity."  However, pursuant to *Beach* and as explained in *Tustin*, a "substantial impairment of structural integrity" is not enough under this "collapse" provision.

      **b.  Pursuant to *Beach*, this is not a "collapse."**

The plaintiffs seek coverage for cracking pursuant to the "collapse" provision.   However, cracking, bulging or expansion are excluded from coverage.  **Ex. 1**, pp. 10-11; *Cali v. Merrimack Mut. Fire Ins. Co.*, 43 A.D. 3d 415 (N.Y.A.D. 2 Dept. 2007); *Labate v. Liberty Mut. Ins. Co.*, 45 A.D. 3d 811 (N.Y.A.D. 2 Dept. 2007); *Wurtele v. Cincinnati Ins. Co.*, 2009 WL 205057 (D. Neb. 2009); *Kelley v. Iantosca*, 78 Mass.App.Ct. 147 (2010).

The "collapse" provision explicitly defines what is ***not*** a collapse; namely settling, cracking, shrinking, bulging or expansion.  **Ex. 1**, p. 10.  Thus, the result should be the same as in *Alexander v. General Ins. Co. of America*, 2017 WL 188134 (D. Conn. 2017) and *Jemiola v. Hartford Cas. Ins. Co.*, 2017 WL 1258778 (Conn. Super. 2017).  It does not matter that "collapse" does not include language concerning an abrupt falling down or caving in.  As noted in *Alexander* and cited with approval in *Jemiola*, "there has been cracking, bulging (sp), etc. Those situations are also excluded."  *Jemiola* at *9.  The collapse provisions at issue in *Alexander* and *Jemiola* mandated that an actual collapse occur in order for coverage to attach, as opposed to a substantial impairment of structural integrity.  Conversely, hairline cracks have always been excluded from coverage.

If *Beach* controls, then "collapse" includes coverage for a substantial impairment of the structural integrity of a building.[1]  *Beach* at 252.  *Beach* did not explicitly articulate what was

---

[1] The concrete foundation walls are not part of the building. *Shoemaker v. Liberty Mut. Ins. Co.*, 17 Mass.L.Rptr. 57 (Mass. Super. Ct. 2003); *Murphy v. American Central Ins. Co.*, 54 S.W. 407, 410 (Tx. App. 1899).  The correct application of the last antecedent rule to the "Loss Settlement"

meant by "substantial impairment of the structural integrity of a building."  Nevertheless, it was clearly inferred by its facts.  A crack in the foundation wall had continued to widen during the pendency of the claim until it had reached a width of approximately nine inches, "wooden support beams on top of the foundation wall had pulled apart," and "the foundation wall had tipped over into the basement from the top and was no longer supporting the house."  *Id.* at 248-249.  The home "was in imminent[2] danger of falling over." *Id.* at 249.

*Beach* noted that coverage for "collapse" could follow consequentially from excluded activity, such as cracking, bulging, or expansion. *Id.* at 251-252.  *Beach* differentiated between cracking, bulging or expansion and a "collapse."  *Id.*  There has to be more than hairline cracks in the foundation of a safe home in order to constitute a "collapse."  It is clear from the matters cited and the condition of the home that *Beach* contemplated a structure in imminent danger of falling over which necessitated immediate repairs.  *Id.* at 249.

In *Beach*, numerous witnesses testified "that the house would have caved in had the plaintiffs not acted to repair the damage."  *Id.* at 248-249.  No actual caving-in occurred and the structure was not completely uninhabitable only because immediate repairs were made.  *Id.*  Beach held that "[r]equiring the insured to await an actual collapse would not only be economically wasteful,

---

provision further support that the foundation is not part of the building. *Roberge v. Amica*, 2015 WL 9480008 (D. Conn. 2015), *2-3. **Ex. 1**, p. 14.

[2] The imminence of an actual collapse was a crucial element of the *Beach* analysis.  *Id.* at 249. Imminent means "ready to take place."  *Strycharz v. Cady*, 323 Conn. 548, 586 (2016). "[I]mminent harm" means that something is so likely to cause harm that immediate action has to be taken to prevent such harm.  *Strycharz*, 323 Conn. at 587.

but would also conflict with the insured's contractual and common law duty to mitigate damages." *Id.* at fn. 2.  As such, *Beach* transformed an "actual collapse" into a "substantial impairment of structural integrity of a building." The plaintiffs now seek to conflate the excluded cracking referenced in *Beach* with "substantial impairment of structural integrity."  This they cannot do.  "Every provision of a contract of insurance is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it."  *A.M. Larson Co. v. Lawlor Ins. Agency*, 153 Conn. 618, 622 (1966). Per binding law, hairline cracking in the foundation of a safe home cannot be made synonymous with "collapse."

It is completely speculative whether this home will ever be in any danger.  The home was built in 1998.  **Ex. 7**, p. 6.  The plaintiffs first noticed cracks in their foundation in September or October of 2015. **Ex. 6**, p. 35.  The basement has never been finished.  **Ex. 6**, pp. 17-18.  There has never been any siding or obstruction over the exterior concrete foundation.  **Ex. 6**, p. 18.  Mr. Neal first visited the Property on October 5, 2015.  **Ex. 7**, p. 5.

Mr. Neal observed "three hairline cracks visible on the exterior of the foundation."  **Ex. 7**, p. 7.  Mr. Neal believes "spider web cracks" are the type of cracks that are typically found when concrete is defective.  **Ex. 7**, p. 19.  However, he admits that he is "not a concrete expert." **Ex. 8**, p. 35. Mr. Neal did not note any "spider web cracks" on the exterior foundation.  **Ex. 7**, p. 20.  He does not know if these hairline cracks have gotten worse since 2015.  **Ex. 7**, p. 21.

Mr. Neal observed hairline spider web cracks on the interior foundation.  **Ex. 7**, p. 19.

"Hairline" is the least significant term that Mr. Neal would use to describe cracking.  **Ex. 7**, pp.

19-20.  Mr. Neal did not measure any of the cracks, but guessed that they would be a thirty-

second of an inch or less. **Ex. 7**, p. 20.  He has not been back to the Property since October 5,

2015.  Mr. Neal has no plans to return to the Property. **Ex. 7**, p. 17.  The Lesters do not know if

the cracks have gotten any worse since 2015.  **Ex. 6**, p. 37; **Ex. 9**, p. 17.

Mr. Neal testified that there is no bowing in any of the foundation walls.  **Ex. 7**, p. 22.  He

did not inspect the living space and, thus, noted no damage to it. **Ex. 7**, pp. 30-31.  The foundation

was holding up the above structure and retaining soil on the exterior at the time of Mr. Neal's

visit. **Ex. 7**, pp. 33.  The home is safe to live in. **Ex. 7**, p. 38. The plaintiffs still live in the home.

**Ex. 6**, p. 40. The Property has not been condemned by a building inspector and Mr. Neal does

not believe that it should be condemned. **Ex.** 9, p. 20; **Ex. 7**, p. 32.  Nobody has told the plaintiffs

to relocate for safety reasons. **Ex. 6**, pp. 38-39.  The foundation walls are not in imminent danger

of falling down. **Ex. 7**, p. 38.   No part of the home is in imminent danger of falling down. **Ex.

7**, p. 38.  The walls do not even need to be shored, much less replaced. **Ex. 7**, p. 32

Mr. Neal does not have an opinion as to when the foundation walls will fall down or become

unsafe absent their replacement. **Ex. 7**, p. 41.  He cannot testify to a reasonable degree of

engineering probability that the foundation walls will become structurally dangerous within the

next **_one thousand years_**. **Ex. 7**, p. 28.  He expects that they may become structurally dangerous

15

sometime between the next one thousand and one million years.  **Ex. 7**, p. 28. However, he is uncertain whether the foundation will ever structurally fail.  **Ex. 7**, p. 24.

There are properties that Mr. Neal has inspected that have foundations which are bowing by as much as five inches.  **Ex. 7**, p. 23.  Even at those properties the walls have not fallen down and the homeowners are still living there.  **Ex. 7**, p. 23.  Mr. Neal has inspected around 800 properties with cracked foundations.  **Ex. 7**, p. 34.  He is unaware of a single foundation which has fallen down.  **Ex. 7**, pp. 34-35.

Mr. Neal testified that the phrase "substantial impairment of structural integrity" is not an engineering term of art.  **Ex. 7**, p. 34.  It is not a phrase utilized by him.  **Ex. 10**, p. 35. Nevertheless, Mr. Neal testified that his inclination is that it means that the "structure's ability to carry the loads it was intended to carry has been reduced" in a substantial manner.  **Ex. 11** p. 39. According to Mr. Neal, indicia of such a condition would be walls which are bowing inward and movement and damage to the above structure.  **Ex. 11**, p. 39.  These conditions are not present at the Property.

This claim is at the excluded cracking, bulging and expansion stage referenced in *Beach*.  Mr. Neal and the plaintiffs do not know if the hairline cracks have gotten any worse since 2015.  **Ex. 6**, p. 37; **Ex. 7**, p. 17; **Ex. 9**, p. 17.  There is no scientific, expert, or factual basis for a contention that this home will ever remotely resemble the conditions in *Beach*.  Whether a "substantial impairment of structural integrity" may speculatively follow this excluded claim one thousand to one million years from now is of no import.

16

### c. **This Court Should Apply The** *Queen Ann Park* **Standard Inferred In** *Beach***.**

"Collapse" means "substantial impairment to the structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe." *Queen Ann Park Homeowners Ass'n v. State Farm Fire and Cas. Co.*, 352 P. 3d 790, 791 (WA 2015). The "substantial impairment" must be one that is "so severe as to materially impair a building's ability to remain upright." *Queen Ann*, 352 P.3d at 794. The policy at issue in *Queen Ann*—like the policies in *Beach* and Liberty's here—had specific language excluding "settling, cracking, shrinking, bulging, or expansion" from its definition of "collapse" so that a "substantial impairment" must mean something more than these excluded phenomenon. *Id.. See also, Fantis Foods, Inc. v. North River Ins. Co.*, 732 A.2d 176, 183 (N.J. App. Div. 2000)(collapse means "any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by.").

It was "simply implausible" that walls had "collapsed" when a 1998 policy was in effect given that the walls were still standing in 2015. *Queen Ann Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 633 Fed.Appx. 415 (9th Cir. 2016). *See also, Am. Econ. Ins. Co. v. CHL, LLC,* 2016 WL 3632488 (W.D. Wash. 2016)(implausible that there was a severe ability in a building's ability to remain upright between 1999 and 2002 when the building remained standing in 2014).

It is simply implausible that a "collapse" has occurred. Mr. Neal observed "three hairline cracks visible on the exterior of the foundation." **Ex. 7**, p. 7. Mr. Neal believes "spider web

17

cracks" are the type of cracks that are typically found when concrete is defective. **Ex. 7**, p. 19. However, he admits that he is "not a concrete expert." **Ex. 8**, p. 35. Mr. Neal did not note any "spider web cracks" on the exterior foundation. **Ex. 7**, p. 20. He does not know if these hairline cracks have gotten worse since 2015. **Ex. 7**, p. 21.

Mr. Neal observed hairline spider web cracks on the interior foundation. **Ex. 7**, p. 19. "Hairline" is the least significant term that Mr. Neal would use to describe cracking. **Ex. 7**, pp. 19-20. Mr. Neal did not measure any of the cracks, but guessed that they would be a thirty-second of an inch or less. **Ex. 7**, p. 20. He has not been back to the Property since October 5, 2015. Mr. Neal has no plans to return to the Property. **Ex. 7**, p. 17. The Lesters do not know if the cracks have gotten any worse since 2015. **Ex. 6**, p. 37; **Ex. 9**, p. 17.

Mr. Neal testified that there is no bowing in any of the foundation walls. **Ex. 7**, p. 22. He did not inspect the living space and, thus, noted no damage to it. **Ex. 7**, pp. 30-31. The foundation was holding up the above structure and retaining soil on the exterior at the time of Mr. Neal's visit. **Ex. 7**, pp. 33. The home is safe to live in. **Ex. 7**, p. 38. The plaintiffs still live in the home. **Ex. 6**, p. 40. The Property has not been condemned by a building inspector and Mr. Neal does not believe that it should be condemned. **Ex.** 9, p. 20; **Ex. 7**, p. 32. Nobody has told the plaintiffs to relocate for safety reasons. **Ex. 6**, pp. 38-39. The foundation walls are not in imminent danger of falling down. **Ex. 7**, p. 38. No part of the home is in imminent danger of falling down. **Ex. 7**, p. 38. The walls do not even need to be shored, much less replaced. **Ex. 7**, p. 32

18

Mr. Neal does not have an opinion as to when the foundation walls will fall down or become unsafe absent their replacement. **Ex. 7**, p. 41. He cannot testify to a reasonable degree of engineering probability that the foundation walls will become structurally dangerous within the next ___*one thousand years*___. **Ex. 7**, p. 28. He expects that they may become structurally dangerous sometime between the next one thousand and one million years. **Ex. 7**, p. 28. However, he is uncertain whether the foundation will ever structurally fail. **Ex. 7**, p. 24.

There are properties that Mr. Neal has inspected that have foundations which are bowing by as much as five inches. **Ex. 7**, p. 23. Even at those properties the walls have not fallen down and the homeowners are still living there. **Ex. 7**, p. 23. Mr. Neal has inspected around 800 properties with cracked foundations. **Ex. 7**, p. 34. He is unaware of a single foundation which has fallen down. **Ex. 7**, pp. 34-35.

Mr. Neal testified that the phrase "substantial impairment of structural integrity" is not an engineering term of art. **Ex. 7**, p. 34. It is not a phrase utilized by him. **Ex. 10**, p. 35. Nevertheless, Mr. Neal testified that his inclination is that it means that the "structure's ability to carry the loads it was intended to carry has been reduced" in a substantial manner. **Ex. 11** p. 39. According to Mr. Neal, indicia of such a condition would be walls which are bowing inward and movement and damage to the above structure. **Ex. 11**, p. 39. These conditions are not present at the Property. Mr. Neal and the plaintiffs do not know if the hairline cracks have gotten any worse since 2015. **Ex. 6**, p. 37; **Ex. 7**, p. 17; **Ex. 9**, p. 17.

When the logical definition set forth in *Queen Ann*—and clearly inferred in *Beach*—is afforded to "substantial impairment of structural integrity", this claim fails. Neighbors did not have to tell the Beaches that a "substantial impairment of structural integrity" had occurred when a crack continued to widen during the pendency of the claim until it had reached a width of approximately nine inches, "wooden support beams on top of the foundation wall had pulled apart," and "the foundation wall had tipped over into the basement from the top and was no longer supporting the house." *Beach* at 248-249, **Ex. 6**, pp. 32-33. *Beach* did not intend for every crack in a wall to require a jury resolution of whether there has been a "collapse."

This matter is distinguishable from *Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882 (D. Conn. 2010) and *Belz v. Peerless Ins. Co.*, 204 F.Supp.3d 457 (D. Conn. 2016) because the foundation has not been replaced. *Belz* was incorrect that the insurer was championing Washington law over Connecticut law.   Instead, *Queen Ann* explicitly set forth the standard clearly inferred in *Beach*.

### d. The plaintiffs cannot prove that the home will eventually be endangered, as they inappropriately rely on the testimony of an unqualified lay witness:

Mr. Neal is no chemist. **Ex. 7**, p. 22. He readily admits that he is "not a concrete expert." **Ex. 8**, p. 35. He has no scientific background relevant to the identification of chemical processes in concrete. **Ex. 7**, p. 31. He admits that he is not an expert in chemical reactions in concrete. **Ex. 7**, p. 25. He has never conducted a petrographic examination and admits that he is unqualified to perform one. **Ex. 7**, p. 27. He cannot testify that this cracking progressed by a measurable variable each month or year. **Ex. 7**, pp. 21. His "expertise" is limited to Google searches. **Ex.**

**7**, p. 25. Even then, he admits that the reports he read "were so technical, I had absolutely no idea what they were talking about." **Ex. 8**, p. 35.  He has seen no literature—engineering or otherwise—that says that the oxidation process cannot be arrested.  **Ex. 8**, p. 31.  He has seen no literature—engineering or otherwise—that says that the alkali-silica reaction cannot be arrested. **Ex. 10**, p. 19.  Nick Scaglione—a petrographer who studies concrete for a living and actually studied *this* concrete—says that the oxidation process can be arrested.  **Ex. 12**, p. 9.  Moreover, Mr. Scaglione notes that there is no evidence of alkali-silica reaction in the concrete, further discrediting Mr. Neal's "visual observations."  **Ex. 12**, p. 8; **Ex. 3**, p. 1.  Mr. Cianci opined that there has not been a substantial impairment of structural integrity.  **Ex. 4**, p. 6.

Mr. Neal lives in Tolland County and is concerned that he may have a similarly-afflicted foundation that is currently asymptomatic.  **Ex. 8**, p. 61; **Ex. 13**, p. 53.  He is so concerned that he conducts monthly inspections of his foundation.  **Ex. 13**, p. 53.  As a Tolland County resident who is concerned that he may one day be in the same position as the plaintiffs, his personal interest is aligned with theirs.  As such, his testimony is that of a concerned taxpayer and homeowner, not that of an expert. It cannot be credited.

The plaintiffs' apocalyptic projection for their home is grounded in neither science nor fact. Mr. Neal is admittedly unqualified to testify as to chemical processes in concrete and, thus, his self-interested lay witness testimony is not evidence and cannot be considered. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); FRE 702.  Mr. Neal is no more

qualified to testify about chemical reactions in concrete and what the future holds for this foundation than he is to serve as a medical expert because of an article he reviewed on WebMd.

Mr. Neal readily admits that he is "not a concrete expert." **Ex. 8**, p. 35. However, that is precisely what the plaintiffs need to prove their case given it is so heavily predicated upon what will supposedly and eventually happen absent replacement of the foundation. The plaintiffs need an expert with a background relevant to the study of chemical processes in concrete to offer these opinions. Instead they offer an engineer masquerading as a visual petrographer.

### e.    This claim is barred by the Policy's water damage exclusion:

The Policy's water damage exclusion bars this claim. **Ex. 1**, pp. 12-13. Mr. Neal testified that the foundation was exposed to "groundwater", "surface water", and "rain water." **Ex. 7**, p. 30. Mr. Neal observed no problems with the floor slab. **Ex. 7**, p. 40. He believes that the reduced exposure to exterior water accounted for the difference in the cracking in the foundation walls and floor slab. **Ex. 7**, p. 40. Liberty's petrographer agrees. **Ex. 12**, p. 8.

The Policy's water damage exclusion contains an anti-concurrent causation provision. **Ex. 1**, p. 12. The anti-concurrent causation provision effectively circumvents the efficient cause doctrine. *Lombardi v. Universal North America Ins. Co.,* 2015 WL 600823 (Conn. Super. 2015). The "vast majority of states that have considered the matter have upheld and applied anti-concurrent cause provisions" to bar claims where water damage is a contributing cause of loss. *Id.* at 3 (collecting cases). As it is undisputed that groundwater, surface water, and rain water

have contributed to cause the hairline cracking observed in the plaintiffs' foundation, the water damage exclusion entitles Liberty to summary judgment. *Id*.

**2. The Policy Terms "Foundation" And "Retaining Walls" Are Unambiguous.**

The claim is barred by the exclusion for loss caused by faulty, inadequate or defective materials used in construction. **Ex. 1**, p. 13; *Megna v. United Services Auto. Ass'n*, 2004 WL 944775 (Conn. Super. 2004); *Tulgan v. St. Paul Travelers Ct. Foundation, Inc.*, 2008 WL 4926875 (Conn. Super. 2008); *Edmond v. Hartford Ins. Com.*, 2008 WL 616092 (D. Conn. 2008). The Policy also disclaims losses caused by deterioration and by settling, shrinking, bulging or expansion, including resultant cracking. **Ex. 1**, pp. 10-11. The plaintiffs thus seek coverage for "collapse". However, the "collapse" provision excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the collapse of the building. The policy at issue in *Beach* contained a markedly different collapse provision which did not contain this exclusion. *Beach* at fn. 1.

**a. Foundation.**

"The existence of more than one dictionary definition is not the sine qua non of ambiguity. If it were, few words would be unambiguous." *Buell Industries, Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 546 (2002). *Beach* repeatedly referred to the basement walls as "foundation walls" and the "foundation."

"Foundation" unquestionably refers to the basement walls. The plaintiffs know that their basement walls are the foundation. Mr. Lester referred to the basement walls as the foundation

in his deposition.  **Ex. 6**, pp. 22, 27.  So did Mrs. Lester.  **Ex. 9**, p. 19.  The blueprints for the Property which the plaintiffs received sometime in 2005 refer to the concrete walls as the foundation.  **Ex. 6**, pp. 14-16, **Ex. 14**. Liberty first insured the Property on June 1, 2007. **Ex. 2**, ¶5.  The plaintiffs referred to their concrete walls as the foundation in the November 6, 2005 State of Connecticut Department of Consumer Protection ("DCP") Residential Property Disclosure Report ("Disclosure Report") they prepared concerning their prior property.  **Ex. 15**, p. 3, **Ex. 6**, pp. 18-19.  The October 27, 2005 Uniform Residential Appraisal Report ("Appraisal") concerning the Property refers to the concrete basement walls as the foundation.  **Ex. 16**, p. 1; **Ex. 6**, pp. 19-20.  The plaintiffs received a Disclosure Report in connection with their purchase of the Property which referred to the concrete basement walls as the foundation.  **Ex. 17**, p. 2; **Ex. 6**, pp. 20-21.  The plaintiffs received Mr. Neal's report which repeatedly refers to the basement walls as the foundation.  **Ex. 3**, p. 1; **Ex. 6**, p. 21. The plaintiffs received a foundation replacement estimate from Don Childree which refers to the basement walls as the foundation and repeatedly differentiates between the foundation and footings.  **Ex. 18**, pp. 1-2; **Ex. 6**, pp. 22-23.

The plaintiffs received a November 1, 2005 home inspection report prepared by Mr. Neal prior to purchasing the Property which repeatedly refers to the concrete basement walls as the foundation.  **Ex. 19**, pp. 6, 8, 29, 53; **Ex. 6**, p. 24.

24

Mr. Neal testified that the residential building code defines the concrete basement walls as the foundation. **Ex. 10**, p. 29. Mr. Neal refers to the basement walls as the foundation. **Ex. 7**, p. 17; **Ex. 3**, p. 1. He testified that the concrete basement walls are considered the foundation in the engineering industry. **Ex. 10**, p. 29. An NBC investigative series refers to these claims as concerning foundations.[3] The Office of the Attorney General's ("OAG") report on this issue concerns foundations. **Ex. 20**, p. 1. The Department of Consumer Protection ("DCP") refers to the issue as concerning concrete foundations. **Ex. 21**. A statute refers to this issue as regarding the foundation and is titled "An Act Concerning Concrete Foundations." **Ex. 22**. This statute cannot serve its purpose if the basement walls are not the foundation. The Department of Insurance's ("DOI") notice regarded foundations. **Ex. 23**. If foundation refers only to footings then this notice which directed that policies cannot be cancelled for crumbling foundations cannot serve its purpose. A Report on Deteriorating Concrete in Residential Foundations prepared by the DCP and OAG to the Connecticut General Assembly noted that "[a] foundation for a residential structure consists of three essential parts. The footing provides the base which supports the foundation walls and the slab forms the floor." **Ex. 24**, p. 2, fn. 1. Mr. Neal agrees that the foundation walls are the foundation. **Ex. 7**, p. 39

---

[3] http://www.nbcconnecticut.com/troubleshooters/Troubleshooters-Crumbling-Foundations-406306585.html

The Connecticut Supreme Court explicitly denounced reliance on a competing dictionary definition to the exclusion of all other evidence. *Buell* at 546.  Yet this court has previously deemed "foundation" ambiguous based upon Attorney Michael Parker's dictionary of choice[4] and an inapposite Alabama case. *Belz v. Peerless Ins. Co.* 46 F.Supp.3d 157, 164 (D. Conn. 2014); *Bacewicz,* 2010 WL 3023882 at *4; *Turner v. State Farm Fire and Cas. Co.*, 614 So. 2d 1029 (Ala. 1993).  Similarly, *"*noscitur a sociis*"* is not Connecticut law, but instead was gleaned from a treatise. *Metsack v. Liberty Mutual Fire. Ins. Co.*, 2015 WL 5797016, fn. 2 (D. Conn. 2016).

The sole legal authority for this purported ambiguity in *Bacewicz* was *Turner*. However, the policy at issue in *Turner* did not contain the endorsement here which differentiates between foundation and footings.  **Ex. 1**, pp. 11, 26.  Neither did the policy in *Belz.*  Foundation cannot mean footings, else the term footings in the Policy is redundant and meaningless.  In *Turner*, the homeowners claimed that their basement walls were not the foundation because the walls were free standing when constructed and initially formed the interior walls of the first floor of the house.   Mr. Turner subsequently filled dirt around the walls to make a basement after construction.  *Id.* at 1031. Conversely, the foundation walls here were formed during the original construction in 1993.  *Turner* is not remotely analogous to this case.

---

[4] The plaintiffs have never looked up foundation or retaining wall in a dictionary.  **Ex. 6**, p. 39; **Ex. 9**, p. 18.  This is precisely why a dictionary definition is not the "sine qua non" of ambiguity.

The judiciary should interpret "foundation" consistently with the legislature, state statutes, state building codes, and the above governmental departments.  The fact that the foundation is not part of the building is reinforced by the Policy's loss settlement provision, which provides that "[t]o determine…the full replacement cost of the building…do not include the value of…foundations, piers or any supports which are below the undersurface of the lowest basement floor." **Ex. 1**, p. 14.

The basement walls are the foundation and the footings—should there be any—would constitute supports below the undersurface of the lowest basement floor.[5]  The Policy sets apart the terms "footings" and "foundation." **Ex. 1**, pp. 11, 26. Interpretation of an insurance policy must be based on the language expressed in the entire policy. *Wentland v. American Equity Ins. Co.*, 267 Conn. 592 (2004).  "When interpreting an insurance policy, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result."  *Connecticut Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 6 (2008).  A ruling that the footings are the foundation would render this distinction superfluous and would conflict with binding precedent concerning that a policy must be interpreted in a manner that gives effect to every provision to reach a reasonable overall result. It would also conflict with the plaintiffs' demonstrated understanding of the term.

---

[5] The plaintiffs do not know if their Property has footings.  **Ex. 6**, pp. 39-40; **Ex. 9**, p. 16. The plaintiffs must whet the curiosity of the court with concrete particulars. *Applegate* 425 F.2d at 960. It is not enough to vaguely surmise that there are footings.

Moreover, foundation cannot mean footings when there is no evidence that there are footings at the Property.

*Beach* referred to the basement walls as "foundation walls" and the "foundation."[6] Foundation in an insurance policy has meant a building's concrete support for over a hundred years. *Murphy v. American Central Ins. Co.*, 54 S.W. 407, 410 (Tx. App. 1899). The Connecticut Supreme Court will likely make the finding reached in *Wurst v. State Farm Fire and Casualty Company*, 431 F.Supp.2d 501 (D. N.J. 2006) that the basement walls are the "foundation." After all, *Beach* differentiated between the "top of the foundation wall" and the "bottom of the "building wall." *Id.* at 247.

*Shoemaker v. Liberty Mut. Ins. Co.*, 17 Mass.L.Rptr. 57 (Mass. Super. Ct. 2003) found no ambiguity in the terms "foundation" and "retaining wall", wherein the plaintiffs sought recovery for the collapse of a foundation wall. The court ruled for the insurer:

> "[L]oss to a foundation is within a list of ancillary items to a home under the plain terms of the provision. The ancillary terms are not part of the building. As such, reading the provision to allow for insurance coverage when the collapse of the Shoemakers' 'foundation' was not caused by the collapse of the garage itself, would render the exclusionary phrase, '…unless the loss is a direct result of the collapse of a building,' meaningless." *Id.*

In *Parker v. Worcester Ins. Co.*, 247 F.3d 1 (1st. Cir. 2001), the plaintiff brought suit to recover for the supposed "collapse" of the foundation. The policy contained a substantially

---

[6] Early rulings in cracking foundation claims referred to the basement walls as the foundation. *Tofolowsky v. Bilow*, 2003 WL 1475141 (Conn. Super. 2003); *Jones v. The Standard Fire Ins. Co.*, 2013 WL 541015 (Conn. Super. 2013).

identical collapse provision. The argument that "foundation" and "retaining wall" were ambiguous was not made through appeal, despite eleven references in the opinion to the basement walls as the "foundation" and "foundation walls."  The First Circuit noted that "[u]nless there is a rabbit hidden somewhere in the hat, it is not apparent to us how Kathy Parker can establish coverage." *Parker*, 247 F.3d at 6.  The Court noted that while "lawyers are inventive in finding ambiguities to construe against the insurer. …we think it is fair to point out the apparent difficulties." *Id.*

"Foundation" and "retaining wall" are clear, plain and "something only a lawyer's ingenuity could make ambiguous." *Buell*, 259 Conn. at 546.  Insurance policies, building codes, and statutes should not be overridden by the ingenuity of lawyers.

### b.  Retaining wall.

*Beach* referred to basement walls as retaining walls. *Id.* at 249.  *See also*, *Nix v. State Farm Fire & Cas. Co.*, 444 Fed.Appx. 388 (11th Cir. 2011) (collapse of retaining wall in basement of home excluded from coverage).  Thus, even if the concrete walls that support the home are not the "foundation" (which is expressly denied), they are retaining walls.  The concrete foundation walls are partially below grade and retain soil on the exterior.  **Ex. 7**, pp. 33-34.

"To determine the common, natural, and ordinary meaning of an undefined term, it is proper to turn to the definition found in a dictionary." *New London County. Mutual Ins. Co. v. Zachem*, 145 Conn. App. 160 (2013). Merriam-Webster defines retaining wall as "a wall built to resist

29

lateral pressure other than wind pressure; *esp*: one to prevent an earth slide".[7]    The Oxford American English Dictionary defines retaining wall as "a wall that holds back earth or water."[8] The Free Dictionary by Farlex defines retaining wall as "A wall built to hold back a mass of earth or water."[9]    The purpose of a retaining wall is to hold back earth.  If it serves that function, it is a retaining wall.  The basement walls serve that function at the Property.

### 3.  Extrinsic Evidence Reveals That The Claimed Loss Is To The Foundation.

If this court rules that "foundation" and "retaining wall" are ambiguous, the analysis does not conclude there. "If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation…If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." *Metro Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. 295, 306 (2001).

The Chief Justice of the Connecticut Supreme Court, Chase T. Rogers, authored a concurring opinion joined by Justice Zarella which reinforced *Metro Life*:

> "…in the event that an insurance policy term is deemed to be ambiguous, the parties are entitled to present extrinsic evidence regarding the mutual intent of the insured and the insurer as to the scope of coverage, and the trial court must consider that evidence before applying the rule of contra proferentem to resolve the ambiguity in favor of the insured.  In other words, the rule should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted."

---

[7] http://www.merriam-webster.com/dictionary/retaining%20wall.
[8] http://www.oxforddictionaries.com/us/definition/american_english/retaining-wall?q=retaining+wall.
[9] http://www.thefreedictionary.com/retaining+wall.

*Connecticut Ins. Guar. Ass'n. v. Drown*, 314 Conn. 161, 195 (2014).

The dissent noted that "because the parties both have advanced reasonable constructions, I believe we properly may consider undisputed extrinsic evidence." *Id.* at 209. *See also*, *Connecticut Ins. Guar. Ass'n. v. Fontaine*, 278 Conn. 779, 788 (2006) ("[H]aving concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although if the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact...*");* *see also*, *Fiallo v. Allstate Ins. Co.*, 138 Conn.App. 325, 341 (2012). "___It would make absolutely___ ___no sense___ to require the trial court to construe the agreement against the defendant if the extrinsic evidence showed that it was more likely than not that the parties had a contrary intent." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93 (2014)(emphasis ours).

Pursuant to binding Connecticut law, this court must consider this extrinsic evidence prior to the question reaching a jury. It would make absolutely no sense to construe the Policy against Liberty when the plaintiffs knew that their concrete basement walls were their foundation, and, in particular, knew it before the Policy incepted. The evidence detailed, *supra*, establishes this beyond question. "Foundation" and "retaining wall" are not ambiguous. However, even if they were, the extrinsic evidence presents no issues of credibility or choice among reasonable inferences. No reasonable jury could resolve the purported ambiguities in the plaintiffs' favor.

### 4. The Plaintiffs Bear The Burden Of Proving Coverage.

Even assuming arguendo that there was a "collapse", the plaintiffs must prove it, as the additional coverage for "collapse" is an exception to its general exclusion. **Ex. 1**, pp. 10-11; *Capstone Blg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 788, fn. 24 (2013)("The burden of proving that an exclusion applies is on the insurer, but the insured has the burden of proving that an exception to an exclusion reinstates coverage."). They must "demonstrate a reasonable interpretation of the underlying complaint potentially bringing the claims within" the exception to the "collapse" exclusion. *Buell* 259 Conn at 552. They cannot meet their burden. A contrary interpretation of "foundation" would make the Policy internally inconsistent, superfluous, and nonsensical. It would conflict with the utilization of "foundation" by *Beach*, statutes, the legislature, DOI, OAG, DCP, the building code, and the construction, home inspection, and engineering industries.

### C. <u>Liberty Is Entitled To Summary Judgment On The Bad Faith Count:</u>

Absent a wrongful denial of a benefit under the Policy, there can be no action for bad faith. *Capstone Building Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 794-98, 67 A.3d 961 (2013). Thus, Liberty is entitled to summary judgment on Count Two if this Court rules in its favor as to the breach of contract count.

Even if it does not, this court recently granted summary judgment in favor of a defendant insurer on a substantially identical bad faith count in a cracking foundation lawsuit where identical policy provisions were at issue. *Roberts v. Liberty Mut. Fire Ins. Co.*, 2017 WL 3710062, *13-14 (D. Conn. 2017). There is no reason for this court to depart from its sound

analysis here. Our state court has stricken substantially identical bad faith counts in cracking

foundation matters while noting the following:

> "Disagreement between an insurer and insured as to coverage of the appropriate amount to which the insured is entitled is not equivalent to bad faith and, standing alone, does not evince dishonest purpose. The insured's demand may itself be excessive and unwarranted, or the insurer's rejection of the claim may be erroneous but honestly held.
>
> With respect to the implied covenant of good faith and fair dealing, "[a] party to a contract is entitled to take reasonable positions to protect its interests and to resist efforts that would compromise its legal rights. Reasonable measures may include the refusal to pay benefits to an insured."
> *Jones v. Standard Fire Ins. Co.*, 2013 WL 541015 (Conn.Super. 2013).

"Evidence of a mere coverage dispute…will not demonstrate a breach of good faith and fair

dealing." *Uberti v. Lincoln Nat'l Life Ins. Co.*, 144 F.Supp. 2d 90 (D. Conn. 2001).

> "Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. . . .   [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."
> *Buckman v. People Express, Inc.*, 205 Conn. 166, 171 (1987).

> "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose."
> *De La Concha of Hartford, inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 433 (2004).

The plaintiffs have taken the incredible position that Liberty's understanding of "foundation"

shared and expressed by them and detailed, *supra*, is fraud.  Instead, this lawsuit concerns a mere

33

coverage dispute.  In the denial letter, Liberty cited exclusions which are directly applicable to the claim presented, including, but not limited to, faulty materials and cracking.  **Ex. 2**, ¶12; **Ex. 5**, pp. 2-3.  Liberty relied on its engineer's evaluation of the foundation in rendering its coverage determination.  **Ex. 5**, p. 1; **Ex. 4**, p. 6; **Ex. 2**, ¶11..  Liberty investigated, evaluated, and denied this claim on its own merits.  **Ex. 2**, ¶13. It did not consider any other claim when investigating and evaluating this claim.  **Ex. 2**, ¶14.  Liberty did not commit a conscious doing of a wrong because of dishonest purpose or moral obliquity when it investigated, evaluated and decided coverage for this claim. **Ex. 2**, ¶17.  Its investigation and coverage determination were not prompted by an interested or sinister motive. **Ex. 2**, ¶18.

There is no fraud or sinister motive in Liberty interpreting "foundation" in the same manner as the Connecticut Supreme Court, state statutes, and the Connecticut General Assembly.  **Ex. 2**, ¶19.  Liberty had no furtive design in interpreting "foundation" consistently with its usage in the appraisal, home inspection, engineering, and contracting industries.  Liberty's interpretation is in accordance with that offered by the media, Connecticut General Assembly, DCP, DOI, and the OAG.

In *Kim v. State Farm Fire and Cas. Co.* 2015 WL 6675532 (D. Conn. 2015), this court dismissed a substantially identical bad faith count.  This court noted that the provisions of the policy cited by State Farm were not "wholly inapplicable", as contended by the Kims.  To the contrary, State Farm's denial letter quoted and applied policy language which appeared to be directly applicable to the claim.  *Kim*, 2015 WL 6675532 at *1-4.

34

Liberty did the same here. There was nothing misleading about Liberty's denial letter. **Ex. 5**. Liberty quoted and applied the policy provisions in a clear and straightforward manner. **Ex. 5**, p. 2. This court has recognized that Liberty's coverage determination is not unreasonable pursuant to existing insurance law. *Roberts* at \*13. The plaintiffs' belief that these provisions do not bar coverage evinces a mere coverage dispute for which no reasonable jury could find bad faith. *Id.* at \*14.

### D. Liberty Is Entitled To Summary Judgment On The CUTPA/CUIPA Count:

#### 1. There Is No Coverage For The Claim.

A private right of action pursuant to CUTPA exists only in the context of a violation of CUIPA with respect to insurance claims. *State v. Acordia, Inc.*, 310 Conn. 1, 37, 73 A.3d 711 (2013)("[U]nless an insurance related practice violates CUIPA or, arguably, some other statute regulating a specific type of insurance related conduct, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA.").

A CUTPA/CUIPA action only lies if the plaintiff has suffered some injury from the allegedly wrongful conduct. *Abrahams v. Young & Rubicam, Inc.,* 240 Conn. 300, 306 (1997) ("[I]n order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury."); *Gates v. Gov't Emps. Ins. Co*., 2008 WL 1971337, \*4 (Conn. Super. 2008)("In the case of CUTPA, there is no textual or jurisprudential suggestion that it affords standing to a party that has not been injured.").

There is no coverage and no basis for a CUTPA/CUIPA claim.

### 2.   There Was No General Business Practice Of Unfair Claims Handling.

The plaintiffs must show that Liberty engaged in a general business practice of unfair claims handling practices with such frequency as to constitute a general business practice. *Lees v. Middlesex Ins. Co.,* 229 Conn. 842, 847-49 (1994).  Its alleged improper conduct in the handling of a single insurance claim, without any evidence of misconduct in the processing of any other claim, does not rise to the level of a general business practice as required by § 38a-816 (6).  *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 847-48, 643 A.2d 1282 (1994); *Mead v. Burns*, 199 Conn. 651, 666 (1986).

The plaintiffs vaguely reference other claims or lawsuits which are behind handled by their attorney. **Cplt**., ¶24.  However, courts have rejected attempts to establish a "general business practice" by string-citing other cases that include only allegations. *Ferrante v. Allstate Prop. & Cas. Ins. Co.*, 2011 WL 3890988, *2 (Conn. Super. 2011).  The other claims and lawsuits speak only to the conduct of the plaintiffs' attorney and his many foundation clients. *Charter Oak Fire Ins. v. Blue Sky Part.*, 2001 WL 1178318 (Conn. Super. 2001); *Ellison v. Great Am. Spirit Ins. Co.*, 2006 WL 3491242 (Conn. Super. 2006); *Rams II, LLC v. Mass. Bay Ins. Co.*, 2015 WL 3554789 (Conn. Super. 2015) ("[T]he fact that other parties have filed suit against the same defendant speaks to the behavior of these other parties."); *Jendrick v. Middlesex Mut. Assur. Co.*, 2014 WL 4056710 (Conn Super. 2015).

No court or decision-maker has found Liberty in violation of CUIPA.  **Ex. 2**, ¶20-21.  Liberty did not consider *Bacewicz* during its claim evaluation.  **Ex. 2**, ¶15.  Liberty would not consider a

nonbinding trial court decision at the expense of investigating this claim on its own merits. **Ex. 2**, ¶16.  Liberty investigated, evaluated, and denied this claim on its own merits and without consideration given to any other claim. **Ex. 2**, ¶13-14.  The denial letter establishes that it investigated and evaluated this claim on its own merits. **Ex. 5**.

The allegation in **Cplt**, ¶ 21-22 that Liberty obtained knowledge from ISO of other insurers' denials is false.  There is no evidence that ISO provided any information in relation to this claim. ISO does not provide Liberty with information about cracking foundation claims. **Ex. 2**, ¶22-23.

### 3. Liability Is Not Reasonably Clear.

This court recently granted summary judgment in favor of an insurer on a CUTPA/CUIPA count in a cracking foundation lawsuit concerning identical policy language, wherein it held that liability is not reasonably clear. *Roberts* at \*14-15.  There is no reason for this court to depart from its sound analysis here.

Liberty has offered a good-faith coverage determination which is supported by *Beach* and the utilization of "foundation" by the plaintiffs, their engineer, home inspector, and in common parlance. Liberty cited applicable policy exclusions in its denial. **Ex. 5**, pp. 2-3.  Liberty has substantial support for its stance that this is not a "collapse", including the testimony of the plaintiffs' engineer.  It has substantial support that "foundation" unambiguously refers to the basement walls.  "Unless and until a higher court rejects Liberty Mutual's position, the insurer is entitled to continue making its (hitherto unsuccessful) arguments with respect to coverage, without exposing itself to liability under CUTPA/CUIPA." *Roberts* at \*14.

Connecticut courts are well-aware of the frequent and unfortunate practice of plaintiffs attempting to prop up questionable contractual arguments with baseless extra-contractual counts:

> "…[F]irst-party actions against insurers…are increasingly accompanied by bad faith claims and CUTPA/CUIPA actions.  Not infrequently, these additional claims are themselves brought in bad faith, to 'up the ante' at pretrial and trial by increasing the insurer's exposure..."
>
> *Khanthavong v. Allstate Ins. Co.*, 1996 WL 704366 (Conn. Super 1996). *See also, Bauco v. Hartford Fire Ins. Co.*, 2004 WL 573829 (Conn. Super. 2004); *Chicago Title Ins. v. Bristol Heights Ass'n, LLC*, 2009 WL 5698103 (Conn. Super. 2009).

There is no fraud.  Liability is not reasonably clear. As in *Roberts*, the extra-contractual counts must fail.

## III.    CONCLUSION:

For the foregoing reasons, it is respectfully requested that the motion for summary judgment be granted as to all counts.

<div style="margin-left: 50%;">

DEFENDANT,
LIBERTY MUTUAL FIRE INSURANCE
COMPANY


By _/s/ Kieran W. Leary _____
   Kieran W. Leary (ct29484)
   Howd & Ludorf, LLC
   65 Wethersfield Avenue
   Hartford, CT  06114-1121
   (860) 249-1361
   (860) 249-7665 (Fax)
   E-Mail:  kleary@hl-law.com

</div>

38

## CERTIFICATION

This is to certify that on **October 25, 2017**, a copy of the foregoing **Memorandum of Law in Support of Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Brian D. Danforth, Esq.
Tolisano & Danforth, LLC
P.O. Box 676
Ellington, CT  06029
**860 871-2422**
**bdanforth@tanddlaw.com**

                          __/s/ Kieran W. Leary _____ _____
                          Kieran W. Leary