UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTOPHER D. LESTER AND
MONICA G. LESTER            CIVIL ACTION NO.
                            3:16-cv-00909-JAM

        VS.

LIBERTY MUTUAL FIRE
INSURANCE COMPANY           SEPTEMBER 7, 2017


        DEPOSITION OF: CHRISTOPHER D. LESTER
APPEARANCES:
Attorneys for the Plaintiffs:
    TOLISANO & DANFORTH, LLC
        18 Main Street
        P.O. Box 676
        Ellington, Connecticut 06029
        (860) 871-2422
        bdanforth@tanddlaw.com
    BY: BRIAN D. DANFORTH, ESQUIRE


Attorneys for the Defendant:

    HOWD & LUDORF
        65 Wethersfield Avenue
        Hartford, Connecticut 06114-1190
        (860) 249-1361
        kleary@hl-law.com
    BY: KIERAN W. LEARY, ESQUIRE

Also present:  Monica G. Lester

                Wendy J. Leard
            Registered Merit Reporter
                CSR # 00039


    Job No. CS2687237

EXHIBIT 6

. . . Deposition of CHRISTOPHER D. LESTER, taken on behalf of the defendant in the hereinbefore entitled action, pursuant to the Federal Rules of Civil Procedure, before Wendy J. Leard, RMR, duly qualified Notary Public in and for the State of Connecticut, held at the law offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 12:49 p.m., on Thursday, September 7, 2017.

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections, other than as to form, are reserved to the time of trial and that the reading and signing of the deposition are hereby waived.

EXHIBIT 6

It is further stipulated and agreed that the proof of the qualifications of the notary public before whom the deposition is being taken is hereby waived.

CHRISTOPHER D. LESTER, Deponent, having first been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. LEARY:

Q   Good afternoon, Mr. Lester.

My name is Kieran Leary.  I represent Liberty Insurance Corporation in this matter.

Have you ever had your deposition taken before?

A   No.

Q   Okay.

A   Not that I can remember at least.

Q   Okay.  I think you'd remember if you had it taken.

So just a few basic ground rules.

It's very important for us to allow the court reporter to take down a transcript of what we're discussing, so please allow me to finish my questions -- and I'll do the same with you for

your answers, so we have a clean record.

If at any point you need to take a break, please let me know.  I'll be glad to accommodate you; it's not an endurance test.

I would just ask that you answer any pending question before taking a break.

If at any point you don't understand something I ask, please ask me to rephrase it. I'll be happy to do so.

However, if you answer something I ask, I'm going to assume that you understood the question as posed.

Is that fair?

A    Yes.

Q    Okay.  What's your full name, sir?

A    Christopher Dwight Lester.

Q    Okay.  Any other names by which you've been known, or any aliases?

A    No.

Q    What's your date of birth?

A    ███████

Q    And you're married?

A    Yes.

Q    To Monica, correct?

A    Yep.

Q    And how long have you been married?

A    About 33, 34 years.

THE WITNESS:  35?

We were married in '83, so whatever that is.

MR. LEARY:  That's the doghouse question I like to ask.

BY MR. LEARY:

Q    And this home was purchased in 2005, correct?

A    That sounds correct.

Q    All right.  Any kids?

A    Two kids.

Q    And what are their names?

A    Clinton and Caitlyn.

Q    And how old is Clinton?

A    He just turned 30.

THE WITNESS:  Didn't he?

Yes.

BY MR. LEARY:

Q    Is he still living at the house?

A    No.

Q    When is the last time he lived at the house?

A    He moved out --

THE WITNESS:  What, about five years ago?

MR. LEARY:  Okay.

BY MR. LEARY:

Q    And the house we're talking about, which is the subject of this lawsuit, is 24 Laurel Drive in Willington, Connecticut, right?

A    Correct.

Q    And how old is Caitlyn?

A    Caitlyn's --

THE WITNESS:  21?  22?

22.

BY MR. LEARY:

Q    And does Caitlyn still live in the house?

A    Yes.

Q    What does Clinton do for a living?

A    Clinton works for Eversource.

THE WITNESS:  Right?

MRS. LESTER:  Mm-hmm.

THE WITNESS:  Yeah, Eversource.

BY MR. LEARY:

Q    My gas bills aren't going to go up as a result of this deposition?

A    No.

Q    I just wanted to make sure.

Does Clinton have any kind of engineering or residential construction background?

A   No.

Q   What about Caitlyn?

A   No.

Q   What's Caitlyn do?

Is she a student?

A   Caitlyn is working at Sprint.

Q   Gotcha.

Okay.  I assume Monica also lives in the house, correct?

A   Yep.

Q   Besides yourself, Monica, and your children, has anyone else resided at the home during your ownership?

A   No.

MRS. LESTER:  Unless you count two dogs and five cats.

THE WITNESS:  We don't have them anymore.

MR. LEARY:  Another thing is, during the deposition -- it's just one of these legal formalities, is only Chris can talk.

MRS. LESTER:  Okay.  Sorry.

MR. LEARY:  I didn't instruct on

that, but just for the purposes -- you will have your turn to . . .

But thank you.

THE WITNESS:  Okay.  Yes.

BY MR. LEARY:

Q    So no vagrants or anything in the house?

A    Correct.

Q    Do you know when the house was built?

A    I don't remember the dates exactly.  I'm sure it's in the paperwork.

Q    Right.

Does 1998 or '99 sound right?

A    Yeah, that sounds about right.

Q    Do you know how you know when your house was built?

A    I think I first learned about that when we did the closing for the house -- or, actually, when we were buying it, it was probably on the listing.

Q    Gotcha.

And do you have a mortgage on the house?

A    Yes.

Q    Are you current on your payments?

A    Yes.

Q    And is this home owned jointly with

Monica?

A    I'm thinking, because we refinanced and --
I'm trying to remember if we did it in just my
name or both our names.

Q    All right.

A    So I'd have to look at the latest bank
statement.

Q    Understood.

Does anyone other than yourself or your
wife possibly have an ownership interest in this
property?

A    No.

Q    Has anyone ever had an ownership interest
in this property other than yourself or your wife?

A    Can you -- so the people who owned it
before us.

Q    Right.

Since your purchase of it, has anyone
besides your wife or you had an ownership
interest?

A    No.

Q    And have you previously owned any other
homes?

A    Yes.

Q    And is one of them 105 Farmstead Road?

A       Correct, in East Hartford.

Q       Okay.  And you occupied that property for approximately 21 years?

A       That sounds about right.

Q       I know a lot about your life; you're like "This is weird."

A       Those are numbers I don't look up every day.

Q       Right.

        And have you owned any other homes other than that other home in East Hartford?

A       No.

Q       Do you currently own any other properties?

A       No.

Q       Do you know if you had a home inspection conducted at that other home at any point?

A       "Other home" meaning which?

Q       The East Hartford property.

A       Home inspection.

        So we always have an inspection when we buy property.

Q       Okay.

A       I'm not sure what you're probing beyond that.

Q       That's why I'm asking, Did you have home

inspections conducted?

A     We've had contractors in over the years.
I'm trying to -- I don't recall anything specific.

Q     Okay.  Do you know if you ever had an engineer inspect that house?

A     The old house?

Q     Right.

A     I don't recall.

Q     What's your highest level of educational attainment?

A     Bachelor's degree.

Q     And where did you get your bachelor's degree from?

A     Eastern Connecticut.

Q     And what did you get a degree in?

A     Mathematics.

Q     What's your current occupation?

A     Senior manager at Dell EMC.

Q     Okay.  And how long have you been in that position?

A     That current job, about five years.

Q     And how long have you been with Dell?

A     I've been with Dell for 15 years.

Q     Have you ever been a party to a lawsuit

EXHIBIT 6

other than the instant matter?

A    Not that I recall.

Q    Have you ever been convicted of a felony?

A    No.

Q    Have you ever filed for bankruptcy?

A    Nope.

Q    Have you ever had a property which you had an ownership interest in subject to foreclosure proceedings?

A    Nope.

Q    And who did you purchase -- when I say the "home," I'm going to refer to 24 Laurel Drive.

A    Okay.

Q    Who did you purchase the home from?

A    I'm trying to . . .

I don't remember their names offhand.

I'm sure it was in the -- you know, the purchase contracts.

I do recall seeing that in some of the paperwork we turned over.

Q    Loretta Budkofsky?

A    Yeah, that sounds correct.

Q    Okay.  Any idea where she is nowadays?

A    No.  But we had several sheriffs show up at the house after we purchased it looking for

her.

Q    Really?  Interesting.

And do you know why those sheriffs were there?

A    I think it was family-related -- child care/family-related matters.

Q    Gotcha.

A    To the best of my knowledge.

Q    Do you know who built your house?

A    No.

Q    Do you know any subcontractors that did any work on your house?

A    You know, we've had things like the floors refinished and painting, and at one point there was an ice dam.

Q    Let me rephrase.

Do you know any of the subcontractors involved in the original construction of your house?

A    No.

Q    Okay.

MR. LEARY:  I guess we'll mark this as 1.

(Defendant's Exhibit 1, marked for identification-described in index)

MR. LEARY:   Thanks.

THE COURT REPORTER:   You're welcome.

BY MR. LEARY:

Q    And, Mr. Lester, I'm presenting you with what's been marked as Defendant's Exhibit 1.

Were these blueprints prepared in connection with the construction of your property?

A    So we got these at the time of purchase.

Actually, we got them after the purchase, and copies were made by the prior owners, that we received.

Q    Okay.  So are these originals or copies?

A    These are copies that we received after the purchase.

Q    Okay.  And do you know how soon after the purchase you received it?

A    It took us a few weeks to actually get it from them.

Q    But you got it sometime in 2005?

A    Sometime in 2005, correct.

Q    And did you review them then?

A    I think we probably did a quick look at it.  But, you know, I'm not an architect or engineer, so we probably just did a quick review.

Q    Gotcha.

EXHIBIT 6

And what was the purpose of them providing these documents to you?

A    At the time of purchase, we saw that they had them and we asked for a copy.  Just for our records, you know, any future needs.

Q    Okay.  And I'm going to refer to the top blueprint.

There's two blueprints, right?

A    Mm-hmm.

Q    So the top one has some writing that's in a darker shade, correct, than the other one?

A    Okay.

Q    Is that correct, so we can identify these?

A    Yep.

Q    And, in particular, "Woods" are shaded, correct?

A    Yes.

Q    All right.  And there's a proposed house site, correct?

A    Yes.

Q    All right.  Then if you go to the second blueprint, please, there's a -- this one doesn't have any handwriting on it, correct?

A    Correct.

Q    Then there's a plot that says "Existing

foundation," right?

A    Yes.

Q    And is that where your house is?

A    It appears to be accurate, based on what I know.

Q    Do you know if there was a prior home on that site and they tore it down and built your home?

A    No idea.

Q    Do you know why there was an existing foundation?

A    No idea.

Q    Do you know if they used the existing foundation in conjunction with your home or if they poured a new foundation in 1998 or '99?

A    No idea.

Q    No idea.  Okay.

And it says it's done by John Brown Builders, right?

A    That's what the document says, yes.

Q    And have you ever spoken with anyone from John Brown Builders?

A    Nope.

Q    Okay.

A    Until today, I don't recall actually

seeing the name, so . . .

That's interesting.

Q    Did you ever ask Budkofsky about whether they poured a new foundation or just used the existing one?

A    Never came up.

Q    Okay.  Do you have anything else that was prepared in connection with the construction of your property other than these blueprints?

A    Not that I know of.

Q    Okay.  So you don't have any receipts or invoices?

A    Oh, we have all the -- nothing -- so we have the purchase information, but we don't have anything related to the construction of the house.

Q    Gotcha.

And did you ask for that stuff when you bought the house, or . . .

A    Don't recall.  You know, I think we asked for whatever we could get.

Q    Gotcha.

And you moved into the house in approximately 2005; is that correct?

A    Yes.

Q    And has your basement ever been finished?

A    No.

Q    And what about the exterior, have you ever had any kind of siding over your concrete walls on the exterior?

A    Nothing other than what the original construction is.

So you can see, you know, part of the concrete as you walk around the house, if that's what you're asking.

Q    Gotcha.  Right.  That's what I'm . . .

And you had -- strike that.

MR. LEARY:  If you can mark that as 2, please.

(Defendant's Exhibit 2, marked for identification-described in index)

MR. LEARY:  Thanks.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q    Mr. Lester, I've provided you with what's been marked as Defendant's Exhibit 2.

This is a Residential Property Condition Disclosure Report, and this is prepared in connection with the sale of your prior home, correct?

A    For 105 Farmstead?

It looks like it.

Q    Okay.

A    Gas meter . . .

Yes.

Q    Is that your signature on the fourth page?

A    Yep.

Q    Okay.  Is that your wife's signature?

A    Looks like it.

Q    Okay.

MR. LEARY:  Can you mark this as 3, please.

(Defendant's Exhibit 3, marked for identification-described in index)

MR. LEARY:  Thank you.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q    Mr. Lester, I've provided you with what's been marked as Defendant's Exhibit 3.

This is a Uniform Residential Appraisal Report prepared for 24 Laurel Drive.

Have you seen this document before?

A    I don't recall off the top of my head, but I'm sure at the time of purchase, you know, we looked at all the paperwork.

Q    Okay.  And the borrower on here -- if you

go down to the fourth line on the first page, is

listed as "Christopher/Monica Lester," correct?

A    Yes.

Q    All right.

A    That's us.

Q    That's you.

And you produced this document during

discovery, correct?

A    I don't know how else you would have

gotten it.

Q    Right.

So is that a yes?

A    Yes, that's a yes.

Q    Okay.

MR. LEARY:  Mark this as 4, please.

(Defendant's Exhibit 4, marked for

identification-described in index)

MR. LEARY:  Thank you.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q    Mr. Lester, I present you with what's been

marked as Defendant's Exhibit 4.

It's a Residential Property Condition

Disclosure Report for 24 Laurel Drive by the

seller, Loretta Budkofsky.

Have you seen this document before?

A    I don't -- you know, I don't recall seeing it, but as I said before, I'm sure we reviewed all the documents at the time of purchase.

Q    Right.  And you --

A    You know, it's been a few years.

Q    Right.  Of course.

And you've produced this during discovery, correct?

A    Yes.

Q    All right.  I show you what's been marked as Exhibit 5 at Mr. Neal's deposition.

If you can flip, please, to the third page.

This is an October 5, 2015, report by Mr. Neal.

Have you seen this previously?

A    Yes.

Q    Did you meet with Mr. Neal on that date?

A    Yes.  Well, I don't know if -- is this the date of the report or the date he visited the site?

Q    It looks like he did both on the same day.

A    Okay.  But I did meet with him in that time frame.

Q     Okay.   Have you met Mr. Neal at any other point?

A     Not that I can . . .

You know, I think I've seen him at a couple of the concrete foundation meetings, but this was our only person-to-person meeting.

Q     Okay.   Do you know if your wife was present during his inspection on October 5, 2015?

A     She was not present.

Q     Okay.   And the letter is addressed to you, correct?

A     Oh, his letter?

Yes.

Q     Okay.

MR. LEARY:   Mark this as 6, please.

(Defendant's Exhibit 6, marked for identification-described in index)

(Defendant's Exhibits 5 and 7, when referenced in this transcript, were marked at the deposition of Mr. Neal earlier in the day.)

MR. LEARY:   Thank you.

THE COURT REPORTER:   You're welcome.

BY MR. LEARY:

Q     Mr. Lester, I've presented to you what's

been marked as Defendant's Exhibit 6.

It's a proposal by Don Childree, correct?

A    Yes.

Q    And do you know when he provided this for you?

A    I'm looking to see if there is a date on it.

It was recent, within the last couple weeks.

Q    Okay.  And have you entered into an agreement with him?

A    No.

Q    Do you plan to enter into an agreement with him?

A    Do not know at this time.

Q    Okay.  And have you reviewed his proposal?

A    Yes.

Q    Do you have an itemized proposal from him, meaning prices for each item of work listed here?

A    No.  This is the only proposal I have right now.

Q    Okay.  You anticipated my next question.

So you haven't gotten any other estimates from contractors regarding your foundation; is that correct?

A    Correct.

Q    Have you sought any?

A    Not at this time.

Q    Okay.  And I'll present you with what's been marked as Exhibit 7.

This is a home inspection report by Residential Engineering Services prepared for Monica Lester --

A    Mm-hmm.

Q    -- dated November 1, 2005, correct?

A    Correct.

Q    Have you seen this document before?

A    Yes.

Q    And did you review this prior to purchasing the home?

A    Yes.

Q    And it was prepared by Bill Neal, correct?

A    William Neal.

Q    Right.

And were you present during Mr. Neal's home inspection?

A    Yes.

Q    And do you recall that Mr. Neal was your home inspector when he came and did your evaluation of your foundation?

EXHIBIT 6

A    Did not make the connection until we started pulling out all the paperwork.

Q    Gotcha.

And you're like "I've seen this guy before."

Okay.  Have you had any other home inspectors inspect this house?

A    When you say "home inspectors," are you talking about certified engineers or people like appraisers from the bank?

Q    Right.

So let's start with certified home inspectors.

Have you had anyone besides Mr. Neal --

A    No, just --

Q    Just let me finish the question.

A    Sorry.  Sorry.

Q    That's fine.

Have you had anyone besides Mr. Neal prepare a home inspection report for you?

A    No.

Q    And you had an appraiser provide an appraisal report, which we went over, correct?

A    Which document are you referring to?

Q    (Handing.)

What's been marked as Exhibit 3.

A    Yes.  So we've had additional appraisals at the time of refinancing the mortgage.

Q    Okay.  And do they substantially look like these?

A    I don't recall them looking like that.

Q    Okay.  Do you know if you have a copy of the appraisal reports?

A    I gave Brian all the refinancing information that we have at this point.

Q    That's fine.

Other than Mr. Neal, have any other engineers inspected your home at 24 Laurel Drive?

A    Engineers, no.

Q    What about other than Mr. Neal or Mr. Childree -- well, first of all, has Mr. Childree inspected your house?

A    Yes.  He did a walk-through in order to prepare the estimate.

Q    Gotcha.  Okay.

Has anyone other than Mr. Neal -- strike that.

Have any professionals other than Mr. Neal or Mr. Childree been to your home regarding the foundation issue?

EXHIBIT 6

A     The insurance company had a representative walk through, and I don't know what their credentials were.

Q     I'm talking about on your behalf.

A     On my behalf?

Q     Right.

A     No.

Q     And have there been any contractors at your house on your behalf other than Mr. Childree?

A     Contractors, yes.

Q     Okay.

A     But not related to the foundation.

Q     Okay.  And what were they there for?

A     Like I said earlier, we had floors refinished, we had painting, we had ice dam remediation, we had some doors in the interior fixed because they were sticking.

      Those were the ones I recall.

Q     Okay.  So nothing related to foundation issues?

A     Nothing related to the foundation.

Q     Gotcha.

      Have you ever rented your home?

A     No.

Q     Have you ever listed this home for sale?

EXHIBIT 6

A    No.

Q    Have you made any -- and I'm not talking about flooring or anything.

Have you made any renovations or additions to your home?

A    No.

Q    No new rooms or anything?

A    No new rooms, no.

Q    Have you ever acted as a general contractor and constructed a home?

A    No.

Q    Do you have any kind of residential construction background?

A    No.

Q    Do you have any kind of engineering background?

A    No.

Q    Do you know who provided the concrete for your foundation?

A    No.  Not -- you know, hearsay, but . . .

Q    Right.

A    I have no documentation.

Q    Do you know who poured the concrete for your foundation?

A    No.

Q    And your concrete walls are partially below ground, correct?

A    Yes.

Q    They've got soil -- excuse me.

They have soil on either side of the walls?

A    So on the outside of the wall, there's soil.

Q    Right.

A    Yes.

Q    Have you ever had any problem with water infiltration in your basement?

A    No.

Q    Have you ever noticed that your foundation walls get damp or wet during rainstorms?

A    Not during rainstorms, but we did, when we purchased the home, install a dehumidifier just because we don't like damp basements.

So that's something we've just always done to keep the moisture content low, because I don't like that musty moldy . . .

Q    Right.

A    And not that there was any.

Q    Right.

A    I'm not implying there was any, but that's

just something we've always done, because we do store stuff in the basement and didn't want, you know -- proactively, we didn't want to have any issues.

Q    Okay.  And you haven't had any issues?

A    Have not had any moisture or water issues in the basement.

Q    No mold issues?

A    No mold issues.

Q    What do you store in your basement?

A    Stuff:  Christmas decorations, holiday decorations, general household, you know -- furniture that we're not using.  I have a lot of computer stuff down there.

Just kind of overflow area for everything else in the house.

Q    Gotcha.

Do you use your basement for like -- strike that.

Do you have a room in your basement like a living room or a couch or anything?

A    Not -- no.  I mean, we store furniture down there, but we don't use it as a living area.

Q    Right.

A    At one point, for a couple of years, I had

a desk down there where I would work on the computers, but we don't use it as an active room at this point.

Q    Gotcha.

And when did you have a desk down there?

A    A couple of years -- a few years after we bought it.  I was working, you know, on the computers down there.

Q    Gotcha.

But you don't have, like, a TV down there or anything?

A    No, no TV.

Q    Do you know when you reported this claim to Liberty Mutual?

A    So we contacted Brian -- what, like October of '15, I think it was.

And I think we -- you know, Brian reached out, on our behalf, to Liberty, I think.

Q    That's fine, but do you recall reporting the claim to Liberty yourself?

A    I believe I worked through Brian to do that.

Q    Okay.  And have you ever spoken with George Colli?

A    No, but I know who he is.  I've seen him

on TV.

Q    Gotcha.

Have you spoken to anyone from any of the media outlets regarding your foundation?

A    No.

Q    Do you know if your wife has?

A    Not that I'm aware of.

Q    What was the impetus for you filing your claim with Liberty Mutual?

A    Can you clarify that question?

Q    Sure.

What prompted you to make a claim with Liberty?

A    So once we were aware of the issue -- I know there's some time limit, you know, when you identify a problem that you have to file a claim.

So we wanted to basically get ahead of the curve in terms of any filings or deadlines that we needed to be aware of or -- is that answering your question?

Q    Right.

So when you say you became "aware of the issue," how did you become aware of an issue with your foundation?

A    So, originally, in talking with the

neighbors, we discovered that several folks on the street had concrete issues.

So from that, I contacted Bill Neal to inspect our basement to see if we had the issue.

And once he provided us the report stating that, in his opinion, we were affected by this issue, we reached out to Brenda and Brian, and then I think, from there, we filed the insurance claims.

Q    Gotcha.

And who are these neighbors that you spoke to regarding the issue?

A    The folks across the street, Jim and Lynn, I think her name is.

Q    Do you know what their last name is?

A    Not offhand.

Q    Okay.

A    And then also Tim Hines down the street.

Q    Anyone else?

A    I think we had a brief conversation with the other next door neighbor because I -- because when the insurance company sent out their inspector, he said he was going to their house right after ours.

Q    Gotcha.

A     So at that point, I think we had a brief conversation with the neighbors.

Q     Gotcha.

And do you know the name of those neighbors that you were just referencing?

A     It escapes me at the moment.

Q     Okay.

A     Not off the top of my head.

Q     That's fine.

Had you seen any news coverage of foundation issues in Connecticut prior to Bill Neal coming to your property?

A     Coincidentally, the night before he was coming out, I actually saw him on the TV.

Q     Okay.

A     So that was the day prior to.

Q     Okay.  But prior to speaking with the neighbors about concrete foundation issues, had you seen any news coverage about it?

A     No.

Q     All right.  How did you find Don Childree?

A     His name was on a list of contractors provided by the attorneys.

Q     Okay.  And I'm not going to ask you anything about conversations with attorneys

because that's privileged.

A    Okay.

Q    Now, do you have any photographs which were taken of your home prior to your purchase of it?

A    Prior to the purchase.

I'm sure we took pictures.  I know there was pictures on the listing.

I'm sure we took pictures.  I don't know if I have them anymore.

Q    Okay.  When did you first notice cracks in your interior foundation walls?

A    After speaking to the neighbor.

So it would be about a couple weeks before Bill Neal inspected it.

After talking to the neighbors, I went down and did a quick look and saw some cracks, and at that point I contacted Bill.

Q    Gotcha.

So could you run through this interaction with the neighbors?

You were just speaking with them and they brought up the situation with their basement?  Is that basically how this happened?

A    Yes.

Q   And when's the first time you noticed any cracks in your exterior foundation walls?

A   When I did the walk-through with Bill during his inspection, because prior to that, I had not -- it wasn't something that was on my mind, to go down and, you know, look at the basement walls.

Q   Right.

A   You know, it's not something you typically do.

Q   Right.

Do you know if you have any photographs of your basement walls which were taken prior to 2015?

A   Again, that's not something I would typically do, you know, take a picture of the wall.

Q   Right.

A   I would have no reason to, so I don't recall having any.

Q   Okay.  And the same holds true with your exterior concrete walls?

A   Right.

Q   Okay.  Do you know if anyone has taken pictures of your foundation walls other

than -- strike that.

On your behalf, do you know if anyone has taken photographs of your foundation walls other than Bill Neal?

A    On my behalf, no.

Q    And has Mr. Neal been to your property since his October 2015 visit?

A    No.

Q    Is he currently scheduled to come visit your property?

A    No.

Q    Have you made any repairs to the cracks in your foundation?

A    No.

Q    Have you shored your walls?

A    No.

Q    And you haven't replaced your foundation, right?

A    Correct.

Q    And have the cracks gotten any worse since 2015?

A    So it's not something I go down and look at every day.  I'm trying to avoid looking at them.

Q    Right.

A     Nor am I an engineer.

So Bill has offered to come back if I feel there's any serious degradation, but it's not something I've been actively looking at.

Q     Gotcha.

So you haven't done anything to track any progression, right?

A     So at Bill's recommendation, I did mark all the areas where there was cracking at the time he visited.

Q     Okay.  But you haven't done anything to note any progression, correct?

A     You know, it's something I kind of am avoiding.

Q     Okay.  Understood.

A     Because there's not a lot I'm going to do about it right now.

Q     Right.

A     But we did mark it so that we would have a baseline.

Q     Gotcha.

Have you had to relocate from your home for safety reasons?

A     No.

Q     Has anyone told you you should relocate

EXHIBIT 6

from your home for safety reasons?

A    No.

Q    Have you ever painted your foundation walls?

A    No.

Q    Have you ever reviewed your Liberty Mutual policy?

A    I would say at a high level, but there's so much fine print, I honestly have not read every single line of it.

Q    Okay.  Have you ever looked up the term "foundation" in a dictionary?

A    No.

Q    Have you ever looked up the term "retaining wall" in a dictionary?

A    No.

Q    Have you ever visited Britannica.com?

A    No.

Q    Do you know what a "footing" is?

A    Something that's under the house somewhere, but technically, you know, I don't have any details other than I've heard people refer to the footings as somewhere under there.

Q    Okay.  Do you know if your property has footings?

EXHIBIT 6

A   Again, I'm not an engineer, so I would assume that most houses have them.

Q   But you don't know if yours does?

A   Don't know.

Q   Okay.  And you still live at the property, right?

A   Correct.

Q   Do you have any plans to move out?

A   No.

Q   Has a building inspector been to your house regarding your foundation?

A   No.

Q   Has anyone told you when your house would become unsafe absent replacement of a foundation?

A   No.

Q   Have you asked that question?

A   I asked Bill about progression rates of this issue and what to look out for, and his answer was it varies on a lot of factors and neither he nor anyone could definitively tell me what's going to happen in the future.

Q   Have you tried to do anything to lessen any water exposure to your foundation?

A   So when we bought the house, in the original report, they had noted that there was

some grading issues, so we, initially, regraded some of the gardens so that they sloped away from the house.  Beyond that, there has not been any water-related issues.

The only other thing that we have done is we've added gutter extensions to just keep water away from the house just as a best practice.

Other than that, that's -- you know, water's not been a concern, typically.

Q   And when did you add those downspout extenders?

A   I don't recall.  It's been a while.

Q   Is that before or after you reported your claim, do you know?

A   Oh, several years prior.

Q   Gotcha.

Do you know if you have a curtain drain around your foundation?

A   I do know, and the answer is yes.

Q   Okay.  Other than what we're doing today, have you given any formal statements regarding the condition of your foundation?

A   Nothing outside the scope of people we've already spoke about.

Q   Right.  Okay.

So nothing under oath or anything?

A    Correct.

Q    And you mentioned that you've attended some community meetings, correct?

A    Yes.

Q    Is that the Connecticut Coalition Against Crumbling Basements?

A    Yes.

Q    And how many meetings have you attended there?

A    Four or five.

Q    And when was the first meeting that you attended?

A    It was within a couple months of reporting the claim, so probably in the fall of '15.

Q    Gotcha.

Have you ever had any -- you had an ice dam claim, correct?

A    Yes.

Q    And was that with Liberty Mutual?

A    Yes.

Q    Was that claim paid?

A    Yes.

Q    Do you know when it was?

A    I don't have the exact dates.

Q     Do you know what year it was?

A     You know, I don't recall the exact dates.

Q     That's fine.

MR. LEARY:  Would you mark this, please, as 8.

(Defendant's Exhibit 8, marked for identification-described in index)

MR. LEARY:  Thank you.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q     Mr. Lester, I've presented you with what's been marked as Defendant's Exhibit 8.

This is responses to Liberty's interrogatories and requests for production.

And I'll direct you, please, to the second-to-last page.

A     Page 13?

Q     Yes.  The page is not labeled, but it's the page before page 13.  It's an affidavit.

Is that your signature?

A     Yes.

Q     And it's dated August 18, 2017, correct?

A     Correct.

Q     And if you flip to the prior page, please, is that your wife's signature?

A    Looks like it.

Q    Okay.  And it's also dated August 18, 2017, correct?

A    Correct.  Yes.

Q    All right.  And did you have cores extracted from your foundation walls for petrographic examination?

A    Yes, on the bequest of the insurance company.

Q    Okay.  Has your property been reassessed for tax purposes?

A    No.

Q    Do you plan to file for reassessment?

A    Yes.

Q    And when do you plan on doing that?

A    Tomorrow.

Q    Okay.  And do you know if you have to submit any documentation regarding that?

A    They were looking for -- we just got the paperwork today, and they were looking for a copy of the inspection report.

Q    Are you referring to Mr. Neal's report?

A    Mr. Neal's report.

Q    Gotcha.

Okay.  And have you filed any paperwork

EXHIBIT 6

with the Department of Consumer Protection?

A     Yes.

Q     And what have you produced to them?

A     We just filed, on their website, the notification that we had the issue but have not provided any subsequent documentation to them.

Q     Okay.  And when did you submit that to them?

A     That was in the fall of '15.  It was probably October, Novemberish time frame.

I know I had to do it twice because the first time I didn't get a response, so there was actually two submissions.

So it was probably in the November '15 time frame.

Q     Okay.  And do you know if you produced those documents in discovery in this case?

A     I don't recall having any copies of any documents related to those filings.

Q     Okay.  You just filled out a form --

A     A form online.

Q     Gotcha.

And Mr. Neal's report, did you review it on or shortly after the date of October 5, 2015?

A     You're referring to his --

Q    His evaluation.

A    -- evaluation?

Yes.

Q    After you made your claim?

A    Yes.  I did review that.

Q    Okay.

MR. LEARY:  I don't have anything further.

Thank you.

MR. DANFORTH:  Nothing for me.

(The witness was dismissed, and the deposition was concluded at 1:40 p.m.)

I N D E X

----------------------------------------------------

WITNESS                         CHRISTOPHER D. LESTER

----------------------------------------------------

DIRECT EXAMINATION BY MR. LEARY                    3

----------------------------------------------------

EXHIBIT              DESCRIPTION              PAGE

----------------------------------------------------

Defendant's Exhibit 1, two blueprints            13

Defendant's Exhibit 2, a State of
   Connecticut, Department of Consumer
   Protection, Residential Property
   Condition Disclosure Report                    18

Defendant's Exhibit 3, a Uniform
   Residential Appraisal Report                   19

Defendant's Exhibit 4, a Connecticut
   Department of Consumer Protection
   Residential Property Condition Disclosure
   Report                                         20

Defendant's Exhibit 5
   (marked at the deposition of Mr. Neal)

Defendant's Exhibit 6, a Proposal               22

Defendant's Exhibit 7, a Home Inspection
   Report by Residential Engineering Services,
   LLC, Prepared for Monica Lester,
   November 1, 2005
   (marked at the deposition of Mr. Neal)

(Continued)

```
EXHIBIT             DESCRIPTION                    PAGE
```
-------------------------------------------------------

Defendant's Exhibit 8, a document labeled
Responses to:  Defendant's Interrogatories
and Requests for Production, Inspection, and
Examination Directed to the Plaintiffs,
Christopher D. Lester and Monica G. Lester,
dated August 18, 2017                              43

(The original exhibits were
retained by Attorney Leary.)

* * * * * * *

800-567-8658                                      973-410-4040

EXHIBIT 6

STATE OF CONNECTICUT

Page 49

COUNTY OF TOLLAND

I, Wendy J. Leard, a Notary Public for the State of Connecticut, do hereby certify that the deposition of CHRISTOPHER D. LESTER, a witness, was taken before me pursuant to the Federal Rules of Civil Procedure, at the law offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 12:49 p.m., on Thursday, September 7, 2017.

I further certify that the deponent was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Somers, Connecticut, this 9th day of September, 2017.

_____
Wendy J. Leard
Notary Public

My Commission Expires May 31, 2022

EXHIBIT 6

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS
800-567-8658
ASSIGNMENT NO. CS2687237
CASE NAME: Lester, Christopher, Et Al. v. Liberty Mutual Fire
Insurance Company
DATE OF DEPOSITION: 9/7/2017
WITNESS' NAME: Christopher D. Lester

PAGE/LINE(S)/      CHANGE                    REASON
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____

_____
           Christopher D. Lester
(Notary not required in California)
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2017.


_____
     NOTARY PUBLIC
MY COMMISSION EXPIRES_____

EXHIBIT 6

Veritext Legal Solutions

290 W. Mt. Pleasant Ave. - Suite 3200

Livingston, New Jersey 07039

Toll Free: 800-227-8440  Fax: 973-629-1287

September 21, 2017

To: Brian D. Danforth, Esq

Case Name: Lester, Christopher, Et Al. v. Liberty Mutual Fire Insurance Company

Veritext Reference Number: 2687237

Witness:  Christopher D. Lester      Deposition Date:  9/7/2017

Dear Sir:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature at the bottom of the sheet notarized except in California where they are signing under penalty of perjury and forward the errata sheet back to us at the address shown above.

If the jurat is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

Encl.

Cc: Kieran W. Leary, Esq.

[& - basement]

**&**

**&** 1:10,15 2:7 49:7

**0**

**00039** 1:22
**00909** 1:3
**06029** 1:11
**06114-1190** 1:16
**07039** 51:2

**1**

**1** 13:23,24 14:5
  24:10 47:9,20
**105** 9:25 18:25
**12:49** 2:8 49:9
**13** 43:17,19 47:9
**15** 11:24 31:16
  42:15 45:9,14
**18** 1:10 43:22 44:2
  47:11 48:6
**19** 47:13
**1998** 8:12 16:15
**1:40** 46:12

**2**

**2** 18:13,14,20
  47:10
**2-22-57** 4:21
**20** 47:15
**2005** 5:9 14:19,20
  17:23 24:10 47:20
**2015** 21:15 22:8
  36:14 37:7,21
  45:24
**2017** 1:5 2:9 43:22
  44:3 48:6 49:10
  49:22 50:22 51:4
**21** 6:11 10:3 51:4
**22** 6:11,12 47:18
**24** 6:6 12:12 19:20
  20:24 26:13
**249-1361** 1:17

**2687237** 51:7
**290** 51:1

**3**

**3** 19:10,12,18 26:1
  47:5,12
**30** 5:17
**3200** 51:1
**33** 5:2
**34** 5:2
**35** 5:3
**3:16** 1:3

**4**

**4** 20:15,16,22
  47:14
**43** 48:6

**5**

**5** 21:12,15 22:8,18
  45:24 47:16

**6**

**6** 22:15,16 23:1
  47:18
**65** 1:16 2:7 49:8
**676** 1:11

**7**

**7** 1:5 2:9 22:18
  24:5 47:19 49:10

**8**

**8** 43:5,6,12 48:4
**800-227-8440** 51:2
**800-567-8658** 50:2
**83** 5:4
**860** 1:12,17
**871-2422** 1:12

**9**

**9/7/2017** 50:3 51:8
**973-629-1287** 51:2
**99** 8:12 16:15

**9th** 49:21

**a**

**absent** 40:14
**accommodate** 4:3
**accurate** 16:4
**acted** 28:9
**action** 1:3 2:3
**active** 31:2
**actively** 38:4
**add** 41:10
**added** 41:6
**additional** 26:2
**additions** 28:4
**address** 51:17
**addressed** 22:10
**affidavit** 43:19
**afternoon** 3:11
**ago** 6:2
**agreed** 2:13,21 3:1
**agreement** 23:11
  23:13
**ahead** 32:17
**al** 50:3 51:6
**aliases** 4:18
**allow** 3:22,24
**answer** 4:5,10
  40:19 41:19
**answering** 32:19
**answers** 4:1
**anticipated** 23:22
**anymore** 7:20
  35:10
**appearances** 1:8
**appears** 16:4
  49:16
**appraisal** 19:19
  25:23 26:8 47:13
**appraisals** 26:2
**appraiser** 25:22
**appraisers** 25:10

**approximately**
  10:3 17:23
**architect** 14:23
**area** 30:15,23
**areas** 38:9
**asked** 15:4 17:19
  40:16,17
**asking** 10:25 18:9
**assignment** 50:2
**assume** 4:11 7:10
  40:2
**attainment** 11:11
**attended** 42:3,9,13
**attorney** 48:9
**attorneys** 1:9,14
  34:23,25
**august** 43:22 44:2
  48:6
**authority** 2:17
**ave** 51:1
**avenue** 1:16 2:7
  49:8
**avoid** 37:23
**avoiding** 38:14
**aware** 32:7,14,19
  32:22,23

**b**

**bachelor's** 11:12
  11:13
**back** 38:2 51:16
**background** 7:2
  28:13,16
**bank** 9:6 25:10
**bankruptcy** 12:5
**based** 16:4
**baseline** 38:20
**basement** 17:25
  29:12 30:2,7,10,18
  30:20 33:4 35:23
  36:7,13

EXHIBIT 6

[basements - county]                                                    Page 2

**basements** 29:18
  42:7
**basic** 3:21
**basically** 32:17
  35:24
**bdanforth** 1:12
**behalf** 2:2 27:4,5,9
  31:18 37:2,5
**believe** 31:21
**bequest** 44:8
**best** 13:8 41:7
**beyond** 10:23 41:3
**bill** 24:17 33:3
  34:11 35:15,18
  36:3 37:4 38:2
  40:17
**bill's** 38:8
**bills** 6:22
**birth** 4:20
**blueprint** 15:7,22
**blueprints** 14:6
  15:8 17:9 47:9
**borrower** 19:25
**bottom** 51:14
**bought** 17:18 31:7
  40:24
**box** 1:11
**break** 4:2,6
**brenda** 33:7
**brian** 1:13 26:9
  31:15,17,21 33:7
  51:5
**brief** 33:20 34:1
**britannica.com**
  39:17
**brought** 35:23
**brown** 16:18,22
**budkofsky** 12:21
  17:3 20:25
**builders** 16:19,22

**building** 40:10
**built** 8:8,15 13:9
  16:7
**buy** 10:21
**buying** 8:18

              c

**caitlyn** 5:15 6:9,14
  7:4,6,8
**caitlyn's** 6:10
**california** 50:21
  51:15
**care** 13:6
**case** 45:17 50:3
  51:6
**cats** 7:18
**cause** 49:20
**cc** 51:25
**certified** 25:9,12
**certify** 49:4,11,17
**change** 50:5 51:13
  51:14
**changes** 51:12
**child** 13:5
**childree** 23:2
  26:16,17,24 27:9
  34:21
**children** 7:14
**chris** 7:23
**christmas** 30:11
**christopher** 1:2,7
  2:1 3:6 4:16 20:2
  47:3 48:6 49:5
  50:3,4,20 51:6,8
**civil** 1:3 2:4 49:7
**claim** 31:13,20
  32:9,12,16 41:14
  42:15,18,22 46:4
**claims** 33:9
**clarify** 32:10
**clean** 4:1

**clinton** 5:15,16
  6:16,17 7:1
**closing** 8:17
**coalition** 42:6
**coincidentally**
  34:13
**colli** 31:24
**come** 37:9 38:2
**coming** 34:12,14
**commencing** 2:8
  49:9
**commission** 50:25
**community** 42:4
**company** 1:5 27:1
  33:22 44:9 50:3
  51:6
**computer** 30:14
**computers** 31:2,8
**concern** 41:9
**concluded** 46:12
**concrete** 18:3,8
  22:5 28:18,23
  29:1 33:2 34:18
  36:22
**condition** 18:21
  20:23 41:22 47:11
  47:15
**conducted** 10:16
  11:1
**conjunction** 16:14
**connecticut** 1:1,11
  1:16 2:6,8 6:7
  11:15 34:11 42:6
  47:10,14 49:1,4,9
  49:21
**connection** 2:15
  14:7 17:8 18:23
  25:1
**constructed** 28:10
**construction** 7:2
  13:18 14:7 17:8

  17:15 18:6 28:13
**consumer** 45:1
  47:10,14
**contacted** 31:15
  33:3 35:18
**content** 29:20
**continued** 47:24
**contractor** 28:10
**contractors** 11:2
  23:24 27:8,10
  34:22
**contracts** 12:18
**conversation**
  33:20 34:2
**conversations**
  34:25
**convicted** 12:3
**copies** 14:10,12,13
  45:18
**copy** 15:4 26:7
  44:20
**cores** 44:5
**corporation** 3:13
**correct** 4:24 5:10
  5:11 6:8 7:11 8:7
  10:1 12:22 14:20
  15:11,13,16,19,23
  15:24 17:23 18:24
  20:2,8 21:9 22:11
  23:2,25 24:1,10,11
  24:17 25:23 29:2
  37:19 38:12 40:7
  42:2,4,18 43:22,23
  44:3,4
**corrections** 51:12
**couch** 30:21
**counsel** 2:14 49:14
  49:18
**count** 7:17
**county** 49:2

EXHIBIT 6

couple  22:5 23:8
  30:25 31:6 35:14
  42:14
course  21:7
court  1:1 3:23
  14:2 18:17 19:15
  20:19 22:23 43:9
coverage  34:10,19
cracking  38:9
cracks  35:11,17
  36:2 37:12,20
credentials  27:3
crumbling  42:7
cs2687237  1:25
  50:2
csr  1:22
current  8:23 11:18
  11:22
currently  10:13
  37:9
curtain  41:17
curve  32:18
cv  1:3

**d**

d  1:2,7,13 2:1 3:6
  47:1,3 48:6 49:5
  50:4,20 51:5,8
dam  13:15 27:15
  42:18
damp  29:15,18
danforth  1:10,13
  46:10 51:5
darker  15:11
date  4:20 21:19,21
  21:21 23:6 45:24
  50:3 51:8
dated  24:10 43:22
  44:2 48:6 49:21
dates  8:9 42:25
  43:2

day  10:8 21:23
  22:21 34:16 37:23
  49:21 50:22
days  51:19
deadlines  32:18
dear  51:10
decorations  30:11
  30:12
deemed  51:20
defendant  1:14
  2:2
defendant's  13:24
  14:5 18:14,20
  19:12,18 20:16,22
  22:16,18 23:1
  43:6,12 47:9,10,12
  47:14,16,18,19
  48:4,4
definitively  40:20
degradation  38:3
degree  11:12,14
  11:16
dehumidifier
  29:17
dell  11:19,23,24
department  45:1
  47:10,14 51:23
deponent  3:6
  49:11
deposition  1:7 2:1
  2:16,24 3:3,14
  6:23 7:22 21:12
  22:20 46:12 47:17
  47:21 49:5 50:3
  51:8,11
described  13:25
  18:15 19:13 20:17
  22:17 43:7
description  47:7
  48:2

desk  31:1,5
details  39:22
dictionary  39:12
  39:15
direct  3:9 43:15
  47:5
directed  48:5
disclosure  18:22
  20:24 47:11,15
discovered  33:1
discovery  20:8
  21:8 45:17
discussing  3:24
dismissed  46:11
district  1:1,1
document  16:20
  19:21 20:7 21:1
  24:12 25:24 48:4
documentation
  28:22 44:18 45:6
documents  15:2
  21:4 45:17,19
doghouse  5:6
dogs  7:18
doing  41:20 44:15
don  23:2 34:21
door  33:21
doors  27:16
downspout  41:10
drain  41:17
drive  6:6 12:12
  19:20 20:24 26:13
duly  2:5
dwight  4:16

**e**

e  47:1
earlier  22:21
  27:14
east  10:1,11,18
eastern  11:15

educational  11:10
either  29:5
ellington  1:11
emc  11:19
encl  51:24
enclosed  51:11
endurance  4:4
engineer  11:6
  14:24 38:1 40:1
engineering  7:1
  24:7 28:15 47:19
engineers  25:9
  26:13,14
enter  23:13
entered  23:10
entitled  2:3
errata  50:1 51:13
  51:16
escapes  34:6
esq  51:5,25
esquire  1:13,18
estimate  26:19
estimates  23:23
et  50:3 51:6
evaluation  24:25
  46:1,2
event  49:19
eversource  6:17
  6:20
exact  42:25 43:2
exactly  8:9
examination  3:9
  44:7 47:5 48:5
examined  49:13
excuse  29:4
exhibit  13:24 14:5
  18:14,20 19:12,18
  20:16,22 21:12
  22:16 23:1 24:5
  26:1 43:6,12 47:7
  47:9,10,12,14,16

EXHIBIT 6

[exhibit - identification]    Page 4

47:18,19 48:2,4
**exhibits**  22:18
  48:9
**existing**  15:25
  16:10,13 17:5
**expires**  50:25
**exposure**  40:23
**extenders**  41:11
**extensions**  41:6
**exterior**  18:2,4
  36:2,22
**extracted**  44:6

**f**

**factors**  40:19
**fair**  4:13
**fall**  42:15 45:9
**family**  13:5,6
**farmstead**  9:25
  18:25
**fax**  51:2
**federal**  2:4 49:6
**feel**  38:2
**felony**  12:3
**file**  32:16 44:13
**filed**  12:5 33:8
  44:25 45:4
**filing**  32:8
**filings**  32:18 45:19
**filled**  45:20
**find**  34:21 51:11
**fine**  25:18 26:11
  31:19 34:9 39:9
  43:3
**finish**  3:24 25:16
**finished**  17:25
**fire**  1:5 50:3 51:6
**first**  3:7 8:16 20:1
  26:16 35:11 36:1
  42:12 45:12 49:11
**five**  6:1 7:18 11:22
  42:11

**fixed**  27:17
**flip**  21:13 43:24
**flooring**  28:3
**floors**  13:13 27:14
**folks**  33:1,13
**follows**  3:7
**footing**  39:19
**footings**  39:23,25
**foreclosure**  12:8
**form**  2:22 45:20
  45:21
**formal**  41:21
**formalities**  2:15
  7:23
**forward**  51:16
**foundation**  16:1
  16:11,14,15 17:4
  22:5 23:24 24:25
  26:25 27:12,19,21
  28:19,24 29:14
  32:4,24 34:11,18
  35:12 36:2,25
  37:3,13,17 39:3,12
  40:11,14,23 41:18
  41:22 44:6
**four**  42:11
**fourth**  19:5 20:1
**frame**  21:25 45:10
  45:15
**free**  51:2
**full**  4:15
**furniture**  30:13,22
**further**  2:21 3:1
  46:8 49:11,17
**future**  15:5 40:21

**g**

**g**  1:3,20 48:6
**gardens**  41:2
**gas**  6:22 19:3
**general**  28:9 30:12

**george**  31:24
**given**  41:21
**glad**  4:3
**go**  6:22 15:21 20:1
  36:6 37:22
**going**  4:11 6:22
  12:12 15:6 33:23
  34:24 38:16 40:21
**good**  3:11
**gotcha**  7:9 8:20
  13:7 14:25 17:16
  17:21 18:10 25:3
  26:20 27:22 30:17
  31:4,9 32:2 33:10
  33:25 34:3 35:19
  38:5,21 41:16
  42:16 44:24 45:22
**gotten**  20:10 23:23
  37:20
**grading**  41:1
**ground**  3:21 29:2
**guess**  13:22
**gutter**  41:6
**guy**  25:4

**h**

**handing**  25:25
**handwriting**
  15:23
**happen**  40:21
**happened**  35:24
**happy**  4:9
**hartford**  1:16 2:8
  10:1,11,18 49:8
**head**  19:22 34:8
**heard**  39:22
**hearsay**  28:20
**held**  2:6
**hereinbefore**  2:3
  49:16
**hereto**  49:18

**high**  39:8
**highest**  11:10
**hines**  33:18
**hl**  1:17
**hmm**  6:19 15:9
  24:9
**holds**  36:21
**holiday**  30:11
**home**  5:9 7:14
  8:25 10:11,15,16
  10:17,19,25 12:12
  12:14 16:6,8,14
  18:23 24:6,15,21
  24:24 25:6,8,12,20
  26:13,24 27:23,25
  28:5,10 29:17
  35:4 38:22 39:1
  47:19
**homes**  9:23 10:10
**honestly**  39:9
**house**  5:21,24 6:5
  6:14 7:11 8:6,8,14
  8:17,21 11:6,7
  12:25 13:9,12,19
  15:18 16:3 17:15
  17:18,22 18:8
  25:7 26:17 27:9
  30:16 33:23 39:20
  40:11,13,24 41:3,7
**household**  30:12
**houses**  40:2
**howd**  1:15 2:7
  49:7

**i**

**ice**  13:15 27:15
  42:17
**idea**  12:23 16:9,12
  16:16,17
**identification**
  13:25 18:15 19:13
  20:17 22:17 43:7

identify 15:13 32:16

impetus 32:8

implying 29:25

important 3:22

included 51:13

including 2:16

index 13:25 18:15 19:13 20:17 22:17 43:7

indicating 51:13

infiltration 29:12

information 17:14 26:10

initially 41:1

inspect 11:6 25:7 33:4

inspected 26:13,17 35:15

inspection 10:15 10:19,20 22:8 24:6,21 25:20 36:4 44:21 47:19 48:5

inspections 11:1

inspector 24:24 33:23 40:10

inspectors 25:7,8 25:13

install 29:17

instant 12:1

instruct 7:25

insurance 1:5 3:13 27:1 33:8,22 44:8 50:3 51:6

interaction 35:20

interest 9:10,13,20 12:8

interested 49:19

interesting 13:2 17:2

interior 27:16 35:12

interrogatories 43:14 48:4

invoices 17:12

involved 13:18

issue 26:25 32:14 32:23,23 33:4,7,12 40:18 45:5

issues 27:20 30:4,5 30:6,8,9 33:2 34:11,18 41:1,4

item 23:19

itemized 23:18

j

j 1:21 2:4 49:3,23

jam 1:3

jersey 51:2

jim 33:13

job 1:25 11:22

john 16:18,22

jointly 8:25

jurat 51:19

k

keep 29:20 41:6

kids 5:12,13

kieran 1:18 3:12 51:25

kind 7:1 18:3 28:12,15 30:15 38:13

kleary 1:17

know 4:3 8:8,14 8:14 10:5,15 11:5 12:17 13:3,9,11,13 13:17 14:15,23 15:5 16:5,6,10,13 17:10,19 18:7 19:23 20:9 21:2,6 21:20 22:4,7 23:4

23:15 26:7 27:2 28:18,20,23 30:3 30:12 31:7,13,17 31:25 32:6,15,15 33:15 34:4 35:7,9 36:6,9,12,16,24 37:2 38:13 39:19 39:21,24 40:3,4 41:8,14,17,19 42:24 43:1,2 44:17 45:11,16

knowledge 13:8

known 4:18

l

l 2:11

labeled 43:18 48:4

latest 9:6

laurel 6:6 12:12 19:20 20:24 26:13

law 2:6 49:7

law.com 1:17

lawsuit 6:6 11:25

leard 1:21 2:5 49:3 49:23

learned 8:16

leary 1:18 3:10,12 5:6,8,20 6:3,4,13 6:21 7:21,25 8:5 13:22 14:1,3 18:12,16,18 19:10 19:14,16 20:15,18 20:20 22:15,22,24 43:4,8,10 46:7 47:5 48:9 51:25

legal 7:23 50:1 51:1

lessen 40:22

lester 1:2,3,7,20 2:1 3:6,11 4:16 6:19 7:17,24 14:4 18:19 19:17 20:2

20:21 22:25 24:8 43:11 47:3,20 48:6,6 49:5 50:3,4 50:20 51:6,8

letter 22:10,12 51:20

level 11:10 39:8

liberty 1:5 3:13 31:14,18,20 32:9 32:13 39:6 42:20 50:3 51:6

liberty's 43:13

life 10:5

limit 32:15

line 20:1 39:10 50:5 51:13

list 34:22

listed 20:2 23:19 27:25

listing 8:19 35:8

live 6:14 40:5

lived 5:23

lives 7:10

living 5:21 6:16 30:21,23

livingston 51:2

llc 1:10 47:20

long 5:1 11:20,23

look 9:6 10:7 14:22 26:4 35:17 36:6 37:22 40:18

looked 19:24 39:11,14

looking 12:25 23:6 26:6 37:23 38:4 44:19,20

looks 19:1,8 21:23 44:1

loretta 12:21 20:25

**[lot - p.o.]**                                                                 Page 6

**lot** 10:5 30:13 38:16 40:19
**low** 29:20
**ludorf** 1:15 2:7 49:8
**lynn** 33:13

**m**

**main** 1:10
**manager** 11:19
**mark** 13:22 18:12 19:10 20:15 22:15 38:8,19 43:4
**marked** 13:24 14:5 18:14,20 19:12,18 20:16,22 21:11 22:16,20 23:1 24:5 26:1 43:6,12 47:17,21
**married** 4:22 5:1,4
**mathematics** 11:17
**matter** 3:13 12:1
**matters** 13:6
**mean** 30:22
**meaning** 10:17 23:19
**media** 32:4
**meet** 21:19,24
**meeting** 22:6 42:12
**meetings** 22:5 42:4,9
**mentioned** 42:3
**merit** 1:22
**met** 22:1
**meter** 19:3
**mind** 36:6
**mm** 6:19 15:9 24:9
**moisture** 29:20 30:6

**mold** 30:8,9
**moldy** 29:21
**moment** 34:6
**monica** 1:3,20 4:24 7:10,13 9:1 20:2 24:8 47:20 48:6
**months** 42:14
**mortgage** 8:21 26:3
**move** 40:8
**moved** 5:25 17:22
**mt** 51:1
**musty** 29:21
**mutual** 1:5 31:14 32:9 39:6 42:20 50:3 51:6

**n**

**n** 2:11 47:1
**name** 3:12 4:15 9:4 17:1 33:14,15 34:4,22 50:3,4 51:6
**names** 4:17 5:14 9:4 12:16
**neal** 21:16,19 22:1 22:20 24:17,18,23 25:14,19 26:12,15 26:21,23 33:3 34:12 35:15 37:4 37:6 47:17,21
**neal's** 21:12 24:20 44:22,23 45:23
**need** 4:2
**needed** 32:19
**needs** 15:5
**neighbor** 33:21 35:13
**neighbors** 33:1,11 34:2,5,18 35:16,21

**neither** 40:20
**never** 17:6
**new** 16:15 17:4 28:7,8 51:2
**news** 34:10,19
**night** 34:13
**nope** 12:6,10 16:23
**notarized** 51:15
**notary** 2:5 3:3 49:3,24 50:21,24
**note** 38:12 51:12
**noted** 40:25
**notice** 2:17 35:11
**noticed** 29:14 36:1
**notification** 45:5
**november** 24:10 45:14 47:20
**novemberish** 45:10
**nowadays** 12:23
**number** 51:7,13
**numbers** 10:7

**o**

**o** 2:11
**oath** 42:1
**objections** 2:22
**occupation** 11:18
**occupied** 10:2
**october** 21:15 22:8 31:16 37:7 45:10 45:24
**offered** 38:2
**offhand** 12:16 33:16
**officer** 2:17
**offices** 2:7 49:7
**oh** 17:13 22:12 41:15
**okay** 3:17,19 4:15 4:17 6:3 7:10,24

8:4 10:2,22 11:5 11:20 12:13,23 13:21 14:12,15 15:6,12 16:17,24 17:7,11 19:2,7,9 19:25 20:14 21:24 22:1,7,10,14 23:10 23:16,22 24:4 25:6 26:4,7,20 27:11,13,19 30:5 31:23 33:17 34:7 34:15,17,24 35:2 35:11 36:21,24 38:11,15 39:11,24 40:5 41:20,25 44:2,10,17,25 45:7 45:16,20 46:6
**old** 5:16 6:9 11:7
**once** 32:14 33:5
**ones** 27:18
**online** 45:21
**opinion** 33:6
**order** 26:18
**original** 13:18 18:5 40:25 48:9
**originally** 32:25
**originals** 14:12
**outlets** 32:4
**outside** 29:7 41:23
**overflow** 30:15
**owned** 8:25 9:15 9:22 10:10
**owners** 14:10
**ownership** 7:15 9:10,13,19 12:8

**p**

**p** 2:11
**p.m.** 2:8 46:12 49:9
**p.o.** 1:11

[page - recommendation]                                                    Page 7

page   19:5 20:1
  21:14 43:16,17,18
  43:19,19,24 47:7
  48:2 50:5 51:13
paid   42:22
painted   39:3
painting   13:14
  27:15
paperwork   8:10
  12:20 19:24 25:2
  44:20,25
part   18:7
partially   29:1
particular   15:15
parties   2:14 49:18
party   11:25
payments   8:23
penalty   51:16
pending   4:6
people   9:15 25:9
  39:22 41:23
perjury   51:16
person   22:6,6
petrographic   44:7
photographs   35:3
  36:12 37:3
picture   36:16
pictures   35:7,8,9
  36:25
place   2:16
plaintiffs   1:9 48:5
plan   23:13 44:13
  44:15
plans   40:8
pleasant   51:1
please   3:24 4:3,8
  15:22 18:13 19:11
  20:15 21:13 22:15
  43:5,15,24 51:11
  51:11

plot   15:25
point   4:2,7 10:16
  13:14 22:2 26:10
  30:25 31:3 34:1
  35:18
policy   39:7
posed   4:12
position   11:21
possibly   9:10
poured   16:15 17:4
  28:23
practice   41:7
prepare   25:20
  26:19
prepared   14:6
  17:8 18:22 19:20
  24:7,17 47:20
present   1:20 20:21
  22:8,9 24:4,20
presented   22:25
  43:11
presenting   14:4
previously   9:22
  21:17
prices   23:19
print   39:9
prior   14:10 16:6
  18:23 24:14 34:11
  34:16,17 35:4,6
  36:4,13 41:15
  43:24
privileged   35:1
proactively   30:3
probably   8:18
  14:22,24 42:15
  45:10,14
probing   10:23
problem   29:11
  32:16
procedure   2:4
  49:7

proceedings   12:9
produced   20:7
  21:8 45:3,16
production   43:14
  48:5 51:23
professionals
  26:23
progression   38:7
  38:12 40:17
prompted   32:12
proof   3:2
properties   10:13
property   9:11,14
  10:2,18,21 12:7
  14:7 17:9 18:21
  20:23 34:12 37:6
  37:10 39:24 40:5
  44:10 47:11,15
proposal   23:2,16
  23:18,20 47:18
proposed   15:18
protection   45:1
  47:11,14
provide   25:22
provided   18:19
  19:17 23:4 28:18
  33:5 34:23 45:6
providing   15:1
public   2:5 3:3 49:3
  49:24 50:24
pulling   25:2
purchase   9:18
  12:11,14,18 14:8,9
  14:14,16 15:3
  17:14 19:23 21:4
  35:4,6
purchased   5:9
  12:25 29:17
purchasing   24:15
purpose   15:1

purposes   8:1
  44:11
pursuant   2:3 49:6

q

qualifications   3:2
qualified   2:5
question   4:6,12
  5:7 23:22 25:16
  32:10,20 40:16
questions   3:25
quick   14:22,24
  35:17

r

rainstorms   29:15
  29:16
rates   40:17
reached   31:17
  33:7
read   39:9
reading   2:23
  51:20
really   13:2
reason   36:19 50:5
  51:14
reasons   38:23 39:1
reassessed   44:10
reassessment
  44:13
recall   11:3,9 12:2
  12:19 16:25 17:19
  19:22 21:2 24:23
  26:6 27:18 31:19
  36:20 41:12 43:2
  45:18
receipt   51:19
receipts   17:11
received   14:11,13
  14:16
recommendation
  38:8

[record - state]                                                        Page 8

record  4:1
records  15:5
refer  12:12 15:6
  39:22
reference  51:7
referenced  22:19
referencing  34:5
referring  25:24
  44:22 45:25
refinanced  9:2
refinancing  26:3,9
refinished  13:14
  27:15
regarding  23:24
  26:24 32:4 33:12
  40:11 41:21 44:18
registered  1:22
regraded  41:1
related  13:5,6
  17:15 27:12,19,21
  41:4 45:19 49:17
relocate  38:22,25
remediation  27:16
remember  3:18,19
  8:9 9:3 12:16
renovations  28:4
rented  27:23
repairs  37:12
rephrase  4:8
  13:16
replaced  37:17
replacement  40:14
report  18:22 19:20
  20:24 21:15,21
  24:6 25:20,23
  33:5 40:25 44:21
  44:22,23 45:23
  47:11,13,15,19
reported  31:13
  41:13 49:15

reporter  1:22 3:23
  14:2 18:17 19:15
  20:19 22:23 43:9
reporting  31:19
  42:14
reports  26:8
represent  3:12
representative
  27:1
requests  43:14
  48:5
required  50:21
reserved  2:22
resided  7:14
residential  7:2
  18:21 19:19 20:23
  24:7 28:12 47:11
  47:13,15,19
respective  2:14
response  45:12
responses  43:13
  48:4
result  6:23
retained  48:9
retaining  39:15
returned  51:19
review  14:21,24
  24:14 45:23 46:5
  51:12
reviewed  21:3
  23:16 39:6
right  5:12 6:7,18
  8:11,12,13 9:5,17
  10:4,9 11:8 15:8
  15:18,21 16:1,19
  18:10 20:4,11
  21:5,7,11 23:21
  24:19 25:11 27:6
  28:21 29:9,22,24
  30:24 32:21 33:24
  34:21 36:8,11,18

36:23 37:18,25
  38:7,17,18 40:6
  41:25 44:5
rmr  2:5
road  9:25
room  30:20,21
  31:2
rooms  28:7,8
rules  2:4 3:21 49:6
run  35:20

            s

s  2:11,11 50:5
safety  38:23 39:1
sale  18:23 27:25
saw  15:3 34:14
  35:17
says  15:25 16:18
  16:20
scheduled  37:9
scope  41:23
second  15:21
  43:16
see  18:7 23:6 33:4
seeing  12:19 17:1
  21:2
seen  19:21 21:1,17
  22:4 24:12 25:4
  31:25 34:10,19
seller  20:25
senior  11:19
sent  33:22
september  1:5 2:9
  49:10,22 51:4
serious  38:3
services  24:7
  47:19
shade  15:11
shaded  15:15
sheet  50:1 51:13
  51:15,16

sheriffs  12:24 13:3
shored  37:15
shortly  45:24
show  12:24 21:11
shown  51:17
side  29:5
siding  18:3
signature  19:5,7
  43:20,25 51:14
signing  2:23 51:15
  51:20
sincerely  51:22
single  39:10
sir  4:15 51:10
site  15:19 16:7
  21:22
situation  35:23
sloped  41:2
soil  29:4,5,8
solutions  50:1
  51:1
somers  49:21
soon  14:15
sorry  7:24 25:17
  25:17
sought  24:2
sound  8:12
sounds  5:11 8:13
  10:4 12:22
speaking  34:17
  35:13,22
specific  11:4
spoke  33:11 41:24
spoken  16:21
  31:23 32:3
sprint  7:8
start  25:12
started  25:2
state  2:6 47:10
  49:1,4

EXHIBIT 6

[statement - wethersfield]                                        Page 9

statement  9:7
statements  41:21
states  1:1
stating  33:5
stenographically
  49:14
sticking  27:17
stipulated  2:13,21
  3:1
store  30:2,10,22
street  1:10 33:2,13
  33:18
strike  18:11 26:21
  30:19 37:1
student  7:7
stuff  17:17 30:2,11
  30:14
subcontractors
  13:11,17
subject  6:6 12:8
submissions  45:13
submit  44:18 45:7
subscribed  50:21
subsequent  45:6
subsequently
  49:15
substantially  26:4
sufficiency  2:16
suite  51:1
sure  6:25 8:10
  10:23 12:17 19:23
  21:3 32:11 35:7,9
sworn  3:7 49:12
  50:21

            t

t  2:11,11
take  3:23 4:2
  36:16
taken  2:2,18 3:4
  3:14,20 35:4
  36:13,24 37:3

49:6
talk  7:23
talking  6:5 25:9
  27:4 28:2 32:25
  35:16
tanddlaw.com
  1:12
tax  44:11
technically  39:21
tell  40:20 49:12
term  39:11,14
terms  32:18
test  4:4
testified  3:7
testimony  49:14
thank  8:3 19:14
  20:18 22:22 43:8
  46:9
thanks  14:1 18:16
thing  7:21 41:5
things  13:13
think  3:19 8:16
  13:5 14:22 17:19
  22:4 31:16,17,18
  33:8,14,20 34:1
thinking  9:2
third  21:13
thirty  51:19
thursday  2:9
  49:10
tim  33:18
time  2:16,23 5:23
  14:8 15:3 19:23
  21:4,25 23:15
  24:3 26:3 32:15
  36:1 38:9 45:10
  45:12,15
today  16:25 41:20
  44:20
told  38:25 40:13

tolisano  1:10
toll  51:2
tolland  49:2
tomorrow  44:16
top  15:6,10 19:22
  34:8
tore  16:7
track  38:6
transcribed  49:15
transcript  3:23
  22:19 51:11,12
trial  2:23
tried  40:22
true  36:21
truth  49:12,12,13
trying  9:3 11:3
  12:15 37:23
turn  8:2
turned  5:17 12:20
tv  31:10,12 32:1
  34:14
twice  45:11
two  5:13 7:17 15:8
  45:13 47:9
typically  36:9,16
  41:9

            u

u  2:11
understand  4:7
understood  4:11
  9:8 38:15
uniform  19:19
  47:12
united  1:1
unsafe  40:14
use  30:18,23 31:2

            v

v  50:3 51:6
vagrants  8:6

varies  40:19
veritext  50:1 51:1
  51:7
visit  37:7,9
visited  21:21
  38:10 39:17
vs  1:4

            w

w  1:18 51:1,25
waived  2:19,24
  3:4 51:20
walk  18:8 26:18
  27:2 36:3
wall  29:7 36:17
  39:15
walls  18:3 29:1,6
  29:15 35:12 36:2
  36:7,13,22,25 37:3
  37:15 39:4 44:6
want  30:2,3
wanted  6:25 32:17
water  29:11 30:6
  40:23 41:4,6
water's  41:9
way  49:19
we've  11:2 13:13
  26:2 29:19 30:1
  41:6,23
website  45:4
weeks  14:17 23:9
  35:14
weird  10:6
welcome  14:2
  18:17 19:15 20:19
  22:23 43:9
wendy  1:21 2:4
  49:3,23
went  25:23 35:16
wet  29:15
wethersfield  1:16
  2:7 49:8

EXHIBIT 6

**when's**  36:1
**wife**  9:10,14,19
  22:7 32:6
**wife's**  19:7 43:25
**william**  24:18
**willington**  6:7
**witness**  5:3,18 6:1
  6:11,18,20 7:19
  8:4 46:11 47:3
  49:5 50:4 51:8,11
**witness'**  51:14
**woods**  15:15
**work**  13:12 23:19
  31:1
**worked**  31:21
**working**  7:8 31:7
**works**  6:17
**worse**  37:20
**writing**  15:10

**x**

**x**  47:1

**y**

**yeah**  6:20 8:13
  12:22
**year**  43:1
**years**  5:2 6:1 10:3
  11:2,22,24 21:6
  30:25 31:6,6
  41:15
**yep**  4:25 7:12
  15:14 19:6

EXHIBIT 6

Connecticut Procedure in Civil Matters

Chapter 13, Discovery and Depositions

Section 13-30

(D) If requested by the deponent or any party, when the testimony is fully transcribed the deposition shall be submitted to the deponent for examination and shall be read to or by the deponent. Any changes in form or substance which the deponent desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the deponent for making them. The deposition shall then be signed by the deponent certifying that the deposition is a true record of the deponent's testimony, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the deponent within thirty days after its submission to the deponent, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the deponent or the fact of the refusal or failure to sign, together with the reason, if any, given therefore; and the deposition may then be used as fully as though signed unless, on a motion

EXHIBIT 6

to suppress under Section 13-31 (c) (4), the judicial authority holds that the reasons given for the refusal or failure to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 6

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 6