UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTOPHER D. LESTER AND
MONICA G. LESTER            CIVIL ACTION NO.
                            3:16-cv-00909-JAM

     VS.

LIBERTY MUTUAL FIRE
INSURANCE COMPANY           SEPTEMBER 7, 2017

          DEPOSITION OF: WILLIAM F. NEAL, P.E.

APPEARANCES:

Attorneys for the Plaintiffs:

   TOLISANO & DANFORTH, LLC
      18 Main Street
      P.O. Box 676
      Ellington, Connecticut 06029
      (860) 871-2422
      bdanforth@tanddlaw.com
   BY: BRIAN D. DANFORTH, ESQUIRE

Attorneys for the Defendant:
   HOWD & LUDORF
      65 Wethersfield Avenue
      Hartford, Connecticut 06114-1190
      (860) 249-1361
      kleary@hl-law.com
   BY: KIERAN W. LEARY, ESQUIRE

                    Wendy J. Leard
               Registered Merit Reporter
                    CSR # 00039

   Job No. CS2687237

EXHIBIT 7

. . . Deposition of WILLIAM F. NEAL, P.E., taken on behalf of the defendant in the hereinbefore entitled action, pursuant to the Federal Rules of Civil Procedure, before Wendy J. Leard, RMR, duly qualified Notary Public in and for the State of Connecticut, held at the law offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 10:49 a.m., on Thursday, September 7, 2017.

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections, other than as to form, are reserved to the time of trial and that the reading and signing of the deposition are hereby waived.

EXHIBIT 7

It is further stipulated and agreed that the proof of the qualifications of the notary public before whom the deposition is being taken is hereby waived.

WILLIAM F. NEAL, P.E., Deponent, having first been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. LEARY:

Q    Good morning, Mr. Neal.

A    Good morning.

Q    My name is Kieran Leary, and I represent Liberty Mutual Fire Insurance Company in this litigation.

I know you've had your deposition taken a few times by me and other attorneys, so usual ground rules:  Please respond with verbal answers.

If you don't understand something I ask, please ask me; I'll be happy to rephrase.

Please allow me to finish my question; I'll do the same with your answer.

And if you need to take a break at any time, please just let me know, and I'll be happy to accommodate you.  I'll just ask if there is a

EXHIBIT 7

pending question, just go ahead and answer that, and then take the break.

Is that fair?

A    It certainly is.

Q    Okay.  What's your full name, sir?

A    William Neal, N-E-A-L.

Q    And your business address?

A    77 Meadowview -- that's one word, Lane, Vernon, Connecticut.

Q    And your business address is the same?

A    Yes, residence and business is the same.

Q    Okay.  And we're here for the Lester matter, correct?

A    That's correct.

Q    And that's the property that's located at 24 Laurel Drive in Willington, Connecticut?

A    Yes.

Q    I noticed your deposition today, and attached to that is a document request.

Did you bring any documents today?

A    I did.

Q    Okay.  And what do you have?

A    The complete contents of my file.

Q    Can I please see the complete contents of your file?

A       (Handing.)

MR. LEARY:  I'll mark this as 1, please.

(Defendant's Exhibit 1, marked for identification-described in index)

MR. LEARY:  Thank you.

THE COURT REPORTER:  You're welcome.

THE WITNESS:  I also brought a CD of all the photographs that I have taken.

(Handing.)

MR. LEARY:  Okay.  Thanks.

BY MR. LEARY:

Q       And I'll have you work off this, if you don't mind.

All right?

A       That's fine.

Q       All right.  So you've given me the complete contents of your file and a disk with photographs labeled "Lester photos 10-5-15," correct?

A       Yes.

Q       Is that the date of your visit to the property?

A       Yes.

Q       All right.  And going over your file

contents, the first page is a -- it looks like some kind of intake form, right?

A    Yes.

Q    Okay.  And the second page is field notes, correct?

A    Yes.

Q    And it says "Built in 1998," right?

A    Yes.

Q    Where did you get that information from?

A    From the Lesters.

Q    It says here "9 years," correct?

A    Yes.

Q    And that was also relayed by the Lesters?

A    Yes.

Q    Did you meet with one Lester or both?

A    I have no record of that.

Q    Okay.  And when you say it was relayed by a Lester, was that synchronously or was it one or the other?

A    It was from one or the other.

Q    Okay.  And it says "Noticed several weeks ago," right?

A    Yes.

Q    What's that in reference to?

A    The cracks in the foundation.  The Lesters

EXHIBIT 7

related to me that they had noticed the cracks several weeks prior to my visit.

Q    Okay.  But you don't know which Lester you spoke to, do you?

A    No.

Q    And that says "3 HL EXT"?

A    Right.

Q    What does that stand for?

A    There were three hairline cracks visible on the exterior of the foundation.

Q    Okay.  And then it says -- well, why don't you tell me what the following line is indicating, which starts with "Initial."

A    Yeah.  That's my shorthand for initial spider web cracks on the interior of the foundation and in several locations.

Q    And "Brenda okay," is that a reference that it's okay to send a copy of the report to Brenda Draghi?

A    Yes.

Q    How do I know that?

So on the following page is a copy of a report dated October 5, 2015, correct?

A    Yes.

Q    Then you have some color photographs?

EXHIBIT 7

A    Yes.

Q    And you have an email from yourself after that to Mr. Lester, it looks like, and a cc to Brenda Draghi with the report, right?

A    Yes.

Q    All right.  Anything else in your file?

A    No, that's it.

Q    All right.  And do you recall me deposing you in the Bienkowski matter?

A    Yes.

MR. LEARY:  I'll mark this as 2, please.

(Defendant's Exhibit 2, marked for identification-described in index)

MR. LEARY:  Thank you.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q    Mr. Neal, I present you with what's been marked as Exhibit 2.

This is a transcript of your deposition in Bienkowski.

If I asked you the same questions I asked you then, would I get the same answers from you?

A    Yes.

Q    Do you recall me deposing you in

McAllister versus Liberty Mutual?

A     Yes.

                MR. LEARY:  We'll mark it as 3,

        please.

                (Defendant's Exhibit 3, marked for

                    identification-described in index)

                MR. LEARY:  Thank you.

                THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

    Q     Mr. Neal, I've presented you with what's

been marked as Defendant Exhibit 3.

        That is a transcript of your deposition in

McAllister versus Liberty Mutual.

        If I asked you the same questions I asked

you in the McAllister deposition, would I get the

same answerers?

    A     Yes.

                MR. LEARY:  Let's make this 4.

                (Defendant's Exhibit 4, marked for

                    identification-described in index)

                MR. LEARY:  Thank you.

                THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

    Q     Mr. Neal, I've presented you with what's

been marked as Exhibit 4.

It's a transcript of your deposition in Gladysz versus Liberty Insurance Corporation.

If I asked you the same questions I asked you in Gladysz, will I get the same answers from you?

A   Yes.

Q   And you recall that deposition, right?

A   Yes.

Q   All right.  I hope so.  It was three weeks ago.

And do you understand that you've been disclosed as an expert in this case?

A   Yes.

MR. LEARY:  Can you mark this as 5, please.

(Defendant's Exhibit 5, marked for identification-described in index)

MR. LEARY:  Thank you.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q   Mr. Neal, I present you with Exhibit 5.

It's an expert disclosure.

Have you seen this before?

A   No.

Q   I'm sure your attorney filled it out for

you -- or filled it out for plaintiffs.

It says you charge 200 per hour for testimony, correct?

A    Yes.

Q    Is that your rate?

A    Yes, it is.

Q    I can expect an email the second you walk out this door with your invoice?

A    Not "the second," no.

Q    And your report is attached, correct?

A    Yes, it is.

Q    And then you have a testimony list?

A    Yes.

Q    It looks like it needs to be updated a little bit, but have you been deposed at all since our last meeting on August 17?

A    No.

And I do have an updated testimony list. (Handing.)

Q    Okay.  Great.  Thanks.

MR. LEARY:  Let's mark this as 6, please.

(Defendant's Exhibit 6, marked for identification-described in index)

MR. LEARY:  Thank you.

EXHIBIT 7

THE COURT REPORTER: You're welcome.

BY MR. LEARY:

Q And this is your updated testimony list, what's been marked as Exhibit 6, right?

A Yes.

Q All right. And then lastly on your expert disclosure is your CV, right?

A Yes.

Q All right. Let's take a look at your report.

I'll use the copy in Exhibit 1 because it's in color.

It looks like your report is dated October 5, 2015, correct?

A That's correct.

Q That's the same day you visited this house, correct?

A Yes, it is.

Q And you had actually been to this property previously, correct?

A I have no recollection of that.

Q Okay.

MR. LEARY: We'll mark this as 7, please.

(Defendant's Exhibit 7, marked for
identification-described in index)

MR. LEARY:  Thanks.

THE COURT REPORTER:  You're welcome.

BY MR. LEARY:

Q    Mr. Neal, I've presented you with what's
been marked as Exhibit 7.

Is this your home inspection report?

A    It does appear to be that, yes.

Q    Okay.  And that's your company, right,
Residential Engineering Services?

A    Yes, it is.

Q    And it's listed as 457 Center Street in
Manchester, right?

A    Yes.

Q    So you changed the location for your
company at one point?

A    Yeah.  Actually, several times.

Q    Okay.

A    But this was an office building that we
had bought in Manchester and decided that I did
not want a separate office.  So we were there
several years, and then I moved the office back to
my residence.

Q    Okay.  And it's dated on the first page

November 1, 2005, correct?

A    Yes.

Q    And if you look at the third page, it looks like the client's signature, Monica Lester, correct?

A    Yes.

Q    And then it says "Inspector:  William Neal," correct?

A    Yep.

Q    And that's your signature?

A    Yes, it is.

Q    And then there's Timothy Neal's initials, correct?

A    Yes.

Q    And is that his signature, do you know?

A    Yes.

Q    Who's Timothy Neal?

A    It's my son.

Q    And is he an engineer as well?

A    No.  He's a licensed home inspector.

Q    Gotcha.

And is Eric your son as well?

A    Yes, he is.

Q    And is he a licensed home inspector as well?

A    He was at this time.

Q    Gotcha.

And you dated it November 1, 2005, correct?

A    Yes.

Q    All right.  And I'm not going to go through it, but is this your standard -- at the time, home inspection form?

A    At that time, this was our standard form.

Q    And it looks like it's "Copyrighted 2002, William F. Neal," correct?

A    Yes.

Q    Is this a self-created form?

A    It is.

Q    Is there a standard home inspection form that the industry uses?

A    There are several commercial documents out there that we find efficient.

Q    Okay.  And was this based upon any of those, or you just created your own document?

A    I created my own document.

26 years ago, this was about seven pages, and we've modified, added, changed it numerous times over the years.

Q    And do you use, today, a document that you

EXHIBIT 7

self-created, or do you use one of the industry forms?

A    We still use our own document.

Q    Okay.  We'll go back to your report of October 5, 2015.

Do you recall the Lesters mentioning to you that you were the home inspector?

A    I do not recall that.  They may have or they may not have.

Q    Okay.  And besides a home inspection or your visit on October 5, 2015, have you been to the property besides those dates?

A    Not to my recollection.

Q    Have you ever been to that property since October 5, 2015?

A    Not to my recollection.

Q    Okay.  And your report notes that the basement is unfinished, correct?

A    This?  (Indicating.)

Q    Yes.

A    Sorry.

Q    No problem.

A    Yes, it does.

Q    Okay.  Do you know if it had ever been finished?

EXHIBIT 7

A     At this time, I did not.

Q     Have you prepared any other reports regarding the Lester property?

A     Not to the best of my knowledge.

Q     Do you currently have any plans to return to the Lester property?

A     No.

Q     And your report says that you were at the home for the specific purpose of conducting a visual examination of the concrete foundation, correct?

A     Yes.

Q     And it's addressed to Christopher Lester, correct?

A     Yes.

Q     Does that refresh your recollection as to whether you talked to Christopher or Monica?

A     It does not, with any degree of certainty.

Q     Do you generally address your letters to who you met with at the property?

A     I generally address them to whoever booked the job.

Q     Gotcha.

      Do you know how long you were at this property?

A     Not specifically.  Normally, it's approximately an hour.

Q     And this information as to the home being built in 1998 was provided by one of the Lesters, correct?

A     That's correct.

Q     Did you pull a property card to verify the information?

A     No.

Q     And also the information that the home has been occupied for nine years was provided by one or both of the Lesters, correct?

A     That's correct.

Q     As was information that they very recently noticed cracks, correct?

A     That's correct.

Q     And your field notes said "three weeks," so are those your words, "very recently"?

A     Yes, they are.

Q     Okay.  Excuse me.  Your field notes note "several weeks ago," correct?

A     "Several weeks," yes.

Q     Okay.  And the news coverage of this foundation issue in Tolland County kind of broke in July of 2015, correct?

A    I believe that's correct.  Yes.

Q    Okay.  And in your report, you note that most of the visible interior concrete foundation has hairline spider web cracks, right?

A    Yes.

Q    And what's the significance of the spider web cracks being hairline cracks?

A    Well, the significance of the "spider web cracks" is that those are the type of crack that is typically found when the concrete is defective, and the "hairline" means that at this point in time they were quite small.

Q    Okay.  And would you say these were some of the smallest spider web cracks that you've seen at some of these properties you've looked at?

A    No.

Q    So you've seen some that are smaller than hairline?

A    I have seen cracks that I would describe as "hairline" that were smaller than these cracks.

Q    Okay.  What word would you use to denote less significant cracking than "hairline" cracks?

A    A very small fine crack I would describe as "hairline," and nothing -- I wouldn't use any other term for a very . . .

EXHIBIT 7

Q    So "hairline" is the word you would use to denote the smallest of cracking, correct?

A    Yes.  It's a subjective term, obviously.

Q    Right.

Did you measure these cracks?

A    No.

Q    How large are hairline cracks?

A    Having never measured a hairline crack, that's hard to say, but I would -- for purposes of discussion, I would say perhaps a thirty-second of an inch or less.

Q    Okay.  And how large do cracks have to be before you would not describe them as "hairline" anymore?

A    Again, for purposes of the discussion, bigger than a thirty-second of an inch.

Q    Okay.  And then you note that the exterior foundation has several vertical hairline cracks, correct?

A    Yes.

Q    Did you see any spider web cracks on the exterior foundation?

A    No.

Q    And your field notes say "three hairline exterior cracks," right?

A    Yes.

Q    So "several" is three in this case, correct?

A    Yes.

Q    Do you know if these cracks have gotten any worse since your inspection back in 2015?

A    I do not.

Q    Do you know if there was ever any kind of siding on the exterior to cover up the concrete walls?

A    I do not.

Q    Can you testify as to any uniform rate of progression of the cracks in the walls?

A    In this specific case or in general?

Q    Right.

In this specific case, can you testify that these cracks increased by any measurable variable every month or year?

A    No.

Q    And you note that, based solely on your visual observations, the most likely cause of a foundation distress is alkali-silica reaction, correct?

A    Yes.

Q    And have you conducted a petrographic

EXHIBIT 7

examination?

A    No.

Q    Are you a chemist?

A    No.

Q    Are you a scientist?

A    No.

Q    And you note that alkali-silica reaction causes the distress to be visible 15 to 20 years after the foundation is poured, correct?

A    Yes.

Q    And you note that you believe the cracks are the first visible signs of that condition, correct?

A    Yes.

Q    So if alkali-silica reaction were occurring in these walls, you believe that would be the infancy period of that condition, correct?

A    Yes.

Q    And you don't note any bowing of the walls in this case, right?

A    That's correct.

Q    And you've noted that at some other properties, right?

A    Bowing?

Q    Right.

A    Yes, I have.

Q    I believe I've seen in some you've written that there was bowing by as much as one inch, right?

A    Yes.  I actually have reports that go up to 5 inches of bowing.

Q    Right.

I don't think any of mine go up that high, but --

A    You don't want that to be your house either.

Q    All right.  So you've got some where the walls are bowing as much as 5 inches, right?

A    Yes.

Q    At those properties, are homeowners still living there?

A    To the best of my knowledge, yes.

Q    And has the home fallen down at that property, where the walls are bowing by 5 inches?

A    Not to my knowledge.

Q    Do you know if those foundation walls that are bowing 5 inches have fallen down?

A    Not to my knowledge.

Q    And you note in your report that the ASR will continue to deteriorate the concrete until it

EXHIBIT 7

may structurally fail, correct?

A    Yes.

Q    So you're not certain that it will eventually structurally fail; is that correct?

A    In this particular case, that is correct.

Q    Okay.  It says that there's no way to arrest the process, correct?

A    Yes.

Q    And have you consulted any literature that says there is no way to arrest an alkali-silica reaction?

A    I have consulted literature that deals with whether or not the process can be arrested.

Q    And what literature is that?

A    I have no recollection or record of that.

Q    Do you know when you looked at that literature?

A    I have no specific recollection.  Sometime within the past eight years.

Q    Okay.  And would that be engineering literature or outside the engineering field?

A    I would think that they either would have been university, government, or professional organization reports.

Q    But not by an engineer, correct?

A     I have no recollection.

Q     You don't know who prepared these reports, correct?

A     I have no recollection.

Q     All right.  And how did you access that literature?

A     It would have been on the Internet.

Q     Like a Google search?

A     Google search.  I have talked, over the years, to a number of people knowledgeable about this process, the situation, and I know that they've recommended certain reports and papers to be looked at.

My purpose in doing it was to improve my understanding of the situation, not to become an expert in it.

Q     Okay.  And so you're not an expert in chemical reactions in concrete, right?

A     No.

Q     Okay.  And you're not an expert in alkali-silica reaction, correct?

A     That is correct.

Q     Do you know who these individuals that you said you spoke to are?

A     Not specifically.

EXHIBIT 7

Q    Okay.  Did you meet them in some clandestine alley and talk about alkali-silica reaction?

A    No.  One of my clients was an engineer for the State of Connecticut, roads and bridges.  He was a concrete expert who was very familiar with ASR.

I also spoke to somebody at Concrete Testing Services, which does a lot of test work for the federal government, and one of my clients also works in the laboratory at UConn that does concrete testing.

So I have encountered knowledgeable professionals, and a lot of my research to broaden my understanding has been directed by those types of people.

Q    Okay.  And what are the names of these people that you spoke to?

A    I have kept no records, and I don't recall.

Q    Okay.  So you don't know the name of your friend at the UConn lab who does concrete testing?

A    It would be a client who has this problem in his basement, so . . .

Q    You don't recall his name?

A     I don't recall his name.

Q     Okay.  Would you recognize him if you saw him?

A     Probably not.

Q     Okay.  And does that hold true with the other individuals that you just spoke about, you don't know their names?

A     Yes, that's correct.

A lot of the research was, you know, in trying to get an understanding of what was going on, papers written by the American Concrete Institute, papers published by various agencies through the federal government, and by research in universities.

Q     Gotcha.

And have you ever conducted a petrographic examination?

A     No.

Q     Would you be qualified to conduct a petrographic examination?

A     No.

Q     Have you done any tests to see if you can arrest alkali-silica reaction in concrete?

A     No.

Q     And you note that it's not possible to

EXHIBIT 7

predict how quickly the foundation will deteriorate to the point it is structurally dangerous, correct?

A    That's correct.

Q    Can you testify, within a reasonable degree of engineering probability, that these foundation walls would deteriorate to the point that they're structurally dangerous within the next hundred years?

A    No.

Q    What about within the next 200 years?

A    No.

Q    What about the next thousand years?

A    No.

Q    What about the next million years?

A    Yes.

Q    So somewhere between a thousand and a million years?

A    Yes.  Concrete can last a thousand years, but my guess is, after a million years, there's not much left.  So . . .

Q    Right.

I don't think we've reached a million years for concrete on any structure.

A    We have Roman concrete that's still in

pretty good shape over 3,000 years old, so . . .

Q    Do you know if those walls have ASR in them?

A    They do not.

Q    Okay.  Have you tested those walls?

A    No.

Q    Okay.  And you urge Mr. Lester to develop a corrective plan with a licensed contractor as soon as possible, correct?

A    Yes.

Q    Do you know if he did that?

A    I do not.

Q    Did you refer him to a licensed contractor?

A    Not to my recollection.

Q    Do you know how the Lesters found you?

A    I do not.

To the best of my knowledge, I've looked at every foundation on Laurel Drive, so I'm assuming it's from a neighbor.

Q    Is Laurel Drive -- were the houses all built by the same builder?

A    I believe so, but I can't testify to that with certainty.

Q    Do you know who built the Lester house?

A    No, I don't.

Q    Do you know who supplied their concrete for the foundation?

A    I do not.

Q    You don't note any efflorescence in your report, correct?

A    I don't, no.

Q    And you usually note efflorescence if present, correct?

A    Yes, I do.

Q    Do you expect that these foundation walls are exposed to groundwater?

A    Yes.

Q    What about rainwater?

A    Yes.

Q    And surface water?

A    Yes.

Q    Were the walls damp when you inspected them?

A    I have no record of that.

Q    Okay.  Did you inspect the living portion of the home?

A    I have no notes to that effect.  I would say probably not.

Q    Okay.  And you don't note any damages in

EXHIBIT 7

the living portion of the home in your report, correct?

A    That is correct, yes.

Q    And you would do that if there were damages, correct?

A    I would do that if the -- if my client indicated there were things happening in the finished portions of the house.

I would also do it based on the condition of the foundation.

Q    Okay.  In this case, you didn't do that, right?

A    I didn't do that because there had been no movement in the concrete foundation; therefore, there would have been no related issues in the finished portions of the home above.

Q    Okay.  Do you have any scientific background relative to the identification of chemical reactions in concrete?

A    No.

Q    Were the walls structurally unsound as of the date of your visit?

A    No.

Q    Were they structurally dangerous?

A    No.

EXHIBIT 7

Q    Do you know if the Lesters have replaced their basement walls?

A    I do not.

Q    Do you know if they've made any repairs to their walls?

A    I do not.

Q    Did you advise them to shore their walls?

A    No.

Q    Do you know if they shored their walls?

A    I do not.

Q    Did you advise them to relocate for safety reasons?

A    No.

Q    Did they have to relocate for safety reasons, in your opinion?

A    No.

Q    Do you know if this property has been condemned by a building inspector?

A    No.

Q    Do you believe it should have been condemned by a building inspector?

A    No.

Q    Have you ever heard these questions before?

A    No.

Q    All right.  Are the foundation walls still holding up the living portion of the home?

A    I have no personal knowledge of that.

Q    You don't know whether they are holding up the house above it?

A    I haven't seen the property for two years, so I don't know -- I have no idea what the current condition is.

Q    As of the date of your visit, were the foundation walls still holding up the living portion of the home?

A    Yes.

Q    Do you expect that to be any different today?

A    I would . . .

     Based on my experience, I have no way to determine what could be expected after two years.

Q    Okay.  Were the walls still holding back -- strike that.

     Were the walls still retaining soil on the outside as of the date of your visit?

A    Yes.

Q    And the foundation walls were partially above grade, correct?

A    Yes.

Q    And partially below grade, right?

A    Yes.

Q    And you didn't consult your home inspection report in conjunction with preparing your report on October 5, 2015, did you?

A    No.

Q    And the phrase "substantial impairment of structural integrity," that's not an engineering term of art; is that correct?

A    That's correct.

Q    Now, do you know when you were first contacted regarding this case?

A    No.

Q    And how many cases are you working on with Tolisano & Danforth?

A    I have no idea.

Q    Over a hundred?

A    I believe that it probably is over a hundred, yes.

Q    Okay.  And you've looked at over 800 of these properties, right?  Or around 800 of these properties, right?

A    Around 800, yes.

Q    And you're not aware of a single one where the foundation has fallen, correct?

A    That is correct.

Q    Did you take any photographs of the property besides those that are on the disk you've provided me?

A    I would . . .

That is possible.

Q    I would just ask you provide any additional photographs, if you have them.

A    If you look at the CD, the photographs are numbered sequentially.

If there are any missing numbers in the sequence, that would mean that that photograph was blurred or somehow absolutely no use to me, so it would have been deleted.

So the only photographs that I would have taken that are not on the disk were photographs that did not have any use because they were blurred, they were defective for some reason and didn't show anything useful.

Q    Gotcha.

A    I don't know how else to put it.

Q    They were just selfies, right?  "This is Bill Neal in your basement?"

A    Yes, something like that.

Q    Okay.  And have you seen any reports by

EXHIBIT 7

any other engineers regarding the Lester property?

A    No.

Q    Have you spoken to the Lesters since visiting their property on the October day in 2015?

A    Not to my recollection.

Q    Did you note any repairs to the cracks in the Lesters' foundation?

A    No.

Q    Were you able to inspect the footings in the Lester foundation?

A    No.

Q    Do you know if there are footings at the Lester foundation -- property?

Let me ask that again.

Do you know if there are footings at the Lester property?

A    No.

Q    Did they note any water intrusion into the basement?

A    I didn't make note of it, and if there was any evidence of water intrusion, I normally would have made note of it.

Q    Do you know what prompted them to retain your services in October of 2015?

EXHIBIT 7

A     I do not.

Q     Do you know if it was related to the news coverage at all?

A     I don't.

Q     Did you see any kind of markings on the walls, like handwriting or markers?

A     According to the photographs in my report, they had -- it appears that they had marked some of the cracks with squares of green tape.

Q     Okay.  Do you know when they did that?

A     No.

Q     Did you ask them?

A     I have no recollection.

Q     Okay.  Do you know if any contractors have been to the Lester property?

A     No.

Q     Are you aware of any contractor estimates for the property?

A     No.

Q     Have the walls fallen down?

A     Not to my knowledge.

Q     Has the home fallen down?

A     Not to my knowledge.

Q     Has any part of the home fallen down?

A     Not to my knowledge.

EXHIBIT 7

Q   Have the walls caved in?

A   Not to my knowledge.

Q   Has any part of the home caved in?

A   Not to my knowledge.

Q   As of the date of your visit, could the home still be safely occupied?

A   Yes.

Q   Was there any part of the home that could not be safely occupied as of the date of your visit?

A   No.

Q   Were the walls in imminent danger of falling down on the date of your visit?

A   No.

Q   Was the home in imminent danger of falling down on the date of your visit?

A   No.

Q   Were the walls in imminent danger of caving in on the date of your visit?

A   No.

Q   Do you know if there were any additions to this property?

A   I have no record of it.

Normally, if there were additions, I would note where they were located and the date of

construction.

Q  Okay. Did you make any determination as to the water table in the area of the foundation?

A  No.

Q  And these concrete walls we're talking about are the foundation, correct?

A  The concrete walls and the footings constitute the foundation.

Q  Did you make any determination as to whether this property was in a flood zone?

A  No.

Q  Did you see a dehumidifier in the basement when you were there?

A  I have no recollection.

Q  Did you notice any kind of mustiness or odor in the basement?

A  I have no recollection.

Q  Did you see any signs of mold in the basement?

A  Again, no recollection.

Q  Did you note any problem with gutters or drainage around the foundation?

A  That's something I would not have looked at.

Q  Did you look to see if the gutters had

downspout extenders on them?

A     No.

Q     Was there any kind of curvature around the foundation?

A     That I would not be able to determine.

Q     Did you note any problems with the basement floor slab?

A     No.

Q     Do you believe that the difference in exposure to exterior water could be a reason that there's differences in the cracks that you would notice in the walls as opposed to the floor slab?

A     Yes.

Q     Were there any solely interior concrete partition walls that the property -- meaning within basement itself, that was a concrete wall?

A     I have no recollection.

Q     Have you seen any properties where that's the case?

A     Yes.

Q     Did you see any photographs of the walls which were taken prior to your 2015 visit?

A     No.

Q     Do you know if you took any photographs of the property in 2005 when you did your home

inspection?

A    No.  In 2005, we were not using photographs in our home inspection reports at that time.

Q    Do you have an opinion as to when the foundation walls will fall down absent replacement?

A    No.

Q    Do you have an opinion as to when the foundation walls will become unsafe absent replacement?

A    No.

Q    Have you ever tried to repair a foundation?

A    Could you -- I want to answer your question the right way.

Do you mean me personally?

Q    Right.

A    No.  I've never personally tried to repair a foundation.

Q    Right.

You're not a licensed contractor, right?

A    That is correct.

Q    Have you ever been a licensed contractor?

A    No.

Q     Do you represent any insurance companies in these foundation claims?

A     No.

Q     Have you reviewed the Liberty Mutual policy issued to the Lesters?

A     No.

Q     Have you ever given an opinion as to whether a particular claim is covered or not under a policy?

A     No.

Q     Did you note any paint-filled cracks at the property?

A     I have no record of it.

Q     Has soil been excavated from against the foundation walls?

A     Not to my knowledge.

Q     Do you believe that was necessary, to excavate soil from the foundation walls?

A     No.

Q     Do you know if the walls are damp-proof?

A     I do not.

Q     And you live in Tolland County, correct?

A     Yes.

Q     And you've expressed potential concerns that you could have a defective foundation,

correct?

A    Yes.

Q    You still haven't had any luck tracking down that contractor who poured your foundation, right?

A    No.

Q    Are you aware of any homes that had this problem, that have fallen down?

A    No.

Q    Are you aware of any homes that have this problem where the foundation has fallen down?

A    No.

Q    When were you first licensed as an engineer?

A    I believe it was 1972.

Q    Okay.  And your license is active, correct?

A    Yes.

          MR. LEARY:  All right.  I don't have anything further.

          Thank you.

          MR. DANFORTH:  Thank you.

     (The witness was dismissed, and the deposition was concluded at 11:43 a.m.)

I N D E X

---------------------------------------------------

WITNESS                         WILLIAM F. NEAL, P.E.

---------------------------------------------------

DIRECT EXAMINATION BY MR. LEARY                    3

---------------------------------------------------

EXHIBIT              DESCRIPTION              PAGE

---------------------------------------------------

Defendant's Exhibit 1, the contents of
   Mr. Neal's file                                5

Defendant's Exhibit 2, a copy of Mr. Neal's
   deposition transcript dated January 26, 2017   8

Defendant's Exhibit 3, a copy of Mr. Neal's
   deposition transcript dated March 30, 2017     9

Defendant's Exhibit 4, a copy of Mr. Neal's
   deposition transcript dated August 17, 2017    9

Defendant's Exhibit 5, an Expert Disclosure
   dated August 28, 2017                         10

Defendant's Exhibit 6, a document labeled
   Testimony Given by William F. Neal, P.E.      11

Defendant's Exhibit 7, a Home Inspection
   Report by Residential Engineering Services,
   LLC, Prepared for Monica Lester,
   November 1, 2005                              13

            (The original exhibits were
             retained by Attorney Leary.)

                 *  *  *  *  *  *  *

EXHIBIT 7

STATE OF CONNECTICUT

COUNTY OF TOLLAND

I, Wendy J. Leard, a Notary Public for the State of Connecticut, do hereby certify that the deposition of WILLIAM F. NEAL, P.E., a witness, was taken before me pursuant to the Federal Rules of Civil Procedure, at the law offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 10:49 a.m., on Thursday, September 7, 2017.

I further certify that the deponent was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Somers, Connecticut, this 9th day of September, 2017.

_____
Wendy J. Leard
Notary Public

My Commission Expires May 31, 2022

EXHIBIT 7

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS
800-567-8658
ASSIGNMENT NO. CS2687237
CASE NAME: Lester, Christopher, Et Al. v. Liberty Mutual Fire Insurance Company
DATE OF DEPOSITION: 9/7/2017
WITNESS' NAME: William F. Neal

PAGE/LINE(S)/     CHANGE               REASON
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____

_____
William F. Neal
(Notary not required in California)
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2017.

_____
      NOTARY PUBLIC
MY COMMISSION EXPIRES_____

EXHIBIT 7

Veritext Legal Solutions
290 W. Mt. Pleasant Ave. - Suite 3200
Livingston, New Jersey 07039
Toll Free: 800-227-8440   Fax: 973-629-1287

_____, 2017

William F. Neal

Case Name: Lester, Christopher, Et Al. v. Liberty Mutual Fire
Insurance Company

Veritext Reference Number: 2687237

Witness:  William F. Neal          Deposition Date:  9/7/2017

Dear Sir:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly

waived, please review the transcript and note any

changes or corrections on the jurat/errata sheet

included, indicating the page, line number, change and

reason for the change. Sign at the bottom of the sheet

in the presence of a notary except in California where

you are signing under penalty of perjury and forward

the errata sheet back to us at the address shown above.

If the jurat is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

Encl.
Cc: Kieran W. Leary, Esq.

[& - basement]                                                                Page 1

**&**

**&** 1:12,18 2:7 34:15 45:7

**0**

**00039** 1:23
**00909** 1:4
**06029** 1:14
**06114-1190** 1:19
**07039** 47:2

**1**

**1** 5:2,4 12:11 14:1 15:3 44:9,19
**10** 44:15
**10-5-15** 5:19
**10:49** 2:8 45:9
**11** 44:17
**11:43** 43:24
**13** 44:19
**15** 22:8
**17** 11:16 44:14
**18** 1:13
**1972** 43:15
**1998** 6:7 18:4

**2**

**2** 8:11,13,19 44:10
**20** 22:8
**200** 11:2 28:11
**2002** 15:10
**2005** 14:1 15:3 40:25 41:2 44:19
**2015** 7:23 12:14 16:5,11,15 18:25 21:6 34:5 36:5,25 40:22
**2017** 1:7 2:9 44:11 44:12,14,15 45:10 45:22 46:22 47:3
**2022** 45:25
**24** 4:16

**249-1361** 1:19
**26** 15:22 44:11
**2687237** 47:7
**28** 44:15
**290** 47:1

**3**

**3** 7:6 9:3,5,11 44:5 44:12
**3,000** 29:1
**30** 44:12
**31** 45:25
**3200** 47:1
**3:16** 1:4

**4**

**4** 9:18,19,25 44:13
**457** 13:13

**5**

**5** 7:23 10:14,16,21 12:14 16:5,11,15 23:6,13,19,22 34:5 44:9,15

**6**

**6** 11:21,23 12:4 44:16
**65** 1:18 2:7 45:8
**676** 1:13

**7**

**7** 1:7 2:9 12:23 13:1,7 44:18 45:10
**77** 4:8

**8**

**8** 44:11
**800** 34:20,21,23
**800-227-8440** 47:2
**800-567-8658** 46:2
**860** 1:14,19
**871-2422** 1:14

**9**

**9** 6:11 44:12,14
**9/7/2017** 46:3 47:8
**973-629-1287** 47:2
**9th** 45:21

**a**

**a.m.** 2:8 43:24 45:9
**able** 36:10 40:5
**absent** 41:6,10
**absolutely** 35:13
**access** 25:5
**accommodate** 3:25
**action** 1:3 2:3
**active** 43:16
**added** 15:23
**additional** 35:8
**additions** 38:21,24
**address** 4:7,10 17:19,21 47:18
**addressed** 17:13
**advise** 32:7,11
**agencies** 27:12
**ago** 6:22 10:10 15:22 18:21
**agreed** 2:13,21 3:1
**ahead** 4:1
**al** 46:3 47:6
**alkali** 21:22 22:7 22:15 24:10 25:21 26:2 27:23
**alley** 26:2
**allow** 3:21
**american** 27:11
**answer** 3:22 4:1 41:15
**answerers** 9:16
**answers** 3:18 8:23 10:4

**anymore** 20:14
**appear** 13:9
**appearances** 1:10
**appears** 37:8 45:16
**approximately** 18:2
**area** 39:3
**arrest** 24:7,10 27:23
**arrested** 24:13
**art** 34:9
**asked** 8:22,22 9:14 9:14 10:3,3
**asr** 23:24 26:7 29:2
**assignment** 46:2
**assuming** 29:20
**attached** 4:19 11:10
**attorney** 10:25 44:22
**attorneys** 1:11,17 3:17
**august** 11:16 44:14,15
**authority** 2:17
**ave** 47:1
**avenue** 1:18 2:7 45:8
**aware** 34:24 37:17 43:7,10

**b**

**back** 13:23 16:4 21:6 33:19 47:18
**background** 31:18
**based** 15:19 21:20 31:9 33:16
**basement** 16:18 26:24 32:2 35:23 36:20 39:12,16,19

40:7,16
**bdanforth** 1:15
**behalf** 2:2
**believe** 19:1 22:11
  22:16 23:2 29:23
  32:20 34:18 40:9
  42:17 43:15
**best** 17:4 23:17
  29:18
**bienkowski** 8:9,21
**bigger** 20:16
**bill** 35:23
**bit** 11:15
**blurred** 35:13,18
**booked** 17:21
**bottom** 47:15
**bought** 13:21
**bowing** 22:19,24
  23:3,6,13,19,22
**box** 1:13
**break** 3:23 4:2
**brenda** 7:17,19
  8:4
**brian** 1:15
**bridges** 26:5
**bring** 4:20
**broaden** 26:14
**broke** 18:24
**brought** 5:8
**builder** 29:22
**building** 13:20
  32:18,21
**built** 6:7 18:4
  29:22,25
**business** 4:7,10,11

**c**

**california** 46:21
  47:16
**card** 18:7
**case** 10:12 21:2,14
  21:16 22:20 24:5

31:11 34:12 40:19
  46:3 47:6
**cases** 34:14
**cause** 21:21 45:20
**causes** 22:8
**caved** 38:1,3
**caving** 38:19
**cc** 8:3 47:25
**cd** 5:8 35:9
**center** 13:13
**certain** 24:3 25:12
**certainly** 4:4
**certainty** 17:18
  29:24
**certify** 45:4,11,17
**change** 46:5 47:14
  47:15
**changed** 13:16
  15:23
**changes** 47:13
**charge** 11:2
**chemical** 25:18
  31:19
**chemist** 22:3
**christopher** 1:2
  17:13,17 46:3
  47:6
**civil** 1:3 2:4 45:7
**claim** 42:8
**claims** 42:2
**clandestine** 26:2
**client** 26:23 31:6
**client's** 14:4
**clients** 26:4,10
**color** 7:25 12:12
**commencing** 2:8
  45:9
**commercial** 15:17
**commission** 45:25
  46:25

**companies** 42:1
**company** 1:7 3:14
  13:10,17 46:3
  47:6
**complete** 4:23,24
  5:18
**concerns** 42:24
**concluded** 43:24
**concrete** 17:10
  19:3,10 21:9
  23:25 25:18 26:6
  26:8,12,22 27:11
  27:23 28:19,24,25
  30:2 31:14,19
  39:5,7 40:14,16
**condemned** 32:18
  32:21
**condition** 22:12,17
  31:9 33:8
**conduct** 27:19
**conducted** 21:25
  27:16
**conducting** 17:9
**conjunction** 34:4
**connecticut** 1:1,14
  1:19 2:6,8 4:9,16
  26:5 45:1,4,9,21
**connection** 2:15
**constitute** 39:8
**construction** 39:1
**consult** 34:3
**consulted** 24:9,12
**contacted** 34:12
**contents** 4:23,24
  5:18 6:1 44:9
**continue** 23:25
**contractor** 29:8,14
  37:17 41:22,24
  43:4
**contractors** 37:14

**copy** 7:18,22
  12:11 44:10,12,13
**copyrighted** 15:10
**corporation** 10:2
**correct** 4:13,14
  5:20 6:5,11 7:23
  11:3,10 12:14,15
  12:17,20 14:1,5,8
  14:13 15:4,11
  16:18 17:11,14
  18:5,6,12,13,15,16
  18:21,25 19:1
  20:2,19 21:3,23
  22:9,13,17,21 24:1
  24:4,5,7,25 25:3
  25:21,22 27:8
  28:3,4 29:9 30:6,9
  31:2,3,5 33:24
  34:9,10,25 35:1
  39:6 41:23 42:22
  43:1,17
**corrections** 47:13
**corrective** 29:8
**counsel** 2:14 45:14
  45:18
**county** 18:24
  42:22 45:2
**court** 1:1 5:7 8:16
  9:8,22 10:19 12:1
  13:4
**cover** 21:9
**coverage** 18:23
  37:3
**covered** 42:8
**crack** 19:9,23 20:8
**cracking** 19:22
  20:2
**cracks** 6:25 7:1,9
  7:15 18:15 19:4,7
  19:7,9,14,19,20,22
  20:5,7,12,18,21,25

**[cracks - ext]** Page 3

21:5,13,17 22:11
36:7 37:9 40:11
42:11
**created** 15:13,20
15:21 16:1
**cs2687237** 1:25
46:2
**csr** 1:23
**current** 33:7
**currently** 17:5
**curvature** 40:3
**cv** 1:4 12:7

**d**

**d** 1:2,15 44:1
**damages** 30:25
31:5
**damp** 30:18 42:20
**danforth** 1:12,15
34:15 43:22
**danger** 38:12,15
38:18
**dangerous** 28:3,8
31:24
**date** 5:22 31:22
33:9,21 38:5,9,13
38:16,19,25 46:3
47:8
**dated** 7:23 12:13
13:25 15:3 44:11
44:12,14,15 45:21
**dates** 16:12
**day** 12:16 36:4
45:21 46:22
**days** 47:19
**deals** 24:12
**dear** 47:9
**decided** 13:21
**deemed** 47:20
**defective** 19:10
35:18 42:25

**defendant** 1:17
2:2 9:11
**defendant's** 5:4
8:13 9:5,19 10:16
11:23 13:1 44:9
44:10,12,13,15,16
44:18
**degree** 17:18 28:6
**dehumidifier**
39:12
**deleted** 35:14
**denote** 19:21 20:2
**department** 47:22
**deponent** 3:6
45:11
**deposed** 11:15
**deposing** 8:8,25
**deposition** 1:8 2:1
2:16,24 3:3,16
4:18 8:20 9:12,15
10:1,7 43:24
44:11,12,14 45:5
46:3 47:8,10
**describe** 19:19,23
20:13
**described** 5:5 8:14
9:6,20 10:17
11:24 13:2
**description** 44:7
**deteriorate** 23:25
28:2,7
**determination**
39:2,9
**determine** 33:17
40:5
**develop** 29:7
**difference** 40:9
**differences** 40:11
**different** 33:13
**direct** 3:9 44:5

**directed** 26:15
**disclosed** 10:12
**disclosure** 10:22
12:7 44:15
**discussion** 20:10
20:15
**disk** 5:18 35:3,16
**dismissed** 43:23
**distress** 21:22 22:8
**district** 1:1,1
**document** 4:19
15:20,21,25 16:3
44:16
**documents** 4:20
15:17
**doing** 25:14
**door** 11:8
**downspout** 40:1
**draghi** 7:19 8:4
**drainage** 39:22
**drive** 4:16 29:19
29:21
**duly** 2:5

**e**

**e** 4:6 44:1
**effect** 30:23
**efficient** 15:18
**efflorescence** 30:5
30:8
**eight** 24:19
**either** 23:11 24:22
**ellington** 1:14
**email** 8:2 11:7
**encl** 47:24
**enclosed** 47:10
**encountered** 26:13
**engineer** 14:19
24:25 26:4 43:14
**engineering** 13:11
24:20,21 28:6
34:8 44:18

**engineers** 36:1
**entitled** 2:3
**eric** 14:22
**errata** 46:1 47:13
47:18
**esq** 47:25
**esquire** 1:15,20
**estimates** 37:17
**et** 46:3 47:6
**event** 45:19
**eventually** 24:4
**evidence** 36:22
**examination** 3:9
17:10 22:1 27:17
27:20 44:5
**examined** 45:13
**excavate** 42:18
**excavated** 42:14
**excuse** 18:20
**exhibit** 5:4 8:13,19
9:5,11,19,25 10:16
10:21 11:23 12:4
12:11 13:1,7 44:7
44:9,10,12,13,15
44:16,18
**exhibits** 44:22
**expect** 11:7 30:11
33:13
**expected** 33:17
**experience** 33:16
**expert** 10:12,22
12:6 25:16,17,20
26:6 44:15
**expires** 45:25
46:25
**exposed** 30:12
**exposure** 40:10
**expressed** 42:24
**expressly** 47:11
**ext** 7:6

**extenders** 40:1
**exterior** 7:10 20:17,22,25 21:9 40:10

**f**

**f** 1:8 2:1 3:6 15:11 44:3,17 45:5 46:4 46:20 47:4,8
**fail** 24:1,4
**fair** 4:3
**fall** 41:6
**fallen** 23:18,22 34:25 37:20,22,24 43:8,11
**falling** 38:13,15
**familiar** 26:6
**fax** 47:2
**federal** 2:4 26:10 27:13 45:6
**field** 6:4 18:17,20 20:24 24:21
**file** 4:23,25 5:18 5:25 8:6 44:9
**filled** 10:25 11:1 42:11
**find** 15:18 47:10
**fine** 5:16 19:23
**finish** 3:21
**finished** 16:25 31:8,16
**fire** 1:6 3:14 46:3 47:6
**first** 3:7 6:1 13:25 22:12 34:11 43:13 45:11
**flood** 39:10
**floor** 40:7,12
**following** 7:12,22
**follows** 3:7
**footings** 36:10,13 36:16 39:7

**form** 2:22 6:2 15:8 15:9,13,15
**formalities** 2:15
**forms** 16:2
**forward** 47:17
**found** 19:10 29:16
**foundation** 6:25 7:10,16 17:10 18:24 19:3 20:18 20:22 21:22 22:9 23:21 28:1,7 29:19 30:3,11 31:10,14 33:1,10 33:23 34:25 36:8 36:11,14 39:3,6,8 39:22 40:4 41:6 41:10,14,20 42:2 42:15,18,25 43:4 43:11
**free** 47:2
**friend** 26:22
**full** 4:5
**further** 2:21 3:1 43:20 45:11,17

**g**

**g** 1:3
**general** 21:14
**generally** 17:19,21
**given** 5:17 42:7 44:17
**gladysz** 10:2,4
**go** 4:1 15:6 16:4 23:5,8
**going** 5:25 15:6 27:10
**good** 3:11,12 29:1
**google** 25:8,9
**gotcha** 14:21 15:2 17:23 27:15 35:20
**gotten** 21:5

**government** 24:23 26:10 27:13
**grade** 33:24 34:1
**great** 11:20
**green** 37:9
**ground** 3:18
**groundwater** 30:12
**guess** 28:20
**gutters** 39:21,25

**h**

**hairline** 7:9 19:4,7 19:11,18,20,22,24 20:1,7,8,13,18,24
**handing** 5:1,10 11:19
**handwriting** 37:6
**happening** 31:7
**happy** 3:20,24
**hard** 20:9
**hartford** 1:19 2:8 45:8
**heard** 32:23
**held** 2:6
**hereinbefore** 2:3 45:16
**hereto** 45:18
**high** 23:8
**hl** 1:20 7:6
**hold** 27:5
**holding** 33:2,4,10 33:18
**home** 13:8 14:20 14:24 15:8,15 16:7,10 17:9 18:3 18:10 23:18 30:22 31:1,16 33:2,11 34:3 37:22,24 38:3,6,8,15 40:25 41:3 44:18

**homeowners** 23:15
**homes** 43:7,10
**hope** 10:9
**hour** 11:2 18:2
**house** 12:17 23:10 29:25 31:8 33:5
**houses** 29:21
**howd** 1:18 2:7 45:7
**hundred** 28:9 34:17,19

**i**

**idea** 33:7 34:16
**identification** 5:5 8:14 9:6,20 10:17 11:24 13:2 31:18
**imminent** 38:12 38:15,18
**impairment** 34:7
**improve** 25:14
**inch** 20:11,16 23:3
**inches** 23:6,13,19 23:22
**included** 47:14
**including** 2:16
**increased** 21:17
**index** 5:5 8:14 9:6 9:20 10:17 11:24 13:2
**indicated** 31:7
**indicating** 7:12 16:19 47:14
**individuals** 25:23 27:6
**industry** 15:16 16:1
**infancy** 22:17
**information** 6:9 18:3,8,10,14

EXHIBIT 7

[initial - met]                                                                 Page 5

initial  7:13,14
initials  14:12
inspect  30:21
  36:10
inspected  30:18
inspection  13:8
  15:8,15 16:10
  21:6 34:4 41:1,3
  44:18
inspector  14:7,20
  14:24 16:7 32:18
  32:21
institute  27:12
insurance  1:7 3:14
  10:2 42:1 46:3
  47:6
intake  6:2
integrity  34:8
interested  45:19
interior  7:15 19:3
  40:14
internet  25:7
intrusion  36:19,22
invoice  11:8
issue  18:24
issued  42:5
issues  31:15

**j**

j  1:22 2:4 45:3,23
jam  1:4
january  44:11
jersey  47:2
job  1:25 17:22
july  18:25
jurat  47:13,19

**k**

kept  26:19
kieran  1:20 3:13
  47:25

kind  6:2 18:24
  21:8 37:5 39:15
  40:3
kleary  1:20
know  3:16,24 7:3
  7:21 14:15 16:24
  17:24 21:5,8
  23:21 24:16 25:2
  25:11,23 26:21
  27:7,9 29:2,11,16
  29:25 30:2 32:1,4
  32:9,17 33:4,7
  34:11 35:21 36:13
  36:16,24 37:2,10
  37:14 38:21 40:24
  42:20
knowledge  17:4
  23:17,20,23 29:18
  33:3 37:21,23,25
  38:2,4 42:16
knowledgeable
  25:10 26:13

**l**

l  2:11 4:6
lab  26:22
labeled  5:19 44:16
laboratory  26:11
lane  4:8
large  20:7,12
lastly  12:6
laurel  4:16 29:19
  29:21
law  2:6 45:7
law.com  1:20
leard  1:22 2:5 45:3
  45:23
leary  1:20 3:10,13
  5:2,6,11,12 8:11
  8:15,17 9:3,7,9,18
  9:21,23 10:14,18
  10:20 11:21,25

12:2,23 13:3,5
  43:19 44:5,22
  47:25
left  28:21
legal  46:1 47:1
lester  1:2,3 4:12
  5:19 6:15,18 7:3
  8:3 14:4 17:3,6,13
  29:7,25 36:1,11,14
  36:17 37:15 44:19
  46:3 47:6
lesters  6:10,13,25
  16:6 18:4,12
  29:16 32:1 36:3,8
  42:5
letter  47:20
letters  17:19
liberty  1:6 3:14
  9:1,13 10:2 42:4
  46:3 47:6
license  43:16
licensed  14:20,24
  29:8,13 41:22,24
  43:13
line  7:12 46:5
  47:14
list  11:12,18 12:3
listed  13:13
literature  24:9,12
  24:14,17,21 25:6
litigation  3:15
little  11:15
live  42:22
living  23:16 30:21
  31:1 33:2,10
livingston  47:2
llc  1:12 44:19
located  4:15 38:25
location  13:16
locations  7:16

long  17:24
look  12:9 14:3
  35:9 39:25
looked  19:15
  24:16 25:13 29:18
  34:20 39:23
looks  6:1 8:3 11:14
  12:13 14:4 15:10
lot  26:9,14 27:9
luck  43:3
ludorf  1:18 2:7
  45:8

**m**

main  1:13
manchester  13:14
  13:21
march  44:12
mark  5:2 8:11 9:3
  10:14 11:21 12:23
marked  5:4 8:13
  8:19 9:5,11,19,25
  10:16 11:23 12:4
  13:1,7 37:8
markers  37:6
markings  37:5
matter  4:13 8:9
mcallister  9:1,13
  9:15
meadowview  4:8
mean  35:12 41:17
meaning  40:15
means  19:11
measurable  21:17
measure  20:5
measured  20:8
meet  6:15 26:1
meeting  11:16
mentioning  16:6
merit  1:22
met  17:20

EXHIBIT 7

million  28:15,18 28:20,23
mind  5:14
mine  23:8
missing  35:11
modified  15:23
mold  39:18
monica  1:3 14:4 17:17 44:19
month  21:18
morning  3:11,12
moved  13:23
movement  31:14
mt  47:1
mustiness  39:15
mutual  1:6 3:14 9:1,13 42:4 46:3 47:6

**n**

n  2:11 4:6 44:1
name  3:13 4:5 26:21,25 27:1 46:3,4 47:6
names  26:17 27:7
neal  1:8 2:1 3:6,11 4:6 8:18 9:10,24 10:21 13:6 14:8 14:17 15:11 35:23 44:3,17 45:5 46:4 46:20 47:4,8
neal's  14:12 44:9 44:10,12,13
necessary  42:17
need  3:23
needs  11:14
neighbor  29:20
never  20:8 41:19
new  47:2
news  18:23 37:2
nine  18:11

normally  18:1 36:22 38:24
notary  2:5 3:3 45:3,24 46:21,24 47:16
note  18:20 19:2 20:17 21:20 22:7 22:11,19 23:24 27:25 30:5,8,25 36:7,19,21,23 38:25 39:21 40:6 42:11 47:12
noted  22:22
notes  6:4 16:17 18:17,20 20:24 30:23
notice  2:17 39:15 40:12
noticed  4:18 6:21 7:1 18:15
november  14:1 15:3 44:19
number  25:10 47:7,14
numbered  35:10
numbers  35:11
numerous  15:23

**o**

o  2:11
objections  2:22
observations  21:21
obviously  20:3
occupied  18:11 38:6,9
occurring  22:16
october  7:23 12:14 16:5,11,15 34:5 36:4,25
odor  39:16

office  13:20,22,23
officer  2:17
offices  2:7 45:7
okay  4:5,12,22 5:11 6:4,17,21 7:3 7:11,17,18 11:20 12:22 13:10,19,25 15:19 16:4,10,17 16:24 18:20,23 19:2,13,21 20:12 20:17 24:6,20 25:17,20 26:1,17 26:21 27:2,5 29:5 29:7 30:21,25 31:11,17 33:18 34:20 35:25 37:10 37:14 39:2 43:16
old  29:1
opinion  32:15 41:5 41:9 42:7
opposed  40:12
organization  24:24
original  44:22
outside  24:21 33:21

**p**

p  2:11
p.e.  1:8 2:1 3:6 44:3,17 45:5
p.o.  1:13
page  6:1,4 7:22 13:25 14:3 44:7 46:5 47:14
pages  15:22
paint  42:11
papers  25:12 27:11,12
part  37:24 38:3,8
partially  33:23 34:1

particular  24:5 42:8
parties  2:14 45:18
partition  40:15
penalty  47:17
pending  4:1
people  25:10 26:16,18
period  22:17
perjury  47:17
personal  33:3
personally  41:17 41:19
petrographic  21:25 27:16,20
photograph  35:12
photographs  5:9 5:19 7:25 35:2,8,9 35:15,16 37:7 40:21,24 41:3
photos  5:19
phrase  34:7
place  2:16
plaintiffs  1:11 11:1
plan  29:8
plans  17:5
pleasant  47:1
please  3:18,20,21 3:24 4:24 5:3 8:12 9:4 10:15 11:22 12:24 47:12
point  13:17 19:11 28:2,7
policy  42:5,9
portion  30:21 31:1 33:2,11
portions  31:8,16
possible  27:25 29:9 35:6

potential  42:24
poured  22:9 43:4
predict  28:1
prepared  17:2
  25:2 44:19
preparing  34:4
presence  47:16
present  8:18 10:21
  30:9
presented  9:10,24
  13:6
pretty  29:1
previously  12:20
prior  7:2 40:22
probability  28:6
probably  27:4
  30:24 34:18
problem  16:22
  26:23 39:21 43:8
  43:11
problems  40:6
procedure  2:4
  45:7
process  24:7,13
  25:11
production  47:22
professional  24:23
professionals
  26:14
progression  21:13
prompted  36:24
proof  3:2 42:20
properties  19:15
  22:23 23:15 34:21
  34:22 40:18
property  4:15
  5:23 12:19 16:12
  16:14 17:3,6,20,25
  18:7 23:19 32:17
  33:6 35:3 36:1,4
  36:14,17 37:15,18

38:22 39:10 40:15
  40:25 42:12
provide  35:7
provided  18:4,11
  35:4
public  2:5 3:3 45:3
  45:24 46:24
published  27:12
pull  18:7
purpose  17:9
  25:14
purposes  20:9,15
pursuant  2:3 45:6
put  35:21

**q**

qualifications  3:2
qualified  2:5
  27:19
question  3:21 4:1
  41:16
questions  8:22
  9:14 10:3 32:23
quickly  28:1
quite  19:12

**r**

rainwater  30:14
rate  11:5 21:12
reached  28:23
reaction  21:22
  22:7,15 24:11
  25:21 26:3 27:23
reactions  25:18
  31:19
reading  2:23
  47:11,20
reason  35:18
  40:10 46:5 47:15
reasonable  28:5
reasons  32:12,15

recall  8:8,25 10:7
  16:6,8 26:20,25
  27:1
receipt  47:19
recognize  27:2
recollection  12:21
  16:13,16 17:16
  24:15,18 25:1,4
  29:15 36:6 37:13
  39:14,17,20 40:17
recommended
  25:12
record  6:16 24:15
  30:20 38:23 42:13
records  26:19
refer  29:13
reference  6:24
  7:17 47:7
refresh  17:16
regarding  17:3
  34:12 36:1
registered  1:22
related  7:1 31:15
  37:2 45:17
relative  31:18
relayed  6:13,17
relocate  32:11,14
repair  41:13,19
repairs  32:4 36:7
rephrase  3:20
replaced  32:1
replacement  41:7
  41:11
report  7:18,23 8:4
  11:10 12:10,13
  13:8 16:4,17 17:8
  19:2 23:24 30:6
  31:1 34:4,5 37:7
  44:18
reported  45:15

reporter  1:22 5:7
  8:16 9:8,22 10:19
  12:1 13:4
reports  17:2 23:5
  24:24 25:2,12
  35:25 41:3
represent  3:13
  42:1
request  4:19
required  46:21
research  26:14
  27:9,13
reserved  2:22
residence  4:11
  13:24
residential  13:11
  44:18
respective  2:14
respond  3:18
retain  36:24
retained  44:22
retaining  33:20
return  17:5
returned  47:19
review  47:12
reviewed  42:4
right  5:15,17,25
  6:2,7,22 7:7 8:4,6
  8:8 10:7,9 12:4,6
  12:7,9 13:10,14
  15:6 19:4 20:4,25
  21:15 22:20,23,25
  23:4,7,12,13 25:5
  25:18 28:22 31:12
  33:1 34:1,21,22
  35:22 41:16,18,21
  41:22 43:5,19
rmr  2:5
roads  26:5
roman  28:25

[rules - times] Page 8

**rules**  2:4 3:18 45:6

**s**

**s**  2:11,11 46:5
**safely**  38:6,9
**safety**  32:11,14
**saw**  27:2
**says**  6:7,11,21 7:6
  7:11 11:2 14:7
  17:8 24:6,10
**scientific**  31:17
**scientist**  22:5
**search**  25:8,9
**second**  6:4 11:7,9
  20:10,16
**see**  4:24 20:21
  27:22 37:5 39:12
  39:18,25 40:21
**seen**  10:23 19:14
  19:17,19 23:2
  33:6 35:25 40:18
**self**  15:13 16:1
**selfies**  35:22
**send**  7:18
**separate**  13:22
**september**  1:7 2:9
  45:10,22
**sequence**  35:12
**sequentially**  35:10
**services**  13:11
  26:9 36:25 44:18
**seven**  15:22
**shape**  29:1
**sheet**  46:1 47:13
  47:15,18
**shore**  32:7
**shored**  32:9
**shorthand**  7:14
**show**  35:19
**shown**  47:18
**siding**  21:9

**sign**  47:15
**signature**  14:4,10
  14:15
**significance**  19:6,8
**significant**  19:22
**signing**  2:23 47:11
  47:17,20
**signs**  22:12 39:18
**silica**  21:22 22:7
  22:15 24:10 25:21
  26:2 27:23
**sincerely**  47:21
**single**  34:24
**sir**  4:5 47:9
**situation**  25:11,15
**slab**  40:7,12
**small**  19:12,23
**smaller**  19:17,20
**smallest**  19:14
  20:2
**soil**  33:20 42:14,18
**solely**  21:20 40:14
**solutions**  46:1
  47:1
**somebody**  26:8
**somers**  45:21
**son**  14:18,22
**soon**  29:9
**sorry**  16:21
**specific**  17:9 21:14
  21:16 24:18
**specifically**  18:1
  25:25
**spider**  7:15 19:4,6
  19:8,14 20:21
**spoke**  7:4 25:24
  26:8,18 27:6
**spoken**  36:3
**squares**  37:9
**stand**  7:8

**standard**  15:7,9
  15:15
**starts**  7:13
**state**  2:6 26:5 45:1
  45:4
**states**  1:1
**stenographically**
  45:14
**stipulated**  2:13,21
  3:1
**street**  1:13 13:13
**strike**  33:19
**structural**  34:8
**structurally**  24:1
  24:4 28:2,8 31:21
  31:24
**structure**  28:24
**subjective**  20:3
**subscribed**  46:21
**subsequently**
  45:15
**substantial**  34:7
**sufficiency**  2:16
**suite**  47:1
**supplied**  30:2
**sure**  10:25
**surface**  30:16
**sworn**  3:7 45:12
  46:21
**synchronously**
  6:18

**t**

**t**  2:11,11
**table**  39:3
**take**  3:23 4:2 12:9
  35:2
**taken**  2:2,18 3:4
  3:16 5:9 35:16
  40:22 45:6
**talk**  26:2

**talked**  17:17 25:9
**talking**  39:5
**tanddlaw.com**
  1:15
**tape**  37:9
**tell**  7:12 45:12
**term**  19:25 20:3
  34:9
**test**  26:9
**tested**  29:5
**testified**  3:7
**testify**  21:12,16
  28:5 29:23
**testimony**  11:3,12
  11:18 12:3 44:17
  45:14
**testing**  26:9,12,22
**tests**  27:22
**thank**  5:6 8:15 9:7
  9:21 10:18 11:25
  43:21,22
**thanks**  5:11 11:20
  13:3
**things**  31:7
**think**  23:8 24:22
  28:23
**third**  14:3
**thirty**  20:10,16
  47:19
**thousand**  28:13,17
  28:19
**three**  7:9 10:9
  18:17 20:24 21:2
**thursday**  2:9
  45:10
**time**  2:16,23 3:24
  15:1,8,9 17:1
  19:12 41:4
**times**  3:17 13:18
  15:24

EXHIBIT 7

**timothy** 14:12,17
**today** 4:18,20
  15:25 33:14
**tolisano** 1:12
  34:15
**toll** 47:2
**tolland** 18:24
  42:22 45:2
**tracking** 43:3
**transcribed** 45:15
**transcript** 8:20
  9:12 10:1 44:11
  44:12,14 47:10,12
**trial** 2:23
**tried** 41:13,19
**true** 27:5
**truth** 45:12,12,13
**trying** 27:10
**two** 33:6,17
**type** 19:9
**types** 26:15
**typically** 19:10

**u**

**u** 2:11
**uconn** 26:11,22
**understand** 3:19
  10:11
**understanding**
  25:15 26:15 27:10
**unfinished** 16:18
**uniform** 21:12
**united** 1:1
**universities** 27:14
**university** 24:23
**unsafe** 41:10
**unsound** 31:21
**updated** 11:14,18
  12:3
**urge** 29:7
**use** 12:11 15:25
  16:1,3 19:21,24

20:1 35:13,17
**useful** 35:19
**uses** 15:16
**usual** 3:17
**usually** 30:8

**v**

**v** 46:3 47:6
**variable** 21:18
**various** 27:12
**verbal** 3:18
**verify** 18:7
**veritext** 46:1 47:1
  47:7
**vernon** 4:9
**versus** 9:1,13 10:2
**vertical** 20:18
**visible** 7:9 19:3
  22:8,12
**visit** 5:22 7:2
  16:11 31:22 33:9
  33:21 38:5,10,13
  38:16,19 40:22
**visited** 12:16
**visiting** 36:4
**visual** 17:10 21:21
**vs** 1:5

**w**

**w** 1:20 47:1,25
**waived** 2:19,24
  3:4 47:12,20
**walk** 11:7
**wall** 40:16
**walls** 21:10,13
  22:16,19 23:13,19
  23:21 28:7 29:2,5
  30:11,18 31:21
  32:2,5,7,9 33:1,10
  33:18,20,23 37:6
  37:20 38:1,12,18
  39:5,7 40:12,15,21

41:6,10 42:15,18
  42:20
**want** 13:22 23:10
  41:15
**water** 30:16 36:19
  36:22 39:3 40:10
**way** 24:6,10 33:16
  41:16 45:19
**we've** 15:23 28:23
**web** 7:15 19:4,7,8
  19:14 20:21
**weeks** 6:21 7:2
  10:9 18:17,21,22
**welcome** 5:7 8:16
  9:8,22 10:19 12:1
  13:4
**wendy** 1:22 2:4
  45:3,23
**wethersfield** 1:18
  2:7 45:8
**william** 1:8 2:1 3:6
  4:6 14:7 15:11
  44:3,17 45:5 46:4
  46:20 47:4,8
**willington** 4:16
**witness** 5:8 43:23
  44:3 45:5 46:4
  47:8
**word** 4:8 19:21
  20:1
**words** 18:18
**work** 5:13 26:9
**working** 34:14
**works** 26:11
**worse** 21:6
**written** 23:2 27:11

**x**

**x** 44:1

**y**

**yeah** 7:14 13:18
**year** 21:18
**years** 6:11 13:23
  15:22,24 18:11
  22:8 24:19 25:10
  28:9,11,13,15,18
  28:19,20,24 29:1
  33:6,17
**yep** 14:9

**z**

**zone** 39:10

EXHIBIT 7

Connecticut Procedure in Civil Matters

Chapter 13, Discovery and Depositions

Section 13-30

(D) If requested by the deponent or any party, when the testimony is fully transcribed the deposition shall be submitted to the deponent for examination and shall be read to or by the deponent. Any changes in form or substance which the deponent desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the deponent for making them. The deposition shall then be signed by the deponent certifying that the deposition is a true record of the deponent's testimony, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the deponent within thirty days after its submission to the deponent, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the deponent or the fact of the refusal or failure to sign, together with the reason, if any, given therefore; and the deposition may then be used as fully as though signed unless, on a motion

EXHIBIT 7

to suppress under Section 13-31 (c) (4), the judicial authority holds that the reasons given for the refusal or failure to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 7

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 7

EXHIBIT 7