UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PAUL S. GLADYSZ AND
PAMELA J. GLADYSZ          CIVIL ACTION NO.
                          3:16-cv-00917-VLB
     VS.

LIBERTY INSURANCE
CORPORATION               AUGUST 17, 2017


     DEPOSITION OF: WILLIAM F. NEAL, P.E.


APPEARANCES:


Attorneys for the Plaintiffs:

   TOLISANO & DANFORTH, LLC
      18 Main Street
      P.O. Box 676
      Ellington, Connecticut 06029
      (860) 871-2422
      bdanforth@tanddlaw.com
   BY: BRIAN D. DANFORTH, ESQUIRE

Attorneys for the Defendant:
   HOWD & LUDORF
      65 Wethersfield Avenue
      Hartford, Connecticut 06114-1190
      (860) 249-1361
      kleary@hl-law.com
   BY: KIERAN W. LEARY, ESQUIRE


                Wendy J. Leard
           Registered Merit Reporter
                CSR # 00039


      Job No. CS2679759

EXHIBIT 8

Page 2

. . . Deposition of WILLIAM F. NEAL, P.E., taken on behalf of the defendant in the hereinbefore entitled action, pursuant to the Federal Rules of Civil Procedure, before Wendy J. Leard, RMR, duly qualified Notary Public in and for the State of Connecticut, held at the law offices of Tolisano & Danforth, LLC, 18 Main Street, Ellington, Connecticut, commencing at 10:12 a.m., on Thursday, August 17, 2017.

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections, other than as to form, are reserved to the time of trial and that the reading and signing of the deposition are hereby waived.

It is further stipulated and agreed that the proof of the qualifications of the notary public before whom the deposition is being taken is hereby waived.

WILLIAM F. NEAL, P.E., Deponent, having first been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. LEARY:

Q    Good morning, Mr. Neal.

A    Good morning.

Q    My name is Kieran Leary, and I represent Liberty Insurance Corporation.

You've had your deposition taken before, so I'm not going to spend too much time with the ground rules; just a reminder that we need verbal answers to any questions as opposed to head nods.

Please let me finish my questions; I'll do the same with you with your answer.

If you don't understand, please ask me to rephrase, and I'll be happy to do so. But if you answer, I'm going to assume you understood.

Is that fair?

A    That is fair.

EXHIBIT 8

Q    And if you need a break at any time, you know, coffee in the car or anything like that, just let me know.  I'll be happy to accommodate any requests.

It's not an endurance contest; just if there's a pending question, please answer it before we go ahead and take a break.

A    Okay.

Q    Could you please state your full name, sir?

A    William Neal.  N-E-A-L.

Q    And what is your home address?

A    77 Meadowview, that's one word, Lane, Vernon, Connecticut.

Q    Okay.  And is that also your business address?

A    It is.

Q    And we're here today for the Gladysz matter, correct?

A    That's correct.

MR. LEARY:  If you can mark that as 1, please.

(Defendant's Exhibit 1, marked for identification-described in index)

EXHIBIT 8

BY MR. LEARY:

Q    Mr. Neal, I present you with what's been marked as Exhibit 1.  It's a renotice of your deposition for today at 10 a.m.

Did you receive a copy of this?

A    I did.

Q    And attached on page 3 is a Schedule A which requests documents from you.

Did you bring any documents today?

A    I did.

Q    And what have you brought?

A    My complete file relating to Paul and Pamela Gladysz.

Q    And can I see your complete file, please?

A    (Handing.)

Those are my photos, and that is my complete file.

Q    Thank you.

Are these copies for us to keep or do you have --

A    Those are copies.

Q    Okay.  Great.

And you presented --

MR. LEARY:  Why don't we mark this Exhibit 2.

EXHIBIT 8

(Defendant's Exhibit 2, marked for identification-described in index)

BY MR. LEARY:

Q    And, Bill, the file that you produced is a CD -- we've marked as Exhibit 2 the file you've produced, which includes a CD with the photos you took of the property, correct?

A    That's correct.

Q    And it looks like an email from yourself to Pamela, attaching the report?

A    Yes.

Q    Then's an email from yourself to Brenda Draghi.  It looks like it's sent by Bill Neal, but it's actually from Fran Neal, dated January 13, 2016, correct?

A    Yes.

Q    The following page is another email from yourself to Pamela Gladysz dated March 1, 2016, correct?

A    Yes.

Q    So that's a second email concerning your report, but did you send the same -- it looks like you sent an additional addendum?

A    There were two reports issued --

Q    Gotcha.

EXHIBIT 8

A    -- in this case.

Q    Okay.  So after the March 1, 2016, email, we have a color copy of your December 29, 2015, report, correct?

A    Yes.

Q    And then there's a second report dated March 1, 2016, correct?

A    Yes.

Q    And this March 1, 2016, report concerns your inspection of the addition, correct?

A    Yes.

Q    That looks like you have an intake scheduling form?

A    That's correct.

Q    Okay.  And after that, it looks like you have field notes from your December 29, 2015, visit, right?

A    Yes.

Q    After that, an intake form.

I presume this is for your March 1, 2016, visit, right?

A    Yes.

Q    All right.  And then you have some field notes from your March 1, 2016, visit, right?

A    Yes.

EXHIBIT 8

Q   All right.   Is there anything in your file aside from those documents that you haven't produced?

A   No.

Q   And the address of this property is 210 Orcutville Road, right?

A   That's correct.

MR. LEARY:   Orcutville is O-R-C-U-T-V-I-L-L-E.

THE COURT REPORTER:   Thank you.

BY MR. LEARY:

Q   And that's in Stafford, Connecticut, correct?

A   Yes.

Q   I deposed you a few previous times, correct?

A   Yes.

MR. LEARY:   Let's mark that as 3, please.

(Defendant's Exhibit 3, marked for identification-described in index)

BY MR. LEARY:

Q   Mr. Neal, I present you with what's been marked as Exhibit 3.   It's a transcript from your deposition in Bienkowski versus Liberty Mutual on

EXHIBIT 8

January 26, 2017.

And you've had a chance to review this, correct?

A    I don't believe so.

Q    Okay.  If I ask you the same questions I asked you about -- strike that.

If I ask you the same questions I asked you in Bienkowski under oath, would I receive the same answers from you?

A    Yes.

Q    Okay.  So you haven't subsequently gone to a different school and lived a completely different life since Bienkowski, right?

A    No, I haven't.

Q    Okay.

MR. LEARY:  I'll mark this as 4, please.

(Defendant's Exhibit 4, marked for identification-described in index)

BY MR. LEARY:

Q    Mr. Neal, I present you with Exhibit 4.

This is a transcript of your deposition in McAllister versus Liberty Mutual taken on March 30, 2017.

Do you recall being deposed on that day?

EXHIBIT 8

A     I do.

Q     And if I ask you the same questions I asked you under oath on March 30, 2017, would I receive the same answers from you?

A     Yes.

Q     Okay.  And you've been disclosed as an expert in this case, correct?

A     Yes.

          MR. LEARY:  I'll mark this as 5, please.

               (Defendant's Exhibit 5, marked for identification-described in index)

BY MR. LEARY:

Q     Mr. Neal, I present you with Exhibit 5.

          This is an expert disclosure of you dated March 28, 2017.

          Have you seen this before?

A     No.

Q     Okay.  And it lists here "testimony fee," on page 2, as $200 per hour; is that correct?

A     Yes.

Q     Is that your current rate?

A     Yes.

          MR. LEARY:  Let's mark this as 6.

EXHIBIT 8

(Defendant's Exhibit 6, marked for identification-described in index)

BY MR. LEARY:

Q    Mr. Neal, I present you with what's been marked as Exhibit 6.

It's a copy of your CV and your testimony list, correct?

A    Yes.

Q    All right.  And we've gone over your CV previously, but your testimony list -- it looks like you're missing the McAllister deposition from this list, correct?

A    Yes.  This is not an up-to-date list.

Q    Okay.  So this is an incomplete list, correct?

A    Yes.

Q    It looks like you have a few depositions listed in 2016 and 2017, and then prior to 2016, the next closest one is 1999, correct?

A    Yes.  And when we say it's an "incomplete list," we're referring to things that may have happened prior to 1999 or between 1999 and 2016.

Q    Okay.  Do you know approximately how many times you were deposed between '99 and '16?

A    All I can do is guess.  Maybe five or six

EXHIBIT 8

times.

Q    Okay.  Do you know how many times you were deposed in the year 2015?

A    Again, to the best of my recollection, none.

Q    Okay.  And what about 2014?

A    Again, to the best of my recollection, none.

Q    Okay.  How about 2013?

A    To the best of my recollection, none.

Q    I'm going to stop there.

And have you continually maintained your professional engineering license since receiving it?

A    Yes.

Q    And when did you receive it?

A    I believe it was 1972.

Q    And are you licensed in any states other than Connecticut, as an engineer?

A    No.

Q    All right.  And Residential Engineering Services, LLC, that's your business, right?

A    Yes, it is.

Q    And how long have you owned that business?

A    Started in 1992.  I'm trying to figure out

EXHIBIT 8

if that's 25 or 26 years.

Q    Okay.  I think it's 27 now, but . . .

Are there any other engineers at Residential Engineering Services?

A    No.

Q    Actually, my math is pretty terrible.  I think it's 25.

MR. DANFORTH:  I just noticed that.

Have another sip of coffee.

MR. LEARY:  Yes, right.

BY MR. LEARY:

Q    And attached to the disclosure was your report in this matter.

MR. LEARY:  I'll mark that as 7.

(Defendant's Exhibit 7, marked for identification-described in index)

BY MR. LEARY:

Q    Mr. Neal, I present you with what's been marked as Exhibit 7.

It's a copy of your December 29, 2015, report, correct?

A    Yes.

Q    And you prepared that one other report dated March 1, 2016, correct?

A    Yes.

EXHIBIT 8

Q    So when you went back on March 1, 2016, did you reinspect the original foundation?

A    I may have.  I have no recollection of doing that.  There's nothing in my notes.

If I did, I assume that the condition was substantially the same and, therefore, I didn't make note of it, but I can't say for certain whether I did or not.

Q    Okay.  If you inspected it, would you have prepared a report or noted it in a report or field notes?

A    Only if I saw some kind of a significant change.

Q    Okay.  And was December 29, 2015, the first time you were at that property?

A    To the best of my knowledge.

Q    And what do you mean by that?

A    Over the past 25 or 26 years, I've inspected, for various reasons, over 15,000 houses, and I could have been at that house for another reason in 1993.  I just don't know.

Q    All right.  So to the best of your recollection, you haven't been at that house prior to December 29, 2015, correct?

A    To the best of my recollection, that is

EXHIBIT 8

correct.

Q    Have you been back since March 1, 2016?

A    No.

Q    Do you have any current plans to return to this property?

A    No.

Q    Okay.  And it looks like you visited the home for the purpose of conducting a visual examination of the concrete foundation, correct?

A    Yes.

Q    And this is addressed to Paul, correct, your report?

A    Yes.

Q    All right.  And did you speak to Pam during your visit?

A    I have no recollection if she was there.

Q    Okay.  Who was there besides Paul on that wintery day in 2015?

A    I have no recollection.

Q    Do you know how long you were at the property?

A    Specifically, no.  Normally, I'm at the property for about an hour.

Q    Okay.  And it notes that the house was built in '83, correct?

EXHIBIT 8

A     Yes.

Q     And how do you know that?

A     It's information provided by Mr. Gladysz.

Q     Did you pull the property records or just rely on his representation?

A     Just relied on his representation.

Q     Did you also obtain information from Mr. Gladysz that he's occupied the home for 30 years?

A     Yes.

Q     And your report says you recently noticed cracks in the concrete foundation, correct?

A     Yes.

Q     And it says -- strike that.

Do you know when "recently" was?

A     According to my field notes, he said "three to four years."

Q     Okay.  And then it says, "The cracks have significantly increased in size and number during the last six months," correct?

A     Yes.

Q     Is that information that was provided by Mr. Gladysz?

A     Yes.

Q     Do you know if there were any photographs

EXHIBIT 8

of that progression?

A    Not to my knowledge.

Q    Do you know if Mr. Gladysz had tracked the progression of cracks?

A    Not to my knowledge.

Q    And is "significantly" your word or his?

A    I can't say with any certainty that he used the word "significantly," but he made it clear to me during our conversation that they significantly changed.

Q    Okay.  And how did he do that?

A    I have no specific recollection.

Q    Okay.  And the media coverage started sometime in, like, July of 2015, right?

A    I believe that's correct.

Q    Okay.  And it notes that the basement is unfinished, correct, in the first paragraph of your report?

A    Yes, it does.

Q    Okay.  And it also notes that the garage and family room addition foundation -- that was built in 1997, have no visible cracks, right?

A    Yes, that is correct.

Q    And the second paragraph notes that "Most of the visible 1983 concrete foundation, both

EXHIBIT 8

exterior and interior, as well as the concrete retaining walls, have numerous spider web cracks," correct?

A    Yes.

Q    Do you know how wide those cracks were?

A    Based on my photographs, I'd say that they were up to approximately a quarter inch.

Q    Okay.  And you didn't measure these cracks, did you?

A    In this case, I did not, no.

Q    Okay.  Do you know if those cracks have gotten any worse since your inspection in 2015?

A    No.

Q    Do you know if the basement was ever finished?

A    I have no record of that, or knowledge.

Q    And was there any siding or obstruction over the exterior concrete walls?

A    Again, I have no recollection.

Q    Okay.

A    My photographs might tell that.

Q    Yes.  It looks like, in your photographs -- I'll point to 19, 20, 21.

It looks like they project above grade and you can see the exterior concrete walls, correct?

EXHIBIT 8

A     Yes.  At least in the photographs, there's no obstruction.

Q     Okay.  And do you believe that the cracks are attributable to a material defect in the concrete?

A     Yes.

Q     And is that a progressive condition, meaning the cracks progressively expand?

A     Yes.

Q     All right.  Not one day there's a pristine wall, the next day there is map cracking all over the place; is that correct?

A     I can't say with any accuracy what may or may not have happened at this home.

Q     Okay.

A     I've seen so many variations and cracks that do appear very rapidly that I can't say for sure that did not happen.

Q     Okay.  Can you testify as to any uniform rate of progression of the cracks in these foundation walls?

A     No.  There is none.

Q     All right.  You can't say that these cracks increase by any measurable variable every, let's say, month or year, can you?

EXHIBIT 8

A    Not unless they were observed and marked and recorded on a periodic basis, there's no way to say that.

Q    Right.

That hasn't been done here, to your knowledge, correct?

A    That is correct.

Q    It says that the foundation -- in the second paragraph, it says that "The foundation walls in several locations are bowing inward by as much as one inch," correct?

A    Yes.

Q    You never saw how these walls stood when constructed, correct?

A    That's correct.

Q    Did you ever see how they stood in 2010?

A    No.

Q    You note that "There's moderate efflorescence, especially in more heavily cracked areas," correct?

A    Yes.

Q    What do you think the significance of that is?

A    Efflorescence is present, to one degree or another, in all concrete foundations.  It is an

EXHIBIT 8

indication of where the concrete has been wetter, damper as more access to water than areas that have little or no efflorescence.

So it's just an indication that the areas that were more heavily cracked did have more access to moisture or water.

Q    And when you say "moisture or water," are we referring to groundwater?

A    Not specifically, no.

Q    Would it include groundwater?

A    Yes.

Q    And would it include surface water?

A    Yes.

Q    Would it include rainwater?

A    Yes.

Q    Okay.  You note that "A metal basement window frame has been pushed out of position by the expanding and shifting foundation," correct?

A    Yes.

Q    How do you know that a metal basement window frame was pushed out of position by an expanding and shifting foundation?

A    That's based on the totality of my observations.  I don't know how else to put it.

Q    Okay.  Did you see -- strike that.

EXHIBIT 8

When was that metal basement window frame first pushed out of position?

A    I have no idea.

Q    Did you ask?

A    All I can answer is "probably."

Q    Okay.  But you don't have any record of when that occurred, do you?

A    No.

Q    Did you inspect the living space of this home?

A    That is my normal practice, but again, I can't say with any degree of certainty.

Q    Okay.  And you don't have any note in your report about your observations of the living space, do you?

A    I do not.

Q    Do you have any photos of the living space?

A    No.

Q    And do you have any field notes regarding the living space?

A    No.

Q    You note in paragraph 3 that, based solely on your visual observations, "the most likely cause of a foundation distress is a chemical

EXHIBIT 8

Page 23

reaction," correct?

A    Yes.

Q    Do you know which chemical reaction that would be?

A    I do not.

Q    And in some of your prior reports, you note that it was attributable to an alkali-silica reaction, correct?

A    That's correct.

Q    And is there a reason why you changed from alkali-silica reaction to putting "chemical reaction"?

A    Yeah.  When we first became aware of this problem, all indications were that it was ASR, alkali-silica reaction, which is a well-known, much studied, well-understood problem.

After the University of Connecticut did their study, they identified ASR, but they also identified that the majority of the problem was being caused by a mineral known as iron pyrrhotite.

And since have evidence that we have ASR, we have iron pyrrhotite -- some houses actually have both things happening.

Based on a visual observation, there's no

EXHIBIT 8

way to tell which ones, so we just say "chemical reaction."

Q    Okay.  And when you say "we," who are you referring to?

A    Me.

Q    And UConn's study wasn't out by December 29, 2015, was it?

A    I don't recall specifically, but I think it came up shortly after that.

Q    Okay.  So if you changed your report based on the UConn study, how could you have done that when this report is written before the UConn study?

A    I had -- I'm trying to think of the best way to put it.

I had prior knowledge of what they were going to say.

Q    And how did you have that?

A    Just talking with people at UConn.  They were finding pyrrhotite like they had in Canada, so at that point, I changed my report.

Q    Who did you talk to at UConn?

A    I don't recall.

Q    Do you have any written records reflecting those conversations?

EXHIBIT 8

A    No.

Q    You note that, in paragraph 3, line 2, "The defect typically causes this type of distress to be visible 15 to 20 years or more after the foundation is poured," correct?

A    That is what it says.

Q    What's the basis for that notation?

A    Experience up to that point in time.

Q    And had you been to -- what's the earliest you've been to a foundation with a chemical reaction problem after pour?

A    The earliest that I've been to or that I'm aware of?

Q    Let's start with where you've been to.

A    That would be, I believe, eleven years -- eleven years old, where we are seeing signs of initial stages of cracking.

Q    Do you know what house that is?

A    Not offhand, no.

Q    And when did you see that house?

A    I don't recall.

Q    And what's the earliest that you recall as far as -- strike that.

What's the earliest you're aware of as far as cracking appearing after pour?

EXHIBIT 8

A    Four years.

Q    And which house is that?

A    I don't recall the address.  It is in Ellington.

Q    Okay.  And do you remember --

A    Normally, I kind of invoke client confidentiality because they are my client.

But they have been on TV --

Q    Right.

A    -- so everybody knows where the house is.

Q    Right.

And do you know these folks' names?

THE WITNESS:  Brian, can you help me out with that one?

MR. DANFORTH:  What year was it?

THE WITNESS:  That's the folks in Ellington with the four-year-old detached garage that cracked.

MR. DANFORTH:  The last name is Mahoney.

THE WITNESS:  Mahoney.

MR. LEARY:  Mahoney, okay.

BY MR. LEARY:

Q    And 15 to 20 years after a 1983 pour would be 1998 to 2003, correct?

EXHIBIT 8

A     Yes.

Q     My math is a little better that time, right?

A     You got it.

Q     That's because I did it in advance.

Are you a chemist?

A     No.

Q     Do you have any scientific background relative to the identification of chemical reactions in concrete?

A     No.

Q     What about any background relative to identification of mineral backgrounds in concrete?

A     No.

Q     Have you ever done a petrographic examination?

A     No.

Q     Would you be qualified to conduct a petrographic examination?

A     No.

Q     And in paragraph 3, in the middle of it, you note that "The defect will continue to deteriorate the concrete, and the foundation walls will very likely bulge inward until they structurally fail," correct?

EXHIBIT 8

A    That's correct.

Q    Why do you note that's "very likely"?

A    Because the foundation at the time of my visit was structurally defective.

Q    Okay.  But is "bulge" the same as "bowing"?

A    Yes.  I would say they're interchangeable in context.

Q    Okay.  How far would a foundation wall have to bow inward before it fell down?

A    That depends on a whole lot of factors that are really not analyzable.  If we got much over 4 inches of bow, I tell people to leave the house.

Q    Okay.  And these walls were bowing by as much as one inch, correct?

A    Yes.

Q    And that's after 32 years in this case, right?

A    That amount of bow was apparent at 32 years of age, but that amount of bow occurred in a much shorter time period than 32 years.

Q    How do you know that?

A    Because the foundation wasn't cracked the way it was 32 years ago.

EXHIBIT 8

Q     How do you know that yourself?

A     I'm just going to have to say that's my opinion.

Q     And what's that based upon?

A     Based on my experience.

Q     Okay.  And did you measure the bow of these walls?

A     Yes.

Q     And what did you measure it with?

A     Four-foot level.

Q     Okay.  Do you have any photographs reflecting that measurement?

A     No.

Q     So you note that they'll "likely bulge inward until they structurally fail," correct?

A     Yes.

Q     So they hadn't structural failed as of that date, correct?

A     The wall was in a state of structural failure.

Q     But had it failed?

A     It had not failed yet, but it was on the way.

Q     Okay.  And was it still holding up the above living portion of the home?

EXHIBIT 8

A     Yes.

Q     You note that "There's no way to arrest the process," correct?

A     That is correct.

Q     And what's that based upon?

A     That's based on the fact that nobody has -- among other things, that nobody has come forward with a way to do it.

If somebody knew how to arrest this problem, they'd be all over Northeastern Connecticut maxing tons of money.

There is no way.

Q     All right.  What evidence are you aware of that these foundation walls at the Gladysz property are ever going to exhibit anything more than the cracks as they presently stand, an inward bulge of as much as one inch?

A     The wall was bulged in because the horizontal cracks have eliminated the walls' ability to resist horizontal soil pressure, and that pressure will continue to push the wall inward until it collapses.

Q     And when's the wall going to collapse?

A     I have no idea.

Q     Can you say, with a reasonable degree of

EXHIBIT 8

engineering probability, that this wall will collapse in the next ten years?

A    No.

Q    How about in the next 100 years?

A    No.

Q    Have you seen any engineering literature that states that there's no way to arrest the process?

A    No.

Q    Are you aware of any literature anywhere to that effect?

A    No.

Q    You note that "There is no way to repair the existing damage," correct?

A    Yes.

Q    What's that based upon?

A    My experience.

Q    Have you ever repaired a damaged foundation?

A    Personally, no.

Q    You note that "The basement walls at this time are structurally unsound, and corrective action is necessary," right?

A    Yes.

Q    What does "structurally unsound" mean?

EXHIBIT 8

A     That the walls are bowing inward and they will continue to do so until they collapse.

Q     Okay.  And is "structurally sound" different than "structurally failed"?

A     Yes.

Q     And how so?

A     Well, if it's structurally failed, it's already broken.  If it's structurally unsound, it's going to break.

That's the best way to put it.

Q     And you note that "corrective action is necessary," right?

A     Yes.

Q     What did you mean by that?

A     That the foundation needs to be replaced.

Q     And do you know if it has been replaced?

A     I do not.

Q     And then you note at the end of that paragraph that "It is my recommendation that the basement walls be replaced," correct?

A     Yes.

Q     You further note that "It is not possible to predict how quickly the foundation will deteriorate to the point it is structurally dangerous," correct?

EXHIBIT 8

A    Yes.

Q    And so it's not structurally dangerous as of your December 29, 2015, visit, correct?

A    Correct.

Q    And the same held true when you went back on March 1, 2016, right?

A    Yes.

Q    And you urged them to develop a corrective plan with a licensed contractor as soon as possible, right?

A    Yes.

Q    Do you know if they did so?

A    I do not.

Q    Did you make a referral for them?

A    I have no recollection.

Q    Have you ever referred a homeowner to a licensed contractor?

A    To the best of my knowledge, no.

When I'm asked about that, I give them several names of people who do do that and suggest they contact all of them or somebody else.

Q    Okay.  What are some of those names?

A    That would be Don Childree or Childree Construction, LaRoche Builders, and Soucy.  And I don't remember if it's Dean or John Soucy.

EXHIBIT 8

Q    How did you learn about alkali-silica reaction?

A    When I saw my first defective concrete foundation about eight years ago, I had no idea what I was looking at, so I suggested that we have the concrete tested.

I called a concrete testing company -- I don't know if they're testing so much, but I found them on the Internet. And in their references, they do a lot of work for the government, for the Air Force, Navy, the government buildings.

And I called them, explained what I saw -- and I'll say right now, I have no record of the conversation; I don't know who I talked to.

And he said, "Oh," he said, "there's foundations failing from ASR. Everybody knows J.J. Mottes has an ASR problem."

Q    Okay.

A    And that's probably where the concrete came from.

So that's kind of how . . .

Q    And you said this is about eight years ago, right?

A    It was eight or nine years ago, yeah.

Q    So let me try my math here.

EXHIBIT 8

2008 or 2009, right?

A    Yes, somewhere around there.

Q    Do you know what property that was?

A    I don't recall offhand.

Q    Have you consulted any treatises or other publications regarding alkali-silica reaction?

A    Yes.

Q    And which ones?

A    I have no recollection.

Q    Do you know when you consulted them?

A    It was probably at the time I saw my first one.  Maybe for a year or two after that, I would search for publications by the Concrete Institute or government university research, that kind of thing.

So I've read a number of things about it. Some of them were useful, some of them were totally useless, and some of them were -- I'm not a concrete expert.

Some of them were so technical, I had absolutely no idea what they were talking about.

Q    And when you say "searched," are these things you found on the Internet?

A    Yes.

Q    Okay.  Did you go to any universities and

EXHIBIT 8

pull books on alkali-silica reaction?

A    Papers, research papers.

Q    You went to libraries?

A    No, no.  Online.

Q    Oh, okay.

And how did you learn about iron sulfide oxidation?

A    That's pretty much all local.

Q    All right.  And you haven't studied any treatises or any publications regarding that, have you?

A    There are just not very many that I'm aware of that are pertinent to the problem we're having.

Q    Okay.  Have you done some Google searches regarding iron sulfite oxidation?

A    Yes.

Q    Are you aware of any other chemical reactions that could cause map cracking in concrete such as you saw at the Gladysz home?

A    Only in a peripheral way.  There seemed to be maybe some other things that would cause this type of cracking.

I'm not sure that they're not just a different name for the same thing.

Q    Okay.

A    But, you know, at this point in time, based on everything we know, it's iron pyrrhotite or ASR that is creating our problem.

Q    Now, in other cases, you've written reports that stated that immediate repairs were necessary, correct?

A    Probably, yes.

Q    Do you know if repairs in those cases were made?

A    I do not.

Q    And you didn't write immediate repairs were necessary in this report, did you?

A    I did not.

Q    Is that because the condition in this one isn't that bad?

A    It was because the deterioration wasn't to a point where I felt there was an immediate safety issue.

Q    Okay.  Have you seen a home inspection report for this home?

A    Not to my knowledge.

Q    Did you ever ask for one?

A    Not to my knowledge.

Q    Have you seen any photographs of the

EXHIBIT 8

foundation which were taken prior to your visit?

A   Not to my knowledge.

Q   And the home was still safe to live in as of the date of your visit, correct?

A   Yes.

Q   And it was still safe to live in on the date of your return on March 1, 2016, correct?

A   Yes.

Q   Do you know when this home would become unsafe to live in unless the foundation is replaced?

A   Not at this time, no.

Q   And you sent this report to Brenda Draghi, right?

A   Yes.

Q   And have you ever heard the phrase "substantial impairment of structural integrity" before?

A   Yes.

Q   And when's the first time you heard that phrase?

A   Probably at the first deposition I had in regard to defective concrete.

Q   Okay.  And according to your testimony list, that was sometime in 2016, correct?

A    Yes, according to that list that we have.

Q    All right.  Do you know who you heard it from for the first time?

A    I would guess it would be whoever the attorney was that was doing that deposition.

Q    Do you know what case it was?

A    If I can refer here?

Q    Sure.

A    I don't think you passed that over.

That was the -- yeah, that guy.

Q    (Handing.)

A    I would have to say it was probably the second deposition.  And that was the deposition by Halloran & Sage, and the attorney was DeMeo.  I think that's the first time I heard it.

Q    Okay.  And "substantial impairment of structural integrity" is not an engineering term of art, correct?

A    It's one that I was not familiar with prior to this problem showing up.

Q    Okay.

A    I mean, certainly it has meaning.

Q    Right.

But in the engineering community, it's not a phrase that engineers use as an engineering

EXHIBIT 8

term; is that correct?

A    I believe that's correct, yes.

Q    And there was groundwater exposure to these foundation walls, right?

A    Yes.

Q    And rainwater exposure?

A    Yes.

Q    And surface water exposure?

A    Yes.

Q    And the foundation walls retain soil, correct?

A    Yes.

Q    Do you know when you were first contacted regarding the Gladysz property?

A    We don't keep a record of when we were first contacted.  Since it was scheduled for December 29 of 2015, typically the contact would have been made within one to two weeks prior to that date.

Q    And do you know who you were contacted by?

A    No.  It was either Pamela or Paul Gladysz.

Q    Okay.  Do you know how they found you?

A    Our booking sheet says that they were referred to us by Brenda Draghi.

Q    Okay.  And you work with Brenda Draghi on

EXHIBIT 8

a number of other claims, correct?

A    Correct.

Q    And Attorney Danforth, correct?

A    That's correct.

Q    Do you work with any other attorneys on these claims?

A    Yes.

Q    And who are they?

A    Michael Kopsick.

Q    And spell list has name for us?

A    K-O-P-S-I-C-K.

Q    And do you work with anyone else other than those two attorneys?

A    Not to this point.

Q    And who is Michael Kopsick?

A    He's an attorney.

Q    Is he representing foundation claimants?

A    Yes.  He contacted me.  He said he had a client who needed to have a foundation inspection, so we did the inspection.

And to the best of my knowledge, I've never met Mr. Kopsick.

And it turns out, during the middle of a battle with an insurance company -- and I am being deposed next week in this matter, and it looks

EXHIBIT 8

like it's going to trial.

So I don't know if you can say I'm working with him.  I'm certainly involved in the case that he has.

Q    Okay.  And do you know what firm Michael Kopsick is with?

A    Yes, because I got a letter from him yesterday.  It's -- maybe Mr. Danforth can help me out.

THE WITNESS:  It's Kahan, Kerensky --

MR. DANFORTH:  Caposella.

THE WITNESS:  And what was the other one?

MR. DANFORTH:  Caposella.

THE WITNESS:  Yes.  And they're located in Vernon.  I believe that's the name.

MR. LEARY:  I believe that's correct.

BY MR. LEARY:

Q    Is that the only claim you're involved in that also involves Mr. Kopsick?

A    Again, looking at the list of prior testimony, the first deposition, which involved my client, Clyde Smith --

Q    Okay.

EXHIBIT 8

A     -- I believe that that was Attorney Kopsick also, but I do not know.

Q     Okay.  Are you working with any insurance companies on foundation claims?

A     No.

Q     Do you have any particularly ill feeling towards insurance companies?

A     I do not.

Q     And how many projects are you working on with Attorney Draghi?

A     I have no idea.

Q     More than 50?

A     Yes.

Q     More than 100?

A     Probably.

Q     More than 200?

A     Maybe.  I just do not know.

Q     More than a million?

A     No.

Q     Okay.  So somewhere in that range.

A     Yes.

Q     And Attorney Danforth, more than 100?

A     Maybe.

Q     Definitely more than 50, right?

A     I would think so.

EXHIBIT 8

Q    Okay.

A    I don't mean to be evasive.

My records indicate I have about 800 clients who have defective concrete.  Many of those consult Attorney Draghi and Danforth.

I know some of those have been resolved one way or another, so how many it may have been and how many are basically -- unless somebody has another problem, like the Gladyszes did, I don't know too much about it.

So I . . .

Q    Okay.  So out of 800, how many of them would you say came around to find you after news reports in July of 2015?

A    All I can say is a majority of them -- I consulted with the majority of my clients after the initial news reports.

Q    Okay.  Do you know how many you consulted with prior to news reports in July of 2015?

A    I do not know that offhand.  I do have somewhat of an accurate record of that, but even that is incomplete.

Q    And what's a ballpark figure, would you say, out of those 800?

A    I would say maybe 150, 200 prior to that.

EXHIBIT 8

Q    Okay.  And you charge a flat fee for your inspections, correct?

A    I do.

Q    400 bucks?

A    Yes.

Q    Do you know if any engineers have been to this property prior to your visit?

A    I have no recollection of that.

Q    Have you spoken to Paul since your visit in December of 2015?

A    I would assume so, since I returned on March 1.  So I either spoke to him or Pamela.

Q    Have you spoken to either one of them since March 1, 2016?

A    I have no record or recollection of that.

Q    Okay.

A    I'm assuming the answer is no, but I just can't be certain.

Q    Did you see any repairs to the foundation's cracks when you were there?

A    I have no notes of repaired cracks, and my photographs don't show any repaired cracks.

So I'm going to say that it is my belief that there were no repaired cracks at that time.

Q    Did the walls need to be shored at the

EXHIBIT 8

time of your visit?

A    No.

Q    Do you know if the Gladyszes have moved out of their home for safety reasons?

A    I do not.

Q    Did you advise them to move out of their home for safety reasons?

A    I have no record of that.

Q    Have you ever advised a foundation claimant to move out for safety reasons?

A    Yes.

Q    And do you know who those individuals are?

A    I do have a record of that, yes.

Q    And who are they?

A    Can we go off the record?

Q    That one I can't go off the record for.

A    Okay.  I do, but I have an obligation to protect my client's privacy.

Q    Okay.  Is that a legal obligation?

A    Since I'm not an attorney, I can't answer that, but I believe it's an ethical obligation.

Q    For engineers?

A    I would say yes, but I just think, in general, we have a right to guard people's privacy.

EXHIBIT 8

Q    Okay.  And do you know, of those, how many people you have advised to relocate for safety reasons?

A    Three.

Q    And did they relocate for safety reasons?

A    One did.

Q    And has that home fallen down?

A    Not at this point.

Q    Are you aware of any cracking-foundation home where the walls have fallen down?

A    Not yet.

Q    Are you aware of any cracking-foundation home where the property has been condemned by a building inspector or town official?

A    No.

Q    Do you know when you advised those three individuals to move out for safety reasons?

A    I could find out.  I don't recall offhand.

Q    Was it within the past six months?

A    No.

Q    Was it within the past year?

A    I am going to say probably not.

Q    Was it more than two years ago?

A    All I can say is maybe.

Q    And what concerned you at those properties

EXHIBIT 8

to make the recommendation that they relocate for safety reasons?

A    The walls were significantly bulged in.

The concrete had started to expand to the point where the house was being twisted out of shape.

The beams were pushed up off the Lally columns.

There was nothing supporting the floors of the house.

In a couple of cases, there were reports of very loud cracking sounds, almost -- you know, very loud, and the house vibrating at the time of the loud noises.

It was just very obvious that the house was in a condition where it could come down at any time.

Q    Okay.  And you didn't make a recommendation at the Gladysz home, correct?

A    No.

Q    Did the Gladyszes report any loud booms or similar things at their home?

A    I have nothing in my notes to show that.

Q    Okay.  Do you know if those homeowners have replaced their foundation?

EXHIBIT 8

A       To the best of my knowledge, no.

MR. LEARY:  Would you mark this, please, as 8.

(Defendant's Exhibit 8, marked for identification-described in index)

BY MR. LEARY:

Q    Mr. Neal, I've presented you with what's been marked as Defendant's Exhibit 8.

This is a report by Carl Cianci.

Have you seen this before?

A    No.

Q    Have you ever met Mr. Cianci?

A    I believe I did.

Q    Have you ever seen a report by him?

A    Yes, I have.

Q    All right.  And back to those three homeowners -- before I deviate too much, do you know who their insurance companies were?

A    No.

Q    Do you know if they have lawsuits?

A    No, I don't.

Q    Okay.

MR. LEARY:  Off the record for a second.

EXHIBIT 8

(A conversation was held off the record.)

MR. LEARY:  Back on.

BY MR. LEARY:

Q    All right.  And Mr. Cianci, if you go to what's labeled as "page 1," under his "Observation" section, he notes, on the third line, "a small earthquake in 2011," correct?

A    Yes.  That is what he says.

Q    Did the Gladyszes tell you about a small earthquake in 2011?

A    No.

Q    If you go down, on page 1, to paragraph 3, the last full sentence says, "All of the map cracking observed is not of recent origin as evidenced by the weathering and coloring of the concrete within the cracked areas."

Is that what it says?

A    That's what it says.

Q    And do you agree?

A    I, agree that that's his opinion.

Q    Do you agree that the cracking is not of recent origin?

A    No.

Q    And why is that?

A    He has no way of knowing that.

EXHIBIT 8

Page 51

Q    Well, I'm asking why you think that's not the case.

A    What I'm saying is I don't know if that's the case.

Q    Okay.  All you know is what you saw during your visit, right?

A    Yes.

Q    All right.  Did you see any markings on the walls?

A    I don't recall.

Q    Are you aware of any replacement estimates?

A    No.

Q    And you didn't pull an assessor's card to get the property history, correct?

A    No.

Q    Do you know where the concrete for the foundation walls is from?

A    No.

Q    Have the walls fallen down?

A    Not to the best of my knowledge.

Q    Has the home fallen down?

A    Not to the best of my knowledge.

Q    Has any part of the home fallen down?

A    Again, I have no personal knowledge of

EXHIBIT 8

that.

Q    And was there any part of the home that could not be safely occupied as of the date of your visit?

A    No.

Q    Were the walls in imminent danger of falling down as of the date of your visit?

A    No.

Q    If you would flip to page 2, please.

Mr. Cianci has a terminology section and notes that "The currently adopted residential code refers to the vertical element between the footing and wood sill plate as part of a foundation," correct?

A    Yes.

Q    Do you agree with that?

A    Yes.

Q    If you would flip to page 3, please.

Mr. Cianci notes that "Chapter 4 of currently adopted Residential Building Code is titled Foundations and addresses the requirements for residential concrete foundations and footings," correct?

A    Yes.

Q    And do you agree with that?

EXHIBIT 8

A    The building code is a huge document.

Without it sitting in front of me, I can't say yes, but I have no reason to disagree with it.

I don't even know why he puts this stuff in his report.

Q    And in your report, you refer to your observations as regarding a visual inspection of the foundation, right?

A    Yes.

Q    Did you get an opportunity to inspect the footings during your visit?

A    No.

Q    And that's because they are completely underground, correct?

A    That's correct.

Q    Do you know if there are footings at this property?

A    I'm going to have to say I'd be extremely surprised if there weren't, but no, I don't know if there are, with any degree of certainty.

MR. LEARY:  Would you mark this as 9, please.

(Defendant's Exhibit 9, marked for identification-described in index)

EXHIBIT 8

Page 54

BY MR. LEARY:

Q    Mr. Neal, I present you with what's been marked as Defendant's Exhibit 9.

It's a State of Connecticut, Department of Consumer Protection, Report on Deteriorating Concrete and Residential Foundations.

It's dated December 30, 2016.

Have you seen this document before?

A    I believe so, yes.

Q    Flip to page 2, please.

And footnote 1 notes that "A foundation for a residential structure consists of three essential parts.  The footing provides the base which supports the foundation walls, and the slab forms the floor."

Do you agree with this definition?

A    No.

Q    And why is that?

A    The floor is not part of the foundation.

Q    Okay.  But the foundation walls are, correct?

A    That is correct.

I have to admit, I had not noticed this before.  I have to say, on the record, that is one of the dumbest things I've ever read.

EXHIBIT 8

The floor is not an essential part of the foundation.  You can take the floor out of there and the house doesn't care; you've just got a muddy base.

Q    I'll let your feelings be known to the Department of Consumer Protection.

Did you make any determination as to the water table in the area of the foundation?

A    No.

Q    Do you know if this property is in a flood zone?

A    No.

Q    Do you know if the Gladyszes had problems with flooding in their basement?

A    If I can just take a quick look at this.

Q    Sure.

A    I can't say with certainty, but based on my photographs, I don't see any evidence of that in my photographs.

Q    Did you ask them about problems with water intrusion in their basement?

A    In all likelihood, yes.

Q    But you don't recall a response, right?

A    No.  If it had been positive, I would have -- it would have been in my notes.

EXHIBIT 8

Q    Okay.  And did you see a dehumidifier in the basement when you were there?

A    I have no recollection.

Q    Did you smell any odors associated with damp basements or mold when you were there?

A    I don't recall.

Q    Did you see any signs of mold in the basement?

A    It's not something I would have been looking for unless it was so obvious it just jumped out at you.

My focus was on the concrete, which would not necessarily -- it's not a place where you would expect to find mold.

Q    And did you see any problem with gutters or drainage around the foundation?

A    I don't specifically look at that.

Q    Do you know if there was a curtain drain around the foundation?

A    No.

Q    Did you note any problems with the floor slab itself?

A    For the reasons we just talked about, I normally don't look at the floor slab.

Q    Okay.  And you don't have any notation as

EXHIBIT 8

to the slab in your report, correct?

A    That's correct.  I rarely see a problem with the floor slab.  Out of the 800 or so buildings I've looked at that have this problem, just a guess, five or six floor slabs were affected.

Q    What do you think accounts for the difference between the cracking in the walls and the floor slab?

A    I could offer a number of suggestions about why that might be, but the honest answer is I have absolutely no idea.

Q    Okay.  Do you think the exposure to exterior water source is a potential reason?

A    That's definitely one of the suggestions or theories I would have offered, yes.

Q    Okay.  Have you seen any problems with foundations poured using concrete from Mottes in the 2000s?

A    Yes.

Q    What's the latest poured foundation that you're aware of which has a problem?

A    The latest one where we suspect it has a problem that I personally have seen is 2006.

Q    And do you know when you saw that house

EXHIBIT 8

yourself?

A    I would guess it was within the past year.

Q    Okay.  So that would place that home maybe within ten years of being poured, right?

A    Ten or eleven years.

Q    Do you know if it's been confirmed that concrete in that case was from Mottes?

A    I don't recall.  We very seldom find out for certain where the concrete came from.

Q    Okay.  And do you know if there's been any petrographic examination on that concrete?

A    I do not.

Q    And you don't have an opinion as to when the Gladyszes are going to have to move out for safety reasons absent replacement of the foundation, correct?

A    That's correct.

Q    And do you know if this property has been condemned by a town official or building inspector?

A    I do not.

Q    And, in your opinion, it didn't need to be condemned, correct?

A    That's correct.

Q    And 100 percent of your work on this case

EXHIBIT 8

is on behalf of homeowners as opposed to insurance companies, correct?

A    Let me make sure I answer correctly.

I have not done any work for insurance companies in regard to this matter.

Q    In regard to problems with cracked foundations in Northeastern Connecticut, you haven't done work for insurance companies, right?

A    Right.

Q    Okay.  Have you ever reviewed an insurance policy and opined whether a particular claim is covered or not?

A    People have asked me to do that, and I just tell them "You've got to talk to an attorney."

Q    So the answer would be "no," right?

A    That's correct.

Q    Have you received any false alarm calls from homeowners who think that they may have a problem but you go out there and it's normal shrinkage or settlement cracks instead?

A    Yes.

Q    And how many of them would you say are out there?

A    How many have I done?

EXHIBIT 8

Q    Correct, yes.

A    Oh, that I don't keep a record of.  I get those kinds of calls for a number of reasons.

I've got to say it's several hundred.

Q    Okay.  And that's also in connection with your home inspection business, right?

A    No.  That would be as an engineer, not as a home inspector.

Q    You also do home inspection, right?

A    My company does, right.

Q    You do them, correct?

A    Yeah, I still do a few.

Q    Who else at your company does home inspection?

A    My son, Timothy Neal.

Q    And who else?  Anyone else?

A    No.

Q    And is Timothy an engineer as well?

A    No.

Q    Fran is your wife, right?

A    That's correct.

Q    Okay.  Is Fran an engineer or home inspector?

A    Oh, no.

Q    Okay.  If I see any report from Fran, I'll

EXHIBIT 8

Page 61

remember that.

How much does what a homeowner tells you about their property factor into your engineering evaluations?

A    None.

Q    Okay.

A    When I ask those questions, I'm trying to get as much sense as I can of what's going on, what happens, when it happens.

So the information that I collect from the homeowner is done for that purpose; it's not in any way whatsoever to help me form my opinion.

Q    Okay.  And you live in Tolland County, correct?

A    Yes.

Q    And you believe that you may have an affected foundation; is that correct?

A    I wouldn't put it that way.  I'm in the position where I have no idea whether I'm going to have a problem or not.

Q    And when was your home built?

A    2003.

Q    And do you know where the concrete for your foundation came from?

A    No.

EXHIBIT 8

Q    All right.  Do you have any indications that it came from Mottes?

A    No.

Q    Are you the original owner of your home?

A    Yes.

Q    And did you have any role in its construction?

A    I'm going to say no.  I went there every night after my last appointment of the day and got filled in by the builder.

So I tried to keep track of what was going on, but the -- I live in an over-55 condominium, so the house was -- you know, it's a little different than me contracting a builder to build a single-family house.

Q    Right.

Do you know if the -- do you know who the builder was?

A    Yes.

Q    And who was the builder?

A    Bryan Edwards.

Q    And do you know his company name?

A    Mr. Edwards changed his company name every time he did a project.

Q    Have you ever talked to Mr. Edwards about

EXHIBIT 8

where he got the concrete from for that condominium?

A     Mr. Edwards will not reply to any inquiry, no matter how it's made.

Q     And why do you say that?

A     I'm on the board of directors.  And we have sent him emails, mail, telephone calls, and certified mail, and we get no response.

Q     And is the certified mail coming back undelivered or is it delivered?

A     I don't remember.  We'd have to ask the management company.

Q     Gotcha.

And does Mr. Edwards live in Tolland County?

A     Yes.

Q     Do you know if he's still constructing residential properties?

A     I believe he's retired at this point, but since he changes his name for every project, it's kind of hard to figure out.

Q     You're not making any contracting referrals to Mr. Edwards, are you?

A     Oh, no.

Q     Now, you said that the first time you

800-567-8658                                                      973-410-4040

EXHIBIT 8

encountered a foundation that may have had this problem is 2008 or 2009, right?

A    Yes.

Q    Do you know if you've ever written a report that these cracks weren't a structural concern?

A    I'm trying to think back to the very early days of this problem, and I just have to say I do not believe so.

Q    Okay.  And by "early days of this problem," did you write any reports -- strike that.

Do you believe there are any reports out there where you were consulted regarding cracking in the basement and may have not known about this chemical reaction problem that you cite in the Gladysz report?

A    I think I understand the question, but would you . . .

Q    I can rephrase it.  It's not the best question I ever asked.

Basically, I'm asking, Have you ever written a report where you now believe the walls you were inspecting had a chemical reaction problem, but you didn't identify it in your report

EXHIBIT 8

because you weren't aware of it?

A    I'm going to have to say that that is possible.  I just don't know.

Q    Okay.  Are you aware of any reports you wrote where you identified a chemical reaction causing cracks but didn't opine that it amounted to some sort of structural concern?

A    Again, the only way I can answer that is I don't believe so.

Q    Okay.  Have you read any case law regarding some of the decisions in foundation cases?

A    I'm going to have to say no.  I don't recall that.

Q    Are you aware of any decisions on foundation cases?

A    Only secondhand.  Yes, I am aware of what people have told me, but I have no personal knowledge.  I don't know if that makes sense as an answer.

Q    Gotcha.

So you haven't personally read any legal opinions written by judges regarding foundation problems?

A    Not to the best of my knowledge, no.

EXHIBIT 8

Q    And you've been on the news regarding the problem, correct?

A    Yes.

Q    And do you know how many times you've been on the news regarding this problem?

A    No.  It's something I don't keep track of.

Q    And --

A    I'd say three or four times.

Q    Do you know when the first time you were on the news was?

A    No.

Q    Did you consult or speak with any news media personnel regarding this problem prior to the initial media coverage in July 2015?

A    Again, I don't believe so.

Q    Okay.  Do you know how the news found you? Or did you find the news?

A    Oh, I don't go looking for somebody for that, no.

I have to say I just don't remember.

Q    Okay.  And --

A    I know they contacted me, but that's all I recall.

Q    Right.

Do you know how they found you?

EXHIBIT 8

A     I'm guessing that it may have been through Attorney Draghi, but I don't know.

Q     Okay.  Do you know how the news found out about the foundation problem?

A     I do not.

Q     Okay.  Have you spoken at any community meetings regarding the foundation problem?

A     Yes.

Q     And is that the Coalition Against Crumbling Basements meetings?

A     I think I spoke at one of those meetings. And then I also spoke at a meeting of people affected by the problem prior to the formation of the coalition.

Q     Okay.  And how many times have you spoken to community groups regarding this problem?

A     I'd say two or three times, maybe four.

Q     Okay.  And how many attendees have there been at these meetings?

A     I'm just guessing, 1 to 200 people, maybe.

Q     Did any of those individuals subsequently become clients of yours?

A     I believe so, yes.

Q     Do you have any idea of a number?

A     Three or four, maybe.  Best guess.

EXHIBIT 8

Q    Okay.  And let's take a look at your 3-1-16 report, please.

A    Yes.

Q    It's going to be in Exhibit 2.

And you note that, during your last visit in December 2015, you did not find any cracks in the foundation of the addition, correct?

A    That's correct.

Q    And you note that the addition was constructed in 1997, correct?

A    Yes.

Q    And was that information provided by the Gladyszes?

A    Yes.

Q    And you didn't pull the property record to confirm that, correct?

A    That's correct.

Q    And you note that, in your photographs, there's three visible cracks, correct?

A    Yes.

Q    You say that "These cracks may be the first visible indications of defective concrete," correct?

A    Yes.

Q    And what's that based upon?

EXHIBIT 8

A    The fact that the -- it may be a rather lengthy explanation.

Those cracks were not in that foundation, basically, three months prior.  So when the building was -- and I'm going to do this in my head.

When the building was 18 years old, there were no cracks in the foundation.  When it was 18 years and 3 months old, there were three cracks in the foundation.

Those are not shrinkage cracks.  Shrinkage cracks show up within a year, at most, within two years of construction.  And because those cracks took almost 20 years to show up, they are not shrinkage cracks.

So it is a possibility that those cracks were the first visible indications of defective concrete.

It also could be indicative of a different kind of a problem.

Q    Okay.  You just don't know, right?

A    I just don't know.

Q    And you don't have any photographs of the foundation taken before your March 1, 2016, visit, do you?

EXHIBIT 8

A    No.  I don't take photos of things that weren't a problem, so . . .

Q    Okay.  It says, "We, therefore, need to monitor both the original and the addition concrete foundations for future developments," correct?

A    Yes.

Q    Are you aware of any developments since March 1, 2016?

A    No.

MR. LEARY:  I don't have anything further.

Thank you.

(The witness was dismissed, and the deposition was concluded at 11:51 a.m.)

EXHIBIT 8

Page 71

I N D E X

----------------------------------------------------------

WITNESS                              WILLIAM F. NEAL, P.E.

----------------------------------------------------------

DIRECT EXAMINATION BY MR. LEARY                      3

----------------------------------------------------------

EXHIBIT                DESCRIPTION              PAGE

----------------------------------------------------------

Defendant's Exhibit 1, a Renotice of
    Deposition dated August 1, 2017                4

Defendant's Exhibit 2, a CD and an email
    dated Tuesday, December 29, 2015, 7: p.m.,
    with attachments                               6

Defendant's Exhibit 3, a copy of the
    deposition of William F. Neal, P.E.,
    dated January 26, 2017                         8

Defendant's Exhibit 4, a copy of the
    deposition of William F. Neal, P.E.
    dated March 30, 2017                           9

Defendant's Exhibit 5, document labeled
    Expert Disclosure dated March 28, 2017        10

Defendant's Exhibit 6, a résumé and testimony
    list for William F. Neal, P.E.                11

Defendant's Exhibit 7, a letter dated
    December 29, 2015                             17

Defendant's Exhibit 8, a document labeled
    Claim Investigation at 210 Orcutville Road,
    Stafford Springs, Connecticut                 49

                    (Continued)

Page 72

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Defendant's Exhibit 9, a document labeled "Report on deteriorating concrete in residential foundations, state of Connecticut, Department of Consumer Protection, December 30, 2016" | | 53 |

(The original exhibits were
retained by Attorney Leary.)

\* \* \* \* \* \*

EXHIBIT 8

73

STATE OF CONNECTICUT                          Page 73

COUNTY OF TOLLAND

I, Wendy J. Leard, a Notary Public for the State of Connecticut, do hereby certify that the deposition of WILLIAM F. NEAL, P.E., a plaintiff, was taken before me pursuant to the Federal Rules of Civil Procedure, at the law offices of TOLISANO & DANFORTH, LLC, 18 Main Street, Ellington, Connecticut, commencing at 10:12 a.m., on Thursday, August 17, 2017.

I further certify that the deponent was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Somers, Connecticut, this 19th day of August, 2017.

_____
Wendy J. Leard
Notary Public

My Commission Expires May 31, 2022

EXHIBIT 8

[& - advised]                                                    Page 1

**&**

**&** 1:12,18 2:7 39:14 73:8

**0**

**00039** 1:23
**00917** 1:4
**06029** 1:14
**06114-1190** 1:19

**1**

**1** 4:22,23 5:3 6:18 7:2,7,9,20,24 13:24 14:1 15:2 33:6 38:7 45:12 45:14 50:5,12 54:11 67:20 69:24 70:9 71:9,9
**10** 5:4 71:17
**100** 31:4 43:14,22 58:25
**10:12** 2:9 73:9
**11** 71:18
**11:51** 70:15
**13** 6:14
**15** 25:4 26:24
**15,000** 14:19
**150** 44:25
**16** 11:24
**17** 1:7 2:9 71:20 73:10
**18** 1:13 2:7 69:7,9 73:8
**19** 18:23
**1972** 12:17
**1983** 17:25 26:24
**1992** 12:25
**1993** 14:21
**1997** 17:22 68:10
**1998** 26:25
**1999** 11:19,22,22

**19th** 73:21

**2**

**2** 5:25 6:1,5 10:20 25:2 52:9 54:10 68:4 71:10
**20** 18:23 25:4 26:24 69:14
**200** 10:20 43:16 44:25 67:20
**2000s** 57:19
**2003** 26:25 61:22
**2006** 57:24
**2008** 35:1 64:2
**2009** 35:1 64:2
**2010** 20:16
**2011** 50:7,10
**2013** 12:9
**2014** 12:6
**2015** 7:3,16 12:3 13:20 14:14,24 15:18 17:14 18:12 24:7 33:3 40:17 44:14,19 45:10 66:14 68:6 71:11 71:20
**2016** 6:15,18 7:2,7 7:9,20,24 11:18,18 11:22 13:24 14:1 15:2 33:6 38:7,25 45:14 54:7 69:24 70:9 72:6
**2017** 1:7 2:9 9:1 9:24 10:3,16 11:18 71:9,13,15 71:17 73:10,22
**2022** 73:25
**21** 18:23
**210** 8:6 71:21
**249-1361** 1:19
**25** 13:1,7 14:18

**26** 9:1 13:1 14:18 71:13
**27** 13:2
**28** 10:16 71:17
**29** 7:3,16 13:20 14:14,24 24:7 33:3 40:17 71:11 71:20

**3**

**3** 5:7 8:18,20,24 22:23 25:2 27:21 50:12 52:18 69:9 71:5,12
**3-1-16** 68:2
**30** 9:24 10:3 16:9 54:7 71:15 72:6
**31** 73:25
**32** 28:18,21,22,25
**3:16** 1:4

**4**

**4** 9:16,18,21 28:13 52:19 71:9,14
**400** 45:4
**49** 71:22

**5**

**5** 10:9,11,14 71:16
**50** 43:12,24
**53** 72:6
**55** 62:12

**6**

**6** 10:24 11:1,5 71:11,18
**65** 1:18
**676** 1:13

**7**

**7** 13:14,15,19 71:11,19
**77** 4:13

**8**

**8** 49:3,4,8 71:13,21
**800** 44:3,12,24 57:3
**83** 15:25
**860** 1:14,19
**871-2422** 1:14

**9**

**9** 53:21,23 54:3 71:15 72:4
**99** 11:24

**a**

**a.m.** 2:9 5:4 70:15 73:9
**ability** 30:20
**absent** 58:15
**absolutely** 35:21 57:12
**access** 21:2,6
**accommodate** 4:3
**accounts** 57:7
**accuracy** 19:13
**accurate** 44:21
**action** 1:3 2:3 31:23 32:11
**addendum** 6:23
**addition** 7:10 17:21 68:7,9 70:4
**additional** 6:23
**address** 4:12,16 8:5 26:3
**addressed** 15:11
**addresses** 52:21
**admit** 54:23
**adopted** 52:11,20
**advance** 27:5
**advise** 46:6
**advised** 46:9 47:2 47:16

| | | | |
|---|---|---|---|
| **age** 28:21 | **associated** 56:4 | **basement** 17:16 | **break** 4:1,7 32:9 |
| **ago** 28:25 34:4,23 34:24 47:23 | **assume** 3:23 14:5 45:11 | 18:14 21:16,20 22:1 31:21 32:20 | **brenda** 6:12 38:13 40:24,25 |
| **agree** 50:19,20,21 52:16,25 54:16 | **assuming** 45:17 | 55:14,21 56:2,8 64:15 | **brian** 1:15 26:13 |
| **agreed** 2:13,21 3:1 | **attached** 5:7 13:12 | **basements** 56:5 | **bring** 5:9 |
| **ahead** 4:7 | **attaching** 6:10 | 67:10 | **broken** 32:8 |
| **air** 34:11 | **attachments** 71:11 | **basically** 44:8 | **brought** 5:11 |
| **alarm** 59:18 | **attendees** 67:18 | 64:22 69:4 | **bryan** 62:21 |
| **alkali** 23:7,11,15 34:1 35:6 36:1 | **attorney** 39:5,14 41:3,16 43:1,10,22 | **basis** 20:2 25:7 | **bucks** 45:4 |
| **amount** 28:20,21 | 44:5 46:20 59:15 | **battle** 41:24 | **build** 62:14 |
| **amounted** 65:6 | 67:2 72:9 | **bdanforth** 1:15 | **builder** 62:10,14 62:18,20 |
| **analyzable** 28:12 | **attorneys** 1:11,17 41:5,13 | **beams** 48:7 | **builders** 33:24 |
| **answer** 3:20,23 4:6 22:5 45:17 | **attributable** 19:4 23:7 | **behalf** 2:2 59:1 | **building** 47:14 52:20 53:1 58:19 |
| 46:20 57:11 59:3 59:16 65:8,20 | **august** 1:7 2:9 71:9 73:10,22 | **belief** 45:23 | 69:5,7 |
| **answers** 3:18 9:9 10:4 | **authority** 2:17 | **believe** 9:4 12:17 17:15 19:3 25:15 | **buildings** 34:11 57:4 |
| **apparent** 28:20 | **avenue** 1:18 | 40:2 42:16,18 43:1 46:21 49:13 | **built** 15:25 17:22 61:21 |
| **appear** 19:17 | **aware** 23:13 25:13 25:24 30:13 31:10 | 54:9 61:16 63:19 64:9,13,23 65:9 | **bulge** 27:24 28:5 29:14 30:17 |
| **appearances** 1:10 | 36:13,18 47:9,12 | 66:15 67:23 | **bulged** 30:18 48:3 |
| **appearing** 25:25 | 51:11 57:22 65:1 | **best** 12:4,7,10 | **business** 4:15 |
| **appears** 73:16 | 65:4,15,17 70:8 | 14:16,22,25 24:14 32:10 33:18 41:21 | 12:22,24 60:6 |
| **appointment** 62:9 | **b** | 49:1 51:21,23 | **c** |
| **approximately** 11:23 18:7 | **back** 14:1 15:2 | 64:20 65:25 67:25 | **c** 8:9 41:11 |
| **area** 55:8 | 33:5 49:16 50:2 | **better** 27:2 | **called** 34:7,12 |
| **areas** 20:20 21:2,4 50:16 | 63:9 64:7 | **bienkowski** 8:25 9:8,13 | **calls** 59:18 60:3 63:7 |
| **arrest** 30:2,9 31:7 | **background** 27:8 27:12 | **bill** 6:4,13 | **canada** 24:20 |
| **art** 39:18 | **backgrounds** 27:13 | **board** 63:6 | **caposella** 42:11,14 |
| **aside** 8:2 | **bad** 37:16 | **booking** 40:23 | **car** 4:2 |
| **asked** 9:6,7 10:3 33:19 59:13 64:21 | **ballpark** 44:23 | **books** 36:1 | **card** 51:14 |
| **asking** 51:1 64:22 | **base** 54:13 55:4 | **booms** 48:21 | **care** 55:3 |
| **asr** 23:14,18,23 34:16,17 37:4 | **based** 18:6 21:23 22:23 23:25 24:10 | **bow** 28:10,13,20 28:21 29:6 | **carl** 49:9 |
| **assessor's** 51:14 | 29:4,5 30:5,6 31:16 37:3 55:17 68:25 | **bowing** 20:10 28:6 28:15 32:1 | **case** 7:1 10:7 18:10 28:18 39:6 42:3 51:2,4 58:7 |
| | | **box** 1:13 | 58:25 65:10 |

EXHIBIT 8

[cases - correct]                                                    Page 3

cases 37:5,9 48:11
  65:12,16
cause 22:25 36:19
  36:22 73:20
caused 23:20
causes 25:3
causing 65:6
cd 6:5,6 71:10
certain 14:7 45:18
  58:9
certainly 39:22
  42:3
certainty 17:7
  22:12 53:20 55:17
certified 63:8,9
certify 73:4,11,17
chance 9:2
change 14:13
changed 17:10
  23:10 24:10,21
  62:23
changes 63:20
chapter 52:19
charge 45:1
chemical 22:25
  23:3,11 24:1
  25:10 27:9 36:18
  64:16,24 65:5
chemist 27:6
childree 33:23,23
cianci 49:9,12 50:4
  52:10,19
cite 64:16
civil 1:3 2:4 73:7
claim 42:20 59:11
  71:21
claimant 46:10
claimants 41:17
claims 41:1,6 43:4
clear 17:9

client 26:6,7 41:19
  42:24
client's 46:18
clients 44:4,16
  67:22
closest 11:19
clyde 42:24
coalition 67:9,14
code 52:11,20 53:1
coffee 4:2 13:9
collapse 30:23
  31:2 32:2
collapses 30:22
collect 61:10
color 7:3
coloring 50:15
columns 48:8
come 30:7 48:16
coming 63:9
commencing 2:8
  73:9
commission 73:25
community 39:24
  67:6,16
companies 43:4,7
  49:18 59:2,5,8
company 34:7
  41:24 60:10,13
  62:22,23 63:12
complete 5:12,14
  5:17
completely 9:12
  53:13
concern 64:6 65:7
concerned 47:25
concerning 6:21
concerns 7:9
concluded 70:15
concrete 15:9
  16:12 17:25 18:1
  18:18,25 19:5

20:25 21:1 27:10
  27:13,23 34:3,6,7
  34:19 35:13,19
  36:20 38:23 44:4
  48:4 50:16 51:17
  52:22 54:6 56:12
  57:18 58:7,9,11
  61:23 63:1 68:22
  69:18 70:5 72:4
condemned 47:13
  58:19,23
condition 14:5
  19:7 37:15 48:16
condominium
  62:12 63:2
conduct 27:18
conducting 15:8
confidentiality
  26:7
confirm 68:16
confirmed 58:6
connecticut 1:1,14
  1:19 2:6,8 4:14
  8:12 12:19 23:17
  30:11 54:4 59:7
  71:22 72:5 73:1,4
  73:9,21
connection 2:15
  60:5
consists 54:12
constructed 20:14
  68:10
constructing
  63:17
construction
  33:24 62:7 69:13
consult 44:5 66:12
consulted 35:5,10
  44:16,18 64:14
consumer 54:5
  55:6 72:5

contact 33:21
  40:17
contacted 40:13
  40:16,20 41:18
  66:22
contest 4:5
context 28:8
continually 12:12
continue 27:22
  30:21 32:2
continued 71:24
contracting 62:14
  63:22
contractor 33:9,17
conversation 17:9
  34:14 50:1
conversations
  24:25
copies 5:19,21
copy 5:5 7:3 11:6
  13:20 71:12,14
corporation 1:7
  3:14
correct 4:19,20
  6:7,8,15,19 7:4,7
  7:10,14 8:7,13,16
  9:3 10:7,20 11:7
  11:12,15,19 13:21
  13:24 14:24 15:1
  15:9,11,25 16:12
  16:20 17:15,17,23
  18:3,25 19:12
  20:6,7,11,14,15,20
  21:18 23:1,8,9
  25:5 26:25 27:25
  28:1,16 29:15,18
  30:3,4 31:14
  32:20,25 33:3,4
  37:7 38:4,7,25
  39:18 40:1,2,11
  41:1,2,3,4 42:18

EXHIBIT 8

[correct - earliest]                                              Page 4

45:2 48:19 50:7
51:15 52:14,23
53:14,15 54:21,22
57:1,2 58:16,17,23
58:24 59:2,17
60:1,11,21 61:14
61:17 66:2 68:7,8
68:10,16,17,19,23
70:6
**corrective** 31:22
32:11 33:8
**correctly** 59:3
**counsel** 2:14 73:14
73:18
**county** 61:13
63:15 73:2
**couple** 48:11
**court** 1:1 8:10
**coverage** 17:13
66:14
**covered** 59:12
**cracked** 20:19
21:5 26:18 28:24
50:16 59:6
**cracking** 19:11
25:17,25 36:19,23
47:9,12 48:12
50:14,21 57:8
64:14
**cracks** 16:12,18
17:4,22 18:2,5,9
18:11 19:3,8,16,20
19:24 30:16,19
45:20,21,22,24
59:21 64:5 65:6
68:6,19,21 69:3,8
69:9,11,12,13,15
69:16
**creating** 37:4
**crumbling** 67:10

**cs2679759** 1:25
**csr** 1:23
**current** 10:22 15:4
**currently** 52:11,20
**curtain** 56:18
**cv** 1:4 11:6,9

### d

**d** 1:15 71:1
**damage** 31:14
**damaged** 31:18
**damp** 56:5
**damper** 21:2
**danforth** 1:12,15
2:7 13:8 26:15,19
41:3 42:8,11,14
43:22 44:5 73:8
**danger** 52:6
**dangerous** 32:25
33:2
**date** 11:13 29:18
38:4,7 40:19 52:3
52:7
**dated** 6:14,18 7:6
10:15 13:24 54:7
71:9,11,13,15,17
71:19 73:21
**day** 9:25 15:18
19:10,11 62:9
73:21
**days** 64:8,10
**dean** 33:25
**december** 7:3,16
13:20 14:14,24
24:7 33:3 40:17
45:10 54:7 68:6
71:11,20 72:6
**decisions** 65:11,15
**defect** 19:4 25:3
27:22
**defective** 28:4
34:3 38:23 44:4

68:22 69:17
**defendant** 1:17
2:2
**defendant's** 4:23
6:1 8:20 9:18
10:11 11:1 13:15
49:4,8 53:23 54:3
71:9,10,12,14,16
71:18,19,21 72:4
**definitely** 43:24
57:15
**definition** 54:16
**degree** 20:24
22:12 30:25 53:20
**dehumidifier** 56:1
**delivered** 63:10
**demeo** 39:14
**department** 54:4
55:6 72:5
**depends** 28:11
**deponent** 3:6
73:11
**deposed** 8:15 9:25
11:24 12:3 41:25
**deposition** 1:8 2:1
2:16,24 3:3,15 5:4
8:25 9:22 11:11
38:22 39:5,13,13
42:23 70:15 71:9
71:13,15 73:5
**depositions** 11:17
**described** 4:24 6:2
8:21 9:19 10:12
11:2 13:16 49:5
53:24
**description** 71:7
72:2
**detached** 26:17
**deteriorate** 27:23
32:24

**deteriorating** 54:5
72:4
**deterioration**
37:17
**determination**
55:7
**develop** 33:8
**developments**
70:5,8
**deviate** 49:17
**difference** 57:8
**different** 9:12,13
32:4 36:25 62:14
69:19
**direct** 3:9 71:5
**directors** 63:6
**disagree** 53:3
**disclosed** 10:6
**disclosure** 10:15
13:12 71:17
**dismissed** 70:14
**distress** 22:25 25:3
**district** 1:1,1
**document** 53:1
54:8 71:16,21
72:4
**documents** 5:8,9
8:2
**doing** 14:4 39:5
**don** 33:23
**draghi** 6:13 38:13
40:24,25 43:10
44:5 67:2
**drain** 56:18
**drainage** 56:16
**duly** 2:5
**dumbest** 54:25

### e

**e** 4:11 8:9 71:1
**earliest** 25:9,12,22
25:24

[early - foundation]                                                    Page 5

early  64:7,10
earthquake  50:7
  50:10
edwards  62:21,23
  62:25 63:3,14,23
effect  31:11
efflorescence
  20:19,24 21:3
eight  34:4,22,24
either  40:21 45:12
  45:13
element  52:12
eleven  25:15,16
  58:5
eliminated  30:19
ellington  1:14 2:8
  26:4,17 73:8
email  6:9,12,17,21
  7:2 71:10
emails  63:7
encountered  64:1
endurance  4:5
engineer  12:19
  60:7,18,22
engineering  12:13
  12:21 13:4 31:1,6
  39:17,24,25 61:3
engineers  13:3
  39:25 45:6 46:22
entitled  2:3
especially  20:19
esquire  1:15,20
essential  54:13
  55:1
estimates  51:12
ethical  46:21
evaluations  61:4
evasive  44:2
event  73:19
everybody  26:10
  34:16

evidence  23:22
  30:13 55:18
evidenced  50:15
examination  3:9
  15:9 27:16,19
  58:11 71:5
examined  73:13
exhibit  4:23 5:3,25
  6:1,5 8:20,24 9:18
  9:21 10:11,14
  11:1,5 13:15,19
  30:15 49:4,8
  53:23 54:3 68:4
  71:7,9,10,12,14,16
  71:18,19,21 72:2,4
exhibits  72:8
existing  31:14
expand  19:8 48:4
expanding  21:18
  21:22
expect  56:14
experience  25:8
  29:5 31:17
expert  10:7,15
  35:19 71:17
expires  73:25
explained  34:12
explanation  69:2
exposure  40:3,6,8
  57:13
exterior  18:1,18
  18:25 57:14
extremely  53:18

**f**

f  1:8 2:1 3:6 71:3
  71:13,15,18 73:5
fact  30:6 69:1
factor  61:3
factors  28:11
fail  27:25 29:15

failed  29:17,21,22
  32:4,7
failing  34:16
failure  29:20
fair  3:24,25
fallen  47:7,10
  51:20,22,24
falling  52:7
false  59:18
familiar  39:19
family  17:21 62:15
far  25:23,24 28:9
federal  2:4 73:6
fee  10:19 45:1
feeling  43:6
feelings  55:5
fell  28:10
felt  37:18
field  7:16,23 14:10
  16:16 22:20
figure  12:25 44:23
  63:21
file  5:12,14,17 6:4
  6:5 8:1
filled  62:10
find  44:13 47:18
  56:14 58:8 66:17
  68:6
finding  24:20
finish  3:19
finished  18:15
firm  42:5
first  3:6 14:15
  17:17 22:2 23:13
  34:3 35:11 38:20
  38:22 39:3,15
  40:13,16 42:23
  63:25 66:9 68:22
  69:17 73:11
five  11:25 57:5

flat  45:1
flip  52:9,18 54:10
flood  55:10
flooding  55:14
floor  54:15,19
  55:1,2 56:21,24
  57:3,5,9
floors  48:9
focus  56:12
folks  26:12,16
following  6:17
follows  3:7
foot  29:10
footing  52:12
  54:13
footings  52:23
  53:11,16
footnote  54:11
force  34:11
form  2:22 7:13,19
  61:12
formalities  2:15
formation  67:13
forms  54:15
forward  30:8
found  34:8 35:23
  40:22 66:16,25
  67:3
foundation  14:2
  15:9 16:12 17:21
  17:25 19:21 20:8
  20:9 21:18,22
  22:25 25:5,10
  27:23 28:3,9,24
  30:14 31:19 32:15
  32:23 34:4 38:1
  38:10 40:4,10
  41:17,19 43:4
  46:9 47:9,12
  48:25 51:18 52:13
  53:8 54:11,14,19

EXHIBIT 8

[foundation - information]                                                    Page 6

54:20 55:2,8 56:16,19 57:21 58:16 61:17,24 64:1 65:11,16,23 67:4,7 68:7 69:3,8 69:10,24

**foundation's** 45:20

**foundations** 20:25 34:16 52:21,22 54:6 57:18 59:7 70:5 72:5

**four** 16:17 26:1,17 29:10 66:8 67:17 67:25

**frame** 21:17,21 22:1

**fran** 6:14 60:20,22 60:25

**front** 53:2

**full** 4:9 50:13

**further** 2:21 3:1 32:22 70:12 73:11 73:17

**future** 70:5

**g**

**garage** 17:20 26:18

**general** 46:24

**give** 33:19

**gladysz** 1:2,3 4:18 5:13 6:18 16:3,8 16:23 17:3 30:14 36:20 40:14,21 48:19 64:17

**gladyszes** 44:9 46:3 48:21 50:9 55:13 58:14 68:13

**go** 4:7 35:25 46:15 46:16 50:4,12 59:20 66:18

**going** 3:16,23 12:11 24:17 29:2 30:15,23 32:9 42:1 45:23 47:22 53:18 58:14 61:8 61:19 62:8,11 65:2,13 68:4 69:5

**good** 3:11,12

**google** 36:15

**gotcha** 6:25 63:13 65:21

**gotten** 18:12

**government** 34:10 34:11 35:14

**grade** 18:24

**great** 5:22

**ground** 3:17

**groundwater** 21:8 21:10 40:3

**groups** 67:16

**guard** 46:24

**guess** 11:25 39:4 57:5 58:2 67:25

**guessing** 67:1,20

**gutters** 56:15

**guy** 39:10

**h**

**halloran** 39:14

**handing** 5:15 39:11

**happen** 19:18

**happened** 11:22 19:14

**happening** 23:24

**happens** 61:9,9

**happy** 3:22 4:3

**hard** 63:21

**hartford** 1:19

**head** 3:18 69:6

**heard** 38:16,20 39:2,15

**heavily** 20:19 21:5

**held** 2:6 33:5 50:1

**help** 26:13 42:8 61:12

**hereinbefore** 2:3 73:16

**hereto** 73:18

**history** 51:15

**hl** 1:20

**holding** 29:24

**home** 4:12 15:8 16:8 19:14 22:10 29:25 36:20 37:20 37:21 38:3,9 46:4 46:7 47:7,10,13 48:19,22 51:22,24 52:2 58:3 60:6,8,9 60:13,22 61:21 62:4

**homeowner** 33:16 61:2,11

**homeowners** 48:24 49:17 59:1 59:19

**honest** 57:11

**horizontal** 30:19 30:20

**hour** 10:20 15:23

**house** 14:20,23 15:24 25:18,20 26:2,10 28:14 48:5,10,13,15 55:3 57:25 62:13,15

**houses** 14:20 23:23

**howd** 1:18

**huge** 53:1

**hundred** 60:4

**i**

**idea** 22:3 30:24 34:4 35:21 43:11 57:12 61:19 67:24

**identification** 4:24 6:2 8:21 9:19 10:12 11:2 13:16 27:9,13 49:5 53:24

**identified** 23:18 23:19 65:5

**identify** 64:25

**immediate** 37:6,12 37:18

**imminent** 52:6

**impairment** 38:17 39:16

**inch** 18:7 20:11 28:16 30:17

**inches** 28:13

**include** 21:10,12 21:14

**includes** 6:6

**including** 2:16

**incomplete** 11:14 11:20 44:22

**increase** 19:24

**increased** 16:19

**index** 4:24 6:2 8:21 9:19 10:12 11:2 13:16 49:5 53:24

**indicate** 44:3

**indication** 21:1,4

**indications** 23:14 62:1 68:22 69:17

**indicative** 69:19

**individuals** 46:12 47:17 67:21

**information** 16:3 16:7,22 61:10

**[information - looked]** Page 7

| | | | |
|---|---|---|---|
| 68:12 | issued 6:24 | 51:3,5,17 53:4,16 | 42:18,19 49:2,6,23 |
| **initial** 25:17 44:17 | **j** | 53:19 55:10,13 | 50:2,3 53:21 54:1 |
| 66:14 | | 56:18 57:25 58:6 | 70:11 71:5 72:9 |
| **inquiry** 63:3 | **j** 1:3,22 2:4 73:3 | 58:10,18 61:23 | **leave** 28:13 |
| **inspect** 22:9 53:10 | 73:23 | 62:13,17,17,22 | **legal** 46:19 65:22 |
| **inspected** 14:9,19 | **j.j.** 34:17 | 63:17 64:4 65:3 | **lengthy** 69:2 |
| **inspecting** 64:24 | **january** 6:14 9:1 | 65:19 66:4,9,16,22 | **letter** 42:7 71:19 |
| **inspection** 7:10 | 71:13 | 66:25 67:2,3 | **level** 29:10 |
| 18:12 37:20 41:19 | **job** 1:25 | 69:21,22 | **liberty** 1:6 3:14 |
| 41:20 53:7 60:6,9 | **john** 33:25 | **knowing** 50:25 | 8:25 9:23 |
| 60:14 | **judges** 65:23 | **knowledge** 14:16 | **libraries** 36:3 |
| **inspections** 45:2 | **july** 17:14 44:14 | 17:2,5 18:16 20:6 | **license** 12:13 |
| **inspector** 47:14 | 44:19 66:14 | 24:16 33:18 37:22 | **licensed** 12:18 |
| 58:20 60:8,23 | **jumped** 56:11 | 37:24 38:2 41:21 | 33:9,17 |
| **institute** 35:13 | **k** | 49:1 51:21,23,25 | **life** 9:13 |
| **insurance** 1:6 3:14 | | 65:19,25 | **likelihood** 55:22 |
| 41:24 43:3,7 | **k** 41:11,11 | **known** 23:15,20 | **line** 25:2 50:7 |
| 49:18 59:1,4,8,10 | **kahan** 42:10 | 55:5 64:15 | **list** 11:7,10,12,13 |
| **intake** 7:12,19 | **keep** 5:19 40:15 | **knows** 26:10 34:16 | 11:14,21 38:25 |
| **integrity** 38:17 | 60:2 62:11 66:6 | **kopsick** 41:9,15,22 | 39:1 41:10 42:22 |
| 39:17 | **kerensky** 42:10 | 42:6,21 43:2 | 71:18 |
| **interchangeable** | **kieran** 1:20 3:13 | **l** | **listed** 11:18 |
| 28:7 | **kind** 14:12 26:6 | | **lists** 10:19 |
| **interested** 73:19 | 34:21 35:14 63:21 | **l** 2:11 4:11 8:9,9 | **literature** 31:6,10 |
| **interior** 18:1 | 69:20 | **labeled** 50:5 71:16 | **little** 21:3 27:2 |
| **internet** 34:9 | **kinds** 60:3 | 71:21 72:4 | 62:13 |
| 35:23 | **kleary** 1:20 | **lally** 48:7 | **live** 38:3,6,10 |
| **intrusion** 55:21 | **knew** 30:9 | **lane** 4:13 | 61:13 62:12 63:14 |
| **investigation** | **know** 4:2,3 11:23 | **laroche** 33:24 | **lived** 9:12 |
| 71:21 | 12:2 14:21 15:20 | **latest** 57:21,23 | **living** 22:9,14,17 |
| **invoke** 26:6 | 16:2,15,25 17:3 | **law** 2:6 65:10 73:7 | 22:21 29:25 |
| **involved** 42:3,20 | 18:5,11,14 21:20 | **law.com** 1:20 | **llc** 1:12 2:7 12:22 |
| 42:23 | 21:24 23:3 25:18 | **lawsuits** 49:20 | 73:8 |
| **involves** 42:21 | 26:12 28:23 29:1 | **leard** 1:22 2:5 73:3 | **local** 36:8 |
| **inward** 20:10 | 32:16 33:12 34:8 | 73:23 | **located** 42:16 |
| 27:24 28:10 29:15 | 34:14 35:3,10 | **learn** 34:1 36:6 | **locations** 20:10 |
| 30:16,22 32:1 | 37:2,3,9 38:9 39:2 | **leary** 1:20 3:10,13 | **long** 12:24 15:20 |
| **iron** 23:20,23 36:6 | 39:6 40:13,20,22 | 4:21 5:1,24 6:3 | **look** 55:15 56:17 |
| 36:16 37:3 | 42:2,5 43:2,17 | 8:8,11,18,22 9:16 | 56:24 68:1 |
| **issue** 37:19 | 44:6,10,18,20 45:6 | 9:20 10:9,13,24 | **looked** 57:4 |
| | 46:3,12 47:1,16 | 11:3 13:10,11,14 | |
| | 48:12,24 49:18,20 | 13:17 26:22,23 | |

[looking - observations]                                                    Page 8

looking  34:5 42:22
  56:10 66:18
looks  6:9,13,22
  7:12,15 11:10,17
  15:7 18:22,24
  41:25
lot  28:11 34:10
loud  48:12,13,14
  48:21
ludorf  1:18

**m**

mahoney  26:20,21
  26:22
mail  63:7,8,9
main  1:13 2:7 73:8
maintained  12:12
majority  23:19
  44:15,16
making  63:22
management
  63:12
map  19:11 36:19
  50:13
march  6:18 7:2,7
  7:9,20,24 9:24
  10:3,16 13:24
  14:1 15:2 33:6
  38:7 45:12,14
  69:24 70:9 71:15
  71:17
mark  4:21 5:24
  8:18 9:16 10:9,24
  13:14 49:2 53:21
marked  4:23 5:3
  6:1,5 8:20,24 9:18
  10:11 11:1,5
  13:15,19 20:1
  49:4,8 53:23 54:3
markings  51:8
material  19:4

math  13:6 27:2
  34:25
matter  4:19 13:13
  41:25 59:5 63:4
maxing  30:11
mcallister  9:23
  11:11
meadowview  4:13
mean  14:17 31:25
  32:14 39:22 44:2
meaning  19:8
  39:22
measurable  19:24
measure  18:8 29:6
  29:9
measurement
  29:12
media  17:13 66:13
  66:14
meeting  67:12
meetings  67:7,10
  67:11,19
merit  1:22
met  41:22 49:12
metal  21:16,20
  22:1
michael  41:9,15
  42:5
middle  27:21
  41:23
million  43:18
mineral  23:20
  27:13
missing  11:11
moderate  20:18
moisture  21:6,7
mold  56:5,7,14
money  30:11
monitor  70:4
month  19:25

months  16:20
  47:19 69:4,9
morning  3:11,12
mottes  34:17
  57:18 58:7 62:2
move  46:6,10
  47:17 58:14
moved  46:3
muddy  55:4
mutual  8:25 9:23

**n**

n  2:11 4:11 71:1
name  3:13 4:9
  26:19 36:25 41:10
  42:17 62:22,23
  63:20
names  26:12 33:20
  33:22
navy  34:11
neal  1:8 2:1 3:6,11
  4:11 5:2 6:13,14
  8:23 9:21 10:14
  11:4 13:18 49:7
  54:2 60:15 71:3
  71:13,15,18 73:5
necessarily  56:13
necessary  31:23
  32:12 37:7,13
need  3:17 4:1
  45:25 58:22 70:3
needed  41:19
needs  32:15
never  20:13 41:22
news  44:13,17,19
  66:1,5,10,12,16,17
  67:3
night  62:9
nine  34:24
nods  3:18
noises  48:14

normal  22:11
  59:20
normally  15:22
  26:6 56:24
northeastern
  30:10 59:7
notary  2:5 3:3
  73:3,24
notation  25:7
  56:25
note  14:7 20:18
  21:16 22:13,23
  23:7 25:2 27:22
  28:2 29:14 30:2
  31:13,21 32:11,18
  32:22 56:21 68:5
  68:9,18
noted  14:10
notes  7:16,24 14:4
  14:11 15:24 16:16
  17:16,20,24 22:20
  45:21 48:23 50:6
  52:11,19 54:11
  55:25
notice  2:17
noticed  13:8 16:11
  54:23
number  16:19
  35:16 41:1 57:10
  60:3 67:24
numerous  18:2

**o**

o  2:11 8:9 41:11
oath  9:8 10:3
objections  2:22
obligation  46:17
  46:19,21
observation  23:25
  50:6
observations
  21:24 22:14,24

EXHIBIT 8

**[observations - presented]**                                        Page 9

| | | | |
|---|---|---|---|
| 53:7 | 47:1 48:18,24 | 45:12 | **phrase** 38:16,21 |
| **observed** 20:1 | 49:22 51:5 54:20 | **papers** 36:2,2 | 39:25 |
| 50:14 | 56:1,25 57:13,17 | **paragraph** 17:17 | **place** 2:16 19:12 |
| **obstruction** 18:17 | 58:3,10 59:10 | 17:24 20:9 22:23 | 56:13 58:3 |
| 19:2 | 60:5,22,25 61:6,13 | 25:2 27:21 32:19 | **plaintiff** 73:5 |
| **obtain** 16:7 | 64:10 65:4,10 | 50:12 | **plaintiffs** 1:11 |
| **obvious** 48:15 | 66:16,21 67:3,6,15 | **part** 51:24 52:2,13 | **plan** 33:9 |
| 56:10 | 67:18 68:1 69:21 | 54:19 55:1 | **plans** 15:4 |
| **occupied** 16:8 | 70:3 | **particular** 59:11 | **plate** 52:13 |
| 52:3 | **old** 25:16 26:17 | **particularly** 43:6 | **please** 3:19,21 4:6 |
| **occurred** 22:7 | 69:7,9 | **parties** 2:14 73:18 | 4:9,22 5:14 8:19 |
| 28:21 | **ones** 24:1 35:8 | **parts** 54:13 | 9:17 10:10 49:3 |
| **odors** 56:4 | **online** 36:4 | **passed** 39:9 | 52:9,18 53:22 |
| **offer** 57:10 | **opine** 65:6 | **paul** 1:2 5:12 | 54:10 68:2 |
| **offered** 57:16 | **opined** 59:11 | 15:11,17 40:21 | **point** 18:23 24:21 |
| **offhand** 25:19 | **opinion** 29:3 50:20 | 45:9 | 25:8 32:24 37:2 |
| 35:4 44:20 47:18 | 58:13,22 61:12 | **pending** 4:6 | 37:18 41:14 47:8 |
| **officer** 2:17 | **opinions** 65:23 | **people** 24:19 | 48:5 63:19 |
| **offices** 2:7 73:7 | **opportunity** 53:10 | 28:13 33:20 47:2 | **policy** 59:11 |
| **official** 47:14 | **opposed** 3:18 59:1 | 59:13 65:18 67:12 | **portion** 29:25 |
| 58:19 | **orcutville** 8:6,8 | 67:20 | **position** 21:17,21 |
| **oh** 34:15 36:5 60:2 | 71:21 | **people's** 46:24 | 22:2 61:19 |
| 60:24 63:24 66:18 | **origin** 50:14,22 | **percent** 58:25 | **positive** 55:24 |
| **okay** 4:8,15 5:22 | **original** 14:2 62:4 | **period** 28:22 | **possibility** 69:16 |
| 7:2,15 9:5,11,15 | 70:4 72:8 | **periodic** 20:2 | **possible** 32:22 |
| 10:6,19 11:14,23 | **owned** 12:24 | **peripheral** 36:21 | 33:10 65:3 |
| 12:2,6,9 13:2 14:9 | **owner** 62:4 | **personal** 51:25 | **potential** 57:14 |
| 14:14 15:7,17,24 | **oxidation** 36:7,16 | 65:18 | **pour** 25:11,25 |
| 16:18 17:11,13,16 | | **personally** 31:20 | 26:24 |
| 17:20 18:8,11,20 | **p** | 57:24 65:22 | **poured** 25:5 57:18 |
| 19:3,15,19 21:16 | **p** 2:11 41:11 | **personnel** 66:13 | 57:21 58:4 |
| 21:25 22:6,13 | **p.e.** 1:8 2:1 3:6 | **pertinent** 36:13 | **practice** 22:11 |
| 24:3,10 26:5,22 | 71:3,13,15,18 73:5 | **petrographic** | **predict** 32:23 |
| 28:5,9,15 29:6,11 | **p.m.** 71:11 | 27:15,19 58:11 | **prepared** 13:23 |
| 29:24 32:3 33:22 | **p.o.** 1:13 | **photographs** | 14:10 |
| 34:18 35:25 36:5 | **page** 5:7 6:17 | 16:25 18:6,21,23 | **present** 5:2 8:23 |
| 36:15 37:1,20 | 10:20 50:5,12 | 19:1 29:11 37:25 | 9:21 10:14 11:4 |
| 38:24 39:16,21 | 52:9,18 54:10 | 45:22 55:18,19 | 13:18 20:24 54:2 |
| 40:22,25 42:5,25 | 71:7 72:2 | 68:18 69:23 | **presented** 5:23 |
| 43:3,20 44:1,12,18 | **pam** 15:14 | **photos** 5:16 6:6 | 49:7 |
| 45:1,16 46:17,19 | **pamela** 1:3 5:13 | 22:17 70:1 | |
| | 6:10,18 40:21 | | |

EXHIBIT 8

presently   30:16
pressure   30:20,21
presume   7:20
pretty   13:6 36:8
previous   8:15
previously   11:10
prior   11:18,22
  14:23 23:6 24:16
  38:1 39:20 40:18
  42:22 44:19,25
  45:7 66:13 67:13
  69:4
pristine   19:10
privacy   46:18,25
probability   31:1
probably   22:5
  34:19 35:11 37:8
  38:22 39:12 43:15
  47:22
problem   23:14,16
  23:19 25:11 30:10
  34:17 36:13 37:4
  39:20 44:9 56:15
  57:2,4,22,24 59:20
  61:20 64:2,8,11,16
  64:25 66:2,5,13
  67:4,7,13,16 69:20
  70:2
problems   55:13,20
  56:21 57:17 59:6
  65:24
procedure   2:4
  73:7
process   30:3 31:8
produced   6:4,6
  8:3
professional   12:13
progression   17:1,4
  19:20
progressive   19:7

progressively   19:8
project   18:24
  62:24 63:20
projects   43:9
proof   3:2
properties   47:25
  63:18
property   6:7 8:5
  14:15 15:5,21,23
  16:4 30:15 35:3
  40:14 45:7 47:13
  51:15 53:17 55:10
  58:18 61:3 68:15
protect   46:18
protection   54:5
  55:6 72:6
provided   16:3,22
  68:12
provides   54:13
public   2:5 3:3 73:3
  73:24
publications   35:6
  35:13 36:10
pull   16:4 36:1
  51:14 68:15
purpose   15:8
  61:11
pursuant   2:3 73:6
push   30:21
pushed   21:17,21
  22:2 48:7
put   21:24 24:15
  32:10 61:18
puts   53:4
putting   23:11
pyrrhotite   23:21
  23:23 24:20 37:3

**q**

qualifications   3:2
qualified   2:5
  27:18

quarter   18:7
question   4:6 64:18
  64:21
questions   3:18,19
  9:5,7 10:2 61:7
quick   55:15
quickly   32:23

**r**

r   8:9
rainwater   21:14
  40:6
range   43:20
rapidly   19:17
rarely   57:2
rate   10:22 19:20
reaction   23:1,3,8
  23:11,12,15 24:2
  25:11 34:2 35:6
  36:1 64:16,24
  65:5
reactions   27:10
  36:19
read   35:16 54:25
  65:10,22
reading   2:23
really   28:12
reason   14:21
  23:10 53:3 57:14
reasonable   30:25
reasons   14:19 46:4
  46:7,10 47:3,5,17
  48:2 56:23 58:15
  60:3
recall   9:25 24:8,23
  25:21,22 26:3
  35:4 47:18 51:10
  55:23 56:6 58:8
  65:14 66:23
receive   5:5 9:8
  10:4 12:16

received   59:18
receiving   12:13
recollection   12:4,7
  12:10 14:3,23,25
  15:16,19 17:12
  18:19 33:15 35:9
  45:8,15 56:3
recommendation
  32:19 48:1,19
record   18:16 22:6
  34:13 40:15 44:21
  45:15 46:8,13,15
  46:16 49:23 50:1
  54:24 60:2 68:15
recorded   20:2
records   16:4 24:24
  44:3
refer   39:7 53:6
references   34:9
referral   33:14
referrals   63:23
referred   33:16
  40:24
referring   11:21
  21:8 24:4
refers   52:12
reflecting   24:24
  29:12
regard   38:23 59:5
  59:6
regarding   22:20
  35:6 36:10,16
  40:14 53:7 64:14
  65:11,23 66:1,5,13
  67:7,16
registered   1:22
reinspect   14:2
related   73:17
relating   5:12
relative   27:9,12

EXHIBIT 8

[relied - sitting] Page 11

relied  16:6
relocate  47:2,5
  48:1
rely  16:5
remember  26:5
  33:25 61:1 63:11
  66:20
reminder  3:17
renotice  5:3 71:9
repair  31:13
repaired  31:18
  45:21,22,24
repairs  37:6,9,12
  45:19
rephrase  3:22
  64:20
replaced  32:15,16
  32:20 38:11 48:25
replacement  51:11
  58:15
reply  63:3
report  6:10,22 7:4
  7:6,9 13:13,21,23
  14:10,10 15:12
  16:11 17:18 22:14
  24:10,12,21 37:13
  37:21 38:13 48:21
  49:9,14 53:5,6
  54:5 57:1 60:25
  64:5,17,23,25 68:2
  72:4
reported  73:15
reporter  1:22 8:10
reports  6:24 23:6
  37:6 44:14,17,19
  48:11 64:11,13
  65:4
represent  3:13
representation
  16:5,6

representing
  41:17
requests  4:4 5:8
requirements
  52:21
research  35:14
  36:2
reserved  2:22
residential  12:21
  13:4 52:11,20,22
  54:6,12 63:18
  72:5
resist  30:20
resolved  44:6
respective  2:14
response  55:23
  63:8
retain  40:10
retained  72:9
retaining  18:2
retired  63:19
return  15:4 38:7
returned  45:11
review  9:2
reviewed  59:10
right  7:17,21,23
  7:24 8:1,6 9:13
  11:9 12:21,22
  13:10 14:22 15:14
  17:14,22 19:10,23
  20:4 26:9,11 27:3
  28:19 30:13 31:23
  32:12 33:6,10
  34:13,23 35:1
  36:9 38:14 39:2
  39:23 40:4 43:24
  46:24 49:16 50:4
  51:6,8 53:8 55:23
  58:4 59:8,9,16
  60:6,9,10,20 62:1
  62:16 64:2 66:24

69:21
rmr  2:5
road  8:6 71:21
role  62:6
room  17:21
rules  2:4 3:17 73:6
résumé  71:18

**s**

s  1:2 2:11,11 41:11
safe  38:3,6
safely  52:3
safety  37:18 46:4
  46:7,10 47:2,5,17
  48:2 58:15
sage  39:14
saw  14:12 20:13
  34:3,12 35:11
  36:20 51:5 57:25
saying  51:3
says  16:11,14,18
  20:8,9 25:6 40:23
  50:8,13,17,18 70:3
schedule  5:7
scheduled  40:16
scheduling  7:13
school  9:12
scientific  27:8
search  35:13
searched  35:22
searches  36:15
second  6:21 7:6
  17:24 20:9 39:13
  49:24
secondhand  65:17
section  50:6 52:10
see  5:14 18:25
  20:16 21:25 25:20
  45:19 51:8 55:18
  56:1,7,15 57:2
  60:25

seeing  25:16
seen  10:17 19:16
  31:6 37:20,25
  49:10,14 54:8
  57:17,24
seldom  58:8
send  6:22
sense  61:8 65:19
sent  6:13,23 38:13
  63:7
sentence  50:13
services  12:22
  13:4
settlement  59:21
shape  48:6
sheet  40:23
shifting  21:18,22
shored  45:25
shorter  28:22
shortly  24:9
show  45:22 48:23
  69:12,14
showing  39:20
shrinkage  59:21
  69:11,11,15
siding  18:17
significance  20:22
significant  14:12
significantly  16:19
  17:6,8,10 48:3
signing  2:23
signs  25:16 56:7
silica  23:7,11,15
  34:1 35:6 36:1
sill  52:13
similar  48:22
single  62:15
sip  13:9
sir  4:10
sitting  53:2

EXHIBIT 8

six   11:25 16:20 47:19 57:5
size   16:19
slab   54:14 56:22 56:24 57:1,3,9
slabs   57:5
small   50:7,9
smell   56:4
smith   42:24
soil   30:20 40:10
solely   22:23
somebody   30:9 33:21 44:8 66:18
somers   73:21
somewhat   44:21
son   60:15
soon   33:9
sort   65:7
soucy   33:24,25
sound   32:3
sounds   48:12
source   57:14
space   22:9,15,18 22:21
speak   15:14 66:12
specific   17:12
specifically   15:22 21:9 24:8 56:17
spell   41:10
spend   3:16
spider   18:2
spoke   45:12 67:11 67:12
spoken   45:9,13 67:6,15
springs   71:22
stafford   8:12 71:22
stages   25:17
stand   30:16

start   25:14
started   12:25 17:13 48:4
state   2:6 4:9 29:19 54:4 72:5 73:1,4
stated   37:6
states   1:1 12:18 31:7
stenographically   73:14
stipulated   2:13,21 3:1
stood   20:13,16
stop   12:11
street   1:13 2:8 73:8
strike   9:6 16:14 21:25 25:23 64:11
structural   29:17 29:19 38:17 39:17 64:5 65:7
structurally   27:25 28:4 29:15 31:22 31:25 32:3,4,7,8 32:24 33:2
structure   54:12
studied   23:16 36:9
study   23:18 24:6 24:11,13
stuff   53:4
subsequently   9:11 67:21 73:15
substantial   38:17 39:16
substantially   14:6
sufficiency   2:16
suggest   33:20
suggested   34:5
suggestions   57:10 57:15

sulfide   36:6
sulfite   36:16
supporting   48:9
supports   54:14
sure   19:18 36:24 39:8 55:16 59:3
surface   21:12 40:8
surprised   53:19
suspect   57:23
sworn   3:7 73:12

**t**

t   2:11,11 8:9
table   55:8
take   4:7 55:2,15 68:1 70:1
taken   2:2,18 3:4 3:15 9:23 38:1 69:24 73:6
talk   24:22 59:14
talked   34:14 56:23 62:25
talking   24:19 35:21
tanddlaw.com   1:15
technical   35:20
telephone   63:7
tell   18:21 24:1 28:13 50:9 59:14 73:12
tells   61:2
ten   31:2 58:4,5
term   39:17 40:1
terminology   52:10
terrible   13:6
tested   34:6
testified   3:7
testify   19:19
testimony   10:19 11:6,10 38:24 42:23 71:18 73:14

testing   34:7,8
thank   5:18 8:10 70:13
then's   6:12
theories   57:16
thing   35:15 36:25
things   11:21 23:24 30:7 35:16,23 36:22 48:22 54:25 70:1
think   13:2,7 20:22 24:8,14 39:9,15 43:25 46:23 51:1 57:7,13 59:19 64:7,18 67:11
third   50:6
three   16:17 47:4 47:16 49:16 54:12 66:8 67:17,25 68:19 69:4,9
thursday   2:9 73:10
time   2:16,23 3:16 4:1 14:15 25:8 27:2 28:3,22 31:22 35:11 37:2 38:12,20 39:3,15 45:24 46:1 48:13 48:17 62:24 63:25 66:9
times   8:15 11:24 12:1,2 66:4,8 67:15,17
timothy   60:15,18
titled   52:21
today   4:18 5:4,9
told   65:18
tolisano   1:12 2:7 73:7
tolland   61:13 63:14 73:2

EXHIBIT 8

tons   30:11
totality   21:23
totally   35:18
town   47:14 58:19
track   62:11 66:6
tracked   17:3
transcribed   73:15
transcript   8:24
  9:22
treatises   35:5
  36:10
trial   2:23 42:1
tried   62:11
true   33:5
truth   73:12,12,13
try   34:25
trying   12:25 24:14
  61:7 64:7
tuesday   71:11
turns   41:23
tv   26:8
twisted   48:5
two   6:24 35:12
  40:18 41:13 47:23
  67:17 69:12
type   25:3 36:23
typically   25:3
  40:17

**u**

u   2:11 8:9
uconn   24:11,12,19
  24:22
uconn's   24:6
undelivered   63:10
underground
  53:14
understand   3:21
  64:18
understood   3:23
  23:16

unfinished   17:17
uniform   19:19
united   1:1
universities   35:25
university   23:17
  35:14
unsafe   38:10
unsound   31:22,25
  32:8
urged   33:8
use   39:25
useful   35:17
useless   35:18

**v**

v   8:9
variable   19:24
variations   19:16
various   14:19
verbal   3:17
vernon   4:14 42:16
versus   8:25 9:23
vertical   52:12
vibrating   48:13
visible   17:22,25
  25:4 68:19,22
  69:17
visit   7:17,21,24
  15:15 28:4 33:3
  38:1,4 45:7,9 46:1
  51:6 52:4,7 53:11
  68:5 69:24
visited   15:7
visual   15:8 22:24
  23:25 53:7
vlb   1:4
vs   1:5

**w**

w   1:20
waived   2:19,24
  3:4

wall   19:11 28:9
  29:19 30:18,21,23
  31:1
walls   18:2,18,25
  19:21 20:10,13
  27:23 28:15 29:7
  30:14,19 31:21
  32:1,20 40:4,10
  45:25 47:10 48:3
  51:9,18,20 52:6
  54:14,20 57:8
  64:23
water   21:2,6,7,12
  40:8 55:8,20
  57:14
way   20:2 24:1,15
  28:25 29:23 30:2
  30:8,12 31:7,13
  32:10 36:21 44:7
  50:25 61:12,18
  65:8 73:19
we've   6:5 11:9
weathering   50:15
web   18:2
week   41:25
weeks   40:18
wendy   1:22 2:4
  73:3,23
went   14:1 33:5
  36:3 62:8
wethersfield   1:18
wetter   21:1
whatsoever   61:12
when's   30:23
  38:20
wide   18:5
wife   60:20
william   1:8 2:1 3:6
  4:11 71:3,13,15,18
  73:5

window   21:17,21
  22:1
wintery   15:18
witness   26:13,16
  26:21 42:10,12,15
  70:14 71:3
wood   52:13
word   4:13 17:6,8
work   34:10 40:25
  41:5,12 58:25
  59:4,8
working   42:2 43:3
  43:9
worse   18:12
write   37:12 64:11
written   24:12,24
  37:5 64:4,23
  65:23
wrote   65:5

**x**

x   71:1

**y**

yeah   23:13 34:24
  39:10 60:12
year   12:3 19:25
  26:15,17 35:12
  47:21 58:2 69:12
years   13:1 14:18
  16:9,17 25:4,15,16
  26:1,24 28:18,21
  28:22,25 31:2,4
  34:4,22,24 47:23
  58:4,5 69:7,9,13
  69:14
yesterday   42:8

**z**

zone   55:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 8

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 8