UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEVEN L. VERA AND
KIM E. VERA                CIVIL ACTION NO.
                           3:16-cv-00072-RNC

        VS.


LIBERTY MUTUAL FIRE
INSURANCE COMPANY             AUGUST 17, 2017


        DEPOSITION OF: WILLIAM F. NEAL, P.E.


APPEARANCES:


Attorneys for the Plaintiffs:

    TOLISANO & DANFORTH, LLC
        18 Main Street
        P.O. Box 676
        Ellington, Connecticut 06029
        (860) 871-2422
        bdanforth@tanddlaw.com
    BY: BRIAN D. DANFORTH, ESQUIRE

Attorneys for the Defendant:
    HOWD & LUDORF
        65 Wethersfield Avenue
        Hartford, Connecticut 06114-1190
        (860) 249-1361
        kleary@hl-law.com
    BY: KIERAN W. LEARY, ESQUIRE

                  Wendy J. Leard
            Registered Merit Reporter
                 CSR # 00039


    Job No. CS2679783

EXHIBIT 10

. . . Deposition of WILLIAM F. NEAL, P.E., taken on behalf of the defendant in the hereinbefore entitled action, pursuant to the Federal Rules of Civil Procedure, before Wendy J. Leard, RMR, duly qualified Notary Public in and for the State of Connecticut, held at the law offices of Tolisano & Danforth, LLC, 18 Main Street, Ellington, Connecticut, commencing at 12:08 p.m., on Thursday, August 17, 2017.

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections, other than as to form, are reserved to the time of trial and that the reading and signing of the deposition are hereby waived.

EXHIBIT 10

It is further stipulated and agreed that the proof of the qualifications of the notary public before whom the deposition is being taken is hereby waived.

(Defendant's Exhibits 1 and 3-9, marked for identification-described in index)

WILLIAM F. NEAL, P.E., Deponent, having first been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. LEARY:

Q    Good afternoon, Mr. Neal.

A    Good afternoon.

Q    I'm still Kieran Leary, and I still represent Liberty Mutual Fire Insurance Company.

I know you've had your deposition taken before because I just took it in the Gladysz matter, correct?

A    That's correct.

Q    Just a few ground rules for this record.

I need verbal answers from you, no nods of the head, just for a clear record.

Please let me finish my questions, and

EXHIBIT 10

I'll let you finish your answers.

If you don't understand anything I ask, please ask me to rephrase; I'll be happy to do so.

If at any time you need a break, please let me know; I'll be glad to accommodate you.

But if there is a pending question, please answer it before taking your break.

Can just say for your full name for the record, please?

A    William Neal, N-E-A-L.

Q    And what's your home address?

A    77 Meadowview Lane, Vernon, Connecticut.

Q    And that's also your business address?

A    Yes, it is.

Q    And we're here for the Vera matter, correct?

A    Yes.

Q    That's the home at 28 Laurel Drive in Willington?

A    Yes.

Q    Mr. Neal, I present you with what's been marked as Defendant's Exhibit 1.  It's a renotice of your deposition.

Have you received this?

A    Yes, I have.

EXHIBIT 10

Q    And on page 3, there is a request for documents, including your file.

Do you have any documents for me?

A    I do.

Q    Are these copies?

A    Yes.

Q    Okay.

MR. LEARY:  I'll mark this as 2.

(Defendant's Exhibit 2, marked for identification-described in index)

BY MR. LEARY:

Q    What's been marked as 2 is a CD.

And what's on this CD?

A    Those are photographs I took of the Vera home on August 28, 2015.

Q    Is that why you've labeled the CD "Vera photos"?

A    Yes.

Q    Okay.  And it looks like you also have a color copy of your August 28, 2015, report, including photographs, correct?

A    That's correct.

Q    Then you have an intake sheet for this property as well, correct?

A    That's correct.

EXHIBIT 10

Page 6

Q    Then you have your one-page field notes dated August 27, 2015, correct?

A    Yes.

Q    This might be the first time I saw that you didn't write the report the same day.

Got there late in the day, huh?

A    I didn't notice that.

Q    Three o'clock, yes.

A    That is very unusual that it wasn't done the same day, but I'll assume the dates are correct.

Q    All right.  And I'll show you what's been marked as Defendant's Exhibit 3.  It's a transcript of your deposition in Bienkowski versus Liberty Mutual on January 26, 2017.

Do you remember me deposing you that day?

A    I do.

Q    And would you answer questions I asked the same if I asked you those question today?

A    Yes.

Q    And I'll present you with what's been marked as Exhibit 4.  This is a copy of a transcript of my deposition of you on March 30, 2017, in McAllister versus Liberty Mutual.

Do you recall me deposing you on that day?

EXHIBIT 10

A    I do.

Q    If I asked you the same questions I asked you on March 30, 2017, under oath, you would answer them the same today?

A    Yes.

Q    And I just deposed you earlier this morning in Gladysz versus Liberty Insurance Corporation, correct?

A    Yes.

Q    And if I ask you the same questions I asked you this morning, would you answer them the same now?

A    Yes.

Q    And I'll show you what's been marked as Exhibit 5.  This is a copy of your expert disclosure.

Have you seen this document before?

A    No.

Q    Okay.  And it says you charge $200 per hour; is that correct?

A    That's correct.

Q    Then I'll show you Exhibit 6.

This is your résumé and testimony list, correct?

A    Yes.

EXHIBIT 10

Q     And we went over this in Gladysz earlier this morning, correct?

A     Yes, we did.

Q     And I'll show you a copy of your home inspection report dated August 28, 2015.

It's been marked as Exhibit 7, correct?

A     Yes.

Q     And this is also the same report you produced, which is marked as Exhibit 2, as part of your file, right?

A     Yes.

Q     Is there anything additional in your file that you haven't given me today?

A     No.

Q     And it appears that you visited this home on August 28 -- excuse me, August 27, 2017, right?

Or, excuse me, you visited this home on August 27, 2015, right?

A     That's correct.

Q     It's about a month after the news reports, correct?

A     Yes.  I believe that's correct.

Q     Were the news reports the impetus for the Veras filing this claim or contacting you?

A     I don't know.  I have no recollection or

EXHIBIT 10

any notes to that.  It's certainly possible; I just don't know.

Q    Okay.  Did you ask them?

A    No.

Well, I don't want to say definitely no. I'm just going to say probably not.  It's not something I would typically ask.

Q    Okay.  And in your referral sheet, it says you were referred by "Brenda," correct?

A    Yes.

Q    Is that Brenda Draghi?

A    Yes, it is.

Q    Okay.  And this report says that the home was built in 1993, correct?

A    Yes.

Q    And is that information you received from the Veras?

A    Yes.

Q    Did you pull the property assessor's card?

A    No.

Q    Have you been back to the property since August 27, 2015?

A    I don't believe so.  I have no record of it.

Q    Have you ever been to this home prior to

EXHIBIT 10

August 27, 2015?

A    Not to the best of my recollection.

Q    Do you have any current plans to return to this property?

A    No.

Q    And it says that you went to conduct a visual examination of the concrete foundation, correct?

A    That's correct.

Q    And do you address a letter to Steve in reference -- in your letter of your conversation with him, right?

A    Yes.

Q    Did you ever speak to Kim?

A    I have no recollection whether I did or not.

Q    Do you know if anyone was there besides yourself or Steve?

A    I have no recollection of that.

Q    How long were you at this property?

A    Typically, I'm there approximately an hour.

Q    And it says that they've occupied the home for seven years, right?

A    Yes, it does.

Q     And was that also information provided by Steve?

A     Yes.

Q     It says "very recently noticed cracks," right?

A     Yes.

Q     Do you know how recently?

A     No.  My field notes specifically -- I wrote specifically "very recently."

"Recently" would be within a year or two.

"Very recently" is something I don't normally write and, you know, that's based on what my client tells me at the time.

And, you know, usually I get kind of a nonspecific answer when I ask, "When did you notice the cracks?"

You know, it might be, "I don't know.  Two or three months ago, maybe four months.  Last week."

I am guessing that, because of the news coverage, they decided to go look at their foundation, and that's the first time they saw the cracks.

So I'm guessing it may have been a month, but I just cannot state with any specificity at

EXHIBIT 10

all what that means.

Q   Okay.

A   It's very subjective.

Q   Sure.

And you note in your second paragraph "At this time, the exterior foundation has three small vertical cracks," correct?

A   Yes.

Q   And you also note that "The garage foundation also has some small vertical cracks which appear to be common shrinkage cracks," correct?

A   Yes.

Q   And those small vertical cracks on the exterior were also, apparently, common shrinkage cracks, right?

A   Yes.

Q   So you didn't notice any, let's say, map cracking or spider web cracking on the exterior foundation walls, did you?

A   No.

Q   You didn't notice any map cracking in the garage foundation walls, correct?

A   That's correct.

Q   But you note that there is very narrow

EXHIBIT 10

spider web cracking in the foundation walls, correct?

A    Yes.

Q    In the interior, right?

A    Yes.

Q    And it says "The basement is approximately 90 percent finished," correct?

A    Yes.

Q    Do you know when it was finished?

A    I do not.

Q    And do you know if any of the finishing has been removed?

A    I have no record of that.

Q    You haven't seen the basement -- strike that.

You haven't seen 90 percent of the interior foundation walls behind that finishing, have you?

A    No.

Q    How wide was the widest crack you noticed in the interior foundation?

A    Based on my report and the photographs, they are what I would typically call "hairline cracks."

I would say none of them -- the biggest

EXHIBIT 10

Page 14

was probably around a 1/16 of an inch, maybe
smaller, with one exception where the crack does
appear to be a little bit wider.

Q    Did you measure any of these cracks?

A    I did not.

Q    Do you know if these cracks have gotten
worse since your visit on August 27, 2015?

A    No.

Q    And you don't normally write "Very narrow
spider web cracking in the foundation" in these
reports you do for cracking foundations, do you?

A    No.

Q    What did you mean by that?

A    What was meant was that the cracks were
very small and -- it just means that they were
very small.

Q    Would you say --

A    They are not very wide.

Q    Right.

     Would you say this is one of the least
severely cracked foundations you've inspected?

A    It is not the least severely cracked that
I've seen, but it certainly falls into that
category.

     And I don't know if that's a meaningful

EXHIBIT 10

answer or not.  If not, I apologize.

Q    You can't testify as to any uniform rate of progression of these cracks; is that correct?

A    That's correct.

Q    You can't say if it increased by any measurable variable every month or year, can you?

A    No.  I've seen cracks that apparently progress very slowly, and I've seen cracks that I know for a fact that have progressed at a rate of three or four inches a week.

Q    And you didn't notice any bowing in these walls, correct?

A    No, there is no bowing.

Q    And you do note bowing in other cases, correct?

A    Sometimes, yes.

Q    And specifically in the Gladysz report, you noted bowing as much as one inch, correct?

A    Yes.

Q    And you would have noted bowing if it was present in the Vera foundation, correct?

A    Yes.

Q    And you say that, based on your visual observations, "The most likely cause of the spider web cracking is the onset of alkali-silica

EXHIBIT 10

reaction," correct?

A    That's correct.

Q    And you don't note efflorescence in your report, correct?

A    There's no mention of it, no.

Q    And is that because there is no efflorescence present on the foundation walls?

A    There is some, but it was -- the photographs do show some efflorescence.  It's not heavy.  It wasn't mentioned in the report.

Q    Okay.  And you've previously testified that, in properties you've inspected, the efflorescence is more heavily concentrated in more heavily cracked areas, correct?

A    That is more common than not, but it's not a given.

Q    Did you inspect the living space at the Vera home?

A    I have no record of that.  I am going to say -- I'm just going to say I have no record of it.

Q    Okay.  And you note that "The basement walls will begin to bulge inward until they structurally fail," correct?

A    Yes.

EXHIBIT 10

Q    But they haven't begun to bulge inward, have they?

A    That's correct.

Q    So how do you know that -- let's strike that.

What's the basis for the statement that they "will begin to bulge inward"?

A    Based on my experience and research at that point, which was limited to ASR, it is -- again, you can't say for certain that that's going to happen, but the likelihood is so close to certainty that that was my opinion at the time.

Q    Okay.  When --

A    That doesn't sound like a very good answer.  If you need clarification, let me know.

Q    When do you think these walls will begin to bulge inward?

A    That I do not know.

Q    Can you say, with any reasonable degree of engineering probability, that they will begin to bulge inward within the next 10 years?

A    No.

Q    Within the next 20 years?

A    No.

Q    Within the next 100 years?

EXHIBIT 10

A     No.

Q     And you say they "will begin to bulge inward until they structurally fail," correct?

A     Yes.

Q     So as of the date of your visit, they had not structurally failed?

A     That's correct.

Q     You say, "There's no way to arrest the process," correct?

A     Yes.

Q     And the "process" in this case you believed was alkali-silica reaction, correct?

A     Yes.

Q     And you're not a chemist, right?

A     That's correct.

Q     And you have never conducted a petrographic examination, right?

A     Right.

Q     And you would not be qualified to conduct one, right?

A     That's correct.

Q     And you haven't consulted any treatises regarding alkali-silica reaction, or other similar professional publications; is that fair to say?

A     That I have not?

EXHIBIT 10

Q    Right.

A    No.  I would not say that.

Q    You've consulted some reports concerning ASR, right?

A    Yes.  The government reports and university research.

Q    Okay.  And had you consulted that as of August 27, 2015?

A    Yes.

Q    Have you seen a petrographic examination report in connection with the Vera foundation?

A    I'm going to have to say probably not.

When I am made aware a petrographic report, it's my practice to ask for a copy, which would then be in my client's file, and I don't have that.

Q    Okay.  And have you consulted any engineering literature which states that alkali-silica reaction cannot be arrested?

A    I don't know of any literature that says that.

Q    Engineering or otherwise, right?

A    Right.

Q    And you say "15 to 20 years," correct?

Strike that.

EXHIBIT 10

You say that "The stress will be visible 15 to 20 years after pour," right?

A    Yes.

Q    So that would put us somewhere between 2008 and 2013, correct?

A    Yes.

Q    And you don't have any scientific background relative to the identification of chemical reactions in concrete, correct?

A    That's correct.

Q    Or mineral reaction, right?

A    Correct.

Q    You say that "The basement walls at this time are beginning to lose their structural integrity," correct?

A    Yes.

Q    So they had not lost their structural integrity as of the date of your visit, correct?

A    That's correct.

Q    And you note that "corrective action is necessary," correct?

A    Yes.

Q    And that you recommend that the walls be replaced, correct?

A    Yes.

EXHIBIT 10

Q    Okay.  Do you know if the walls have been replaced?

A    I do not.

Q    You urge them to develop a corrective plan with a licensed contractor, correct?

A    Yes.

Q    Do you know if they've done so?

A    I do not.

Q    You say that "It's not possible to predict how quickly a foundation will deteriorate," correct?

A    Correct.

Q    "Until the point it's structurally dangerous," right?

A    Right.

Q    So it wasn't structurally dangerous as of the date of your visit, right?

A    Right.

Q    Why are you recommending that the walls be replaced if they have not lost their structural integrity?

A    Because it is my opinion that eventually the walls will need to be replaced, and with the condition of the walls that I saw at this time in this area, it would be impossible -- almost

EXHIBIT 10

Page 22

impossible for them to sell their house, take on a second mortgage, to take any advantage of the value of the house because the cracking has decreased its value.

Q    So it was more in line with the value of a home as opposed to any structural concern?

A    My action here has to do with what I'm concerned about is going to happen in the future.

I didn't tell them that they needed to replace the walls as soon as possible, that they needed a corrective action plan.

Q    Okay.

A    If they did want to sell the house, they'd have to do something.  If the walls got very much worse in the next few months or year, it's in their best interest to have a corrective action plan in place.

Q    And what would a corrective action plan consist of if it doesn't consist of replacing the walls?

A    It would consist of replacing the walls.

Q    So a corrective action plan is synonymous with replacing the foundation?

A    In this -- for this problem, in my opinion, yes.

EXHIBIT 10

Q    Okay.  Have you ever replaced a foundation?

A    No.

Q    Are you a licensed contractor?

A    No.

Q    Was this home still safe to live in as of the date of your visit?

A    Yes.

Q    Did you advise the Veras to move out for safety reasons?

A    No.

Q    And you've advised three homeowners to move out for safety reasons, correct?

A    That's correct.

Q    Did you see any evidence of repairs to the foundation?

A    I don't see any evidence of repairs in my photos, and I have no notes to that effect.

So I would have to say it is not likely that I saw any evidence of repairs.

Q    And was the foundation still holding up the above living structure?

A    Yes.

Q    Was it still retaining soil on the outside?

EXHIBIT 10

Page 24

A     Yes.

Q     And these walls project partially above grade, correct?

A     Yes.

Q     But they're also partially underground, correct?

A     Yes.

Q     Do you know if the Veras have relocated for safety reasons?

A     I do not.

Q     Do you know if their property has been condemned?

A     I do not.

Q     Did it need to be condemned as of the date of your visit?

A     No.

Q     Did you ask for a copy of a home inspection report for the property?

A     I have no specific recollection, but I will say probably not.

Q     Did you see any photographs of the foundation walls which were taken prior to your visit?

A     Not to my recollection.

Q     And do you know if an engineer had visited

EXHIBIT 10

this property prior to your visit?

A    I do not.

Q    Did you ask the Veras?

A    Again, I have no specific recollection, but I would assume not.

Q    You didn't refer the Veras to any contractors, did you?

A    I have no recollection that I did.

Q    And you don't know if the walls have been replaced, right?

A    I do not.

Q    Do you know if there's been any progression of the cracks since your visit?

A    No.

Q    And is there groundwater exposure to these foundation walls?

A    Yes.

Q    Surface water exposure?

A    Yes.

Q    Rainwater exposure?

A    Yes.

Q    And you charge a flat fee of $400, correct?

A    Yes.

Q    Do you know when you were first contacted

EXHIBIT 10

regarding this claim?

A    No.

Q    Do you know who built the home?

A    No.

Q    Do you know where the concrete is from?

A    No.

Q    Have you spoken to Mr. Vera since your visit?

A    Not to my recollection.

Q    Do you have any recollection of speaking to Kim?

A    No.

Q    You don't know, or you don't have a recollection?

A    I don't have a recollection.

Q    Okay.  And you don't know if that finishing's been removed, correct?

A    That's correct.

Q    Have the walls been shored up?

A    I have no knowledge of that.

Q    You didn't advise them to do so, correct?

A    That's correct.

Q    And the walls didn't need to be shored at the time of your visit, correct?

A    That's correct.

EXHIBIT 10

Q    Did they report any problems with water intrusion into the basement?

A    I don't believe so.

Q    Did you see any signs of water intrusion in the basement?

A    Again, I didn't make note of that.  So I have to assume that I did not, but I can't say with any certainty.

Q    Okay.  And the walls haven't fallen down, correct?

A    Not to -- as of my visit, they had not, and I have no knowledge that that has happened in the meantime.

Q    All right.  And the home has not fallen down, correct?

A    That's -- again, to the best of my knowledge, no.

Q    And no part of the home has fallen down, to the best of your knowledge, correct?

A    That's correct.

Q    And the home could still safely be occupied as of the date of your visit, correct?

A    Yes.

Q    And the walls were not in imminent danger of falling down as of the date of your visit,

EXHIBIT 10

correct?

A    Correct.

Q    And the home was not in imminent danger of falling down as of the date of your visit; is that correct?

A    That's correct.

Q    And no part of the home was in imminent danger of falling down as of the date of your visit; is that correct?

A    That's correct.

Q    I'll present you with Exhibit 8.  This is a report from Paul Cianci.

Have you ever met Paul Cianci?

A    I met one, and I don't know who it was.

Q    Paul is the young one.  Carl is his dad.

A    I'm going to assume it was Carl.

Q    Have you seen this report before?

A    No.

Q    And if you go to what's labeled as "page 1" and go down to the last sentence -- or, excuse me, go to the last paragraph, there is a sentence towards the bottom that starts "We also."

Let me know when you see that.

A    I've got it.

Q    Okay.  "We also documented evidence of map

EXHIBIT 10

cracking within the foundation that is not normal when inspected"; is this correct?

A    Yes.

Q    And then if you look at the last sentence fragment of that paragraph, it says, "It's indicative of an early stage of an expansive reaction," correct?

A    Yes.

Q    And that reflects your observations as well, right?

A    That's a similar conclusion.

Q    Okay.  In this report, Mr. Cianci includes a terminology section, correct?

A    Yeah, he usually does.

Q    On page 2.

A    Yes.

Q    And do you agree with him that "In the currently adopted residential building code, the vertical element between the footing and the wood sill plate is part of the foundation," correct?

A    Yes.

Q    And in the engineering industry, the concrete basement walls are referred to as the foundation, correct?

A    Yes.  Part of the foundation, yeah.

EXHIBIT 10

Q    In fact, in your report, you specifically note that you were conducting a visual examination of the concrete foundation, correct?

A    Yes.

Q    Did you examine the footings when you were at the property?

A    No.

Q    And you couldn't do it because they're underground, right?

A    That's correct.

Q    You didn't burrow down there to get at those footings, did you?

A    I did not.

Q    Okay.  And I'll present you with what's been marked as Defendant's Exhibit 9.

This is a report from the State of Connecticut, Department of Consumer Protection, on Deteriorating Concrete and Residential Foundations, correct?

A    Yes.

Q    And on page 2, Footnote 1, they have a definition of a foundation.

I believe you -- I'll paraphrase somewhat, referred to it as one of the most insanely idiotic things you've ever read; is that correct?

EXHIBIT 10

A    That's a pretty good paraphrase, yes.

Q    All right.  But you do agree that a foundation includes those concrete walls, correct?

A    Yes.

Q    Did you make any determination as to the water table in the area of this foundation?

A    No.

Q    Did you see a dehumidifier in the basement when you were there?

A    I have no recollection, and I wouldn't have noted that in my field notes.

Q    Did you encounter any moldy or musty smell in the basement?

A    I have no recollection.

Q    Did you see any signs of mold in the basement?

A    It's not something I would have specifically looked for, so, you know, I really can't answer one way or the other.

Q    Did you see any problems with the gutters or drainage around the foundation?

A    That's something I don't specifically look at.

Q    And you also don't look at the floor slab, correct?

EXHIBIT 10

A     Only if -- I look at it in a general way.

I only look at it specifically if my client, whoever they happen to be, expresses concern about what they might see in the slab.

Q     Right.

And you don't have any notations as to the condition of the slab here, right?

A     That's correct.

Q     And you don't have any recollection of any problem with the slab, right?

A     That's correct.

Q     Were there any interior concrete walls that didn't, on the other side of them, retain soil, meaning that they were solely interior partition walls?

A     I don't have any recollection one way or the other, so I can't be helpful with that.

Q     Okay.  In any of these basements you've inspected, have there been solely interior concrete partition walls?

A     Yes.

Q     Okay.  How many would you say that's been the case for?

A     I just don't have any way to make an estimate.

EXHIBIT 10

Q     More than five?

A     Yes.

Q     Okay.  Are you aware of any concrete foundations that have an alkali silica or iron sulfide oxidation problem and yet exhibit no cracks?

A     No, I'm not.

Q     Were there any additions at this property?

A     I didn't make note of the fact that there was an addition.  That's all I can say.

Q     You did or did not?

A     I did not make any notes.

Q     Okay.

A     Normally, if there were an addition, I would specify the age of the addition.

Q     Right.

Do you have an opinion as to when these walls will present an unsafe condition absent replacement of them?

A     No.

Q     Can you say that they will present an unsafe condition, absent replacement, within the next 100 years?

A     I can't say that with certainty, no.

Q     Can you say it with probability?

EXHIBIT 10

A    Yes.  I would say it is more probable than not they will need to be replaced within that time period.

Q    And what's that based upon?

A    It's based on taking everything I know about this problem and rendering an informed opinion.  I don't know how else to put it.

Q    And you're not aware of any cracking foundation where the wall has actually fallen down, correct?

A    That is correct.

Q    And you've looked at over 800, correct?

A    It's somewhere around 800 buildings with the issue, yes.

Q    Okay.  Can you say, with any degree of probability, that these walls will present an unsafe condition, absent replacement, within the next 50 years?

A    No.

Q    And you've heard this phrase "substantial impairment of structural integrity," correct?

A    Yes.

Q    And that is not an engineering term of art, correct?

A    Not to my knowledge.  No.

EXHIBIT 10

Q    Give me one second, but I think we might be done here.

And the phrase "substantial impairment of structural integrity" is not one you utilize in your reports, correct?

A    That's correct.

Q    It's not a phrase that you utilize, correct?

A    That's correct.

MR. LEARY:  I don't have anything further.

Thank you.

(The witness was dismissed, and the deposition was concluded at 12:55 p.m.)

EXHIBIT 10

INDEX

---------------------------------------------------------

WITNESS                          WILLIAM F. NEAL, P.E.

---------------------------------------------------------

DIRECT EXAMINATION BY MR. LEARY                       3

---------------------------------------------------------

EXHIBIT              DESCRIPTION                     PAGE

---------------------------------------------------------

Defendant's Exhibit 1, a renotice of
   deposition dated August 1, 2017                    3

Defendant's Exhibit 2, a CD and an email
   dated Tuesday, December 29, 2015, 7: p.m.,
   with attachments                                   5

Defendant's Exhibit 3, a copy of the
   deposition of William F. Neal, P.E.,
   dated January 26, 2017                             3

Defendant's Exhibit 4, a copy of the
   deposition of William F. Neal, P.E.
   dated March 30, 2017                               3

Defendant's Exhibit 5, an Expert Disclosure
   dated March 28, 2017                               3

Defendant's Exhibit 6, a résumé and testimony
   list for William F. Neal, P.E.                     3

Defendant's Exhibit 7, a letter dated
   August 28, 2015                                    3

Defendant's Exhibit 8, a Claim
   Investigation at 28 Laurel Drive,
   Willington, Connecticut                            3

(Continued)

EXHIBIT 10

```
EXHIBIT              DESCRIPTION              PAGE
```

Defendant's Exhibit 9, a report from the State of Connecticut Department of Consumer Protection on Deteriorating Concrete and Residential Foundations                3

(The original exhibits were retained by Attorney Leary.)

* * * * * * * *

EXHIBIT 10

Page 38

STATE OF CONNECTICUT

COUNTY OF TOLLAND

I, Wendy J. Leard, a Notary Public for the State of Connecticut, do hereby certify that the deposition of WILLIAM F. NEAL, P.E., a witness, was taken before me pursuant to the Federal Rules of Civil Procedure, at the law offices of TOLISANO & DANFORTH, LLC, 18 Main Street, Ellington, Connecticut, commencing at 12:08 p.m., on Thursday, August 17, 2017.

I further certify that the deponent was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Somers, Connecticut, this 19th day of August, 2017.

_____
Wendy J. Leard
Notary Public

My Commission Expires May 31, 2022

EXHIBIT 10

Page 39

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS
800-567-8658
ASSIGNMENT NO. CS2679783
CASE NAME: Vera, Steven v. Liberty Mutual Fire Insurance Company
DATE OF DEPOSITION: 8/17/2017
WITNESS' NAME: William F. Neal

PAGE/LINE(S)/    CHANGE                    REASON
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____
_____/_____/_____/_____

_____
            William F. Neal
(Notary not required in California)
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2017.


_____
    NOTARY PUBLIC
MY COMMISSION EXPIRES_____

EXHIBIT 10

Page 40

Veritext Legal Solutions

290 W. Mt. Pleasant Ave. - Suite 3200

Livingston, New Jersey 07039

Toll Free: 800-227-8440  Fax: 973-629-1287

_____, 2017

William F. Neal

Case Name: Vera, Steven v. Liberty Mutual Fire Insurance Company

Veritext Reference Number: 2679783

Witness:  William F. Neal        Deposition Date:  8/17/2017

Dear Sir:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly

waived, please review the transcript and note any

changes or corrections on the jurat/errata sheet

included, indicating the page, line number, change and

reason for the change. Sign at the bottom of the sheet

in the presence of a notary except in California where

you are signing under penalty of perjury and forward

the errata sheet back to us at the address shown above.

If the jurat is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department


Encl.

Cc: Kieran W. Leary, Esq.

EXHIBIT 10

[& - basis]                                                                 Page 1

| & | | | |
|---|---|---|---|

**&**   1:12,18 2:7 38:8

**0**

**00039**   1:23
**00072**   1:4
**06029**   1:14
**06114-1190**   1:19
**07039**   40:2

**1**

**1**   3:6 4:22 28:20
   30:21 36:9,9
**1/16**   14:1
**10**   17:21
**100**   17:25 33:23
**12:08**   2:9 38:9
**12:55**   35:14
**15**   19:24 20:2
**17**   1:7 2:9 38:10
**18**   1:13 2:7 38:8
**1993**   9:14
**19th**   38:21

**2**

**2**   5:8,9,12 8:9
   29:15 30:21 36:11
**20**   17:23 19:24
   20:2
**200**   7:19
**2008**   20:5
**2013**   20:5
**2015**   5:15,20 6:2
   8:5,18 9:22 10:1
   14:7 19:8 36:11
   36:20
**2017**   1:7 2:9 6:15
   6:24 7:3 8:16 36:9
   36:14,16,17 38:10
   38:22 39:22 40:3
**2022**   38:25
**249-1361**   1:19

**26**   6:15 36:14
**2679783**   40:7
**27**   6:2 8:16,18
   9:22 10:1 14:7
   19:8
**28**   4:18 5:15,20
   8:5,16 36:17,20,22
**29**   36:11
**290**   40:1

**3**

**3**   5:1 6:13 36:5,9
   36:13,14,16,17,19
   36:20,22 37:5
**3-9**   3:6
**30**   6:23 7:3 36:16
**31**   38:25
**3200**   40:1
**3:16**   1:4

**4**

**4**   6:22 36:15
**400**   25:22

**5**

**5**   7:15 36:12,17
**50**   34:18

**6**

**6**   7:22 36:18
**65**   1:18
**676**   1:13

**7**

**7**   8:6 36:11,20
**77**   4:12

**8**

**8**   28:11 36:21
**8/17/2017**   39:3
   40:8
**800**   34:12,13
**800-227-8440**   40:2
**800-567-8658**   39:2

**860**   1:14,19
**871-2422**   1:14

**9**

**9**   30:15 37:4
**90**   13:7,16
**973-629-1287**   40:2

**a**

**absent**   33:18,22
   34:17
**accommodate**   4:5
**action**   1:3 2:3
   20:20 22:7,11,16
   22:18,22
**addition**   33:10,14
   33:15
**additional**   8:12
**additions**   33:8
**address**   4:11,13
   10:10 40:18
**adopted**   29:18
**advantage**   22:2
**advise**   23:9 26:21
**advised**   23:12
**afternoon**   3:14,15
**age**   33:15
**ago**   11:18
**agree**   29:17 31:2
**agreed**   2:13,21 3:1
**alkali**   15:25 18:12
   18:23 19:19 33:4
**answer**   4:7 6:18
   7:4,11 11:15 15:1
   17:15 31:19
**answers**   3:23 4:1
**apologize**   15:1
**apparently**   12:15
   15:7
**appear**   12:11 14:3
**appearances**   1:10

**appears**   8:15
   38:16
**approximately**
   10:21 13:6
**area**   21:25 31:6
**areas**   16:14
**arrest**   18:8
**arrested**   19:19
**art**   34:24
**asked**   6:18,19 7:2
   7:2,11
**asr**   17:9 19:4
**assessor's**   9:19
**assignment**   39:2
**assume**   6:10 25:5
   27:7 28:16
**attachments**   36:12
**attorney**   37:8
**attorneys**   1:11,17
**august**   1:7 2:9
   5:15,20 6:2 8:5,16
   8:16,18 9:22 10:1
   14:7 19:8 36:9,20
   38:10,22
**authority**   2:17
**ave**   40:1
**avenue**   1:18
**aware**   19:13 33:3
   34:8

**b**

**back**   9:21 40:18
**background**   20:8
**based**   11:12 13:22
   15:23 17:8 34:4,5
**basement**   13:6,14
   16:22 20:13 27:2
   27:5 29:23 31:8
   31:13,16
**basements**   32:18
**basis**   17:6

bdanforth  1:15
beginning  20:14
begun  17:1
behalf  2:2
believe  8:22 9:23
  27:3 30:23
believed  18:12
best  10:2 22:16
  27:16,19
bienkowski  6:14
biggest  13:25
bit  14:3
bottom  28:22
  40:15
bowing  15:11,13
  15:14,18,20
box  1:13
break  4:4,7
brenda  9:9,11
brian  1:15
building  29:18
buildings  34:13
built  9:14 26:3
bulge  16:23 17:1,7
  17:17,21 18:2
burrow  30:11
business  4:13

**c**

california  39:21
  40:16
call  13:23
card  9:19
carl  28:15,16
case  18:11 32:23
  39:3 40:6
cases  15:14
category  14:24
cause  15:24 38:20
cc  40:25
cd  5:12,13,16
  36:11

certain  17:10
certainly  9:1
  14:23
certainty  17:12
  27:8 33:24
certify  38:4,11,17
change  39:5 40:14
  40:15
changes  40:13
charge  7:19 25:22
chemical  20:9
chemist  18:14
cianci  28:12,13
  29:12
civil  1:3 2:4 38:7
claim  8:24 26:1
  36:21
clarification  17:15
clear  3:24
client  11:13 32:3
client's  19:15
close  17:11
code  29:18
color  5:20
commencing  2:8
  38:9
commission  38:25
  39:25
common  12:11,15
  16:15
company  1:7 3:17
  39:3 40:6
concentrated
  16:13
concern  22:6 32:4
concerned  22:8
concerning  19:3
concluded  35:14
conclusion  29:11
concrete  10:7 20:9
  26:5 29:23 30:3

30:18 31:3 32:12
  32:20 33:3 37:5
condemned  24:12
  24:14
condition  21:24
  32:7 33:18,22
  34:17
conduct  10:6
  18:19
conducted  18:16
conducting  30:2
connecticut  1:1,14
  1:19 2:6,8 4:12
  30:17 36:22 37:4
  38:1,4,9,21
connection  2:15
  19:11
consist  22:19,19
  22:21
consulted  18:22
  19:3,7,17
consumer  30:17
  37:4
contacted  25:25
contacting  8:24
continued  36:25
contractor  21:5
  23:4
contractors  25:7
conversation
  10:11
copies  5:5
copy  5:20 6:22
  7:15 8:4 19:14
  24:17 36:13,15
corporation  7:8
correct  3:20,21
  4:16 5:21,22,24,25
  6:2,11 7:8,20,21
  7:24 8:2,6,19,21
  8:22 9:9,14 10:8,9

12:7,12,23,24 13:2
  13:7 15:3,4,12,15
  15:18,21 16:1,2,4
  16:14,24 17:3
  18:3,7,9,12,15,21
  19:24 20:5,9,10,12
  20:15,18,19,21,24
  21:5,11,12 23:13
  23:14 24:3,6
  25:23 26:17,18,21
  26:22,24,25 27:10
  27:15,19,20,22
  28:1,2,5,6,9,10
  29:2,7,13,20,24
  30:3,10,19,25 31:3
  31:25 32:8,11
  34:10,11,12,21,24
  35:5,6,8,9
corrections  40:13
corrective  20:20
  21:4 22:11,16,18
  22:22
counsel  2:14 38:14
  38:18
county  38:2
court  1:1
coverage  11:21
crack  13:20 14:2
cracked  14:21,22
  16:14
cracking  12:19,19
  12:22 13:1 14:10
  14:11 15:25 22:3
  29:1 34:8
cracks  11:4,16,23
  12:7,10,11,14,16
  13:24 14:4,6,14
  15:3,7,8 25:13
  33:6
cs2679783  1:25
  39:2

[csr - follows]

csr 1:23
current 10:3
currently 29:18
cv 1:4

**d**

d 1:15 36:1
dad 28:15
danforth 1:12,15
  2:7 38:8
danger 27:24 28:3
  28:8
dangerous 21:14
  21:16
date 18:5 20:18
  21:17 23:7 24:14
  27:22,25 28:4,8
  39:3 40:8
dated 6:2 8:5 36:9
  36:11,14,16,17,20
  38:21
dates 6:10
day 6:5,6,10,16,25
  38:21 39:22
days 40:19
dear 40:9
december 36:11
decided 11:21
decreased 22:4
deemed 40:20
defendant 1:17
  2:2
defendant's 3:6
  4:22 5:9 6:13
  30:15 36:9,11,13
  36:15,17,18,20,21
  37:4
definitely 9:5
definition 30:22
degree 17:19
  34:15

dehumidifier 31:8
department 30:17
  37:4 40:22
deponent 3:9
  38:11
deposed 7:6
deposing 6:16,25
deposition 1:8 2:1
  2:16,24 3:3,18
  4:23 6:14,23
  35:14 36:9,13,15
  38:5 39:3 40:8,10
described 3:7 5:10
description 36:7
  37:2
deteriorate 21:10
deteriorating
  30:18 37:5
determination
  31:5
develop 21:4
direct 3:12 36:5
disclosure 7:16
  36:17
dismissed 35:13
district 1:1,1
document 7:17
documented 28:25
documents 5:2,3
draghi 9:11
drainage 31:21
drive 4:18 36:22
duly 2:5

**e**

e 1:3 4:10 36:1
earlier 7:6 8:1
early 29:6
effect 23:18
efflorescence 16:3
  16:7,9,13

element 29:19
ellington 1:14 2:8
  38:8
email 36:11
encl 40:24
enclosed 40:10
encounter 31:12
engineer 24:25
engineering 17:20
  19:18,22 29:22
  34:23
entitled 2:3
errata 39:1 40:13
  40:18
esq 40:25
esquire 1:15,20
estimate 32:25
event 38:19
eventually 21:22
evidence 23:15,17
  23:20 28:25
examination 3:12
  10:7 18:17 19:10
  30:2 36:5
examine 30:5
examined 38:13
exception 14:2
excuse 8:16,17
  28:21
exhibit 4:22 5:9
  6:13,22 7:15,22
  8:6,9 28:11 30:15
  33:5 36:7,9,11,13
  36:15,17,18,20,21
  37:2,4
exhibits 3:6 37:8
expansive 29:6
experience 17:8
expert 7:15 36:17
expires 38:25
  39:25

exposure 25:15,18
  25:20
expresses 32:3
expressly 40:11
exterior 12:6,15
  12:19

**f**

f 1:8 2:1 3:9 36:3
  36:13,15,19 38:5
  39:4,20 40:4,8
fact 15:9 30:1 33:9
fail 16:24 18:3
failed 18:6
fair 18:24
fallen 27:9,14,18
  34:9
falling 27:25 28:4
  28:8
falls 14:23
fax 40:2
federal 2:4 38:6
fee 25:22
field 6:1 11:8
  31:11
file 5:2 8:10,12
  19:15
filing 8:24
find 40:10
finish 3:25 4:1
finished 13:7,9
finishing 13:11,17
finishing's 26:17
fire 1:6 3:17 39:3
  40:6
first 3:10 6:4
  11:22 25:25 38:11
five 33:1
flat 25:22
floor 31:24
follows 3:10

EXHIBIT 10

[footing - leard]                                            Page 4

**footing** 29:19
**footings** 30:5,12
**footnote** 30:21
**form** 2:22
**formalities** 2:15
**forward** 40:17
**foundation** 10:7
  11:22 12:6,10,20
  12:23 13:1,17,21
  14:10 15:21 16:7
  19:11 21:10 22:23
  23:2,16,21 24:22
  25:16 29:1,20,24
  29:25 30:3,22
  31:3,6,21 34:9
**foundations** 14:11
  14:21 30:19 33:4
  37:5
**four** 11:18 15:10
**fragment** 29:5
**free** 40:2
**full** 4:8
**further** 2:21 3:1
  35:11 38:11,17
**future** 22:8

**g**

**garage** 12:9,23
**general** 32:1
**give** 35:1
**given** 8:13 16:16
**glad** 4:5
**gladysz** 3:19 7:7
  8:1 15:17
**go** 11:21 28:19,20
  28:21
**going** 9:6 16:19,20
  17:11 19:12 22:8
  28:16
**good** 3:14,15
  17:14 31:1

**gotten** 14:6
**government** 19:5
**grade** 24:3
**ground** 3:22
**groundwater**
  25:15
**guessing** 11:20,24
**gutters** 31:20

**h**

**hairline** 13:23
**happen** 17:11 22:8
  32:3
**happened** 27:12
**happy** 4:3
**hartford** 1:19
**head** 3:24
**heard** 34:20
**heavily** 16:13,14
**heavy** 16:10
**held** 2:6
**helpful** 32:17
**hereinbefore** 2:3
  38:16
**hereto** 38:18
**hl** 1:20
**holding** 23:21
**home** 4:11,18 5:15
  8:4,15,17 9:13,25
  10:23 16:18 22:6
  23:6 24:17 26:3
  27:14,18,21 28:3,7
**homeowners**
  23:12
**hour** 7:20 10:22
**house** 22:1,3,13
**howd** 1:18
**huh** 6:6

**i**

**identification** 3:7
  5:10 20:8

**idiotic** 30:24
**imminent** 27:24
  28:3,7
**impairment** 34:21
  35:3
**impetus** 8:23
**impossible** 21:25
  22:1
**inch** 14:1 15:18
**inches** 15:10
**included** 40:14
**includes** 29:12
  31:3
**including** 2:16 5:2
  5:21
**increased** 15:5
**index** 3:7 5:10
**indicating** 40:14
**indicative** 29:6
**industry** 29:22
**information** 9:16
  11:1
**informed** 34:6
**insanely** 30:24
**inspect** 16:17
**inspected** 14:21
  16:12 29:2 32:19
**inspection** 8:5
  24:18
**insurance** 1:7 3:17
  7:7 39:3 40:6
**intake** 5:23
**integrity** 20:15,18
  21:21 34:21 35:4
**interest** 22:16
**interested** 38:19
**interior** 13:4,17,21
  32:12,14,19
**intrusion** 27:2,4
**investigation**
  36:22

**inward** 16:23 17:1
  17:7,17,21 18:3
**iron** 33:4
**issue** 34:14

**j**

**j** 1:22 2:4 38:3,23
**january** 6:15
  36:14
**jersey** 40:2
**job** 1:25
**jurat** 40:13,19

**k**

**kieran** 1:20 3:16
  40:25
**kim** 1:3 10:14
  26:11
**kind** 11:14
**kleary** 1:20
**know** 3:18 4:5
  8:25 9:2 10:17
  11:7,12,14,17,17
  13:9,11 14:6,25
  15:9 17:4,15,18
  19:20 21:1,7 24:8
  24:11,25 25:9,12
  25:25 26:3,5,13,16
  28:14,23 31:18
  34:5,7
**knowledge** 26:20
  27:12,17,19 34:25

**l**

**l** 1:2 2:11 4:10
**labeled** 5:16 28:19
**lane** 4:12
**late** 6:6
**laurel** 4:18 36:22
**law** 2:6 38:7
**law.com** 1:20
**leard** 1:22 2:5 38:3
  38:23

EXHIBIT 10

[leary - petrographic]                                                Page 5

| | | | |
|---|---|---|---|
| **leary** 1:20 3:13,16 5:8,11 35:10 36:5 37:8 40:25 | **matter** 3:20 4:15 | 26:23 34:2 | 16:11,22 17:13 19:7,17 21:1 |
| **legal** 39:1 40:1 | **mcallister** 6:24 | **needed** 22:9,11 | 22:12 23:1 26:16 |
| **letter** 10:10,11 36:20 40:20 | **meadowview** 4:12 | **never** 18:16 | 27:9 28:25 29:12 |
| | **mean** 14:13 | **new** 40:2 | 30:14 32:18,22 |
| | **meaning** 32:14 | **news** 8:20,23 11:20 | 33:3,13 34:15 |
| **liberty** 1:6 3:17 6:15,24 7:7 39:3 40:6 | **meaningful** 14:25 | **nods** 3:23 | **onset** 15:25 |
| | **means** 12:1 14:15 | **nonspecific** 11:15 | **opinion** 17:12 21:22 22:25 33:17 34:7 |
| **licensed** 21:5 23:4 | **meant** 14:14 | **normal** 29:1 | |
| **likelihood** 17:11 | **measurable** 15:6 | **normally** 11:12 14:9 33:14 | **opposed** 22:6 |
| **limited** 17:9 | **measure** 14:4 | **notary** 2:5 3:3 38:3,24 39:21,24 40:16 | **original** 37:8 |
| **line** 22:5 39:5 40:14 | **mention** 16:5 | | **outside** 23:25 |
| | **mentioned** 16:10 | | **oxidation** 33:5 |
| **list** 7:23 36:19 | **merit** 1:22 | **notations** 32:6 | |
| **literature** 19:18 19:20 | **met** 28:13,14 | **note** 12:5,9,25 15:14 16:3,22 20:20 27:6 30:2 33:9 40:12 | **p** |
| | **mineral** 20:11 | | **p** 2:11 |
| **little** 14:3 | **mold** 31:15 | | **p.e.** 1:8 2:1 3:9 36:3,13,15,19 38:5 |
| **live** 23:6 | **moldy** 31:12 | | |
| **living** 16:17 23:22 | **month** 8:20 11:24 15:6 | **noted** 15:18,20 31:11 | **p.m.** 2:9 35:14 36:11 38:9 |
| **livingston** 40:2 | **months** 11:18,18 22:15 | **notes** 6:1 9:1 11:8 23:18 31:11 33:12 | **p.o.** 1:13 |
| **llc** 1:12 2:7 38:8 | **morning** 7:7,11 8:2 | **notice** 2:17 6:7 11:16 12:18,22 15:11 | **page** 5:1 6:1 28:20 29:15 30:21 36:7 37:2 39:5 40:14 |
| **long** 10:20 | | | |
| **look** 11:21 29:4 31:22,24 32:1,2 | **mortgage** 22:2 | | **paragraph** 12:5 28:21 29:5 |
| | **move** 23:9,13 | **noticed** 11:4 13:20 | |
| **looked** 31:18 34:12 | **mt** 40:1 | **number** 40:7,14 | **paraphrase** 30:23 31:1 |
| **looks** 5:19 | **musty** 31:12 | **o** | **part** 8:9 27:18 28:7 29:20,25 |
| **lose** 20:14 | **mutual** 1:6 3:17 6:15,24 39:3 40:6 | **o** 2:11 | |
| **lost** 20:17 21:20 | | **o'clock** 6:8 | **partially** 24:2,5 |
| **ludorf** 1:18 | **n** | **oath** 7:3 | **parties** 2:14 38:18 |
| **m** | **n** 2:11 4:10 36:1 | **objections** 2:22 | **partition** 32:15,20 |
| | **name** 4:8 39:3,4 40:6 | **observations** 15:24 29:9 | **paul** 28:12,13,15 |
| **main** 1:13 2:7 38:8 | **narrow** 12:25 14:9 | **occupied** 10:23 27:22 | **penalty** 40:17 |
| **map** 12:18,22 28:25 | **neal** 1:8 2:1 3:9,14 4:10,21 36:3,13,15 36:19 38:5 39:4 39:20 40:4,8 | **officer** 2:17 | **pending** 4:6 |
| | | **offices** 2:7 38:7 | **percent** 13:7,16 |
| **march** 6:23 7:3 36:16,17 | | **okay** 5:7,19 7:19 9:3,8,13 12:2 | **period** 34:3 |
| **mark** 5:8 | **necessary** 20:21 | | **perjury** 40:17 |
| **marked** 3:6 4:22 5:9,12 6:13,22 7:14 8:6,9 30:15 | **need** 3:23 4:4 17:15 21:23 24:14 | | **petrographic** 18:17 19:10,13 |

EXHIBIT 10

| | | | |
|---|---|---|---|
| photographs 5:14 5:21 13:22 16:9 24:21 | process 18:9,11 | read 30:25 | repairs 23:15,17 23:20 |
| photos 5:17 23:18 | produced 8:9 | reading 2:23 40:11,20 | rephrase 4:3 |
| phrase 34:20 35:3 35:7 | production 40:22 | really 31:18 | replace 22:10 |
| place 2:16 22:17 | professional 18:24 | reason 39:5 40:15 | replaced 20:24 21:2,20,23 23:1 25:10 34:2 |
| plaintiffs 1:11 | progress 15:8 | reasonable 17:19 | |
| plan 21:4 22:11,17 22:18,22 | progressed 15:9 | reasons 23:10,13 24:9 | replacement 33:19 33:22 34:17 |
| plans 10:3 | progression 15:3 25:13 | recall 6:25 | replacing 22:19,21 22:23 |
| plate 29:20 | project 24:2 | receipt 40:19 | report 5:20 6:5 8:5 8:8 9:13 13:22 15:17 16:4,10 19:11,14 24:18 27:1 28:12,17 29:12 30:1,16 37:4 |
| pleasant 40:1 | proof 3:2 | received 4:24 9:16 | |
| please 3:25 4:3,4,6 4:9 40:12 | properties 16:12 | recollection 8:25 10:2,15,19 24:19 24:24 25:4,8 26:9 26:10,14,15 31:10 31:14 32:9,16 | |
| point 17:9 21:13 | property 5:24 9:19,21 10:4,20 24:11,18 25:1 30:6 33:8 | | |
| possible 9:1 21:9 22:10 | | | |
| pour 20:2 | protection 30:17 37:5 | recommend 20:23 | reported 38:15 |
| practice 19:14 | | recommending 21:19 | reporter 1:22 |
| predict 21:9 | provided 11:1 | | reports 8:20,23 14:11 19:3,5 35:5 |
| presence 40:16 | public 2:5 3:3 38:3 38:24 39:24 | record 3:22,24 4:9 9:23 13:13 16:19 16:20 | |
| present 4:21 6:21 15:21 16:7 28:11 30:14 33:18,21 34:16 | publications 18:24 | | represent 3:17 |
| | pull 9:19 | refer 25:6 | request 5:1 |
| | pursuant 2:3 38:6 | reference 10:11 40:7 | required 39:21 |
| | put 20:4 34:7 | | research 17:8 19:6 |
| pretty 31:1 | **q** | referral 9:8 | reserved 2:22 |
| previously 16:11 | qualifications 3:2 | referred 9:9 29:23 30:24 | residential 29:18 30:18 37:5 |
| prior 9:25 24:22 25:1 | qualified 2:5 18:19 | reflects 29:9 | respective 2:14 |
| probability 17:20 33:25 34:16 | question 4:6 6:19 | regarding 18:23 26:1 | retain 32:13 |
| | questions 3:25 6:18 7:2,10 | registered 1:22 | retained 37:8 |
| probable 34:1 | quickly 21:10 | related 38:17 | retaining 23:24 |
| probably 9:6 14:1 19:12 24:20 | **r** | relative 20:8 | return 10:3 |
| problem 22:24 32:10 33:5 34:6 | rainwater 25:20 | relocated 24:8 | returned 40:19 |
| | rate 15:2,9 | remember 6:16 | review 40:12 |
| problems 27:1 31:20 | reaction 16:1 18:12,23 19:19 20:11 29:7 | removed 13:12 26:17 | right 6:12 8:10,16 8:18 10:12,24 11:5 12:16 13:4 14:19 18:14,17,18 18:20 19:1,4,22,23 |
| procedure 2:4 38:7 | reactions 20:9 | rendering 34:6 | |
| | | renotice 4:22 36:9 | |

EXHIBIT 10

20:2,11 21:14,15 21:17,18 25:10 27:14 29:10 30:9 31:2 32:5,7,10 33:16
rmr 2:5
rnc 1:4
rules 2:4 3:22 38:6
résumé 7:23 36:18

**s**

s 2:11,11 39:5
safe 23:6
safely 27:21
safety 23:10,13 24:9
saw 6:4 11:22 21:24 23:20
says 7:19 9:8,13 10:6,23 11:4 13:6 19:20 29:5
scientific 20:7
second 12:5 22:2 35:1
section 29:13
see 23:15,17 24:21 27:4 28:23 31:8 31:15,20 32:4
seen 7:17 13:14,16 14:23 15:7,8 19:10 28:17
sell 22:1,13
sentence 28:20,22 29:4
seven 10:24
severely 14:21,22
sheet 5:23 9:8 39:1 40:13,15,18
shored 26:19,23
show 6:12 7:14,22 8:4 16:9

shown 40:18
shrinkage 12:11 12:15
side 32:13
sign 40:15
signing 2:23 40:11 40:17,20
signs 27:4 31:15
silica 15:25 18:12 18:23 19:19 33:4
sill 29:20
similar 18:23 29:11
sincerely 40:21
sir 40:9
slab 31:24 32:4,7 32:10
slowly 15:8
small 12:6,10,14 14:15,16
smaller 14:2
smell 31:12
soil 23:24 32:14
solely 32:14,19
solutions 39:1 40:1
somers 38:21
somewhat 30:23
soon 22:10
sound 17:14
space 16:17
speak 10:14
speaking 26:10
specific 24:19 25:4
specifically 11:8,9 15:17 30:1 31:18 31:22 32:2
specificity 11:25
specify 33:15
spider 12:19 13:1 14:10 15:24

spoken 26:7
stage 29:6
starts 28:22
state 2:6 11:25 30:16 37:4 38:1,4
statement 17:6
states 1:1 19:18
stenographically 38:14
steve 10:10,18 11:2
steven 1:2 39:3 40:6
stipulated 2:13,21 3:1
street 1:13 2:8 38:8
stress 20:1
strike 13:14 17:4 19:25
structural 20:14 20:17 21:20 22:6 34:21 35:4
structurally 16:24 18:3,6 21:13,16
structure 23:22
subjective 12:3
subscribed 39:21
subsequently 38:15
substantial 34:20 35:3
sufficiency 2:16
suite 40:1
sulfide 33:5
sure 12:4
surface 25:18
sworn 3:10 38:12 39:21
synonymous 22:22

**t**

t 2:11,11
table 31:6
take 22:1,2
taken 2:2,18 3:4 3:18 24:22 38:6
tanddlaw.com 1:15
tell 22:9 38:12
tells 11:13
term 34:23
terminology 29:13
testified 3:10 16:11
testify 15:2
testimony 7:23 36:18 38:14
thank 35:12
things 30:25
think 17:16 35:1
thirty 40:19
three 6:8 11:18 12:6 15:10 23:12
thursday 2:9 38:10
time 2:16,23 4:4 6:4 11:13,22 12:6 17:12 20:14 21:24 26:24 34:2
today 6:19 7:4 8:13
tolisano 1:12 2:7 38:7
toll 40:2
tolland 38:2
transcribed 38:15
transcript 6:14,23 40:10,12
treatises 18:22
trial 2:23

EXHIBIT 10

[truth - young]                                                              Page 8

**truth** 38:12,12,13
**tuesday** 36:11
**two** 11:10,17
**typically** 9:7 10:21
  13:23

**u**

**u** 2:11
**underground** 24:5
  30:9
**understand** 4:2
**uniform** 15:2
**united** 1:1
**university** 19:6
**unsafe** 33:18,22
  34:17
**unusual** 6:9
**urge** 21:4
**usually** 11:14
  29:14
**utilize** 35:4,7

**v**

**v** 39:3 40:6
**value** 22:3,4,5
**variable** 15:6
**vera** 1:2,3 4:15
  5:14,16 15:21
  16:18 19:11 26:7
  39:3 40:6
**veras** 8:24 9:17
  23:9 24:8 25:3,6
**verbal** 3:23
**veritext** 39:1 40:1
  40:7
**vernon** 4:12
**versus** 6:14,24 7:7
**vertical** 12:7,10,14
  29:19
**visible** 20:1
**visit** 14:7 18:5
  20:18 21:17 23:7

24:15,23 25:1,13
26:8,24 27:11,22
27:25 28:4,9
**visited** 8:15,17
  24:25
**visual** 10:7 15:23
  30:2
**vs** 1:5

**w**

**w** 1:20 40:1,25
**waived** 2:19,24
  3:4 40:12,20
**wall** 34:9
**walls** 12:20,23
  13:1,17 15:12
  16:7,23 17:16
  20:13,23 21:1,19
  21:23,24 22:10,14
  22:20,21 24:2,22
  25:9,16 26:19,23
  27:9,24 29:23
  31:3 32:12,15,20
  33:18 34:16
**want** 9:5 22:13
**water** 25:18 27:1,4
  31:6
**way** 18:8 31:19
  32:1,16,24 38:19
**web** 12:19 13:1
  14:10 15:25
**week** 11:19 15:10
**wendy** 1:22 2:4
  38:3,23
**went** 8:1 10:6
**wethersfield** 1:18
**wide** 13:20 14:18
**wider** 14:3
**widest** 13:20
**william** 1:8 2:1 3:9
  4:10 36:3,13,15,19
  38:5 39:4,20 40:4

40:8
**willington** 4:19
  36:22
**witness** 35:13 36:3
  38:5 39:4 40:8
**wood** 29:19
**worse** 14:7 22:15
**write** 6:5 11:12
  14:9
**wrote** 11:9

**x**

**x** 36:1

**y**

**yeah** 29:14,25
**year** 11:10 15:6
  22:15
**years** 10:24 17:21
  17:23,25 19:24
  20:2 33:23 34:18
**young** 28:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 10

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 10