Page 1

STATE OF CONNECTICUT              SUPERIOR COURT

DOCKET NO.:  TTD-CV-16-6010054-S   JUDICIAL DISTRICT

STEVEN BIENKOWSKI AND              OF TOLLAND
MARY ANN BIENKOWSKI,

    Plaintiffs,

v.                                 AT ROCKVILLE

LIBERTY MUTUAL FIRE INSURANCE      JANUARY 26, 2017
COMPANY,
    Defendant.

------------------------------------------------------------
    DEPOSITION OF WILLIAM F. NEAL, P.E.
------------------------------------------------------------

A P P E A R A N C E S :
    Attorneys for the Plaintiffs
        TOLISANO & DANFORTH, LLC
            18 Main Street, P.O. Box 676
            Ellington, Connecticut  06029
            (860) 871-2422
        BY:  BRIAN D. DANFORTH, ESQ.

    Attorneys for the Defendant
        HOWD & LUDORF, LLC
            65 Wethersfield Avenue
            Hartford, Connecticut  06114-1121
            (860) 249-1361
        BY:  KIERAN W. LEARY, ESQ.

        DONNA M. DECIANTIS, LSR #181
    Job No. CS2519344

EXHIBIT 11

Deposition of WILLIAM F. NEAL, P.E., taken on behalf of the Defendant, in the hereinbefore-entitled action, pursuant to the Notice of Deposition, before Donna M. DeCiantis, licensed shorthand reporter, duly qualified Notary Public in and for the State of Connecticut, held at the office of Attorney Leary, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 9:42 a.m., Thursday, January 26, 2017.

                    S T I P U L A T I O N S

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice, and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections other than as to form are reserved to the time of trial.

It is further stipulated and agreed that the reading and signing of said deposition by the witness is hereby waived.

It is further stipulated that the proof of the qualifications of the Notary Public before whom the deposition is being taken is hereby waived.

                         I N D E X

WITNESS

WILLIAM F. NEAL, P.E.

     Direct examination by Attorney Leary...........4


                    INDEX OF EXHIBITS

               (Marked for identification)

DEFENDANT'S EXHIBITS

Original exhibits retained by Attorney Leary.

1    Notice of deposition..........................5

2    Documentation provided by Mr. Neal.............7

3    Disclosure of expert witness.................10

4    Investigation report.........................54

5    Report of Deteriorating Concrete in Residential

     Foundations.................................56

Transcript Legend

(sic)          Exactly as said;

(phonetic)     Exact spelling not provided;

(--)           Speaker interrupted, break in speech

               continuity and/or unfinished

               sentence;

(...)          Omission of word(s) when

               reading or deponent's testimony

               trailing off and incomplete;

(indicating)   Pointing.

EXHIBIT 11

Page 4

(The deposition commenced at 9:42 a.m.)

W I L L I A M  F.  N E A L,  P.E.,

being duly sworn by Donna M. DeCiantis, licensed shorthand reporter, a Notary Public within and for the State of Connecticut, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY ATTORNEY LEARY

Q   Good morning, Mr. Neal. My name is Kieran Leary. We're here on the Bienkowski v. Liberty Mutual Fire Insurance Insurance Company case. I represent Liberty Mutual. A few grounds for depositions. Have you had your deposition n taken before?

A   Yes.

Q   Approximately how many times?

A   At a guess, I'd say 10 to 15.

Q   Okay. So you're a veteran at this. But I'm gonna ask questions. If you could, please allow me to finish the questions I'm asking, and it goes the same with your answers, that way it makes for a clear transcription and record. A lot of times in verbal

parlance we have a tendency to nod as opposed to make verbal answers. I just request that you say yes or no as opposed to nodding your head, just to make a clear record. If at any point there's a question you don't understand that I ask, please ask me to rephrase it. I'll be happy to do so.

Also, if there's, you know, a time where you need to take a break, that's fine. It's not an endurance test. I'd just ask that you answer any pending questions before you take a break. Fair?

A    That is fair.

Q    Okay. Please state your full name, sir.

A    William Floyd Neal.

Q    Okay. And your home address?

A    77 Meadowview, one word, Lane in Vernon, Connecticut.

Q    Okay. And your business address?

A    It's the same.

ATTORNEY LEARY: Can you mark this Exhibit 1?

(Defendant's Exhibit No. 1, notice of deposition, was marked for identification.)

Q    Mr. Neal, I'm showing you what's been marked as Exhibit 1, which is the notice of your deposition

for today.  Did you see this document?

A     Yes.

Q     And if you flip to page 3, there's a Schedule A which includes a document request.  Did you bring any of these documents with you today?

A     Yes, I did.

Q     And what'd you bring with you today?

A     I'm sorry?

Q     What did you bring with you today?

A     I believe everything that is on the list. Everything in my files.

Q     Okay.  Everything in your file's what you brought?

A     Yes.

Q     And is that, in front you, the documents you brought today?

A     Yes, it is.

Q     Could I take a look at them, please?  Thank you.  Is this a copy we can mark?

A     I have two for you.

Q     Okay.  Thank you.

A     One you can mark and one you can whatever.

Q     Okay.  Great.  Thank you.

                    ATTORNEY LEARY:  Mark that as

                    Exhibit 2.

(Defendant's Exhibit No. 2, documentation provided by Mr. Neal, was marked for identification.)

A    And I also have digital copies of all of my photos.

Q    Okay.  Great.  I show you what's been marked as Exhibit 2, and this is copy your file documents, correct?

A    Yes.

Q    Okay.  You also provided a CD ROM which has photographs that you've taken at the Bienkowski residence?

A    Yes.

Q    Looks like your file consists of your engineering report.

A    Yes.  That's what we call a booking or a schedule sheet.

Q    Okay.  So this is kinda like a intake sheet?

A    Yep.

Q    And is there a date as to when the assignment came in on the sheet?

A    When the call came in?  No, we don't record that.  Those are my field notes.

Q    Okay.  So this next page after I guess the

intake sheet are notes that you took when you were out at the property inspecting it?

A    Yes.

Q    And you've been out to the property once?

A    Yes.

Q    You have an email to looks like Mr. Bienkowski?

A    Transmitting the report, I believe.

Q    Okay.  Just an assortment of emails?

A    Yep.  Those are all the emails that went back and forth in relation to this.

Q    Looks like there's a tax form.

A    Yep, there's a tax form.

Q    And was this for reassessment of taxes?

A    Yes.

Q    And the last few pages in No. 1 looks like a --

A    CV.

Q    -- copy of your CV.  The next is an invoice, correct?

A    Yeah.  You had requested documentation to the fee I've charged.

Q    Okay.  And then the last is a testimony list. Is this an updated list?  It says it's incomplete.  So you've given looks like three depositions in the past

calendar year or so?

A   Yes.  In relation to the foundations.  I have to explain.  You did ask for a list of deposition testimony I've given in court.  I don't specifically keep records of that.  When you asked for it, I did try to search my records.  Over the past 25 years, I've had about 15,000 clients.  I was able to come up with three invoices from 1999, and the only information I had on those was the name of the attorney or the law firm.

Q   Okay.  But just in the past calendar year on these foundation cases in the year 2016 --

A   This will be the fourth deposition about a foundation.

Q   Okay.  And the Bienkowski residence is located at 8 Fenton Bluffs Drive?

A   Yes.

Q   And you've been retained as an expert in connection with this litigation, correct?

A   Yes.

Q   Are you aware you've been disclosed as an expert?

A   Yes.

                    ATTORNEY LEARY:  We'll mark this as
                    3.

(Defendant's Exhibit No. 3, disclosure of expert witness, was marked for identification.)

Q    Mr. Neal, I'm presenting you with Exhibit 3. This is a copy of the plaintiff's disclosure of expert witness.  Have you seen this document before?

A    Not to my knowledge.

Q    Okay.  Let's go over the -- looks like the subject matter that you are going to testify is as to the condition of the concrete at the home.  Is that your understanding?

A    Yes.

Q    Okay.  And that you're expected to testify that the concrete at the plaintiff's home sustained a chemical reaction warranting its replacement, correct?

A    Yes.

Q    Okay.  And it states that the grounds for your opinion are that your opinions and testimony are based on your education, training and experience as a professional engineer, your examination of the concrete at 8 Fenton Bluffs Drive, and review of any and all documents and photographs, correct?

A    Yes.

Q    Okay.  And is that correct?

A    Yes.

Q    All right.  And is this a copy of your report attached to this expert disclosure?

A    Yes.

ATTORNEY LEARY:  Off the record for a second.

(An off-the-record discussion was held.)

Q    I could probably glean a little bit of this from your CV, but it looks like you received a bachelor's in mechanical engineering, University of Pittsburgh?

A    Yes.

Q    Okay.  And then a master's of science and mechanical engineering from Rennselaer?

A    Yes.

Q    And you're a licensed professional engineer in Connecticut, correct?

A    Yes.

Q    And when did you obtain your professional engineer license?

A    I believe it was 1972.

Q    And you're also a licensed home inspector?

A    Yes.

Q    Do you actively perform home inspections?

A    Yes.

Q    How many home inspections did you perform in in the year 2016, ballpark figure?

A    Yeah, I would say somewhere around 500.  My company did about 500.

Q    Okay.  Is that mostly in the Tolland County area?

A    We do the eastern two-thirds of Connecticut.

Q    Okay.  And how long have you been a home inspector?

A    Twenty-five, twenty-six years.

Q    And is that part of Residential Engineering Services or is that a separate --

A    It's part.

Q    And this map cracking condition in the walls, when's the first time you noticed it in a residential foundation?

A    Approximately seven years ago.

Q    And you've been the owner of Residential Engineering Services since 1992; is that correct?

A    Yes.

Q    Are you the sole owner of this entity?

A    Yes.

Q    How many employees do you have at Residential Engineering Services?

A    One full time and one part time.

EXHIBIT 11

Q    And what are their names?

A    Timothy Neal, my son; and Janet Wieliczka, W-I-E-L-I-C-Z-K-A, who reports in the office on Fridays.

Q    And is your son an engineer as well?

A    No.

Q    So you're the only engineer at Residential Engineering Services?

A    Yes.

Q    Okay.  And you've been there since 1992, correct?

A    Yes.

Q    Okay.  Where were you before Residential Engineering Services?

A    Pratt & Whitney.

Q    How long were you at Pratt & Whitney?

A    I believe it was 29 years.

Q    And were you a professional engineer as well?  Was that your job title there?

A    That was not my job title at Pratt & Whitney.

Q    Okay.  What'd you do at Pratt & Whitney?

A    I did heat transfer and aerodynamics.

Q    And were -- and you utilized your professional engineering degree in connection with that?

EXHIBIT 11

A    No.  The PE license had nothing to with my work at Pratt & Whitney.

Q    Okay.  And could you expound a little bit upon what you actually did with Pratt & Whitney?

A    I'm trying to think of a way to make it concise.  Heat transfer is calculating temperatures and designing cooling systems is probably the simplest way to put it.

Q    That's fine.  It's a different spectrum --

A    Oh yes.

Q    -- from what we're dealing with here.

A    Absolutely.

Q    Okay.  Let's take a look at your report, which is attached to Exhibit 3, your expert disclosure.  I assume they're all the same, but I just want to work off the one that's part of the record.

A    That's fine.

Q    If you look, this is a copy of a report you prepared, correct?

A    It appears to be, yes.

Q    And have you prepared any other reports for the Bienkowski residence other than this one?

A    Yes.

Q    What other reports have you prepared for the Bienkowski residence?

A    After I issued my initial report, Mr. Bienkowski contacted me and informed me that I had a typo in his address, so I did change the report to correct the address.  That was the only change in the report.  And you have an email in the package to that effect.

Q    Okay.  I'm looking I guess more so for substantive changes.

A    No substantive changes at all.

Q    Okay.  So you've written one report.

A    One report with two addresses.

Q    Okay.  And this report that you prepared is dated August 4, 2015, correct?

A    Um-hum, yes, it is.

Q    And that's the same day you visited the house?

A    Yes.

Q    Okay.  And did you visit the house and then go back to the office and type out this report later on?

A    Yes.

Q    All right.  And this was your first time at the home, correct?

A    To the best of my knowledge.

Q    Have you been back since?

EXHIBIT 11

A     Not to my knowledge.

Q     Do you have any further plans to go back to the home?

A     Not at this time.

Q     And let me just go through the contents of your report.  It's -- the first sentence states that you visited your home at this address today for the specific purpose of conducting a visual examination of the concrete foundation, correct?

A     Yes.

Q     And it continues:  "Based on our conversation at the time, the house was built in 1988 and you have occupied the home for twenty seven years."  Correct?

A     Yes.

Q     And that's information that you were given by Steven Bienkowski?

A     After two years I have no idea whether it was Mr. or Mrs. Bienkowski who I spoke with.

Q     Okay.  And the letter is addressed to Steven Bienkowski, correct?

A     Yes.  We normally address the letter to the person who made the appointment.

Q     Okay.  Do you have any recollection sitting here today of speaking with Mrs. Bienkowski?

A     No, I have no recollection of speaking to

either one.

Q   Right.  I'm just -- how long were you at the property?

A   We normally spend about an hour.

Q   Right.  Did you pull the assessor's card to verify the information, or do you strictly go off what a homeowner tells you?

A   I just go off what the homeowner tells me.

Q   Okay.  And continuing, the last sentence of the first paragraph says, "You noticed cracks in the foundation approximately ten years ago," correct?

A   That's what I was told, yes.

Q   So this was written in August of 2015.  So ten years ago would be 2005ish, correct?

A   Um-hum, yes.

Q   All right.  And do you know why you were being contacted in 2015 if cracks were noticed in 2005?

ATTORNEY DANFORTH:  Ojbect to the form.

A   If I can refer to the report for a moment.

Q   Sure.

A   And if you don't mind, I'm going to refer to my notes.

Q   Sure.

A    Based on my notes, it would be my opinion that the foundation had undergone significant deterioration over that time period.

Q    Okay.  And what in your notes reflected your recollection as to that?

A    I'm looking at the condition of the foundation.  It didn't happen overnight and probably occurred over a long period of time.  The other possibility is that about this time period is when this whole concrete issue became public for the press and broadcast news, and people became much more aware of the situation.

Q    Right.  And this report's dated in August of 2015.  I think the local news coverage started in July.

A    July of '15.

Q    I think I've seen you on there a couple times.

A    Yeah.

Q    And were you in contact with the news stations concerning this problem in July of 2015?

A    I'm going to try to answer your question.  If I'm not answering the right question, please let me know.  I have never contacted the any of the television stations.  They have contacted me for

interviews and so forth.  But I have no recollection when that may have been.

Q    Understood.  And you stated that these cracks didn't appear overnight, correct?

A    Yes.

Q    All right.  So none of these cracks that you observed are due to some sort of abrupt event, correct?

A    I'm trying to -- is it possible for you to rephrase the question?

Q    Right.

A    I'm having a little difficulty answering that one.

Q    Right.  What I'm asking is, is it your opinion that the cracks have progressed both in width and numerosity over time as opposed to a singular event occurring which one day there was no cracks and this event occurred and all of a sudden there are cracks all over the place?

A    It is more likely than not that it occurs over a period of time.

Q    Right.  So cracks appear and then get larger over time?

A    Yeah.  Would you like me to expound a little bit?

Q    Sure.

A    I have -- I've looked at about 800 buildings that have this problem over the past seven years, and I have buildings where the cracks appear in the progress very rapid, say a year or less, until we get to a very unpleasant situation.  And then we have other times where the cracks progress much slower.

Q    Right.  Have you ever seen a situation where -- strike that.  Have you ever encountered a situation where a homeowner reports to you that the wall's fine one day and then the next day something happens and there are cracks all over the place?

A    I'm going to answer the question you asked. Yes, I have had people tell me that.

Q    That a wall was in pristine condition one day and then next day it had this kind of map cracking?

A    I have had people tell me that.

Q    Do you believe that?

A    No.

Q    Have you seen this condition, this map cracking problem in commercial properties?

A    Yes.

Q    In Eastern Connecticut?

A    Yes.

Q    And could you name a couple of those

EXHIBIT 11

commercial properties where you've witnessed this?

THE WITNESS:  The building next to your office.  What -- it used to be a medical office building.

ATTORNEY DANFORTH:  If I may interject, that is still a medical office building.  I believe it has switched hands, but yes, it's still a medical office building.

A    I don't remember the address.  It's a medical office building next to Mr. Danforth's office.

Q    Okay.  And let's get back to you theorize that the cracks at the Bienkowski residence may have gotten worse between 2005 and 2015, correct?

A    I really don't want to impart any kind of misinformation or cause any kind of misunderstanding. We basically have two types of cracks in foundations. We have cracks that I call typical, common and ordinary that just about everybody has, and then we have this different type of cracking.  When the Bienkowskis told me that they saw cracks ten years ago, I have no idea what kind of cracks that they saw. They could have been the cracks everybody has, so I really don't want to imply that the foundation suffered from the problem over a period of ten years.

Q   Understood.  When you say "cracks that everybody has," are you referring to like shrinkage cracks?

A   Yes.  I call them shrinkage cracks.

Q   Okay.  Have you seen any photographs taken of the Bienkowski's foundation walls prior to your inspection in August of 2015?

A   Not to my knowledge.

Q   All right.  Let's continue in the report. The second paragraph says, "Most of the visible foundation, both exterior and interior, has numerous spider-web cracks," correct?

A   Yes.

Q   Do you know if the interior basement was finished?

A   There's no mention of that in my notes.  If it were finished, I would normally estimate the percent of the basement that was finished.

Q   Understood.  And do you know if there was any kind of siding on the exterior which obscured visible observation of concrete?

A   Again, I have no note to that effect.

Q   Okay.  And continuing in your report, it says, "The foundation walls in several locations are bowing inward by as much as 2 1/2 inches," correct?

A    Yes.

Q    Okay.  But you never saw the walls where --
strike that.  You never saw the walls as they stood
shortly after construction, did you?

A    No.

Q    Could they have been constructed with an
inward slant?

A    No.

Q    And what's your basis for that opinion, that
they couldn't have had an inward slant upon
construction?

A    Well, the foundation walls are 10-inches
thick, and when it curves, the inside of the curve is
shorter than the outside of the curve.  So the
horizontal cracks were in the foundation were open on
the inside which tells me that wall curved after it
cracked.  If the wall had been poured in that
configuration, the cracks wouldn't have been open on
the inside.

Q    And you note "Heavy efflorescence is present
in many areas of the basement, especially had for
heavily cracked areas," correct?

A    Yes.

Q    And what is efflorescence?

A    It's a white powder.  There's at least some

of that in just about every basement.  It come from the lime in the concrete, and it's an indication of where moisture has been moving through the concrete from the outside to the inside.  That's basically a calcium-type material that's picked up by that moisture and deposited on the inside of the walls when the moisture evaporates.  So that is giving us an indication of water migration through the foundation, and water is necessary for any of these chemical reactions to take place.

Q    Okay.  And so is efflorescence essentially disintegration of the mineral's properties within that --

A    And one --  I talked over you, I'm sorry.

Q    No, it's fine.  It's fine.

A    No, efflorescence is common.  It all by itself does not cause any kind of deterioration of the concrete.

Q    Okay.  And what's the significance of its concentration around more heavily cracked areas?

A    It's really telling us that the more heavily cracked areas appear to have more access to water than areas that were not as heavily cracked.

Q    When you say "access to water," are we talking about groundwater, surface water, rainwater?

A   Any of those three that come through the concrete into the inside of the basement.

Q   Do you think water vapor in the air would have appreciable effect on efflorescence or cracking going on in the walls?

A   It can have an effect on increased amounts of efflorescence.  You know, if it's very damp in the basement, it can be a source of water for the chemical reaction.

Q   Okay.  But not independent of both groundwater or surface water or rainwater, correct?

A   I would say that it could be independent of that.

Q   Right.  And what's the basis for your belief that water vapor as opposed to infiltrated ground water could fuel this reaction?

A   It's basically we're talking about iron pyrrhotite, which is one of the problems that we know we have that condition, basically results from oxidation of the pyrrhotite where the iron gets in the pyrrhotite. And, you know, one of the reasons I would run a dehumidifier in my basement is so my tools don't rust, so I think it's very possible that high humidity in a basement can activate the process.  There's so many different factors involved in the process -- when

it happens, how it happens, how quickly it happens --
that I don't think at this point that high humidity
can be ruled out.  It will make the concrete very
damp.  High humidity, you can actually have
condensation on the inside of foundation walls which
means concrete's pretty wet.

Q    Okay.  And the same holds true with the
groundwater, surface water, or rainwater, correct?
That would have -- you know, the end result of
moisture being exposed to the concrete?

A    Um-hum.

Q    And in heavier concentrations than water
vapor, correct?

A    I think when -- I have no basis to, you know,
to make that -- it's possible.  It depends on a whole
set of conditions and factors, parameters that all
have to combine.

Q    Understood.  Your report states that there
are two second floor doors that are racked out of
square and adjacent drywall is stress cracked,
correct?

A    Yes.

Q    Okay.  And it looks like you're attributing
damage to the doors as due to movement caused by the
failing foundation, correct?

A      Yes.

Q      And did you inspect the living area of the house?

A      Yes.

Q      All right.  And what's the basis for your opinion that the damage in the living portion is due to movement in the foundation?

A      Okay.  Over the course of my career in this business, I've examined approximately 15,000 different homes and buildings, and at any time we see this condition in the building, it's because of structural failure of some type.  That's the only thing that can cause this to happen.  In this case, the only structural compound of the building that was in distress was in the foundation, and we didn't have broken or cracked floor joists; we didn't have inadequate support anywhere, all a variety of factors. The only structural deficiency was the foundation that obviously was moving; and, therefore, it's my opinion that the distress in the finished parts of the house were, in fact, caused by the foundation.

Q      And you said the foundation was moving.  Was it moving, or was it your opinion that it had moved?

A      The fact that it's bowing inward means that the foundation is dropping where it's bowing inward.

Q    Right.  So it's still moving; it's not a condition that's already occurred.

A    No.  It's a failure in progress.

Q    Continuing with the third paragraph, you write, "Based solely on my visual observations, the most likely cause of the foundation distress is Alkali-Silica-Reaction."  It's A-L-K-A-L-I S-I-L-I-C-A.  Is that correct?

A    Um-hum.

Q    And can you explain alkali-silica reaction, please?

A    Yes.  We know at this time that we have two different chemical reactions that are occurring in defective concrete.  At the time this report was written, we believed that the most likely cause was alkali-silica reaction.  That is a reaction between silica -- certain silica-based minerals in the aggregate in the concrete and the alkaline Portland cement that's in the concrete.  Since that time, it's become fairly well known that the vast majority of the problem is iron pyrrhotite.  We do have some buildings that have alkali-silica reaction, some that have pyrrhotite, some that have both.  It's a different chemical reaction from pyrrhotite, but both reactions cause excessive pressure in the concrete to cause it

to crack.  So I'd like to tell people it's like your tire goes flat because you hit a nail or a screw.

Q    Okay.  And you said that foundations in the area have some have alkali-silica reaction occurring, some have iron pyrrhotite, and others have both.

A    To best of my knowledge.

Q    Okay.  Have you seen any petrographic examination reports that attribute the damage to alkili-silica reaction?

A    Is maybe an acceptable answer?

Q    If you don't recall or....

A    I don't recall.  I believe I did see one.

Q    All right.  And so what's the basis for your statement that some of these foundations are, in fact, suffering from a alkali-silica reaction?

A    The State of Connecticut did a study by some engineers at UConn and sampled a number of foundations that were reported to be defective.  And at a minimum they used something called the losalimus (phonetic) ASR Test.  And they did have a number of foundations that showed positive for active ASR.  In fact, I have a sample of the concrete sitting on the shelf in my office.  That particular test turns the concrete a pinkish color.  So we do have evidence that we also have ASR.

Q    And is that just a test that reveals that there's alkali-silica or that it's actually reactive?

A    It's a test that shows that the alkali-silica reaction has already occurred.

Q    And at the the Bienkowski residence, have you modified your opinion as to whether this is ASR attributable damage or iron pyrrhotite?

A    After the Connecticut state report came out, and, in fact, maybe even prior that, we became aware of pyrrhotite being at least a significant problem. And maybe a year ago I changed my report, my reports about this subject. I didn't go back and retroactively change anything, but all my new reports say chemical reaction. They do not specify any chemical reactions that can affect concrete in this way. And unless we have specific evidence of any particular type of reaction that's causing the problem, we say it's a chemical reaction.

Q    Okay.  So you don't -- or you no longer believe that most likely cause of a foundation distress is alkali-silica reaction at the Bienkowski home; is that fair to say?

A    That is correct.

Q    And you said other chemical reactions can cause this problem, and we've talked about iron

pyrrhotite.  Are there any others that you're aware of?

A    There are other iron sulphite minerals, like iron pyrite, P-Y-R-I-T-E, that can have a similar effect.  That can have a similar effect.  We have this AA -- ASR, alkali-silica reaction.  There's AAR, alkali-aggregate reaction.  I can't even remember what the other ones are.  There's a whole -- it's more than two.  We've identified two for sure that we have.

Q    Okay.  Continuing in your report, it says, "It typically causes this type of distress to be visible 15 to 20 years after the foundation is poured," correct?

A    That's what it say.

Q    Is that the same timeline for these other chemical reactions that you just talked about?

A    As far as we know.  I have not -- again, in 800 buildings with defective concrete, 15 years seems to be the soonest that the problem becomes visible.  And, again, this is another change in my report.  I now say 15 years or more because I have houses where I'm convinced that they didn't start to crack until they were about 30 years old.

Q    All right.  What's the soonest that you've seen cracking in a foundation that you believe is

attributable to a chemical reaction? Would it be 15 years?

A    About 15 years.

Q    So you haven't seen one that's five or ten years after pouring?

A    No.

Q    What's the latest poured foundation date that you've witnessed a chemical reaction that you believe is causing cracks?

A    2001.

Q    Do you know what property that is?

A    I don't recall offhand, no.

Q    2001.

A    It may be four or five from 2001.

Q    Okay. In your report continues that "The ASR will continue to deteriorate the concrete in the basement walls will continue to bulge inward until they structurally fail," correct?

A    Yes.

Q    So as of the date of your report, which is August 2015, the walls had not structurally failed; is that correct?

A    They were the in the process of structurally failing. They had not become hazardous at that point.

Q    Okay. Have they become hazardous since

August 4, 2015, to your knowledge?

A    Not to my knowledge.

Q    You said that there was no way to arrest the process, correct?

A    Yes.

Q    If water is a catalyst for this process, would curbing the water infiltration or water exposure to the walls arrest the process?

A    No.

Q    And why is that?

A    It would just slow it down.

Q    Okay.  Could this process initiate without water?

A    Not to my knowledge.

Q    Okay.  And speaking of your knowledge, how did you first become exposed to, let's take them one at a time, alkali-silica reaction?

A    That's when I found my first foundation with this very serious cracking, about seven years ago. And it was the first one.  I obviously had no idea what I was looking at, so I made a number of calls and did some online research.  And before you ask, I cannot remember name of the company, but there is a company in Connecticut that does concrete testing, and on their website they do a lot of work for the federal

government, the Air Force, they do airports, all kinds of concrete testing. And when I talked to whoever I spoke to at that time -- I cannot find the notes from that telephone call -- a guy asked me where the house was. He said, Well, that concrete was poured by J.J. Mottes. They have a big ASR problem. So I then started to research ASR, and it seemed everything seemed to fit with what I was seeing. So that was the initial basis for saying that ASR was the most likely cause. And, again, I have to point out that over the past seven years, things have been, as we learn more and more, get more knowledge, more data, more information, this is a continually changing situation where what I might say today may not necessarily be what I might say tomorrow.

Q    Talk about alkali-silica reaction, was this your first exposure to hearing about alkali-silica reaction is within the past seven years or observing it?

A    Yes, it was the first time.

Q    It's the first time you ever heard of it?

A    Yes.

Q    So alkali-silica reaction is something that, I guess, engineers aren't exposed to in the course of their studies; is that correct?

A    I don't know.  It's possible.

Q    But you weren't exposed to it, correct?

A    I don't recall having studied or heard about it, no.

Q    As part of your professional engineering training, were you trained in identification of chemical processes occurring within concrete?

A    No.  That's not my intention to do so.

Q    Right.  How about iron sulfate reaction or pyrrhotite, when was your first exposure to hearing about that condition?

A    Again, I can't give you a specific time.  As this problem evolved or knowledge of this problem evolved, at some point we became aware of a similar problem in Canada which was caused by iron pyrrhotite. And for a while we had people saying it was iron pyrrhotite, people saying it's was ASR, and I've always maintained I don't know what it is; I just know what it does.

Q    Okay.  And the basis for your 15 to 20 years after the foundation is poured for cracks to show up, that's based on your personal experience?

A    That's based on my personal.  The literature says that the problem takes a minimum of 15 years to show up, and based on my experience at this time, my

experience is 15 to 20 years, relying in part on what homeowners are able to tell me.

Q    And when you say "literature," do you know which treatises or publications you're referring to?

A    No.  I've looked at so many things.  I have one or two documents that I saved, you know, downloaded to my computer.  Others I've just read.

Q    And just read online and to better understand the problem?

A    Yeah.  And the documents, you know, I just want to make it clear, I don't go onto Uncle Joe's concrete website.  I read documents that are published by universities, The American Concrete Institute, The American Society of Civil Engineers.

Q    Not uncle Joe's, right?

A    Not uncle Joe's.

Q    Okay.  And continuing in your report, it states that, in the last paragraph on the first page, "It is not possible to predict how quickly the foundation will deteriorate to the point it is structurally dangerous," correct?

A    That's correct.

Q    Okay.  So as of the date of your report, which was August 4, 2015, the foundation was not structurally dangerous.

A    It was not at that time.  But it was -- the condition was very concerning.

Q    Right.  Do you know if the condition's gotten worse since you visited the property in August of 2015?

A    I do not.

Q    You recommend that the foundation should be closely monitored for further deterioration, correct?

A    Yes.  Do you know if the Bienkowskis have done that?

A    I do not.

Q    What did you mean by closely monitoring it?

A    I mean, you know, they really need to look at it almost on a continual basis.

Q    Do you know if they've done that?

A    I do not.

Q    Last sentence of the first page you write, "I urge you to develop a corrective plan with a licensed contractor as soon as possible," correct?

A    Yes.

Q    Do you know if they've done that?

A    I do not.

Q    Last sentence of your -- or first sentenc of the last paragraph of your report states, "With your permission I am sending a copy of this report to

EXHIBIT 11

Attorney Brenda Draghi."  D-R-A-G-H-I.  Correct?

A    Yes.

Q    And is that the order of how you became involved in this?  Were you through Attorney Draghi or the homeowners find you?

A    In this particular case?

Q    Right.

A    I'm going to look at my copy here.  I may be able to tell you.  Our scheduling or booking sheet does not show a referral from anyone.

Q    So I guess the best answer is you're unsure in this case, correct?

A    I'm unsure.

                    ATTORNEY LEARY:  Let's go off the
                    record for a second.
                        (A recess was taken at 10:36, and
                        the deposition resumed at 10:40.)
                        discussion was held.)

Q    Mr. Neal, have you ever heard of this phrase "substantial impairment to structural integrity"?

A    Yes.

Q    Is that an engineering term or is that more of a legal term?

A    My guess is it's more of a legal term.

Q    What does that phrase mean to you, if someone

says, Has this wall suffered a substantial impairment to its structural integrity?

A My inclination is to answer it means exactly what it says, but that's not what you're looking for. It means that the structure has lost the ability to -- let me rephrase that. It means the structure's ability to carry the loads it was intended to carry has been reduced. It is not as strong. In order words, the structure's not as strong as it's supposed to be.

Q Right. And that would be an impairment, but it would have to be a substantial reduction, correct?

A Yes.

Q Do you think there was a substantial reduction in these foundation wall's ability to load bear the wooden portion above it?

A Absolutely.

Q And what's the basis for that?

A The fact that the walls were curving in, they were bowing inward, they were in the process of failing. And they are also -- because the movement in the framing of the house that was evidenced by the racked door frames, the very unusual cracking in the the drywall, there has to be some distress to the framing as well, and because the framing can't be

seen, that remains to be an unknown, exactly how much.

Q    Okay.  But it's still safe to live in the home, right?

A    At the time of my inspection, I did not advise them to leave.

Q    Have you ever advised any of the homeowners of any of these crumbling foundation cases to vacate the premises?

A    Yes.

Q    And who have you advised to do that?

A    I don't remember offhand.

Q    Do you know how many people?

A    Three.

Q    Okay.  Do you know any of their names?

A    I don't remember offhand.

Q    And is the reason you advised those individuals to vacate the premises as opposed to the Bienkowskis due to the differences in the severity of the condition?

A    Yes.

Q    Were the Bienkowskis walls shored?

A    Shored?

Q    Right.

A    Not to my recollection.

Q    And did you advise them to shore the walls?

A    No.

Q    Do you know if a building inspector has condemned the property or not?

A    I do not.

Q    If you believed that a homeowner had to move out for safety reasons, do you notify the building inspector yourself or do you get involved in that at all or just make oral recommendation to the homeowner?

A    I have done so in conjunction with the building inspector, and other times I just advised them to do so.

Q    And is that just based upon the severity of the condition you're observing?

A    There are all sorts of factors that go into that decision.  It's a decision I don't ever want to have to make again.

Q    Understood.  And what would prompt you to contact the building inspector and take an extra step as opposed to telling the homeowner you should move out for safety reasons?

A    Again, it's the factors that go into that decision are, you know, just very complex.

Q    As far as the homeowner that you advised to move out of these crumbling foundation cases, what did you see that was so concerning to you?

A    I saw severe and continuing movement over a short period of time.  Concrete can and maybe will in every case that it can expand.  In these houses, in at least two of them, I can put my hand between the top of the lally column and the bottom of the beam because the house has been pushed up.  So there's no support under the floors.  The floors are -- the beam is dragging the floor down instead of holding it up.  It's a whole variety of factors.  We also have cases where we have loud booming sounds coming out of the house and the house starts to vibrate, and that's resulting from cracks suddenly appearing in the concrete.  It's almost like an earthquake.  We had one house where we had -- I don't remember the exact number -- six to eight loud booms over a period of a few hours that were heard by neighbors, and the entire house was vibrating.  You can't live in a house like that.  You don't know what's gonna happen.

Q    Understood.  Are these occurrences that you've witnessed or heard yourself, or is this reports that a homeowner has told you about?

A    These are reports that homeowners and neighbors have told me.

Q    Okay.  So at any of these properties, have you yourself heard these loud booms and vibrating of

the house?

A    No.  They've been reported by -- the actual noises have been reported by maybe 15 or 20 of my clients, and the actual vibration has been reported by maybe three.  But only one that were, you know, just occurrence after occurrence after occurrence.  The others were maybe once.

Q    Right.  And at even these properties, have basement walls fallen down?

A    No, not yet.

Q    And at the Bienkowski residence, do you believe that there's groundwater exposure to the foundation walls?

A    I have no way to make a definitive statement about that.  I'd say it's highly likely, but I have no way to....

Q    All right.  Is there soil along the other side of these foundation walls?

A    Yes.

Q    How long should concrete last when poured?

A    We stood on the Roman aqueducts carrying water, so I would say at least two thousand years.

Q    And correct me if I'm wrong, forgive me, but you file doesn't reflect when you were first contacted regarding this case, correct?

A    It does not reflect the date that we received a phone call, no.

Q    Okay.  Was there anything unusual about the foundation at the Bienkowski residence relative to other ones that you've inspected with the crumbling foundation problem?

A    Again, I hope I'm being responsive.  The only thing that was unusual was that it was more severely degraded than the average.  That was the only thing that I would say.

Q    When you say "the average," how many of these crumbling foundation have you inspected?

A    Abut 800 buildings.

Q    Eight hundred that you believe have a problem?

A    Yes.  That includes condominium units.

Q    Okay.  Homes themselves, not including condominiums, how many would you say?

A    Four or five hundred.

Q    Five hundred.  And you work with Attorney Danforth's firm on a lot of these projects, correct?

A    Yes.

Q    Are -- and how many would you say you're working with with Attorney Danforth?

A    This is purely a guess, two hundred.

Q    Are you working with any other law firms on the crumbling foundation claims?

A    I'm gonna say no, and then explain that.

Q    Sure.

A    I have had a number of clients who have said "my attorney is so and so, can you send him a copy of the report?"  So I've worked with them in the sense that I sent them a copy of the report, but I have not really had contact.  With the one exception of client Smith, who was in my list of depositions, obviously I had contact with his attorney -- I can't remember his name during the deposition -- prior to and during the deposition.

Q    Have you done any work on behalf of insurance companies in these concrete foundation cases?

A    Not for foundations, no.

Q    You've worked with insurance companies on other Projects.

A    I've had two or three.  And, again, I'm guessing two or three instances where I was an expert witness for an insurance company.

Q    Has anyone called you with a concern about a foundation that they think may have this problem and you'd go out to look and --

A    Absolutely.

Q    -- and they don't?

A    Absolutely.

Q    How many times has that happened, would you say?

A    Again, I don't track it specifically that way, but I would have to say somewhere between fifty and a hundred times.

Q    And has that number increased since the news coverage of this problem started?

A    It's increased because of that, and it's also increased because of what's happening in the real estate market right now.  People are very aware of the problem.

Q    Before they buy they want to --

A    I have people who plan to sell and want the foundation looked at before they put it on the market for a number of reasons.  I also do it for both buyers and sellers.

Q    And before the news coverage, how many crumbling foundations would you say that you inspected?

A    Somewhere around 200 maybe.

Q    So the bulk have come since the news coverage started?

A    Yes.

Q    And taking a look at this invoice, it looks like you charge $400 for an engineering design or evaluation, correct?

A    Correct.

Q    Do you just charge a flat rate for your inspection and preparing a report?

A    For this particular problem, I charge a one-time flat rate of $400.  And any -- that includes the report, any support that's needed, and that also covers any reinspections that people might want me to do, you know, if things continue to happen and they're concerned about it.

Q    Okay.  So the most you're ever gonna charge the Bienkowskis is $400?

A    That's it.

Q    Do you have a different rate for deposition and trial testimony?

A    No.

Q    Do you have any recollection as to who attended your home inspection?

A    For this one?

Q    Correct.

A    The Bienkowskis?

Q    Yes, right.

A    No, I do not.

EXHIBIT 11

Q    Do you know who built the Bienkowski property?

A    I do not.

Q    Do you know any subcontractors who were involved in constructing it?

A    No.

Q    Did the Bienkowskis provide you with any home inspection reports or contracting reports, estimates, invoices, anything from any other likewise professionals?

A    Not to my recollection.

Q    And would you have asked for that stuff if they had it?

A    The only thing I would normally ask is if they know who supplied the concrete.  And then according to the circumstances, I may ask who built the house, but it's not something I generally do.

Q    And did they know who supplied their concrete?

A    I'm going to assume no, because if they knew, I would have written it in my field notes.

Q    Okay.  And do you believe this is concrete from J.J. Mottes Concrete Company?

A    I'm going to answer the question the way you asked it.

A     Yes, I believe it came from J.J. Mottes.

Q     And have you seen the map cracking conditions in eastern Connecticut foundations that precedes the concrete from any other concrete supplier other than Mottes?

A     I'm going to say I don't know.  When I can find out where the concrete came from, which is not often, it has always been J.J. Mottes.

Q     Are you aware of any other concrete suppliers that were operating in eastern Connecticut when homes were being built in the mid to late '80s?

A     Yes.

Q     And what are some of the names of those concrete companies?

A     We have Enfield Transit, Builders Concrete in Manchester.  I'm not sure if they were still Manchester Sand & Gravel at that time; they did change their name.  Tilcon also delivers concrete to this part of the state.  Those are the four that I can think of offhand.  There are other people that supply concrete.

Q     Have you ever heard a complaint or any issues with the concrete from those suppliers?

A     No.

Q     Did you see any evidence of repairs to the

cracks when you inspected the Bienkowski foundation?

A    I don't think that was in my notes.  I have no written record that there were any repairs.

Q    Okay.  And you're unaware if the condition's gotten worse since you wrote your report; is that correct?

A    That's correct.

Q    You haven't done any testing on the concrete yourself, have you?

A    Nope.

Q    Are there different standards in commercial construction to test the quality of concrete prior to placement than in residential properties?

A    Yes.

Q    And what are the differences in those standards?

A    Residential concrete is required to have a minimum strength of 2500 PSI.  In commercial projects the required strength of the concrete is normally specified by the architect or the engineer, and it can be, and I would say usually is, higher than the strength required in residential construction.  So for commercial construction, it is required that the concrete be tested for strength.  It is not tested to determine if there are any chemical situations or

material deficiencies that would lead to this type of deterioration in the future. And that is something not to say we don't have problems in commercial buildings when, in fact, we do.

Q    Right. And that doctor's office is a an example of that; is that correct?

A    That is an example.

Q    Did you note any problems with the basement floor slab?

A    I didn't note any. Normally we don't see this issue in the floor. And maybe to head off another question, I'm not really concerned about the floor because the floor doesn't hold anything up but minimal stuff. It's not a structural part of the house.

Q    The basement floor slab is made of concrete, though, correct?

A    Yes.

Q    And to your knowledge, it's not showing the cracks that are present in the walls; is that correct?

A    We have seen a few slabs that had a similar -- that had this type of problem, but it is not common.

Q    Right. And it's not occurred at this home, correct?

A     I didn't make note of it, so I would assume not.

Q     Would the floor slab be created with the same concrete used to construct the basement walls?

A     No.

Q     And what's the basis for that statement?

A     Well, first thing you build is the foundation, you pour the footings and you pour the foundation, and the entire house is enclosed, you know, it's framed, closed in, the roof is put on, the windows and doors go in, and after the house is normally -- after the house is weather tight, then the floor is poured.  Otherwise, every time it rains you'd have a swimming pool.  So it's not the same concrete in the sense that it was delivered to, I'd say on average, two, three or more months after the foundation was poured.  So it's definitely a different mix, probably has different aggregate.  Sometimes it doesn't even come from the same company.

Q     Have you seen any petrographic examination reports that have tested the concrete for both the walls and the floor slab?

A     No, I have not.

Q     Have the walls at the Bienkowski property fallen down?

A     They had not fallen down when I was there on August 4, 2015.

Q     Has the home fallen down?

A     Their home?

Q     Right.

A     Not to the best of my knowledge.

Q     Had any part of the home fallen down?

A     Not on that date, no.

Q     Had the walls caved in?

A     Can you tell me what you mean by "caved in"?

Q     Right.  Well, I know your opinion is that they were bowing inward, correct?

A     Yes.

Q     Had they actually caved in to the point that they had given in to the forces, external forces against them and fallen forward toward the floor?

A     No.  They have not collapsed.  They were in the process of collapsing.

Q     Okay.  And the home can still be occupied, correct?

A     As of the date of my visit, it could still be occupied.

Q     And as you sit here today, you can't affirmatively state that the home cannot be occupied; is that fair to say?

A I can't say one way or the other without going back and re-examining.

Q Have you ever heard of an engineer named Karl Cianci?

A Yes, I have heard of him.

Q Have you seen any reports prepared by him?

A I'm going to say I believe so, but I don't know the specifics.

Q Have you ever met Mr. Cianci?

A Not to the best of my recollection.

ATTORNEY LEARY: Mark this as Exhibit 4, please.

(Defendant's Exhibit No. 4, claim investigation report dated 1/29/16, was marked for identification.)

Q Mr. Neal, I presented you with Exhibit 4 which is a report prepared by Mr. Cianci. Have you seen this document before?

A Not to the best of my knowledge. I've sometimes been given reports by others, I scan them and put them in my client's file. I have nothing like this in the file.

Q If you could flip, please, to the page which at the top is labeled "page 2," there's a terminology

section.  Do you see that?

A    Yep.

Q    And it says, "The currently adopted residential code is the 2009 International Residential Code."  Is that correct?

A    That's what it says.

Q    Is that the currently adopted residential code in Connecticut?

A    It was at this time.

Q    Is it not any longer?

A    I believe it has changed.

Q    Okay.  In the residential code, is the vertical element between the footing and the wood sill plate referred to as the foundation?

A    Yes.

Q    And if you flip to page 3, please, the last sentence of the first paragraph states, "Chapter 4 of the currently adopted residential building code is titled 'Foundations,' and addresses the requirements for residential concrete foundations and footings."  Is that what it says?

A    Yes.

Q    And is that a correct reference to Chapter 4 of the residential building code?

A    I would have to assume it is.  I mean, the

EXHIBIT 11

code is that thick (demonstrating). I don't have it memorized.

Q    Right. And if you look at the last sentence of the second paragraph, it states, "It is our experience as well as the standards of the industry that the claimed conditions of the subject matter are to the dwelling's foundation."

Do you agree with that statement?

A    "It is our experience as well as the standards of the industry that the claimed conditions of the subject matter are to the dwelling's foundation." That's extravagant language. I think he's saying that they're talking about the foundation.

Q    Right. That the condition we're talking about --

A    -- is the foundation.

Q    Right.

A    Okay, I agree with that.

Q    Okay.

ATTORNEY LEARY:  Exhibit 5.

(Defendant's Exhibit No. 5, Report of Deteriorating Concrete in Residential Foundations dated 11/30/16, was marked for identification )

Q    Mr. Neal, I'm presenting you with a document that's been marked Defendant's Exhibit 5.  This is a Department of Consumer Protection report titled "Report on Deteriorating Concrete in Residential Foundations" and dated December 30, 2016.  Have you seen this document before?

A    Yes.

Q    If you could flip to page 2, please.  And go down to Footnote 1.  And there's a statement in there that a foundation for a residential structure consists of three essential parts.  The footing provides the base which supports the foundation walls, and the slab forms the floor.  Is that what it says?

A    That's what it says.

Q    And do you agree with that definition for the foundation?

A    That is one definition of a foundation.  The building code has another definition.

Q    Okay.  Would you state that a foundation consists of a footing, foundation wall, and a floor slab?

A    I would not include the floor slab.

Q    But you would include the foundation walls.

A    I would include the foundation walls and, depending on who I was talking to, the footing.

Q    Okay.  And you don't know what other walls have been replaced since your visit, correct?

A    No.

Q    Did you make any determination as to the water table in the area of the foundation during your visit?

A    No.

Q    Do you know if the home's in a flood zone?

A    Do not.

Q    Do you know if they've had prior problems with water infiltration in their basement?

A    Do not.

Q    Is that something you ask?

A    Normally.  And, again, I'll look at my notes.

A    I didn't make any notes about water entry.

Q    Okay.  Was there a dehumidifier in the basement while you were there?

A    I don't recall.  It's something I wouldn't note.

Q    Did you see any signs of mold in the basement while you were there?

A    Not to my recollection.

Q    Were there any odors or notable mustiness that you encountered?

A    Again, not to my recollection.

Q    Did you see any problem with gutters or downspouts or drainage around the foundation?

A    I do not look at that when I'm looking at this problem.

Q    So when you look at this problem, do you strictly do an evaluation of the walls themselves?

A    I start with the foundation, and then if the foundation is obviously has sever deterioration, then I look in the finished areas upstairs, both inside and outside.  We're looking for structural issues, not water issues.

Q    Okay.  So part of your evaluation does not consist of looking for reasons why, outside of a mineral reaction; is that fair to say?

A    No.

Q    So you're not going out saying, Is there a drainage problem?  That's not part of your exam?

A    No.  I'm entirely evaluating the condition of the foundation, period.  I do realize some other people go looking at all these other things, and they write reports with excess verbiage and useless information so they can charge a lot of money.  I'm there really to tell people if you have a problem,  if you do, I'm gonna help you with it.

Q    Have you encountered any properties that has

solely interior concrete poured walls, meaning they're not retaining soil and have no exterior exposure on the other side of the wall?

A    They have no exterior exposure?

Q    Right.  Like basically a interior partition concrete wall.

A    Oh, I know what you mean.  Yes.

Q    Have you seen walls that are like that that were poured around the same time as the foundation walls?

A    Yes.  I'm gonna say so far, but I may retract that.

Q    And those interior, for lack of a better term, partition concrete walls at those properties, did they have the same kind of cracks that you witnessed in the foundation walls?

A    It would be very unusual if they did.

Q    Okay.  Can you think of a property that has that sort of interior concrete partition wall?

A    Yes.

Q    And what property is that?

A    That would be the ones -- the ones that immediately come to mind are four or five condominiums where you have interior walls separating the basements of adjacent units, and those walls are almost never

damaged.

Q    And this condominium you're referring to, is this just one complex or is it multiple condominium complexes?

A    I believe at this point we have five or six complexes with the problem.

Q    And what's the location of this -- of these complexes?

A    That would be Ryefield I and Ryefield II in Vernon.

Q    And could you spell Ryefield, please?

A    R-Y-E-F-I-E-L-D one word.  Lakeview -- and again, I believe that's one word -- Condominiums in Vernon.  Laurel Hill in Stafford, L-A-U-R-E-L.  And we have -- I'm trying to think of the name of it.  Is it okay if I ask Attorney Danforth a question?

Q    That's fine, just go off your own recollection for now.

A    It's -- I believe it's called Deerfield in Manchester.  Which is basically off --

ATTORNEY DANFORTH:  If I may interject, that's Lydall Woods.

THE WITNESS:  Lydall Woods, thank you.  Deerfield is the street that comes in.

A      Deerfield is the street that comes in.

Lydall Woods, L-Y-D-A-L-L Woods.

                ATTORNEY DANFORTH:   I apologize for

                participating.

                ATTORNEY LEARY:   Oh, no, that's

                fine.

A      I couldn't pull it out.

Q      Do you have an opinion as to how long the

foundation walls had been in the condition that you

noticed them on August 4, 2015?

A      No.

Q      Did you see any photographs of the foundation

walls that were taken prior to yours?

A      Not to my knowledge.

Q      Are you aware of any foundations that have

alkali-silica or iron sulphide which have not reacted?

A      Again, I'm gonna try to answer your question

the right way.  I am not -- I'm going to answer this

way:  I am not aware of any specific foundations where

that is true.  It is my belief there are a lot of them

out there that haven't had time to happen yet.

Q      Those homes where you advised the homeowners

to move out, do they take your advice and relocate?

A      I am aware that one did.  The other two, I

don't believe they have.

Q    Are you aware of any home that has this crumbling foundation problem where the walls have fallen down?

A    No.

Q    Is the progression of cracking in all of the walls at the Bienkowskis the same or is some more severe than others?

A    I would have to say some are more severe than others.

Q    Do you know which ones are more severe than the other ones?

A    No.

Q    What's the basis for your statement?

A    The basis is that's usually what I see.  Most houses -- I don't remember a house where all the walls were in the same state.

Q    Right.  And what do you attribute the differences to?

A    It can -- I contribute it to access to water. For instance, if the house is built on a hill, the side of the house where the water runs down, hits the foundation, that wall is always worse.

Q    Do you have an opinion as to when the foundation walls at the Bienkowski property are going to fall down absent replacement?

A    No.

Q    Are you aware of any potential repair which would not require removal and replacement of the walls?

A    Absolutely not.

Q    Have you been involved in the replacement process for any foundation?

A    Only as an observer.  I have, you know, stopped by and watched a couple replacements in progress, but I've not actively participated in the process.

Q    Have you made any presentations to any insurance industry on issues with foundations like this?

A    No.

Q    What about to homeowners?

A    I have made presentations to homeowners at meetings, yes.

Q    Okay.  What percentage of your work is for insurers as opposed to insurance companies -- strike that.  What percentage of your work do you do on behalf of homeowners as opposed to insurance companies?

A    In regard to this specific issue?

Q    Sure.

A    A hundred percent homeowner.

Q    In reference to your work let's say over the past five years.

A    Again, in regard to this specific issue?

Q    In regard to your just practice.

A    I would say in the past five years I have not worked for an insurance company in any capacity.

Q    Have you ever done any work on behalf of Liberty Mutual?

A    Not to the best of my knowledge.

Q    Have you reviewed Liberty Mutual policy at issue in this case?

A    No.  It's outside of my expertise.

Q    Right.  And you've never given an opinion as to whether a particular claim is covered or not under a certain insurance policy, have you?

A    When people ask me, you know, I do get asked the question, and I'll say, you know, it's my understanding that it probably isn't, but you need to speak to an attorney because it's really outside my expertise.

Q    You're not a chemist, correct?

A    No.

Q    Do you have any scientific background relative to the identification of chemical processes?

A    Only in gradual (phonetic) chemistry.

Q    Have you ever performed a petrographic examination?

A    No.  I'm not even remotely qualified to do that.

Q    Are the opinions that you've expressed today the opinions you would give in court if called to testify?

A    Yes.

Q    I don't have any further questions.  Thank you for your time, Mr. Neal.

A    You're welcome.

ATTORNEY DANFORTH:  No questions.

(The deposition concluded at 11:26 a.m.)

EXHIBIT 11

C E R T I F I C A T E

I hereby certify that I am a Notary Public in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither attorney or counsel for nor related to nor employed by any of the parties to this action nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___/_____ day of _Felruary_____ 2017.


_____
Notary Public

Connecticut License # 181

My commission expires November 30, 2019

EXHIBIT 11

[& - appear]                                                                        Page 1

**&**

**&** 1:14,19 13:15
  13:16,20,21 14:2,4
  49:17

**0**

**06029** 1:15
**06114-1121** 1:20

**1**

**1** 3:12 5:20,21,25
  8:16 57:9
**1/2** 22:25
**1/29/16** 54:15
**10** 3:14 4:20 23:12
**10:36** 38:16
**10:40** 38:17
**11/30/16** 56:24
**11:26** 66:14
**15** 4:20 18:16
  31:12,18,21 32:1,3
  35:20,24 36:1
  43:3
**15,000** 9:7 27:9
**16-6010054** 1:2
**18** 1:14
**181** 1:24 67:24
**1972** 11:21
**1988** 16:12
**1992** 12:19 13:10
**1999** 9:8

**2**

**2** 3:13 6:25 7:1,8
  22:25 54:25 57:8
**20** 31:12 35:20
  36:1 43:3
**200** 46:22
**2001** 32:10,13,14
**2005** 17:18 21:14
**2005ish** 17:14
**2009** 55:4

**2015** 15:13 17:13
  17:17 18:14,21
  21:14 22:7 32:21
  33:1 36:24 37:5
  53:2 62:10
**2016** 9:12 12:2
  57:5
**2017** 1:5 2:9 67:19
**2019** 67:25
**249-1361** 1:20
**25** 9:6
**2500** 50:18
**26** 1:5 2:9
**29** 13:17

**3**

**3** 3:14 6:3 9:25
  10:1,4 14:14
  55:16
**30** 31:23 57:5
  67:25

**4**

**4** 3:5,15 15:13
  33:1 36:24 53:2
  54:12,13,17 55:17
  55:23 62:10
**400** 47:2,8,14

**5**

**5** 3:12,16 56:20,21
  57:2
**500** 12:3,4
**54** 3:15
**56** 3:17

**6**

**65** 1:19 2:7
**676** 1:14

**7**

**7** 3:13
**77** 5:15

**8**

**8** 9:16 10:21
**800** 20:2 31:18
  44:13
**80s** 49:11
**860** 1:15,20
**871-2422** 1:15

**9**

**9:42** 2:8 4:1

**a**

**a.m.** 2:8 4:1 66:14
**aa** 31:6
**aar** 31:6
**ability** 39:5,7,15
**able** 9:7 36:2 38:9
**abrupt** 19:7
**absent** 63:25
**absolutely** 14:12
  39:17 45:25 46:2
  64:5
**abut** 44:13
**acceptable** 29:10
**access** 24:22,24
  63:19
**accurate** 67:12
**action** 2:3 67:16
**activate** 25:24
**active** 29:21
**actively** 11:24
  64:10
**actual** 43:2,4
**address** 5:14,17
  15:3,4 16:7,21
  21:10
**addressed** 16:19
**addresses** 15:11
  55:19
**adjacent** 26:20
  60:25

**administer** 67:5
**adopted** 55:3,7,18
**advice** 62:23
**advise** 40:5,25
**advised** 40:6,10,16
  41:10,23 62:22
**aerodynamics**
  13:22
**affect** 30:15
**affirmatively**
  53:24
**aggregate** 28:18
  31:7 52:18
**ago** 12:17 17:11,14
  21:22 30:11 33:19
**agree** 56:8,18
  57:15
**agreed** 2:11,17,20
**air** 25:3 34:1
**airports** 34:1
**alkali** 28:7,10,16
  28:22 29:4,15
  30:2,3,21 31:6,7
  33:17 34:16,17,23
  62:16
**alkaline** 28:18
**alkili** 29:9
**allow** 4:22
**american** 36:13,14
**amounts** 25:6
**ann** 1:3
**answer** 5:9 18:22
  20:13 29:10 38:11
  39:3 48:24 62:17
  62:18
**answering** 18:23
  19:12
**answers** 4:24 5:2
**apologize** 62:3
**appear** 19:4,22
  20:4 24:22

**appearing** 42:12

**appears** 14:20 67:8

**appointment** 16:22

**appreciable** 25:4

**approximately** 4:19 12:17 17:11 27:9

**aqueducts** 43:21

**architect** 50:20

**area** 12:6 27:2 29:4 58:5

**areas** 23:21,22 24:20,22,23 59:9

**arrest** 33:3,8

**asked** 9:5 20:13 34:4 48:12,25 65:17

**asking** 4:23 19:14

**asr** 29:20,21,25 30:6 31:6 32:15 34:6,7,9 35:17

**assessor's** 17:5

**assignment** 7:21

**assortment** 8:9

**assume** 14:15 48:20 52:1 55:25

**attached** 11:2 14:14

**attended** 47:20

**attorney** 2:7 3:5 3:11 4:11 5:19 6:24 9:10,24 11:4 17:19 21:5 38:1,4 38:14 44:20,24 45:6,11 54:11 56:20 61:16,21 62:3,5 65:20 66:13 67:14

**attorneys** 1:13,18

**attributable** 30:7 32:1

**attribute** 29:8 63:17

**attributing** 26:23

**august** 15:13 17:13 18:13 22:7 32:21 33:1 36:24 37:4 53:2 62:10

**authority** 2:15

**avenue** 1:19 2:7

**average** 44:9,11 52:16

**aware** 9:21 18:11 30:9 31:1 35:14 46:12 49:9 62:15 62:19,24 63:1 64:2

**b**

**bachelor's** 11:10

**back** 8:10 15:19 15:25 16:2 21:12 30:12 54:2

**background** 65:24

**ballpark** 12:2

**base** 57:12

**based** 10:19 16:11 18:1 28:5,17 35:22,23,25 41:12

**basement** 22:14 22:18 23:21 24:1 25:2,8,22,24 32:17 43:9 51:8,16 52:4 58:11,17,20

**basements** 60:24

**basically** 21:17 24:4 25:17,19 60:5 61:20

**basis** 23:9 25:14 26:14 27:5 29:13

34:9 35:20 37:14 39:18 52:6 63:13 63:14

**beam** 42:5,7

**bear** 39:16

**behalf** 2:2 45:14 64:22 65:8

**belief** 25:14 62:20

**believe** 6:10 8:8 11:21 13:17 20:18 21:7 29:12 30:20 31:25 32:8 43:12 44:14 48:22 49:1 54:7 55:11 61:5 61:13,19 62:25

**believed** 28:15 41:5

**best** 15:24 29:6 38:11 53:6 54:10 54:20 65:10

**better** 36:8 60:13

**bienkowski** 1:3,3 4:14 7:12 8:7 9:15 14:22,25 15:2 16:16,18,20,24 21:13 30:5,21 43:11 44:4 48:1 50:1 52:24 63:24

**bienkowski's** 22:6

**bienkowskis** 21:21 37:9 40:18,21 47:14,23 48:7 63:6

**big** 34:6

**bit** 11:8 14:3 19:25

**bluffs** 9:16 10:21

**booking** 7:17 38:9

**booming** 42:10

**booms** 42:15,25

**bottom** 42:5

**bowing** 22:25 27:24,25 39:20 53:12

**box** 1:14

**break** 3:21 5:8,10

**brenda** 38:1

**brian** 1:16

**bring** 6:4,7,9

**broadcast** 18:11

**broken** 27:16

**brought** 6:13,16

**build** 52:7

**builders** 49:15

**building** 21:2,4,7 21:9,11 27:11,14 41:2,6,10,18 55:18 55:24 57:18

**buildings** 20:2,4 27:10 28:21 31:18 44:13 51:4

**built** 16:12 48:1,16 49:11 63:20

**bulge** 32:17

**bulk** 46:23

**business** 5:17 27:9

**buy** 46:14

**buyers** 46:17

**c**

**c** 1:12 13:3 28:8 67:1,1

**calcium** 24:5

**calculating** 14:6

**calendar** 9:1,11

**call** 7:17,23 21:18 22:4 34:4 44:2

**called** 29:19 45:22 61:19 66:7

**calls** 33:21

**canada** 35:15

**capacity** 65:7

card  17:5
career  27:8
carry  39:7,7
carrying  43:21
case  4:15 27:13
  38:6,12 42:3
  43:25 65:12
cases  9:12 40:7
  41:24 42:9 45:15
catalyst  33:6
cause  21:16 24:17
  27:13 28:6,15,25
  28:25 30:20,25
  34:10 67:17
caused  26:24
  27:21 35:15
causes  31:11
causing  30:17 32:9
caved  53:9,10,14
cd  7:11
cement  28:19
certain  28:17
  65:16
certify  67:3,6,14
change  15:3,4
  30:13 31:20 49:17
changed  30:11
  55:11
changes  15:8,9
changing  34:13
chapter  55:17,23
charge  47:2,5,7,13
  59:22
charged  8:22
chemical  10:15
  24:9 25:8 28:13
  28:24 30:14,15,18
  30:24 31:16 32:1
  32:8 35:7 50:25
  65:25

chemist  65:22
chemistry  66:1
cianci  54:4,9,18
circumstances
  48:16
civil  36:14
claim  54:13 65:15
claimed  56:6,10
claims  45:2
clear  4:24 5:3
  36:11
client  45:9
client's  54:22
clients  9:7 43:4
  45:5
closed  52:10
closely  37:8,12
code  55:4,5,8,12
  55:18,24 56:1
  57:18
collapsed  53:17
collapsing  53:18
color  29:24
column  42:5
combine  26:17
come  9:7 24:1 25:1
  46:23 52:19 60:23
comes  61:25 62:1
coming  42:10
commenced  4:1
commencing  2:8
commercial  20:21
  21:1 50:11,18,23
  51:3
commission  67:25
commissioned
  67:4
common  21:18
  24:16 51:23
companies  45:15
  45:17 49:14 64:20

64:23
company  1:6 4:15
  12:4 33:23,24
  45:21 48:23 52:19
  65:7
complaint  49:22
complex  41:22
  61:3
complexes  61:4,6
  61:8
compound  27:14
computer  36:7
concentration
  24:20
concentrations
  26:12
concern  45:22
concerned  47:12
  51:12
concerning  18:21
  37:2 41:25
concise  14:6
concluded  66:14
concrete  3:16
  10:10,14,21 16:9
  18:10 22:21 24:2
  24:3,18 25:2 26:3
  26:10 28:14,18,19
  28:25 29:22,23
  30:15 31:18 32:16
  33:24 34:2,5 35:7
  36:12,13 42:2,13
  43:20 45:15 48:15
  48:19,22,23 49:4,4
  49:7,9,14,15,18,21
  49:23 50:8,12,17
  50:19,24 51:16
  52:4,14,21 55:20
  56:22 57:4 60:1,6
  60:14,19

concrete's  26:6
condemned  41:3
condensation  26:5
condition  10:10
  12:14 18:6 20:15
  20:20 25:19 27:11
  28:2 35:11 37:2
  40:19 41:13 56:14
  59:18 62:9
condition's  37:3
  50:4
conditions  26:16
  49:2 56:6,10
condominium
  44:16 61:2,3
condominiums
  44:18 60:23 61:13
conducting  16:8
configuration
  23:18
conjunction  41:9
connecticut  1:1,15
  1:20 2:6,8 4:7
  5:16 11:17 12:7
  20:23 29:16 30:8
  33:24 49:3,10
  55:8 67:4,24
connection  2:13
  9:19 13:24
consist  59:13
consists  7:15
  57:10,20
construct  52:4
constructed  23:6
constructing  48:5
construction  23:4
  23:11 50:12,22,23
consumer  57:3
contact  18:20
  41:18 45:9,11

[contacted - deterioration]                                    Page 4

contacted   15:2
  17:17 18:24,25
  43:24
contents   16:5
continual   37:14
continually   34:13
continue   22:9
  32:16,17 47:11
continues   16:11
  32:15
continuing   17:9
  22:23 28:4 31:10
  36:17 42:1
continuity   3:21
contracting   48:8
contractor   37:19
contribute   63:19
conversation
  16:11
convinced   31:22
cooling   14:7
copies   7:5
copy   6:19 7:8 8:19
  10:5 11:1 14:18
  37:25 38:8 45:6,8
correct   7:9 8:20
  9:19 10:15,22,24
  11:17 12:19 13:11
  14:19 15:4,13,23
  16:9,13,20 17:11
  17:14 19:4,8
  21:14 22:12,25
  23:22 25:11 26:8
  26:13,21,25 28:8
  30:23 31:13 32:18
  32:22 33:4 34:25
  35:2 36:21,22
  37:8,19 38:1,12
  39:12 43:23,25
  44:21 47:3,4,22
  50:6,7 51:6,17,20

51:25 53:12,20
  55:5,23 58:2
  65:22
corrective   37:18
counsel   2:12 67:10
  67:15
county   12:5
couple   18:17
  20:25 64:9
course   27:8 34:24
court   1:1 9:4 66:7
coverage   18:14
  46:9,19,23
covered   65:15
covers   47:10
crack   29:1 31:22
cracked   23:17,22
  24:20,22,23 26:20
  27:16
cracking   12:14
  20:16,21 21:20
  25:4 31:25 33:19
  39:23 49:2 63:5
cracks   17:10,17
  19:3,6,15,17,19,22
  20:4,7,12 21:13,17
  21:18,21,22,23
  22:1,3,4,12 23:15
  23:18 32:9 35:21
  42:12 50:1 51:20
  60:15
created   52:3
crumbling   40:7
  41:24 44:5,12
  45:2 46:20 63:2
cs2519344   1:25
curbing   33:7
currently   55:3,7
  55:18
curve   23:13,14

curved   23:16
curves   23:13
curving   39:19
cv   1:2 8:18,19 11:9

d

d   1:16 3:2 38:1
  61:12 62:2
damage   26:24
  27:6 29:8 30:7
damaged   61:1
damp   25:7 26:4
danforth   1:14,16
  17:19 21:5 44:24
  61:16,21 62:3
  66:13
danforth's   21:11
  44:21
dangerous   36:21
  36:25
data   34:12
date   7:21 32:7,20
  36:23 44:1 53:8
  53:21
dated   15:13 18:13
  54:14 56:23 57:5
day   15:15 19:17
  20:11,11,15,16
  67:19
dealing   14:11
december   57:5
deciantis   1:24 2:4
  4:4
decision   41:15,15
  41:22
deerfield   61:19,24
  62:1
defective   28:14
  29:18 31:18
defendant   1:6,18
  2:2

defendant's   3:10
  5:21 7:1 10:1
  54:13 56:21 57:2
deficiencies   51:1
deficiency   27:18
definitely   52:17
definition   57:15
  57:17,18
definitive   43:14
degraded   44:9
degree   13:24
dehumidifier
  25:22 58:16
delivered   52:15
delivers   49:18
demonstrating
  56:1
department   57:3
depending   57:25
depends   26:15
deponent   67:6
deponent's   3:23
deposited   24:6
deposition   1:9 2:1
  2:4,14,21,25 3:12
  4:1,17 5:22,25 9:3
  9:13 38:17 45:12
  45:13 47:16 66:14
  67:7,9,9
depositions   4:16
  8:25 45:10
design   47:2
designing   14:7
deteriorate   32:16
  36:20
deteriorating   3:16
  56:22 57:4
deterioration   18:3
  24:17 37:8 51:2
  59:8

EXHIBIT 11

[determination - factors]    Page 5

determination 58:4

determine 50:25

develop 37:18

differences 40:18 50:15 63:18

different 14:9 21:20 25:25 27:9 28:13,23 47:16 50:11 52:17,18

difficulty 19:12

digital 7:5

direct 3:5 4:10

direction 67:11

disclosed 9:21

disclosure 3:14 10:2,5 11:2 14:15

discussion 11:6 38:18

disintegration 24:12

distress 27:15,20 28:6 30:21 31:11 39:24

district 1:2

docket 1:2

doctor's 51:5

document 6:1,4 10:6 54:19 57:1,6

documentation 3:13 7:2 8:21

documents 6:5,15 7:8 10:22 36:6,10 36:12

donna 1:24 2:4 4:4

door 39:23

doors 26:19,24 52:11

downloaded 36:7

downspouts 59:2

dragging 42:8

draghi 38:1,4

drainage 59:2,17

drive 9:16 10:21

dropping 27:25

drywall 26:20 39:24

due 19:7 26:24 27:6 40:18

duly 2:5 4:4 67:4,7

dwelling's 56:7,11

**e**

e 1:12,12 3:2 4:3,3 13:3 31:4 61:12 61:12,14 67:1,1

earthquake 42:13

eastern 12:7 20:23 49:3,10

education 10:19

effect 15:6 22:22 25:4,6 31:5,5

efflorescence 23:20,24 24:11,16 25:4,7

eight 42:15 44:14

either 17:1

element 55:13

ellington 1:15

email 8:6 15:5

emails 8:9,10

employed 67:15

employees 12:23

enclosed 52:9

encountered 20:9 58:24 59:25

endurance 5:9

enfield 49:15

engineer 10:20 11:16,20 13:5,7,18 50:20 54:3

engineering 7:16 11:10,14 12:11,19 12:24 13:8,14,24 35:5 38:22 47:2

engineers 29:17 34:24 36:14

entire 42:16 52:9

entirely 59:18

entitled 2:3

entity 12:21

entry 58:15

especially 23:21

esq 1:16,21

essential 57:11

essentially 24:11

estate 46:12

estimate 22:17

estimates 48:8

evaluating 59:18

evaluation 47:3 59:6,12

evaporates 24:7

event 19:7,17,18

everybody 21:19 21:23 22:2

evidence 29:24 30:16 49:25

evidenced 39:22

evolved 35:13,14

exact 3:20 42:14

exactly 3:20 39:3 40:1

exam 59:17

examination 3:5 4:10 10:20 16:8 29:8 52:20 66:3

examined 4:7 27:9

examining 54:2

example 51:6,7

exception 45:9

excess 59:21

excessive 28:25

exhibit 5:20,21,25 6:25 7:1,8 10:1,4 14:14 54:12,13,17 56:20,21 57:2

exhibits 3:8,10,11

expand 42:3

expected 10:13

experience 10:19 35:22,25 36:1 56:5,9

expert 3:14 9:18 9:22 10:2,5 11:2 14:14 45:20

expertise 65:13,21

expires 67:25

explain 9:3 28:10 45:3

exposed 26:10 33:16 34:24 35:2

exposure 33:7 34:17 35:10 43:12 60:2,4

expound 14:3 19:24

expressed 66:6

exterior 22:11,20 60:2,4

external 53:15

extra 41:18

extravagant 56:12

**f**

f 1:9 2:1 3:4 4:3 61:12 67:1

fact 27:21,24 29:14,21 30:9 39:19 51:4

factors 25:25 26:16 27:17 41:14 41:21 42:9

[fail - happened]                                                    Page 6

fail  32:18
failed  32:21
failing  26:25 32:24
  39:21
failure  27:12 28:3
fair  5:10,11 30:22
  53:25 59:14
fairly  28:20
fall  63:25
fallen  43:9 52:25
  53:1,3,7,16 63:3
far  31:17 41:23
  60:11
federal  33:25
fee  8:22
fenton  9:16 10:21
field  7:24 48:21
fifty  46:6
figure  12:2
file  7:8,15 43:24
  54:22,23
file's  6:12
files  6:11
find  34:3 38:5 49:7
fine  5:8 14:9,17
  20:10 24:15,15
  61:17 62:6
finish  4:23
finished  22:15,17
  22:18 27:20 59:9
fire  1:5 4:15
firm  9:10 44:21
firms  45:1
first  12:15 15:22
  16:6 17:10 33:16
  33:18,20 34:17,20
  34:21 35:10 36:18
  37:17,23 43:24
  52:7 55:17
fit  34:8

five  12:10 32:4,14
  44:19,20 60:23
  61:5 65:3,6
flat  29:2 47:5,8
flip  6:3 54:24
  55:16 57:8
flood  58:8
floor  26:19 27:16
  42:8 51:9,11,13,13
  51:16 52:3,13,22
  53:16 57:13,20,22
floors  42:7,7
floyd  5:13
follows  4:8
footing  55:13
  57:11,20,25
footings  52:8
  55:20
footnote  57:9
force  34:1
forces  53:15,15
foregoing  67:7,8
  67:12
forgive  43:23
form  2:18 8:12,13
  17:20
formalities  2:13
forms  57:13
forth  8:11 19:1
forward  53:16
found  33:18
foundation  9:12
  9:14 12:16 16:9
  17:11 18:2,7
  21:24 22:6,11,24
  23:12,15 24:8
  26:5,25 27:7,15,18
  27:21,22,25 28:6
  30:20 31:12,25
  32:7 33:18 35:21
  36:20,24 37:7

39:15 40:7 41:24
  43:13,18 44:4,6,12
  45:2,15,23 46:16
  50:1 52:8,9,17
  55:14 56:7,12,13
  56:16 57:10,12,16
  57:17,19,20,23,24
  58:5 59:2,7,8,19
  60:9,16 62:9,12
  63:2,22,24 64:7
foundations  3:17
  9:2 21:17 29:3,14
  29:17,20 45:16
  46:20 49:3 55:19
  55:20 56:23 57:5
  62:15,19 64:13
four  32:14 44:19
  49:19 60:23
fourth  9:13
framed  52:10
frames  39:23
framing  39:22,25
  39:25
fridays  13:4
front  6:15
fuel  25:16
full  5:12 12:25
further  2:17,20,23
  16:2 37:8 66:10
  67:6,14
future  51:2

g

g  38:1
generally  48:17
give  35:12 66:7
given  8:25 9:4
  16:15 53:15 54:21
  65:14
giving  24:7
glean  11:8

go  10:8 15:19 16:2
  16:5 17:6,8 30:12
  36:11 38:14 41:14
  41:21 45:24 52:11
  57:8 59:20 61:17
goes  4:23 29:2
going  10:9 17:23
  18:22 20:13 25:5
  38:8 48:20,24
  49:6 54:2,7 59:16
  62:18 63:24
gonna  4:22 42:18
  45:3 47:13 59:24
  60:11 62:17
good  4:13
gotten  21:14 37:3
  50:5
government  34:1
gradual  66:1
gravel  49:17
great  6:23 7:7
ground  25:15
grounds  4:16
  10:17
groundwater
  24:25 25:11 26:8
  43:12
guess  4:20 7:25
  15:7 34:24 38:11
  38:24 44:25
guessing  45:20
gutters  59:1
guy  34:4

h

h  38:1
hand  42:4 67:18
hands  21:8
happen  18:7 27:13
  42:18 47:11 62:21
happened  46:3

[happening - issued]                                                                        Page 7

happening  46:11
happens  20:11
  26:1,1,1
happy  5:6
hartford  1:20 2:7
hazardous  32:24
  32:25
head  5:3 51:11
heard  34:21 35:3
  38:19 42:16,20,25
  49:22 54:3,5
hearing  34:17
  35:10
heat  13:22 14:6
heavier  26:12
heavily  23:22
  24:20,21,23
heavy  23:20
held  2:6 11:7
  38:18
help  59:24
hereinbefore  2:3
high  25:23 26:2,4
higher  50:21
highly  43:15
hill  61:14 63:20
hit  29:2
hits  63:21
hold  51:13
holding  42:8
holds  26:7
home  5:14 10:10
  10:14 11:22,24
  12:1,8 15:23 16:3
  16:7,13 30:22
  40:3 47:20 48:7
  51:24 53:3,4,7,19
  53:24 63:1
home's  58:8
homeowner  17:7,8
  20:10 41:5,8,19,23

42:21 65:1
homeowners  36:2
  38:5 40:6 42:22
  62:22 64:16,17,22
homes  27:10 44:17
  49:10 62:22
hope  44:7
horizontal  23:15
hour  17:4
hours  42:16
house  15:16,18
  16:12 27:3,20
  34:4 39:22 42:6
  42:11,11,14,17,17
  43:1 48:17 51:15
  52:9,11,12 63:15
  63:20,21
houses  31:21 42:3
  63:15
howd  1:19
hum  15:14 17:15
  26:11 28:9
humidity  25:23
  26:2,4
hundred  44:14,19
  44:20,25 46:7
  65:1

              i

idea  16:17 21:22
  33:20
identification  3:9
  5:23 7:4 10:3 35:6
  54:16 56:25 65:25
identified  31:9
ii  61:9
immediately  60:23
impairment  38:20
  39:1,11
impart  21:15
imply  21:24

inadequate  27:17
inches  22:25 23:12
inclination  39:3
include  57:22,23
  57:24
includes  6:4 44:16
  47:8
including  2:14
  44:17
incomplete  3:23
  8:24
increased  25:6
  46:8,10,11
independent  25:10
  25:12
index  3:8
indicating  3:24
indication  24:2,8
individuals  40:17
industry  56:5,10
  64:13
infiltrated  25:15
infiltration  33:7
  58:11
information  9:9
  16:15 17:6 34:13
  59:22
informed  15:2
initial  15:1 34:9
initiate  33:12
inside  23:13,16,19
  24:4,6 25:2 26:5
  59:9
inspect  27:2
inspected  44:5,12
  46:21 50:1
inspecting  8:2
inspection  22:7
  40:4 47:6,20 48:8
inspections  11:24
  12:1

inspector  11:22
  12:9 41:2,7,10,18
instance  63:20
instances  45:20
institute  36:13
insurance  1:5 4:15
  4:15 45:14,17,21
  64:13,20,22 65:7
  65:16
insurers  64:20
intake  7:19 8:1
integrity  38:20
  39:2
intended  39:7
intention  35:8
interested  67:16
interior  22:11,14
  60:1,5,13,19,24
interject  21:6
  61:22
international  55:4
interrupted  3:21
interviews  19:1
investigation  3:15
  54:14
invoice  8:19 47:1
invoices  9:8 48:9
involved  25:25
  38:4 41:7 48:5
  64:6
inward  22:25 23:7
  23:10 27:24,25
  32:17 39:20 53:12
iron  25:17,20
  28:21 29:5 30:7
  30:25 31:3,4 35:9
  35:15,16 62:16
issue  18:10 51:11
  64:24 65:4,12
issued  15:1

issues   49:22 59:10 59:11 64:13

**j**

j.j.   34:5 48:23 49:1 49:8
janet   13:2
january   1:5 2:9
job   1:25 13:19,20
joe's   36:11,15,16
joists   27:16
judicial   1:2
july   18:15,16,21

**k**

k   13:3 28:7
karl   54:3
keep   9:5
kieran   1:21 4:13
kind   20:16 21:15 21:16,22 22:20 24:17 60:15
kinda   7:19
kinds   34:1
knew   48:20
know   5:7 17:16 18:24 22:14,19 25:7,18,21 26:9,14 28:12 31:17 32:11 35:1,18,18 36:3,6 36:10 37:3,9,13,15 37:21 40:12,14 41:2,22 42:18 43:5 47:11 48:1,4 48:15,18 49:6 52:10 53:11 54:8 58:1,8,10 60:7 63:10 64:8 65:17 65:18
knowledge   10:7 15:24 16:1 22:8 29:6 33:1,2,14,15

34:12 35:13 51:19 53:6 54:20 62:14 65:10
known   28:20

**l**

l   2:10 4:3,3,3 13:3 28:7,7,8 61:12,14 61:14 62:2,2,2
labeled   54:25
lack   60:13
lakeview   61:12
lally   42:5
lane   5:15
language   56:12
larger   19:22
late   49:11
latest   32:7
laurel   61:14
law   9:10 45:1
lead   51:1
learn   34:11
leary   1:21 2:7 3:5 3:11 4:11,14 5:19 6:24 9:24 11:4 38:14 54:11 56:20 62:5
leave   40:5
legal   38:23,24
legend   3:19
letter   16:19,21
liberty   1:5 4:14,16 65:9,11
license   11:20 14:1 67:24
licensed   2:4 4:5 11:16,22 37:18
likewise   48:9
lime   24:2
list   6:10 8:23,24 9:3 45:10

literature   35:23 36:3
litigation   9:19
little   11:8 14:3 19:12,24
live   40:2 42:17
living   27:2,6
llc   1:14,19
load   39:15
loads   39:7
local   18:14
located   9:16
location   61:7
locations   22:24
long   12:8 13:16 17:2 18:8 43:20 62:8
longer   30:19 55:10
look   6:18 14:13,18 37:13 38:8 45:24 47:1 56:3 58:14 59:3,5,9
looked   20:2 36:5 46:16
looking   15:7 18:6 33:21 39:4 59:3 59:10,13,20
looks   7:15 8:6,12 8:16,25 10:8 11:9 26:23 47:1
losalimus   29:19
lost   39:5
lot   4:25 33:25 44:21 59:22 62:20
loud   42:10,15,25
lsr   1:24
ludorf   1:19
lydall   61:22,23 62:2

**m**

m   1:24 2:4 4:3,4
main   1:14
maintained   35:18
majority   28:20
manchester   49:16 49:17 61:20
map   12:14 20:16 20:20 49:2
mark   5:19 6:19,22 6:24 9:24 54:11
marked   3:9 5:22 5:24 7:3,7 10:3 54:15 56:24 57:2
market   46:12,16
mary   1:3
master's   11:13
material   24:5 51:1
matter   10:9 56:6 56:11
meadowview   5:15
mean   37:12,13 38:25 53:10 55:25 60:7
meaning   60:1
means   26:6 27:24 39:3,5,6
mechanical   11:10 11:14
medical   21:4,6,9 21:10
meetings   64:18
memorized   56:2
mention   22:16
met   54:9
mid   49:11
migration   24:8
mind   17:23 60:23
mineral   59:14
mineral's   24:12

[minerals - opinions]                                                    Page 9

minerals  28:17
  31:3
minimal  51:14
minimum  29:18
  35:24 50:18
misinformation
  21:16
misunderstanding
  21:16
mix  52:18
modified  30:6
moisture  24:3,6,7
  26:10
mold  58:20
moment  17:21
money  59:22
monitored  37:8
monitoring  37:12
months  52:16
morning  4:13
mottes  34:6 48:23
  49:1,5,8
move  41:5,19,24
  62:23
moved  27:23
movement  26:24
  27:7 39:21 42:1
moving  24:3 27:19
  27:22,23 28:1
multiple  61:3
mustiness  58:23
mutual  1:5 4:14
  4:16 65:9,11

          n

n  1:12 2:10 3:2 4:3
  4:17
nail  29:2
name  4:13 5:12
  9:9 20:25 33:23
  45:12 49:18 61:15

named  54:3 67:6
names  13:1 40:14
  49:13
neal  1:9 2:1 3:4,13
  4:13 5:13,24 7:3
  10:4 13:2 38:19
  54:17 57:1 66:11
necessarily  34:14
necessary  24:9
need  5:8 37:13
  65:19
needed  47:9
neighbors  42:16
  42:23
neither  67:14
never  18:24 23:2,3
  60:25 65:14
new  30:13
news  18:11,14,20
  46:8,19,23
nod  5:1
nodding  5:3
noises  43:3
nope  50:10
normally  16:21
  17:4 22:17 48:14
  50:19 51:10 52:12
  58:14
notable  58:23
notary  2:5,24 4:5
  67:3,18,22
note  22:22 23:20
  51:8,10 52:1
  58:19
notes  7:24 8:1
  17:24 18:1,4
  22:16 34:3 48:21
  50:2 58:14,15
notice  2:3,15 3:12
  5:22,25

noticed  12:15
  17:10,17 62:10
notify  41:6
november  67:25
number  29:17,20
  33:21 42:15 45:5
  46:8,17
numerosity  19:16
numerous  22:11

          o

o  2:10
oath  4:8
oaths  67:5
objections  2:18
obscured  22:20
observation  22:21
observations  28:5
observed  19:7
observer  64:8
observing  34:18
  41:13
obtain  11:19
obviously  27:19
  33:20 45:10 59:8
occupied  16:13
  53:19,22,24
occurred  18:8
  19:18 28:2 30:4
  51:24
occurrence  43:6,6
  43:6
occurrences  42:19
occurring  19:17
  28:13 29:4 35:7
occurs  19:20
odors  58:23
offhand  32:12
  40:11,15 49:20
office  2:6 13:3
  15:19 21:3,4,7,9
  21:11,11 29:23

51:5
officer  2:15
oh  14:10 60:7 62:5
ojbect  17:19
okay  4:21 5:12,14
  5:17 6:12,21,23
  7:7,11,19,25 8:9
  8:23 9:11,15 10:8
  10:13,17,24 11:13
  12:5,8 13:10,13,21
  14:3,13 15:7,10,12
  15:18 16:19,23
  17:9 18:4 21:12
  22:5,23 23:2
  24:11,19 25:10
  26:7,23 27:8 29:3
  29:7 30:19 31:10
  32:15,25 33:12,15
  35:20 36:17,23
  40:2,14 42:24
  44:3,17 47:13
  48:22 50:4 53:19
  55:12 56:18,19
  57:19 58:1,16
  59:12 60:18 61:16
  64:19
old  31:23
omission  3:22
once  8:4 43:7
ones  31:8 44:5
  60:22,22 63:10,11
online  33:22 36:8
open  23:15,18
operating  49:10
opinion  10:18 18:1
  19:15 23:9 27:6
  27:19,23 30:6
  53:11 62:8 63:23
  65:14
opinions  10:18
  66:6,7

EXHIBIT 11

[opposed - projects]                                                    Page 10

opposed  5:1,3
  19:16 25:15 40:17
  41:19 64:20,22
oral  41:8
order  38:3 39:8
ordinary  21:19
original  3:11
outcome  67:17
outside  23:14 24:4
  59:10,13 65:13,20
overnight  18:7
  19:4
owner  12:18,21
oxidation  25:20

          p

p  1:12,12 2:10 4:3
  31:4
p.e.  1:9 2:1 3:4
p.o.  1:14
package  15:5
page  6:3 7:25
  36:18 37:17 54:24
  54:25 55:16 57:8
pages  8:16
paragraph  17:10
  22:10 28:4 36:18
  37:24 55:17 56:4
parameters  26:16
parlance  5:1
part  12:11,13,25
  14:16 35:5 36:1
  49:19 51:14 53:7
  59:12,17
participated  64:10
participating  62:4
particular  29:23
  30:17 38:6 47:7
  65:15
parties  2:12 67:16
partition  60:5,14
  60:19

parts  27:20 57:11
pe  14:1
pending  5:10
people  18:11
  20:14,17 29:1
  35:16,17 40:12
  46:12,15 47:10
  49:20 59:20,23
  65:17
percent  22:18 65:1
percentage  64:19
  64:21
perform  11:24
  12:1
performed  66:2
period  18:3,8,9
  19:21 21:25 42:2
  42:15 59:19
permission  37:25
person  16:22
personal  35:22,23
petrographic  29:7
  52:20 66:2
phone  44:2
phonetic  3:20
  29:19 66:1
photographs  7:12
  10:22 22:5 62:12
photos  7:6
phrase  38:19,25
picked  24:5
pinkish  29:24
pittsburgh  11:11
place  2:14 19:19
  20:12 24:10
placement  50:13
plaintiff's  10:5,14
plaintiffs  1:4,13
plan  37:18 46:15
plans  16:2

plate  55:14
please  4:22 5:5,12
  6:18 18:23 28:11
  54:12,24 55:16
  57:8 61:11
point  5:4 26:2
  32:24 34:10 35:14
  36:20 53:14 61:5
pointing  3:24
policy  65:11,16
pool  52:14
portion  27:6 39:16
portland  28:18
positive  29:21
possibility  18:9
possible  19:9
  25:23 26:15 35:1
  36:19 37:19
potential  64:2
pour  52:8,8
poured  23:17
  31:13 32:7 34:5
  35:21 43:20 52:13
  52:17 60:1,9
pouring  32:5
powder  23:25
practice  65:5
pratt  13:15,16,20
  13:21 14:2,4
precedes  49:3
predict  36:19
premises  40:8,17
prepared  14:19,21
  14:24 15:12 54:6
  54:18
preparing  47:6
presence  67:10
present  23:20
  51:20
presentations
  64:12,17

presented  54:17
presenting  10:4
  57:1
press  18:10
pressure  28:25
pretty  26:6
prior  22:6 30:9
  45:12 50:12 58:10
  62:13
pristine  20:15
probably  11:8
  14:7 18:7 52:18
  65:19
problem  18:21
  20:3,21 21:25
  28:21 30:10,18,25
  31:19 34:6 35:13
  35:13,15,24 36:9
  44:6,15 45:23
  46:9,13 47:7
  51:22 59:1,4,5,17
  59:23 61:6 63:2
problems  25:18
  51:3,8 58:10
process  25:24,25
  32:23 33:4,6,8,12
  39:20 53:18 64:7
  64:11
processes  35:7
  65:25
professional  10:20
  11:16,19 13:18,24
  35:5
professionals
  48:10
progress  20:5,7
  28:3 64:10
progressed  19:15
progression  63:5
projects  44:21
  45:18 50:18

EXHIBIT 11

[prompt - requirements]                                                                                   Page 11

**prompt** 41:17
**proof** 2:23
**properties** 20:21
  21:1 24:12 42:24
  43:8 50:13 59:25
  60:14
**property** 8:2,4
  17:3 32:11 37:4
  41:3 48:2 52:24
  60:18,21 63:24
**protection** 57:3
**provide** 48:7
**provided** 3:13,20
  7:2,11
**provides** 57:11
**psi** 50:18
**public** 2:5,24 4:6
  18:10 67:3,18,22
**publications** 36:4
**published** 36:12
**pull** 17:5 62:7
**purely** 44:25
**purpose** 16:8
**pursuant** 2:3
**pushed** 42:6
**put** 14:8 42:4
  46:16 52:10 54:22
**pyrite** 31:4
**pyrrhotite** 25:18
  25:20,21 28:21,23
  28:24 29:5 30:7
  30:10 31:1 35:10
  35:15,17

**q**

**qualifications** 2:24
**qualified** 2:5 66:4
  67:5
**quality** 50:12
**question** 5:4 18:22
  18:23 19:10 20:13
  48:24 51:12 61:16

  62:17 65:18
**questions** 4:22,23
  5:10 66:10,13
**quickly** 26:1 36:19

**r**

**r** 1:12 31:4 38:1
  61:12,14 67:1
**racked** 26:19
  39:23
**rains** 52:13
**rainwater** 24:25
  25:11 26:8
**rapid** 20:5
**rate** 47:5,8,16
**reacted** 62:16
**reaction** 10:15
  25:9,16 28:7,10,16
  28:16,22,24 29:4,9
  29:15 30:4,14,17
  30:18,21 31:6,7
  32:1,8 33:17
  34:16,18,23 35:9
  59:14
**reactions** 24:10
  28:13,24 30:15,24
  31:16
**reactive** 30:2
**read** 36:7,8,12
**reading** 2:21 3:23
**real** 46:11
**realize** 59:19
**really** 21:15,24
  24:21 37:13 45:9
  51:12 59:23 65:20
**reason** 40:16
**reasons** 25:21 41:6
  41:20 46:17 59:13
**reassessment** 8:14
**recall** 29:11,12
  32:12 35:3 58:18

**received** 11:9 44:1
**recess** 38:16
**recollection** 16:23
  16:25 18:5 19:1
  40:24 47:19 48:11
  54:10 58:22,25
  61:18
**recommend** 37:7
**recommendation**
  41:8
**record** 4:25 5:4
  7:23 11:4,6 14:16
  38:15 50:3
**records** 9:5,6
**reduced** 39:8
  67:11
**reduction** 39:12
  39:15
**refer** 17:21,23
**reference** 55:23
  65:2
**referral** 38:10
**referred** 55:14
**referring** 22:2
  36:4 61:2
**reflect** 43:24 44:1
**reflected** 18:4
**regard** 64:24 65:4
  65:5
**regarding** 43:25
**reinspections**
  47:10
**related** 67:15
**relation** 8:11 9:2
**relative** 44:4 65:25
**relocate** 62:23
**relying** 36:1
**remains** 40:1
**remember** 21:10
  31:7 33:23 40:11
  40:15 42:14 45:11

  63:15
**remotely** 66:4
**removal** 64:3
**rennselaer** 11:14
**repair** 64:2
**repairs** 49:25 50:3
**rephrase** 5:5
  19:10 39:6
**replaced** 58:2
**replacement** 10:15
  63:25 64:3,6
**replacements** 64:9
**report** 3:15,16
  7:16 8:8 11:1
  14:13,18 15:1,3,5
  15:10,11,12,19
  16:6 17:21 22:9
  22:23 26:18 28:14
  30:8,11 31:10,20
  32:15,20 36:17,23
  37:24,25 45:7,8
  47:6,9 50:5 54:14
  54:18 56:22 57:3
  57:4
**report's** 18:13
**reported** 29:18
  43:2,3,4
**reporter** 2:5 4:5
**reports** 13:3 14:21
  14:24 20:10 29:8
  30:11,13 42:20,22
  48:8,8 52:21 54:6
  54:21 59:21
**represent** 4:15
**request** 5:2 6:4
**requested** 8:21
**require** 64:3
**required** 50:17,19
  50:22,23
**requirements**
  55:19

[research - slower]                                                Page 12

**research** 33:22
  34:7
**reserved** 2:18
**residence** 7:13
  9:15 14:22,25
  21:13 30:5 43:11
  44:4
**residential** 3:16
  12:11,15,18,23
  13:7,13 50:13,17
  50:22 55:4,4,7,12
  55:18,20,24 56:23
  57:4,10
**respective** 2:12
**responsive** 44:7
**result** 26:9
**resulting** 42:12
**results** 25:19
**resumed** 38:17
**retained** 3:11 9:18
**retaining** 60:2
**retract** 60:11
**retroactively**
  30:13
**reveals** 30:1
**review** 10:21
**reviewed** 65:11
**right** 11:1 15:22
  17:2,5,16 18:13,23
  19:6,11,14,22 20:8
  22:9 25:14 27:5
  28:1 29:13 31:24
  35:9 36:15 37:3
  38:7 39:11 40:3
  40:23 43:8,17
  46:12 47:24 51:5
  51:24 53:5,11
  56:3,14,17 60:5
  62:18 63:17 65:14
**rockville** 1:4

**rom** 7:11
**roman** 43:21
**roof** 52:10
**ruled** 26:3
**run** 25:22
**runs** 63:21
**rust** 25:23
**ryefield** 61:9,9,11

**s**

**s** 1:2,12 2:10,10
  3:22 28:8
**safe** 40:2
**safety** 41:6,20
**sample** 29:22
**sampled** 29:17
**sand** 49:17
**saved** 36:6
**saw** 21:21,22 23:2
  23:3 42:1
**saying** 34:9 35:16
  35:17 56:13 59:16
**says** 8:24 17:10
  22:10,24 31:10
  35:24 39:1,4 55:3
  55:6,21 57:13,14
**scan** 54:21
**schedule** 6:3 7:18
**scheduling** 38:9
**science** 11:13
**scientific** 65:24
**screw** 29:2
**seal** 67:18
**search** 9:6
**second** 11:5 22:10
  26:19 38:15 56:4
**section** 55:1
**see** 6:1 27:10
  29:12 41:25 49:25
  51:10 55:1 58:20
  59:1 62:12 63:14

**seeing** 34:8
**seen** 10:6 18:17
  20:8,20 22:5 29:7
  31:25 32:4 40:1
  49:2 51:21 52:20
  54:6,19 57:6 60:8
**sell** 46:15
**sellers** 46:18
**send** 45:6
**sending** 37:25
**sense** 45:7 52:15
**sent** 45:8
**sentenc** 37:23
**sentence** 3:22 16:6
  17:9 37:17,23
  55:17 56:3
**separate** 12:12
**separating** 60:24
**serious** 33:19
**services** 12:12,19
  12:24 13:8,14
**set** 26:16
**seven** 12:17 16:13
  20:3 33:19 34:11
  34:18
**sever** 59:8
**severe** 42:1 63:7,8
  63:10
**severely** 44:8
**severity** 40:18
  41:12
**sheet** 7:18,19,22
  8:1 38:9
**shelf** 29:22
**shore** 40:25
**shored** 40:21,22
**short** 42:2
**shorter** 23:14
**shorthand** 2:5 4:5
**shortly** 23:4

**show** 7:7 35:21,25
  38:10
**showed** 29:21
**showing** 5:24
  51:19
**shows** 30:3
**shrinkage** 22:2,4
**sic** 3:20
**side** 43:18 60:3
  63:21
**siding** 22:20
**significance** 24:19
**significant** 18:2
  30:10
**signing** 2:21
**signs** 58:20
**silica** 28:7,10,16
  28:17,17,22 29:4,9
  29:15 30:2,3,21
  31:6 33:17 34:16
  34:17,23 62:16
**sill** 55:13
**similar** 31:4,5
  35:14 51:21
**simplest** 14:7
**singular** 19:16
**sir** 5:12
**sit** 53:23
**sitting** 16:23 29:22
**situation** 18:12
  20:6,8,9 34:13
**situations** 50:25
**six** 12:10 42:15
  61:5
**slab** 51:9,16 52:3
  52:22 57:12,21,22
**slabs** 51:21
**slant** 23:7,10
**slow** 33:11
**slower** 20:7

[smith - testimony]                                                    Page 13

smith  45:10
society  36:14
soil  43:17 60:2
sole  12:21
solely  28:5 60:1
son  13:2,5
soon  37:19
soonest  31:19,24
sorry  6:8 24:14
sort  19:7 60:19
sorts  41:14
sounds  42:10
source  25:8
speak  65:20
speaker  3:21
speaking  16:24,25
  33:15
specific  16:8 30:16
  35:12 62:19 64:24
  65:4
specifically  9:4
  46:5
specifics  54:8
specified  50:20
specify  30:14
spectrum  14:9
speech  3:21
spell  61:11
spelling  3:20
spend  17:4
spider  22:12
spoke  16:18 34:3
square  26:20
stafford  61:14
standards  50:11
  50:16 56:5,10
start  31:22 59:7
started  18:14 34:7
  46:9,24
starts  42:11

state  1:1 2:6 4:6
  5:12 29:16 30:8
  49:19 53:24 57:19
  63:16 67:4
stated  19:3
statement  29:14
  43:14 52:6 56:8
  57:9 63:13
states  10:17 16:6
  26:18 36:18 37:24
  55:17 56:4
stations  18:21,25
stenographically
  67:10
step  41:18
steven  1:3 16:16
  16:20
stipulated  2:11,17
  2:20,23
stood  23:3 43:21
stopped  64:9
street  1:14 61:24
  62:1
strength  50:18,19
  50:22,24
stress  26:20
strictly  17:6 59:6
strike  20:9 23:3
  64:20
strong  39:8,9
structural  27:11
  27:14,18 38:20
  39:2 51:14 59:10
structurally  32:18
  32:21,23 36:21,25
structure  39:5
  57:10
structure's  39:6,9
studied  35:3
studies  34:25

study  29:16
stuff  48:12 51:14
subcontractors
  48:4
subject  10:9 30:12
  56:6,11
substantial  38:20
  39:1,12,14
substantive  15:8,9
sudden  19:18
suddenly  42:12
suffered  21:25
  39:1
suffering  29:15
sufficiency  2:14
sulfate  35:9
sulphide  62:16
sulphite  31:3
superior  1:1
supplied  48:15,18
supplier  49:4
suppliers  49:9,23
supply  49:20
support  27:17
  42:6 47:9
supports  57:12
supposed  39:9
sure  17:22,25 20:1
  31:9 45:4 49:16
  64:25
surface  24:25
  25:11 26:8
sustained  10:14
swimming  52:14
switched  21:8
sworn  4:4 67:7
systems  14:7

            t
t  2:10,10 31:4 67:1
  67:1

table  58:5
take  5:8,10 6:18
  14:13 24:10 33:16
  41:18 62:23
taken  2:1,16,25
  4:17 7:12 22:5
  38:16 62:13 67:9
takes  35:24
talk  34:16
talked  24:14 30:25
  31:16 34:2
talking  24:25
  25:17 56:13,14
  57:25
tax  8:12,13
taxes  8:14
telephone  34:4
television  18:25
tell  20:14,17 29:1
  36:2 38:9 53:10
  59:23
telling  24:21 41:19
tells  17:7,8 23:16
temperatures  14:6
ten  17:11,14 21:21
  21:25 32:4
tendency  5:1
term  38:22,23,24
  60:14
terminology  54:25
test  5:9 29:20,23
  30:1,3 50:12
tested  50:24,24
  52:21
testified  4:7 67:8
testify  10:9,13
  66:8
testimony  3:23
  8:23 9:4 10:18
  47:17 67:13

[testing - walls]  Page 14

**testing** 33:24 34:2 50:8
**thank** 6:18,21,23 61:23 66:10
**theorize** 21:12
**thick** 23:13 56:1
**thing** 27:12 44:8,9 48:14 52:7
**things** 34:11 36:5 47:11 59:20
**think** 14:5 18:14 18:17 25:3,23 26:2,14 39:14 45:23 49:20 50:2 56:12 60:18 61:15
**third** 28:4
**thirds** 12:7
**thousand** 43:22
**three** 8:25 9:8 25:1 40:13 43:5 45:19 45:20 52:16 57:11
**thursday** 2:8
**tight** 52:12
**tilcon** 49:18
**time** 2:14,19 5:7 12:15,25,25 15:22 16:4,12 18:3,8,9 19:16,21,23 27:10 28:12,14,19 33:17 34:3,20,21 35:12 35:25 37:1 40:4 42:2 47:8 49:17 52:13 55:9 60:9 62:21 66:11
**timeline** 31:15
**times** 4:19,25 18:18 20:7 41:10 46:3,7
**timothy** 13:2
**tire** 29:2

**title** 13:19,20
**titled** 55:19 57:3
**today** 6:1,5,7,9,16 16:7,24 34:14 53:23 66:6
**told** 17:12 21:21 42:21,23
**tolisano** 1:14
**tolland** 1:3 12:5
**tomorrow** 34:15
**tools** 25:22
**top** 42:4 54:25
**track** 46:5
**trailing** 3:23
**trained** 35:6
**training** 10:19 35:6
**transcript** 3:19 67:12
**transcription** 4:25
**transfer** 13:22 14:6
**transit** 49:15
**transmitting** 8:8
**treatises** 36:4
**trial** 2:19 47:17
**true** 26:7 62:20 67:12
**try** 9:6 18:22 62:17
**trying** 14:5 19:9 61:15
**ttd** 1:2
**turns** 29:23
**twenty** 12:10,10 16:13
**two** 6:20 12:7 15:11 16:17 21:17 26:19 28:12 31:9 31:9 36:6 42:4 43:22 44:25 45:19

45:20 52:16 62:24
**type** 15:19 21:20 24:5 27:12 30:17 31:11 51:1,22
**types** 21:17
**typewriting** 67:11
**typical** 21:18
**typically** 31:11
**typo** 15:3

**u**

**u** 2:10 61:14
**uconn** 29:17
**um** 15:14 17:15 26:11 28:9
**unaware** 50:4
**uncle** 36:11,15,16
**undergone** 18:2
**understand** 5:5 36:8
**understanding** 10:11 65:19
**understood** 19:3 22:1,19 26:18 41:17 42:19
**unfinished** 3:21
**units** 44:16 60:25
**universities** 36:13
**university** 11:10
**unknown** 40:1
**unpleasant** 20:6
**unsure** 38:11,13
**unusual** 39:23 44:3,8 60:17
**updated** 8:24
**upstairs** 59:9
**urge** 37:18
**useless** 59:21
**usually** 50:21 63:14
**utilized** 13:23

**v**

**v** 1:4 4:14
**vacate** 40:7,17
**vapor** 25:3,15 26:13
**variety** 27:17 42:9
**vast** 28:20
**verbal** 4:25 5:2
**verbiage** 59:21
**verify** 17:6
**vernon** 5:15 61:10 61:14
**vertical** 55:13
**veteran** 4:21
**vibrate** 42:11
**vibrating** 42:17,25
**vibration** 43:4
**visible** 22:10,20 31:12,19
**visit** 15:18 53:21 58:2,6
**visited** 15:15 16:7 37:4
**visual** 16:8 28:5

**w**

**w** 1:21 4:3 13:3
**waived** 2:16,22,25
**wall** 20:15 23:16 23:17 39:1 57:20 60:3,6,19 63:22
**wall's** 20:10 39:15
**walls** 12:14 22:6 22:24 23:2,3,12 24:6 25:5 26:5 32:17,21 33:8 39:19 40:21,25 43:9,13,18 51:20 52:4,22,24 53:9 57:12,23,24 58:1 59:6 60:1,8,10,14

60:16,24,25 62:9 62:13 63:2,6,15,24 64:4

**want** 14:16 21:15 21:24 36:11 41:15 46:14,15 47:10

**warranting** 10:15

**watched** 64:9

**water** 24:8,9,22,24 24:25 25:3,8,11,15 25:16 26:8,12 33:6,7,7,13 43:22 58:5,11,15 59:11 63:19,21

**way** 4:24 14:5,8 30:16 33:3 43:14 43:16 46:6 48:24 54:1 62:18,19

**we've** 30:25 31:9

**weather** 52:12

**web** 22:12

**website** 33:25 36:12

**welcome** 66:12

**went** 8:10

**wet** 26:6

**wethersfield** 1:19 2:7

**what'd** 6:7 13:21

**when's** 12:15

**white** 23:25

**whitney** 13:15,16 13:20,21 14:2,4

**width** 19:15

**wieliczka** 13:2

**william** 1:9 2:1 3:4 5:13

**windows** 52:11

**witness** 2:21 3:3 3:14 10:2,6 21:2 45:21 61:23 67:18

**witnessed** 21:1 32:8 42:20 60:16

**wood** 55:13

**wooden** 39:16

**woods** 61:22,23 62:2,2

**word** 3:22 5:15 61:12,13

**words** 39:9

**work** 14:2,16 33:25 44:20 45:14 64:19,21 65:2,8

**worked** 45:7,17 65:7

**working** 44:24 45:1

**worse** 21:14 37:4 50:5 63:22

**write** 28:5 37:17 59:21

**written** 15:10 17:13 28:15 48:21 50:3

**wrong** 43:23

**wrote** 50:5

### x

**x** 3:2

### y

**y** 31:4 61:12 62:2

**yeah** 8:21 12:3 18:19 19:24 36:10

**year** 9:1,11,12 12:2 20:5 30:11

**years** 9:6 12:10,17 13:17 16:13,17 17:11,14 20:3 21:21,25 31:12,18 31:21,23 32:2,3,5 33:19 34:11,18 35:20,24 36:1

43:22 65:3,6

**yep** 7:20 8:10,13 55:2

### z

**z** 13:3

**zone** 58:8

Connecticut Procedure in Civil Matters

Chapter 13, Discovery and Depositions

Section 13-30

(D) If requested by the deponent or any party, when the testimony is fully transcribed the deposition shall be submitted to the deponent for examination and shall be read to or by the deponent. Any changes in form or substance which the deponent desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the deponent for making them. The deposition shall then be signed by the deponent certifying that the deposition is a true record of the deponent's testimony, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the deponent within thirty days after its submission to the deponent, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the deponent or the fact of the refusal or failure to sign, together with the reason, if any, given therefore; and the deposition may then be used as fully as though signed unless, on a motion

EXHIBIT 11

to suppress under Section 13-31 (c) (4), the judicial authority holds that the reasons given for the refusal or failure to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 11

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 11

EXHIBIT 11