Page 1

S T A T E   O F   C O N N E C T I C U T

DOCKET NO.:  WWM-CV16-6010066S   :   SUPERIOR COURT

STARLEAN McALLISTER                :   J.D. OF WINDHAM
                                   :
V.                                 :   AT PUTNAM
                                   :
LIBERTY MUTUAL FIRE INSURANCE      :   March 30, 2017
COMPANY

DEPOSITION OF:   WILLIAM F. NEAL, P.E.


        Taken on behalf of the Defendant, Liberty
Mutual Fire Insurance Company, in the
hereinbefore-entitled action, pursuant to
Section 242, et seq., of the Connecticut
Practice Book, before Hilary O. Winslow,
duly qualified Notary Public in and for the
State of Connecticut and Commonwealth of
Massachusetts, held at HOWD & LUDORF, 65
Wethersfield Avenue, Hartford, CT  06114,
commencing at 10:05 a.m. on Thursday, March
30, 2017.


   Job No. CS2580523
                Hilary O. Winslow
             Licensed Court Reporter, #00361

EXHIBIT 13

APPEARANCES:

TOLISANO & DANFORTH, LLC

    Attorneys for the Plaintiff

    P.O. Box 676

    18 Main Street, Suite #1

    Ellington, CT   06029

    (860)871-2422

    bdanforth@tanddlaw.com

BY:   BRIAN D. DANFORTH, ESQUIRE


HOWD & LUDORF

    Attorneys for the Defendant

    65 Wethersfield Avenue

    Hartford, CT   06114

    (860)249-1361

    kleary@hl-law.com

BY:   KIERAN W. LEARY, ESQUIRE

EXHIBIT 13

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice, and the authority of the officer before whom it is being taken, may be and are hereby waived.

It is further stipulated and agreed that objections other than as to form are reserved to the time of trial.

It is further stipulated and agreed that the reading and signing of said deposition by the witness is hereby waived.

It is further stipulated that the proof of the qualifications of the Notary Public before whom the deposition is being taken is hereby waived.

* * * * * * *

EXHIBIT 13

Page 4

I N D E X

WITNESS                                                    PAGE

WILLIAM F. NEAL, P.E.

        Direct Examination By Mr. Leary            5


DEFENDANT'S EXHIBITS        DESCRIPTION             PAGE

Exhibit 1              Re-Notice of Deposition       5

Exhibit 2              Packet of documents --         6
                      file

Exhibit 3              Deposition transcript of       8
                      Mr. Neal

Exhibit 4              Expert Disclosure             13

Exhibit 5              Cianci Engineering, LLC       48
                      Report

Exhibits are retained by Attorney Leary.

EXHIBIT 13

WILLIAM F. NEAL, P.E., called as a witness by the Defendant, having first been duly sworn by the Notary, was examined and testified on his oath as follows:

(Defendant's Exhibit 1, marked for identification.)

MR. LEARY:  Usual stipulations?

MR. DANFORTH:  Yeah, absolutely.

DIRECT EXAMINATION

BY MR. LEARY

Q.    Good morning, Mr. Neal.

A.    Good morning.

Q.    I'm Kieran Leary.  I represent Liberty Mutual Fire Insurance Company in this litigation.  We met about a month ago for a deposition in another matter.

A.    Yes, we did.

Q.    Okay.  We're here today for this.  And you've had your deposition taken a number of times.  Correct?

A.    Yes.

Q.    Okay.  And we're here for the McAllister

EXHIBIT 13

Page 6

case.  Right?

A.    Yes.

Q.    Ms. McAllister's home is located at 102 Old Town Road in Ashford.  Is that correct?

A.    Yes.

Q.    I'm going to show you a copy of a Re-Notice of Deposition dated March 1st, 2017.  Did you receive a copy of this?

A.    Yes, I did.

Q.    And if you could please flip to page 4. There's a Schedule A with some document requests.  Were you able to compile any documents and bring them today?

A.    Yes.

Q.    And is that a pile of documents in front of you?

A.    Yes.

Q.    Okay.  And do you have multiple copies of these?

A.    Yes.

MR. LEARY:  I'll mark one as Exhibit 2.

(Defendant's Exhibit 2, marked for identification.)

EXHIBIT 13

BY MR. LEARY

Q.    I've marked this as Defendant's Exhibit 2.

A.    Uh-huh.

Q.    And this first page that's titled Residential Engineering Services, LLC -- it's got the client name, email address -- is this, essentially, an intake form?

A.    Yes.

Q.    And it says that Ms. McAllister was referred by John Soucy.  Correct?

A.    Yes.

Q.    Who is John Soucy?

A.    He is a concrete contractor.

Q.    Okay.  And in the bottom left portion, it says that you were scheduled for 6/10, Wednesday, at 12:30.  Correct?

A.    Yes.

Q.    And for $400 it says.  Right?

A.    Uh-huh.

Q.    And you charge a flat fee for your foundation inspections?

A.    Yes.

Q.    The inspection went forward on June 10th, 2015.  Right?

A.    Yes.

EXHIBIT 13

Page 8

MR. LEARY:  Mark this, please.


(Defendant's Exhibit 3, marked for identification.)


BY MR. LEARY

Q.   Mr. Neal, is there anything else in your file other than these documents that you've provided today?

A.   Yes, there is.

Q.   And what's that -- nothing between counsel and you that's substantive beyond, like, scheduling?

A.   No.

Q.   Right.  Okay.  What did you remove from your file or didn't bring today that doesn't pertain to conversations with counsel?

A.   I brought everything.

Q.   You brought everything.  Okay.  And, Mr. Neal, I'm showing you right now what's been marked as Exhibit 3.  This is a copy of the transcript of the deposition I took of you in Bienkowski v. Liberty Mutual.

A.   Uh-huh.

Q.   And it was on January 26th, 2017.  Correct?

A.   Yes.

EXHIBIT 13

Q. I understand these are different properties, and that's why we, unfortunately, have to go through this exercise today. But if I ask you -- if I were to ask you the same questions that I asked you in Bienkowski, would you give me the same answers?

A. I believe so, yes.

Q. And I'm not going to ask you anything about the Bienkowski residence today, but if I asked you background information about yourself or about your understanding of alkali-silica or iron sulfide oxidation, would those answers that you gave in Bienkowski hold true today?

A. Yes.

MR. LEARY: That saves us some time.

MR. DANFORTH: Yes.

BY MR. LEARY

Q. All right. Let's go through these documents you provided in Exhibit 2. Your second page, what is this here?

A. It's what I call field notes or notes I made at the time I visited the McAllister residence.

Q. And for identification purposes, the first page that we're referring to, the first line says bought 2009. Correct?

A. Uh-huh -- yes.

EXHIBIT 13

Q.    This information here you eventually put this into a report.  Correct?

A.    Yes.

Q.    All right.  And who was providing you the information in these field notes?

A.    Ms. McAllister.

Q.    Okay.  And had you met Ms. McAllister before June 10th, 2015?

A.    Not to the best of my knowledge.

Q.    Was anyone else present at the time you were conducting your inspection other than Ms. McAllister?

A.    Not to the best of my recollection.

Q.    Okay.  Did you receive any information about the property from anyone other than Ms. McAllister.

A.    Again, not to the best of my recollection.

Q.    Okay.

A.    That normally does not happen.

Q.    Okay.  And it says that the property was built in 1989.  Correct?

A.    Yes.

Q.    And that's information provided by Star.

A.    Yes.

Q.    I'm going to refer to her as Star because it's easier than Ms. McAllister.  Okay?

A.    That works for me.

EXHIBIT 13

Q.   Did you pull an assessor's card or do anything to verify it was built in 1989?

A.   No.

Q.   It says that she -- it says, "Noticed foundation cracks 1 1/2 years ago."  Correct?

A.   Uh-huh -- yes.

Q.   And is that information provided by Star?

A.   Yes.

Q.   Now, it says, "Bulged in about 2 inches." Correct?

A.   Yes.

Q.   Is that information provided by Star or is that --

A.   It was a measurement that I took.

Q.   Okay.  There's a line in the middle of the page here, and I can read SH.  I can't read -- and slash Brenda, hyphen, okay.  What does that say, and what did you mean with that answer?

A.   The first word that's unintelligible is Shane, S-H-A-N-E.  That would be Shane Stinson.  He's a contractor.

Q.   Okay.

A.   And Brenda would be Brenda Draghi.  She's an attorney.  Again, going by my best recollection, she had asked me for names of contractors and attorneys

EXHIBIT 13

that she might touch or get in touch with. And that was indicating that she gave me permission to send both of those individuals a copy of my report.

Q. Okay. And the next page of the documents you provided is just a credit card sale?

A. Yep.

Q. Payment for your services?

A. Yep.

Q. The fourth page is -- it just says "inspection letter" it looks like?

A. That's something we send to -- sometimes send to clients just verifying the inspection and what we were going to do, you know, the date and the time.

Q. Okay. And then it looks like the next few pages are your engineering report and associated photographs. Correct?

A. Yes.

Q. There's an email after your report from you to Star attaching, I assume, the inspection letter?

A. The first email is -- would be the appointment, and that would be this document here (indicating).

Q. Okay. The appointment letter?

A. The appointment letter. That's just saying that we have an appointment. These are the details.

EXHIBIT 13

Page 13

Q.    And who is Fran Neal?

A.    Depending on how you want to look at it, she's my wife and my officer manager.

Q.    Okay. All right. And the remainder of the documents you provided are just emails where you sent contact information for Brenda and Shane Stinson --

A.    Yep.

Q.    -- and forward Ms. McAllister a copy of your engineering inspection. Correct?

A.    Yeah. I just wanted to look and just make sure it's true before I say yes. Yes, that's correct. Yeah.

Q.    Okay. And are you aware that you've been disclosed as an expert today --

A.    Yes.

Q.    -- or for the purposes of this litigation?

A.    Yep.

Q.    Have you seen your expert disclosure before?

A.    I have seen expert disclosures before. I have not -- I don't know that I've seen the one for this deposition or this case.

(Defendant's Exhibit 4, marked for identification.)

EXHIBIT 13

Page 14

BY MR. LEARY

Q.    Okay.    Mr. Neal, I've provided a copy of your disclosure in this matter.    Have you seen this document before?

THE WITNESS:    Can we go off the record for a minute?

(Discussion was held off the record.)

BY MR. LEARY

Q.    Have you ever seen this disclosure form before?

A.    Yes.

Q.    Okay.    And on the bottom portion of the page, it says, "The grounds for opinion," and it says that will be based on your education, training, and experience as a professional engineer.

A.    Yes.

Q.    And during the last deposition I took of you in Bienkowski v. Liberty Mutual, we went over some of your education and experience.    Correct?

A.    Yes.

Q.    And if I asked you questions about your education and experience today, it would mirror what you answered in Bienkowski.    Correct?

EXHIBIT 13

A.    Yes, it would.

Q.    Okay.  Has anything happened between January 26th, 2017, and today's date that would alter your experience or education as a professional engineer?

A.    Only the fact that I probably looked at 20 of 30 more foundations since that date in January. That's the only difference.

Q.    So you looked at 20 or 30 more foundations since January 26th, rough estimate.

A.    Yeah.  Probably more than that.

Q.    And does that concern this believed Mottes concrete problem?

MR. LEARY:  M-O-T-T-E-S.

THE WITNESS:  I'm sorry, I didn't quite hear the question.

BY MR. LEARY

Q.    Sure.  I'll repeat it.  Your foundation inspections in the last month or so, are those pertaining to this believed Mottes concrete problem?

A.    Yes.

Q.    And were there any that you looked at that didn't have a Mottes concrete problem?

A.    I want to answer that very carefully.  I looked at a number of -- I have looked at a number of

EXHIBIT 13

foundations, and at the time of my inspection, they did not exhibit any symptoms of defective concrete.

Q.   And what were the date ranges for the dates those foundations were poured?

A.   As best we know -- after about seven years of trying to understand this problem, as best we know the defective concrete was poured between 1982 and May of 2016.

Q.   You believe that Mottes was pouring bad concrete as late as 2016?

A.   Absolutely.

Q.   Okay.  Let's go back to your documents that you produced that have been marked as Exhibit 2 --

A.   Okay.

Q.   -- because you have a color copy of your report there.  And it's probably a little more -- so you produced this copy of your report, which is dated June 10th, 2015.  Correct?

A.   Yes.

Q.   Have you prepared any other reports other than this one pertaining to the property at issue in this case?

A.   No.

Q.   And it looks like you visited the home the same date.  Correct?

EXHIBIT 13

A.   Yes.

Q.   And was that your first time at Ms. McAllister's property?

A.   To the best of my recollection.

Q.   Okay.

A.   I just want to clarify that.  You know, I have been doing this a long time.  I've looked at about 15,000 houses, and I often -- not often but -- often might be the right word -- I go to a house, and people tell me I was there eight years ago.  And I say, well, that's fine.  I do not remember that.  So --

Q.   All right.

A.   -- I'm not aware that I was at her house previously.

Q.   Okay.  So you believe this is the first time you were at her house?

A.   Yes.  And I can almost guarantee that was the first time I was at her house since she owned it.

Q.   And Star didn't say to you, you have been to my house eight years ago, had she?

A.   Not to the best of my knowledge.  I would have made a note of that.  That would have been in the notes.

Q.   Okay.  And you went out there, it says, for the specific purpose of conducting a visual examination

EXHIBIT 13

of the concrete foundation.  Correct?

A.    Yes.

Q.    Okay.  And have you been back to the property since June 10th, 2015?

A.    No.  I have no record of that.

Q.    And do you have any plans to go back to the property at this time?

A.    Not at the time, no.

Q.    And it says that, "Based on our conversation at the time, the house was built in 1989, and you have occupied the home for ten years."

Correct?

A.    Yes.

Q.    Do you know how long you were at the property with Star?

A.    Specifically, no.  My normal -- I'm normally at a house for this problem for somewhere around an hour, maybe a little more and maybe a little less.

Q.    Okay.  And it says that, "You," meaning Star, "noticed cracks in the foundation approximately 1 1/2 years ago."

Correct?

A.    Yes.

Q.    If you visited in June of 2015, that would put, like, a year and a half approximately around

EXHIBIT 13

December of 2014 or January of 2015 [sic]?

A.   Yep -- yes.

Q.   Do you know if she said a year or a year and a half ago or provided a specific date?

A.   No.  She would have said about a year and a half ago.  A specific date would have been recorded.

Q.   Okay.  Did you ask why she was just requesting your inspection in June of 2015 if she had noticed cracks a year to a year and a half ago?

A.   As I recall, the cracks had been getting worse, and she had actually called Mr. Soucy in to repair the foundation.  And when he looked at it, he said I cannot repair this.  You need to have an engineer look at it.

Q.   Okay.  And it says that, "Much of the basement is unfinished, which gave us visual access to some of the interior of the foundation."

Correct?

A.   Yes.

Q.   Do you know if a foundation [sic] had ever been finished?

A.   If I can take a look at my photos, I might be able to answer that question a little better.  From my photos, I don't see any evidence of that, so I really can't answer your question one way or the other.

EXHIBIT 13

Q.   Okay.  So you don't know whether it was ever finished or not?

A.   No.

Q.   And you don't see any evidence that it was finished?

A.   That's correct.

Q.   And this is an accurate reflection in your report that the basement -- much of the basement was unfinished.  Correct?

A.   Yes.

Q.   The first sentence of the second paragraph starts, "Most of the visible foundation, both exterior and interior, has numerous spider web cracks."

Correct?

A.   Yes.

Q.   And what are spider web cracks?

A.   Those are cracks that go in all directions -- they're vertical, they're horizontal, they're angled.  And the cracks split and divide repeatedly and, actually, fall back on themselves.  So what you really have is individual chunks of concrete that have been completely defined by cracks all the way around the edge.

Q.   Do you know if there was ever any siding or other covering which obscured the exterior concrete

EXHIBIT 13

walls?

A.    No.

Q.    Was there any siding or covering which was obscuring them at the time of your visit?

A.    There normally are features on the exterior which do limit.  Things like steps, you know, obscure part of the foundation.  Sometimes siding does come down to the ground and obscure part of it.  But I have -- I haven't made any record of that.

Q.    Okay.  And if we could just go through a few of your photographs in your report.

A.    Sure.

Q.    And thank you for providing color copies.  Photograph 1, where is that in relation to the house?

A.    This appears to be adjacent to the garage.

Q.    Okay.

A.    It's on the exterior of the house.

Q.    Right.  How wide were these cracks at their -- strike that.

How wide was the widest crack that you observed at the property?

A.    Based on the photograph, I'd say some of them were a quarter to a half inch wide.

Q.    And is that your recollection of what you saw as well at the property, cracks that were a quarter

EXHIBIT 13

Page 22

inch to maybe a half inch wide?

A.    After the amount of time that's lapsed, I -- and the number of foundations I've looked at, I really have no specific recollection about that type of thing for this particular house.

Q.    Okay.  Do you know if you measured any of the cracks at Ms. McAllister's house?

A.    I'm going to say no because I didn't record it.

Q.    Do you know if Star had taken any photographs of her concrete foundation walls prior to your visit?

A.    That I don't know.

Q.    Did she provide you with any of them?

A.    Not to the best of my recollection.

Q.    And if she did, you would have reflected it in your field notes.  Right?

A.    In all likelihood, yes.

Q.    Do you know if she had done anything to track the progression of the cracks over time?

A.    Again.  I don't know.  I normally recommend to my clients that they do that, but I don't know if she followed through.

Q.    And you don't know if she had done that prior to your visit.  Correct?

EXHIBIT 13

A.    No.    Again, I believe I would have made notes to that effect.

Q.    Have you talked to Star since June 10th, 2015, other than emails providing her with documents?

A.    Not to the best of my knowledge.

Q.    These cracks that you've documented, both in your report of photographs, do you believe that any of these are due to an abrupt event?

A.    It was abrupt in the sense that the cracks were not there, and then they were there.  So the crack itself was an abrupt event.

Q.    Okay.  And what do you mean, they weren't there and they are there?

A.    The concrete is uncracked, and you have an abrupt event that the crack -- you know, it's now cracked.  So the crack itself is an abrupt event.

Q.    Okay.  What does abrupt mean to you?

A.    It means -- never been asked to define "abrupt" before -- instantaneous.  It's -- you know, sometimes these cracks appear accompanied by a very loud sound, vibration in the house.  You know, the concrete -- you can almost visualize it the same way an earthquake occurs.  An earthquake occurs because the rocks under the ground are trying to move, and they're locked by friction.  And all of a sudden a force trying

EXHIBIT 13

to make the rocks move becomes greater than the friction, and it just lets go and very abruptly, instantaneously moves. And that abrupt movement and then it stops, that's what causes the vibration. It results in an earthquake. And we sometimes have similar things happening in these foundations where it just abruptly lets go, results in a loud noise and vibration in the house. So, yeah, they -- the cracks themselves appear abruptly.

Q. Okay. And what -- do you believe that an earthquake caused the cracks or a similar event caused the cracks at Star's home?

A. Oh, absolutely not.

Q. Okay.

A. There's stresses within the concrete not stresses within the earth.

Q. Okay. And when you're talking about these abrupt events or loud sounds, have you witnessed that yourself at any of these properties?

A. No.

Q. And so what are you basing that testimony on?

A. Numerous clients who report the same thing.

Q. Now, the cracks that you saw at Star's house, do you believe that they weren't there in any

EXHIBIT 13

fashion, let's say, on a Monday, and then on a Tuesday, you had these sorts of cracks in the wall?

A.   Yes.

Q.   You believe it's possible that all of a sudden the walls were perfect and in pristine condition with no cracks and then all of a sudden they exhibited this sort of cracking?

A.   Yes, very possible.

Q.   And what are you basing that on?

A.   I'm basing that on testimony of hundreds of clients and, you know, telling me the same types of things over and over again.

Q.   Okay.  And do you believe this Mottes concrete problem is a progressive condition, or do you believe that it's something that could be, as you described, where there's no cracks and then all of a sudden there's an event and then there's cracks?

A.   No.  It is a progressive process.

Q.   So cracks get worse over time?

A.   They do get worse over time, yes.

Q.   Okay.  But you described a scenario where the walls would exhibit no cracking and then all of a sudden some event happens and it results in exponential cracks throughout the property.

A.   The events I described probably produced one

EXHIBIT 13

Page 26

crack.

Q.   And would it --

A.   And then -- you know, then the cracks can occur without that type of drama if you will.

Q.   Okay.  And when you said the events you described would result in maybe one crack, you haven't observed any of those events, have you?

A.   No.

Q.   Right.  So that would be solely based on the testimony of clients.  Correct?

A.   The testimony of clients as well as understanding what happens when these conditions exist within the concrete.

Q.   Okay.  What's the basis for your statement that that sort of event would only result in maybe one crack?

A.   It could result in one crack, it could result in several cracks, two cracks.  We don't know.  There's a lot that we don't know about this problem.

Q.   And do you know if a sudden event happened at Star's property?

A.   I have no clue.

Q.   Okay.  But she did report that she noticed cracks in the foundation approximately 1 1/2 years prior to your visit.  Right?

EXHIBIT 13

A.    Right.

Q.    Okay.  Do you know if her foundation had cracks in it at the time she purchased it?

A.    Do I personally know, no.  I have no way of knowing that.

Q.    Did you ask her for a copy of her home inspection report?

A.    I would say probably not.

Q.    Do you ever do that at the properties you inspect with these foundation issues?

A.    I would have to say, yes, but it's -- it's not a common practice.

Q.    Okay.  You write in your report on the second line that the foundation walls on several locations are bowing inward by as much as 2 inches. Correct?

A.    Yes.

Q.    You weren't at the property prior to June 10th, 2015 --

A.    No.

Q.    -- to the best of your recollection?

A.    Right.

Q.    Did you see how these walls were when they were constructed?

A.    No.

EXHIBIT 13

Q.    You note that, "Heavy efflorescence (a white powder from the concrete) is present in many areas of the basement."

Correct?

A.    Yes.

Q.    We went over efflorescence in a prior deposition of yours that we've marked Exhibit 2, so I'm not going to go over that too much.  But you note that, "It's especially concentrated on the more heavily cracked areas.  Correct?

A.    Yes.

Q.    And what do you think the relationship is between that efflorescence and its presence in the more heavily cracked area?

A.    Well, at this point, we have identified two different chemical reactions that are occurring, and they're causing this problem that we're discussing ASR alkali-silica reaction -- A-L-K-A-L-I-silica reaction, and iron pyrrhotite.  Both of those chemical reactions require the presence of water to occur.  Efflorescence, in and of itself, is not a defect or a problem.  But efflorescence appears on the concrete when moisture is present.

So when you have heavy efflorescence and it's associated with the areas of the foundation that

EXHIBIT 13

are more heavily cracked, that's telling us that that part of the foundation that's more heavily cracked did have access to more water, and it's -- it is just one of the factors in, you know, what happens.

Q.   And when you say access to water, are you referring to groundwater, rainwater, surface water?

A.   It can be groundwater, rainwater, surface water, humidity, high humidity and condensation in the basement.  It can be a plumbing leak.  It can be water from any source.

Q.   And do you see efflorescence in walls at properties that don't have an iron pyrrhotite problem or alkali-silica?

A.   You see some amount of efflorescence in every basement.  Like I said, in and of itself, it is not a problem or a concern.

Q.   Continuing in your report in the middle of the second paragraph, it says, "The left, front corner of the foundation is completely cracked off and is twisting and pulling the frame structure of the house in that corner."

Correct?

A.   Yes.

Q.   What do you mean by its completely cracked off?

EXHIBIT 13

A.    There was pieces of foundation missing.

Q.    Do you have a photograph that demonstrates what you're referring to?

A.    Photograph 7.  That piece of concrete under the -- you can see where the siding is twisted, lifted up.  The corner is being pushed to the left, and that piece of concrete there was just completely loose.

Q.    Okay.  Do you know how long that corner was in that condition?

A.    No.

Q.    Did Star tell you how long it had looked like that?

A.    No.  Not to the best of my knowledge, no.

Q.    Do you think photograph 7 -- strike that.

Do you think that the condition exhibited in the corner of the foundation of photograph 7 happened abruptly, or do you think that's a cracking condition that progressed over time?

A.    I have no way of knowing.

Q.    If you go to the last sentence of the second paragraph, it starts at, "There has been significant movement in the front wall of the foundation."

Correct?

A.    Yes.

Q.    What do you mean by "significant"?

EXHIBIT 13

A.    Well, the movement would be related to what's happening at the corner.  It could be related to the bowing of the foundation.  You know, the concrete in that foundation at that time was starting to expand and push the house out of shape.

Q.    So what's your -- what makes movement significant, in your words, as opposed to insignificant movement?

A.    Significant movement would be any kind of movement -- any foundation moves slightly.  It moves when the weather changes.  It moves -- you have different temperatures, water content between summer and winter, freezing ground causes the foundation to move a little bit.  These are all normal occurrences.  Significant movement is any movement that effects the structure of the building -- when it starts to twist the house so that you get very unusual drywall cracks, when doors and windows are twisted so that they don't open and close properly, when you can actually see movement in the frame of the house, like at that corner where the framing is being pulled apart, you know, which is, obviously, a structural concern.

Q.    Okay.  And it says that, "has caused cracking of the drywall and the finished floors of the house as well as racking of the windows."

EXHIBIT 13

Correct?

A.    Yes.

Q.    Do you have photographs of that condition?

A.    It does not look like I took any, but let me just see.  No, I did not take any photographs of that.

Q.    Have you seen cracking in the drywall of finished floors of a home where it didn't have a foundation problem?

A.    Yes.

Q.    Have you seen racking of windows in a home that didn't have a foundation problem?

A.    Again, I think I have to say yes to that.

Q.    Did you inspect the living portion of the home during your visit on June 10th, 2015?

A.    To make those statements, I would have to say, yes, I did.

Q.    And you state that in the third paragraph that, Based solely on my visual inspections -- strike that.

You say at the start of the third paragraph that, "Based solely on my visible observations, the most likely cause of the foundation distress is alkali-silica reaction."

Correct?

A.    Yes.

EXHIBIT 13

Page 33

Q.    Do you know if there's been a petrographic examination at this property?

A.    I'm not aware of that, no.

Q.    You didn't conduct one, did you?

A.    No.

Q.    Have you ever done a petrographic examination?

A.    No.

Q.    Have you seen the results of petrographic examinations at properties that are believed to have this Mottes concrete problem?

A.    Yes.

Q.    Have you seen that the outcome of those are that the problem is this iron sulfide oxidation with pyrrhotite and not ASR?

A.    I've seen both.

Q.    You've seen both?

A.    Uh-huh.

Q.    What report have you seen that says that the problem is attributable to, let's say, ASR as well?

A.    I can't answer that at this time.  I just don't know.  The UConn study also identified ASR as a problem.

Q.    Okay.  In the middle of the -- do you know -- strike that.

EXHIBIT 13

Do you know if -- I'm sorry.  I believe I asked you, you're not aware of whether or not a petrographic examination has been done at Star's property.  Is that correct?

A.    That is correct, I'm unaware of that.

Q.    Middle of the third paragraph, it says that, "The ASR will continue to deteriorate the concrete, and the basement walls will continue to bulge inward until they structurally fail."

Correct?

A.    Yes.

Q.    So as of your visit in June of 2015, the walls had not structurally failed.  Is that fair to say?

A.    They were certainly in the process of failing.

Q.    Okay.  But they hadn't structurally failed, had they?

A.    That's a question that is very difficult to answer, and it depends on your definition of "structural failure."  The walls, in fact, had failed structurally in the sense that the foundation in that house was no longer capable of doing what it was designed to do.

Q.    Okay.

A.     But did the house structurally fail in the sense that it collapsed, the walls, no.  But, you know, given what was happening in that house, the foundation had failed structurally.  It was still -- it was still holding the house up, and it was -- it had not actually collapsed, but that foundation was no longer structurally sound.

Q.     What do you mean by "structurally sound"?

A.     That means able to do what it's supposed to do.

Q.     What's it supposed to do?

A.     It's supposed to hold the house up and keep the house firmly in place without moving, and it is supposed to resist soil pressure.

Q.     Do you know if -- and it's still holding the house up, isn't it?

A.     It is still holding the house up.  In this case, it was twisting the house out of shape, and it is no longer able to resist soil pressure.  That's why the walls were bowing in, and they will continue to bow in until they collapse.

Q.     Do you know if any soil has entered the basement?

A.     I would say probably not.

Q.     Okay.  You don't have any record that soil

EXHIBIT 13

had, entered the basement, do you?

A.   No.  I definitely would have made a note of that.

Q.   And the walls are holding soil on the outside of them.  Is that correct?

A.   Yes.

Q.   You note in the middle of the third paragraph that, "There is no way to arrest the process."

Correct?

A.   Yes.

Q.   If you excavated the soil away from the wall, would that help alleviate this problem and its progression?

A.   No.

Q.   And why is that?

A.   Because the reaction that's occurring in the concrete is going to continue.

Q.   Would it slow the process if you excavated soil around the walls so that they weren't producing an unbalanced --

A.   All you'd do is just give the concrete more access to water, which would accelerate the process.

Q.   Okay.  If you could, just let me finish the question just for the sake of the record.

EXHIBIT 13

A.    Okay.

Q.    And, you know, you can offer your answer. If you excavate the soil around the foundation walls, would that alleviate the lateral pressure that's being placed upon them?

A.    Yes.

Q.    And would that potentially extend the life span of these foundation walls?

A.    This whole process is so complex and has so many parameters that I think the accurate answer to your question is maybe.  And I'm not trying to prevaricate, I'm trying to be honest.

Q.    Understood.  Have -- what was the waterproofing like at Ms. McAllister's home?

A.    I have no idea.

Q.    Okay.  Do you think that improving waterproofing materials on the foundation walls could alleviate this problem with water exposure?

A.    No.

Q.    And why is that?

A.    Because all that does is slow the process down, it doesn't eliminate it.

Q.    Are you aware there's properties in Tolland County that have a reactive pyrrhotite but have a superior waterproofing membrane and that exhibit no

EXHIBIT 13

cracks, even though they were poured at the same time as a lot of these other properties which are exhibiting tremendous cracking?

A.    I am aware of that.

Q.    What do you think that's attributable to?

A.    It's attributable to the fact that the foundation hasn't gotten enough water yet, and it's a time bomb waiting to explode.

Q.    But wouldn't it also be due to the fact if there's superior waterproofing membrane which is alleviating the problem with exposure to water?

A.    The concrete's going to get access to water somehow through humidity, plumbing leak.  And what we've found -- we do have foundations that crack very early, we have foundations that crack much later.  And once they crack, just one crack that lets the water in, and the whole thing takes off like gangbusters.

So I do have clients who have paid up to $80,000 to have their foundation waterproofed, and they're sorry they did it because it did not prevent the problem from happening.

Q.    Do you know who they had waterproof the property?

A.    No.

Q.    Okay.  Your last paragraph here on page 4

EXHIBIT 13

says that, "The foundation has deteriorated to a point that it is structurally unstable, and immediate repairs are necessary.  Correct?

A.   Yes.

Q.   What did you mean by "structurally unstable"?

A.   Well, the walls are bowing in by 2 inches. We have a corner of the house being pushed away, pulling the framing apart in that corner of the house. Unstable means different things to different people, but the foundation had significant movement, and it was affecting the integrity of the home.

Q.   And you recommend that the walls be replaced.  Correct?

A.   Absolutely.

Q.   Is that because of ASR?

A.   It's because there's no way to repair the concrete.

Q.   And you recommended immediate repairs. Correct?

A.   Yes.

Q.   What was that to prevent?

A.   To prevent potential collapse of the house.

Q.   What does "immediate" mean to you?

A.   That means pick up the phone and call

EXHIBIT 13

somebody.

Q. You think -- right. Not immediate repair, what does the word "immediate" mean?

A. It means right now.

Q. Okay. Do you know if Star has made repairs yet?

A. I do not know that, no.

Q. And you're unaware of the condition of the foundation at the time the home was purchased by Star. Is that correct?

A. That's correct.

Q. You strongly recommend in your report a structural stud wall be built inside the basement wall as a temporary repair. Correct?

A. Yes.

Q. Do you know if that was built?

A. I do not.

Q. And you referred Star to Attorney Brenda Draghi. Is that correct?

A. Yes.

Q. And you referred her to Shane Stinson of Titan Construction. Is that correct?

A. Yes.

Q. How do you know Attorney Draghi?

A. She's my personal and business attorney, and

EXHIBIT 13

I've known her for years.

Q. And how do you know Shane Stinson?

A. I've worked with him for -- again, for years in other aspects of my business.

Q. Do you know if Star ever reached out to Shane Stinson?

A. I do not.

Q. Do you know if she has replaced her foundation?

A. I do not.

Q. Did you tell Star to continue to monitor these cracks to see if they'd progress?

A. Yes.

Q. Is that reflected in any of your field notes?

A. No. That's what I tell all my clients. I do not -- I tell them that it's a one-time fee. Anything they need, if I need to come back to the house, anything at all happens that concerns them, that they need to contact me. It's not going to cost them any more money. And as far as I know, I have not heard from her.

Q. Do you know what she's done to monitor the cracks since your visit?

A. Again, I have no record of that.

EXHIBIT 13

Page 42

Q.   Do you think there's anything unique about this claim as opposed to the dozens of other ones you've looked at?

A.   Unique, no.

Q.   How many foundations have you inspected which you believe are afflicted with this Mottes concrete problem?

A.   In my best estimate, that would be houses, condominium, commercial buildings -- somewhere around 7 or 800 buildings.

Q.   And are any of those buildings in Massachusetts?

A.   No.

Q.   Where are those buildings concentrated?

A.   Northeastern Connecticut.  And we're now starting to see this problem down at the shore as well.

Q.   Did you take any additional photographs other than those reflected in your report?

A.   Again, I want to be accurate.  If I did, they were blurry, and they were discarded.  But all the ones that were useful were retained and were in the report.

Q.   Did you do anything to validate that this home was built in 1989, such as pull an assessor's card?

EXHIBIT 13

A.   No.

Q.   Just went off of information provided by Star?

A.   Yes.

Q.   Did you notice any repairs to the property during your visit?

A.   If I did, I didn't record it.

Q.   And when I'm referring to repairs, you know, patching, things of that nature.  You didn't see any of that?

A.   Not to the best of my knowledge, no.

Q.   Would you have recorded that in your report if you had seen it?

A.   I'd say sometimes.  It's something that is not -- it's really not pertinent to why I'm there.

Q.   Did you notice any paint-filled cracks?

A.   Again, not that I recall.

Q.   Had the walls been shored at the time you visited this property?

A.   No.

Q.   And you don't know if they've been shored since.  Correct?

A.   Correct.

Q.   Has Ms. -- strike that.

Has Star moved out of the property?

EXHIBIT 13

Page 44

A.   I have no knowledge of that.

Q.   Did you advise her to move out for safety reasons?

A.   Not at the time of my visit.

Q.   Okay.  And you advised other homeowners to move out for safety reasons?

A.   Yes, I have.

Q.   Do you know who those other homeowners are?

A.   I have records of it.  Their names are not popping into my....

Q.   Right.  Did you believe that the home was unsafe at the time that you visited it?

A.   No.

Q.   Do you have any ballpark estimate as to when the home will become unsafe absent replacement of these walls?

A.   That's impossible to determine.

Q.   Why is it impossible?

A.   We don't know how quickly the deterioration is going to continue and what affect it's going to have on the structure.  It's just way too complex a situation to make predictions.  That's why I tell people, if anything happens that concerns you, you need to call me so I can reevaluate the house.

Q.   And Star hasn't called you.  Right?

EXHIBIT 13

Page 45

A.    No.

Q.    You don't know if there's been any progression of the cracks since your visit in June of 2015.  Correct?

A.    No.

Q.    Do you know if Star had had problems with water intrusion into her foundation?

A.    I don't remember that.

Q.    She didn't report problems with flooding of her basement or anything like that?

A.    Again, I didn't make any notes to that affect, so I have to assume, no.

Q.    Did you see any problems with drainage around the foundation?

A.    That's not something I particularly was looking for.

Q.    Do you know what prompted Star to contact John Soucy to come out to the property?

A.    No.  I would have to speculate.

Q.    Do you know if any contractors, engineers, or other, likewise, professionals had been to the property prior to your visit aside from Mr. Soucy?

A.    No, I do not.

Q.    Are you aware of any estimate for repairs that have been provided in connection with Star's home?

EXHIBIT 13

A.  No.

Q.  Do you know definitively whether the concrete at Star's home was provided by J.J. Mottes?

A.  No.

Q.  Have you seen any foundations in the area which have substantial cracking and where the concrete was provided by someone other than Mottes?

A.  No.

Q.  Have -- has Star's foundation walls fallen down?

A.  They have not fallen down as of my visit in January of 2015 [sic].

Q.  Okay.  Had her home fallen down?

A.  No.

Q.  Has her home fallen down?

A.  I have no idea.

MR. DANFORTH:  Point of correction, I think you just said January, 2015.  I believe you meant to say June of 2015.

THE WITNESS:  Right, right, June of 2015.

BY MR. LEARY

Q.  Okay.  Let's say since your visit and we'll know --

A.  Since my visit, yeah.

EXHIBIT 13

Q.    -- and we'll know it refers to June 10th, 2015.  And her home could still be occupied as of your visit?

A.    Yes.

Q.    And safely occupied?

A.    Yes.

Q.    Do you believe that the walls were in imminent danger of falling down as of your visit?

A.    No.

Q.    Do you believe they were in imminent danger of caving in?

A.    No.

Q.    Do you think that the home was in imminent danger of falling down?

A.    No.

Q.    Have you ever met a guy named Paul Cianci?

A.    I believe that I did.

Q.    Okay.

        MR. LEARY:  We've been going at it about an hour.  If everyone's all right with taking a five-minute break....

        MR. DANFORTH:  Okay.


        (Discussion was held off the record.)

EXHIBIT 13

Page 48

(Defendant's Exhibit 5, marked for identification.)

BY MR. LEARY

Q.   Mr. Neal, I've provided you what's been marked as Exhibit 5.  This is a report prepared by Paul Cianci.  Have you seen this document before?

A.   I have not.

Q.   Have you seen any reports prepared by Paul Cianci?

A.   I have seen reports prepared by Cianci.  I don't know if they were Paul or Carl or both.

Q.   Paul, Carl, Don, just a Cianci.

A.   Reports prepared by this company.

Q.   Okay.  There you go.

A.   How about that.

Q.   Let's flip to the following page after the cover page that's labeled as page 1.  If you look at the second bullet point, it says that, "In addition, the original residence was constructed prior to her," meaning Star," purchasing the property in 2009."

Correct?

A.   That's what it says.

Q.   Did Star tell you that there was an addition to the property?

EXHIBIT 13

A.    Again, I made no note of it, so I don't know.

Q.    Okay.  If you look at the last paragraph on page 1, it says, "The exposed concrete foundation was observed to have been parged with a cementitious material."

Correct?

A.    That's what it says.

Q.    But you don't recall seeing that?

A.    Based on my photographs, it does look like it has been parged.

Q.    Okay.  If you flip to page 3, please, and Mr. Cianci notes that in the currently adopted residential code, the vertical element between the footing and wood sill plate is defined as part of the foundation.  Do you agree with that?

A.    Yeah, I agree with that, but I have no idea why he puts this in his reports.

Q.    And Chapter 4 of the currently adopted residential code is entitled Foundations, is it not?

A.    I'll stipulate to that.

Q.    Okay.  And under that chapter, it includes basements and vertical walls.  Is that correct?

A.    Yeah.  I -- you know, the code is this thick.  I haven't memorized it, but, yes, the chapter

EXHIBIT 13

on foundations does talk about all of those various types of things, yes (indicating).

Q.    And in the engineering industry and in your experience, the cracks are to Star's foundation.  Is that correct?

A.    If you could just repeat that again.

Q.    Sure.  That wasn't phrased the greatest.

A.    I want to make sure I answer correctly.

Q.    Right.  Right.  The cracks and your observations that we're talking about today concern cracks in the foundation.  Is that correct?

A.    Yes.

Q.    And in the engineering industry, foundation walls or basement walls are the foundation.  Is that correct?

A.    Yes.

Q.    Have you seen any paper trail that links a foundation that's cracked to concrete poured by Mottes or provided by Mottes?

A.    Yes.

Q.    Do you know what property that was?

A.    No.  That's happened a number of times. People were able to prove there was a paper trail that the concrete did come from Mottes, not very often, but I've seen out of 800 buildings maybe -- just

EXHIBIT 13

guessing -- 25 to 50 people were able to show where the concrete came from.

Q.    Do you know if John Soucy used to work for Mottes?

A.    Again, I want to answer that carefully.  I have no personal knowledge of that, but I've seen him on television saying that he did.

Q.    Are there any other explanations for the cracks that you observed at Star's property other than an internal mineral reaction or a --

A.    Not that I'm aware of.

Q.    Do you know if this property was in a flood zone?

A.    Do not.

Q.    Did you make any determinations as to the water table in the area of the foundation?

A.    Nope.

Q.    Was there a dehumidifier in the basement when you were there?

A.    Do not recall.  Don't know.

Q.    Do you know if there was ever one in the basement?

A.    I have no way of knowing that.

Q.    Was there any excessive mustiness in the basement when you were there?

EXHIBIT 13

Page 52

A.   Again, I have no way of recalling that.

Q.   Okay.  As part of your inspection at these properties, do you ever recommend improving drainage around the foundation area?

A.   No.

Q.   Is that -- what's the purpose of your visits, solely to give an evaluation of a current condition and what's causing it?

A.   I get called for a number of reasons, but I -- the major purpose of my visit is to determine if there is any visible indication of defective concrete, to evaluate the current condition of the foundation in the house, and then I counsel people on what they should and should not do.

I do not recommend waterproofing.  I do not recommend improved drainage because all that will ever do is slow the process down.  It will not stop the process.  It will not prevent this from happening.  To the people that go out and tell people they're going to fix their problem with that are -- I want to say something I shouldn't -- I'm just going to say they shouldn't do that.

Q.   Right.  If you see -- but if you do see a problem with drainage around the foundation, let's say gutters or variant [phonetic] downspout extensions, is

EXHIBIT 13

Page 53

that something you would recommend?

A.    People ask me that, and I tell them it's certainly -- you know, and they say I can do that myself.  And I say, you know, if that's something that you want to do, it's certainly going to help.  I don't know if it's going to extend the life of the foundation, you know, 5 months or 50 years.  I have no way of telling you that.  But to put any substantial amount of money into a fix that may not extend the life of the foundation any significant time is just a total waste, and I think you would be better off putting the money towards getting the foundation replaced.

Q.    And pardon me for not remembering, do you live in Tolland County yourself?

A.    I do.

Q.    Do you have a home that's afflicted with bad Mottes concrete?

A.    I wish I knew the answer to that.

Q.    Okay.

A.    My house is now 13 years old.  The problem doesn't show up for 15 years.  I cannot find out where the concrete came from.  And every month or so I go down and look at my foundation and say, is it going to start to crack today, or do I have to wait 15 years to be out of the woods.  So, yeah, I may be afflicted.  I

EXHIBIT 13

don't know.

Q.    So you're concerned that your property might have Mottes --

A.    Absolutely.

Q.    -- concrete.  In fact, just to finish the question -- I'm sorry -- you're concerned that your own property might have a problem with defective Mottes concrete?

A.    It very well may, and I just don't know.

Q.    Is your property exhibiting cracks in your foundation yet?

A.    No.  It's not exhibiting atypical cracks.  I have the cracks that everybody does.

Q.    Shrinkage, settlement cracks?

A.    Yeah.

Q.    Do any of your neighbors have properties that are afflicted with defective Mottes concrete?

A.    No.  All of our houses were built at the same time.

Q.    So all of your homes were built approximately early 2000s?

A.    2003 and 2004.

Q.    Do you know if any of your neighbors have identified Mottes concrete as a -- the supplier of concrete.

EXHIBIT 13

A.    No.    We're all in the same boat.

Q.    How far away from your own personal residence would you say the closest home which you have observed map cracking in the walls is from your own home?

A.    I'm just guessing.  I would say less than a mile.

Q.    Was there any sort of finishing over Star's foundation floor?

A.    Over the floor?

Q.    Right, floor slab.

A.    Oh, that's the Cianci report.  I don't really see the floor in any of my photos, so I don't know.

Q.    Do you know if there were these sorts of, let's say, spider web cracks in the floor slab?

A.    I would say if there were, I probably would have noted it but -- but I can't tell you for certain.

Q.    And floor slab would be made with concrete. Is that correct?

A.    Yes.

Q.    Did you see any interior concrete partition walls within Star's basement?

A.    I have no record of that.  I'm going to assume probably not, but I can't tell you for sure.

EXHIBIT 13

Q.   Have you seen that at other properties with spider web cracking in their foundation walls?

A.   An interior wall?

Q.   Right.

A.   That is not exposed to soil on one side?

Q.   Correct.

A.   Yes, I have seen that.

Q.   Are those walls exhibiting the same sort of cracking damage that the exterior foundation walls are?

A.   Many of those walls are not cracked, and -- but I do have some where those walls are cracked, but they're just not cracked nearly as badly because they have less access to moisture, to water.

Q.   Do you think that's a reason why you might not also see as much cracking in a floor slab?

A.   That's certainly a possibility.  I very rarely see it in the floor.  And that's one of those things I have a lot of thoughts about but no concrete, you know, proof statements I can make about that.

Q.   Do you know when the first time was that you looked at a home that had this sort of spider web cracking in it?

A.   I can -- I can tell you approximately when I saw the first home where it was apparent that things were way out of whack from normal, and that was in

EXHIBIT 13

Page 57

2010.

Q. Do you know what home that was?

A. I do not offhand. I certainly can recover that information. I strongly suspected that prior to that, I probably saw houses that, if I was looking at today, I would have identified differently. But because the problem was not well known -- it certainly wasn't known to me until 2010 -- so I may have looked at houses that I would have diagnosed differently today.

Q. What's the latest date that walls were poured which you have noticed exhibit this sort of spider web cracking?

A. In 2003.

Q. So about 14 years?

A. About 14 years.

Q. Have you been to a property -- strike that.

What's the earliest you have been to a property where you believed Mottes supplied the concrete after it was poured?

A. About 15 years.

Q. Okay. So one you just said was, like, 14 years. Have you been to a property --

A. Okay. Yeah. I'm getting a little confused but --

EXHIBIT 13

Q.    Right.   What's the closest you've been to a Mottes property or -- strike that.

What's the earliest you've been to a property where the concrete exhibits spider web cracking?

A.    About 14 years.

Q.    About 14 years after it was poured?

A.    Yeah.

Q.    And at those properties, did they indicate to you that they had just recently noticed the cracks, or had they been there for a few years?

A.    In those cases, many times people weren't even aware of their cracks.

Q.    You just saw them yourself?

A.    Yes.

Q.    On what occasion did you have to be at their home if they weren't aware of the cracks?

A.    Unfortunately, sometimes it's during a regular home inspection.

Q.    All right.

A.    And sometimes the owner wants to sell, and they've been advised by the real estate agent to have the foundation looked at before it goes on the market.

Q.    And then they find out?

A.    Unfortunately, we see evidence that they

EXHIBIT 13

have this problem.

Q.    Right.    And you do home inspections as well as structural evaluations?

A.    Yes.

Q.    And you're a licensed home inspector?

A.    Yes.

Q.    Is that a requirement now in Tolland County to have an engineer inspect the property prior to sale?

A.    There's no legal requirement.    We are finding more and more financial institutions and sometimes insurance companies are requiring some kind of a -- some kind of a level of comfort that they're not going to be mortgaging or insuring a property that has a problem.

Q.    Right.    And has your involvement in engineering evaluations in connection with the sale of the property increased since this problem became more well known with the news reports?

A.    Oh, absolutely.

Q.    Do you have an opinion as to how long the foundation had been in the condition in which you witnessed it at the time of your visit?

A.    No.

Q.    Ballpark estimate?

A.    Again, you know, this whole problem is not

EXHIBIT 13

well understood.  There's no literature.  The state has done a couple of studies that really didn't tell us very much except they cost a lot of money.  Most -- a lot of my understanding of this problem has to result from what my clients tell me.

Q.    All right.

A.    And I have -- and it's kind of like eyewitness testimony in court.  You can have 15 people see the same event, and they all have a different story.  So I have to weigh what I'm being told and how I'm being told and try to put some kind of believability factor on that.  But I have had too many people tell me -- you know, like when you go to a house and the lady says, I have four children, and I stand in front of this washing machine five days a week, and those cracks were not there last week or last month or whatever it was.  That gives you a certain sense of believability rather than people where they just say, I never go in the basement.  But I do have a sense that the cracking can be extremely rapid, or it can be very slow.  And I have gone back to a number of houses after three or four or five months and seen a very, very noticeable difference in the condition of the foundation just after a few months.

I have other houses where people can tell me

EXHIBIT 13

things that lead me to believe that they have been paying attention, and they'll tell me, you know, the crack started about 15 years ago, and every year they get a little worse. And some people try to keep a little record of what's happening.

So there is such a disparity as to when the cracks start, how fast they progress -- I have houses where it apparently starts and stops; speeds up, slows down; it's fast, it's slow; they crack early, they crack late; and every combination of those things. So there is absolutely no way I can tell you what the condition of the house may have been shortly before I got there. I just can't do it.

We have one outlier where in eight years, which is extremely -- that's the only one that I know of in eight years the foundation cracked so badly it was just in horrible condition after eight years.

There's so many factors involved, you know, exactly every compound that's in the concrete, what is it? What's this? What's that? What's the alkalinity, the water content when it was mixed, and then the soil conditions, the water, the drainage, the grading. It just -- there are so many factors, nobody can predict.

Q. Okay. I think you might have set a record for longest deposition answer, but -- okay. So you

EXHIBIT 13

don't know how long this foundation had been in its condition prior to your visit?

A.   All I can do is say that Star said that she noticed the cracks about a year and a half ago.

Q.   Okay.  Are you aware of any home which has caved in that has this problem with spider web cracking?

A.   Not yet.

Q.   Are you aware of any home where the walls actually fell down?

A.   Not yet.

Q.   Are you aware of any home where the living area fell into the basement?

A.   Not yet.

Q.   How many properties are you aware of which had this problem?

A.   Am I personally aware of?

Q.   Correct.

A.   About 800, 7 or 800.

Q.   And how many have you inspected?

A.   7 or 800.

Q.   Okay.

A.   That's why --

Q.   Right.

A.   -- I said personally aware of.

EXHIBIT 13

Q.   Okay.  And this home you were referencing that had, you know, really progressed and pronounced cracking after eight years, how do you know it was after eight years?

A.   Okay.  This was one that I was not involved in.  The lady sued J.J. Mottes at that point.

Q.   Is that Tofolowski?

A.   Yes, it is, Linda Tofolowski.

THE WITNESS:  And I do not know how to spell that.

BY MR. LEARY

Q.   Yeah.  There's a lot of interesting names in Tolland County that I have run into.

Was the progression of cracking uniform throughout, each wall that you observed, or were some worse than others?

A.   Some are worse than others.

Q.   And are those the areas where there's more exposure to water?

A.   Based on the amount of efflorescence present, I would say, yes.

Q.   Do you know if this property's been condemned?

A.   I don't know.  I know I didn't condemn it.

Q.   And you didn't believe it should have been

EXHIBIT 13

condemned as of the date of your visit?

A.    As of the date of my visit, no.

Q.    Have you ever been involved in the repair or replacement process of a foundation afflicted with spider web cracking?

A.    No.

Q.    Have you ever tried to design a potential remediation for the foundation that exhibits spider web cracking?

A.    I'm going to say I may have.

Q.    Okay.

A.    I know that's weird, but that's what I'm saying.

Q.    And when do you believe you may have.  What do you mean by that?

A.    I seem to recall that years ago -- before I was aware of this problem, I seem to recall a house that had some unusual cracks, and I believe that I did design -- and I don't know if it was, you know, this particular problem or not, but I did -- I did design -- I just have to say I believe I did --

Q.    Okay.

A.    -- before I was aware of the problem.

Q.    Okay.  And what did you design?

A.    Again, going back to a lot of years, I

EXHIBIT 13

believe it was a house with a crawl space, and we -- I believe we built a concrete block wall inside the existing foundation.

Q.   Do you know if that was a successful repair or not?

A.   All I can tell you is nobody ever complained.

Q.   Okay.  Nobody sued you or anything.  Right?

A.   No.

Q.   Have you ever been sued in connection with your engineering practice?

A.   No.

Q.   Has anyone ever brought a lawsuit against you or an entity in which you had an ownership interest?

A.   Yes.  We've had several suits over home inspections.

Q.   And when you say "several," what was the basis for the lawsuits?  What were they alleging that you did wrong?

A.   I'm just trying to remember.  One was over a septic system.  In that case, we told them the septic system was defective.  They hired someone to come in and fix it.  It didn't work, and they sued us.

In another one, we had the people actually

EXHIBIT 13

crawl into a crawl space to look at the leaking oil tank and oil all over the floor. And they moved in the house, and they sued us because their oil tank was leaking.

We had another house -- that one I actually -- we -- my insurance company paid. We told them the chimney needed to be repaired. The homeowner repaired the chimney himself. I don't understand why I had to pay for that one. He repaired the chimney himself, and in the process, he damaged the roof, and we got sued for a new roof.

So we've had -- I don't know, in 15,000 inspections, I'm guessing we were sued maybe ten times for various things. The smaller suits go to small claims. I think I won all but two. And then the bigger claims, which are generally just -- I call them nuisance claims. They have no basis and my insurance company agrees they have no basis, but they pay because they don't want to pay to defend it. So....

Q.    Do you have any pending lawsuits against you or an entity in which you have an ownership interest?

A.    No.    I haven't had one for three, four -- a long time.    I haven't had one for a long time.

Q.    What's a long time?

A.    My sense of time is not all that good.    I'm

going to say three, four years -- I don't know -- five years.

Q.   Have any of the lawsuits against you gone to judgment, or have they all settled or been disposed of?

A.   The small claims suits have all gone to, I guess you call it judgment.  I don't know if that's the right term.

Q.   Have you ever had a judgment against you in any of these lawsuits?

A.   In court or in small claims court?

Q.   In either.

A.   Only in small claims court.

Q.   So for some miniscule amount?

A.   Yes.

Q.   Okay.  What's the largest judgment against you in a lawsuit?

A.   I don't know.  I bet you my insurance company can tell you.

Q.   Okay.  Do you have a range as to what that would be?

A.   Again, I'm just guessing by memory.  I think it was about $35,000.

Q.   And was that for that roof or another sort of claim?

A.   That was for a different roof.

EXHIBIT 13

Q.   Okay.  But it was for a roof, right, the 35,000?

A.   As I recall, it was for a roof.

Q.   And that wasn't in small claims.

A.   No.  That's when my insurance company settled, so it wasn't a judgment.

Q.   It wasn't a judgment, it was a settlement. So the largest judgment against you would have been what?

A.   $2,000.

Q.   Big time.  Right?

A.   Yeah.

Q.   Okay.  Do you -- have you -- so those were in connection with home inspections.  Right?

A.   Yes.

Q.   Have you ever been sued for an engineering --

A.   No.

Q.   -- opinion?

A.   No.

Q.   Have you ever been sued for any repairs or anything that you suggested or did yourself?

A.   We don't do any repairs.  So --

Q.   Okay.

A.   -- or any type of construction work, so, no.

EXHIBIT 13

Q. What about your engineering opinions or recommendations, have you ever been sued for those?

A. No.

Q. That second wall you -- you referenced that you put in a second wall at one property. Do you know what property that was?

A. No. And I don't even know if I could --

Q. Figure it out if -- yeah, that's fine.

A. You know, it's buried in my database someplace. I'd have to pull up all of my engineering jobs and then....

Q. Do you keep a file of your engineering jobs, or is it manual, or do you have, like, an e-file?

A. Everything right now is in e-file.

Q. Okay. Do you do any work on behalf of insurance companies?

A. I have been hired as an expert several times by an insurance company, but I do not remember -- it's something I don't like to do.

Q. You like to work with the homeowners?

A. Right.

Q. When's the last time you worked for an insurance company?

A. Again, I'm just guessing -- maybe 10 or more years ago. I certainly don't advertise as an expert.

EXHIBIT 13

I don't -- once in a while I get -- I just feel sorry for people and decide to do it, but I don't like it.

Q. Have you reviewed the Liberty Mutual policy in this case?

A. I'm sorry?

Q. Have you reviewed the Liberty Mutual policy in this case?

A. I don't believe so.

Q. Have you ever offered an opinion whether a particular claim is covered or not under an insurance policy?

A. I'm going to have to say, yes. I think that's the proper way to answer your question.

Q. And when have you given an opinion as to whether it's covered or not?

A. People, you know, might say, do you think this is covered, and I say, you know, it's my experience that, you know, this foundation problem is going to be denied if you file a claim.

Q. Okay.

A. Which is -- and I say, you know, I'm not an insurance person, I'm not an attorney, but that's my understanding, and you need to talk to somebody to get a better opinion.

Q. Are you aware of any rulings in these

EXHIBIT 13

Page 71

foundation cases?

A.    I am aware of some of the rulings.  I haven't read them.  I've -- but I have heard about them, yes.

Q.    Which ones have you heard about?

A.    It's -- it's -- they're really not pertinent to what I do, so I just stick it in my general knowledge folder and -- I don't know.  I believe there was a ruling -- there was a lot to do -- is it a basement or a foundation, and, you know, rulings as to the language in the insurance policies and, you know, when the insurance companies all changed the language.  And, like I said, it has little direct impact on me and I -- they're just floating around, but I -- I don't know.

Q.    Right.  And those decisions you were talking about, have you become aware of them, let's say, in the past year?

A.    I'd say probably some of them, yeah.

Q.    You're not a chemist, are you?

A.    No.

Q.    Would you know how to conduct a petrographic examination?

A.    Yes.  I would have to go to school for a long time.

EXHIBIT 13

Q.   So you wouldn't know how to do one absent going to school.  Correct?

A.   I'm aware of the process of what's done, but it does require a lot of highly specialized knowledge and training.

Q.   And you don't have that.  Correct?

A.   I absolutely do not have that.

Q.   Have you ever witnessed a petrographic examination being conducted or any part of one?

A.   No.

Q.   What percentage of the calls from homeowners have you gotten concerning foundations which turned out to not be afflicted with Mottes concrete problem?

A.   Okay.  That -- that has continually changed on an overall basis over the past seven or eight years. I think it's a very small percentage.  Recently, and maybe the past six months or a year, again, just guessing, it's roughly 50/50.

Q.   Right.  So --

A.   There are more and more people calling because they're concerned.

Q.   They're concerned about cracking.  It might be a shrinkage or settlement crack, but they're concerned it might be this spider web cracking?

A.   Right.  And more and more people are calling

EXHIBIT 13

because they did want to put their house on the market, and they want to know ahead of time whether or not there's a -- you know, any indication that they have a problem. So that has changed significantly. I never got called when there wasn't a problem --

Q. Right.

A. -- for a long time, and now I think it's roughly 50/50.

Q. Do you know if there were footings at Star's property?

A. No. I can't say whether there were or not. I can say that I would be very surprised if there weren't.

Q. But you can't say whether there were footings or not. Correct?

A. Nope.

MR. LEARY: I don't have anything further. Thank you.

MR. DANFORTH: Thank you.

(Discussion was held off the record.)

MR. LEARY: I'll keep the exhibits and circulate if that works for everyone.

MR. DANFORTH: Whatever you want to do.

EXHIBIT 13

Page 74

THE COURT REPORTER:  Attorney Danforth, I'm on the record, do you think you want a copy or --

MR. DANFORTH:  Bill, do you want a copy?

THE WITNESS:  No.

(Deposition was concluded at 12:05 p.m.)

EXHIBIT 13

**CERTIFICATE**

I, Hilary O. Winslow, License #00361, a Notary Public for the State of Connecticut and Commonwealth of Massachusetts, do hereby certify that the deposition of WILLIAM F. NEAL, P.E. was taken before me pursuant to Connecticut Practice Book, at the HOWD & LUDORF, 65 Wethersfield Avenue, Hartford, CT 06114, commencing at 10:05 a.m. on Thursday, March 30, 2017.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony was stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto nor their counsel, and that I am not in any way interested in the events of said cause.

Witness my hand this 11th day of April, 2017.

_____
Hilary O. Winslow, LSR, Notary

My Commission expires:        My Commission expires:
February 28, 2019(in MA)      February 28, 2021 (in CT)

EXHIBIT 13

**[& - apparent]**                                                           Page 1

**&**

**&**   1:15 2:2,7 75:7

**0**

**00361**   1:22 75:2
**06029**   2:4
**06114**   1:15 2:8
  75:8

**1**

**1**   2:3 4:7 5:6 11:5
  18:21 21:14 26:24
  48:18 49:4
**1/2**   11:5 18:21
  26:24
**10**   69:24
**102**   6:3
**10:05**   1:16 75:8
**10th**   7:23 10:8
  16:18 18:4 23:3
  27:19 32:14 47:1
**11th**   75:18
**12:30**   7:16
**13**   4:9 53:20
**14**   57:15,16,22
  58:6,7
**15**   53:21,24 57:21
  60:8 61:3
**15,000**   17:8 66:12
**18**   2:3
**1982**   16:7
**1989**   10:19 11:2
  18:10 42:24
**1st**   6:7

**2**

**2**   4:7 6:20,22 7:2
  9:18 11:9 16:13
  27:15 28:7 39:7
**2,000**   68:10
**20**   15:6,9
**2000s**   54:21

**2003**   54:22 57:14
**2004**   54:22
**2009**   9:24 48:21
**2010**   57:1,8
**2014**   19:1
**2015**   7:24 10:8
  16:18 18:4,24
  19:1,8 23:4 27:19
  32:14 34:12 45:4
  46:12,18,19,21
  47:2
**2016**   16:8,10
**2017**   1:6,16 6:7
  8:24 15:3 75:9,18
**2019**   75:24
**2021**   75:24
**242**   1:13
**249-1361**   2:9
**25**   51:1
**26th**   8:24 15:3,10
**28**   75:24,24

**3**

**3**   4:8 8:3,20 49:12
**30**   1:6,16 15:7,9
  75:8
**35,000**   67:22 68:2

**4**

**4**   4:9 6:10 13:23
  38:25 49:19
**400**   7:18
**48**   4:10

**5**

**5**   4:4,7,10 48:1,6
  53:7
**50**   51:1 53:7
**50/50**   72:18 73:8

**6**

**6**   4:7

**6/10**   7:15
**65**   1:15 2:8 75:7
**676**   2:3

**7**

**7**   30:4,14,16 42:9
  62:19,21

**8**

**8**   4:8
**80,000**   38:19
**800**   42:10 50:25
  62:19,19,21
**860**   2:4,9
**871-2422**   2:4

**a**

**a.m.**   1:16 75:8
**able**   6:12 19:23
  35:9,19 50:23
  51:1
**abrupt**   23:8,9,11
  23:15,16,17,19
  24:3,18
**abruptly**   24:2,7,9
  30:17
**absent**   44:15 72:1
**absolutely**   5:10
  16:11 24:13 39:15
  54:4 59:19 61:11
  72:7
**accelerate**   36:23
**access**   19:16 29:3
  29:5 36:23 38:12
  56:13
**accompanied**
  23:20
**accurate**   20:7
  37:10 42:19
**action**   1:12
**addition**   48:19,24
**additional**   42:17

**address**   7:6
**adjacent**   21:15
**adopted**   49:13,19
**advertise**   69:25
**advise**   44:2
**advised**   44:5 58:22
**affect**   44:20 45:12
**afflicted**   42:6
  53:16,25 54:17
  64:4 72:13
**agent**   58:22
**ago**   5:18 11:5
  17:10,20 18:21
  19:4,6,9 61:3 62:4
  64:16 69:25
**agree**   49:16,17
**agreed**   3:3,10,14
**agrees**   66:18
**ahead**   73:2
**alkali**   9:10 28:18
  29:13 32:23
**alkalinity**   61:20
**alleging**   65:19
**alleviate**   36:13
  37:4,18
**alleviating**   38:11
**alter**   15:3
**amount**   22:2
  29:14 53:9 63:20
  67:13
**angled**   20:19
**answer**   11:18
  15:24 19:23,25
  33:21 34:20 37:2
  37:10 50:8 51:5
  53:18 61:25 70:13
**answered**   14:25
**answers**   9:5,11
**apart**   31:21 39:9
**apparent**   56:24

EXHIBIT 13

**[apparently - certain]**

apparently 61:8
appear 23:20 24:9
appearances 2:1
appears 21:15
  28:22 75:14
appointment
  12:21,23,24,25
approximately
  18:20,25 26:24
  54:21 56:23
april 75:18
area 28:14 46:5
  51:16 52:4 62:13
areas 28:2,10,25
  63:18
arrest 36:8
ashford 6:4
aside 45:22
asked 9:4,8 11:25
  14:23 23:18 34:2
aspects 41:4
asr 28:17 33:15,20
  33:22 34:7 39:16
assessor's 11:1
  42:24
associated 12:15
  28:25
assume 12:19
  45:12 55:25
attaching 12:19
attention 61:2
attorney 4:12
  11:24 40:18,24,25
  70:22 74:1
attorneys 2:2,7
  11:25
attributable 33:20
  38:5,6
atypical 54:12
authority 3:7

avenue 1:15 2:8
  75:7
aware 13:13 17:13
  33:3 34:2 37:23
  38:4 45:24 51:11
  58:13,17 62:5,9,12
  62:15,17,25 64:17
  64:23 70:25 71:2
  71:17 72:3

**b**

back 16:12 18:3,6
  20:20 41:18 60:21
  64:25
background 9:9
bad 16:9 53:16
badly 56:12 61:16
ballpark 44:14
  59:24
based 14:16 18:9
  21:22 26:9 32:18
  32:21 49:10 63:20
basement 19:16
  20:8,8 28:3 29:9
  29:15 34:8 35:23
  36:1 40:13 45:10
  50:14 51:18,22,25
  55:23 60:19 62:13
  71:10
basements 49:23
basing 24:21 25:9
  25:10
basis 26:14 65:19
  66:17,18 72:15
bdanforth 2:5
behalf 1:11 69:15
believability 60:12
  60:18
believe 9:6 16:9
  17:15 23:1,7
  24:10,25 25:4,13
  25:15 34:1 42:6

44:11 46:19 47:7
  47:10,17 61:1
  63:25 64:14,18,21
  65:1,2 70:8 71:8
believed 15:12,20
  33:10 57:19
best 10:9,12,15
  11:24 16:5,6 17:4
  17:21 22:15 23:5
  27:21 30:13 42:8
  43:11
bet 67:17
better 19:23 53:11
  70:24
beyond 8:12
bienkowski 8:21
  9:5,8,12 14:20,25
big 68:11
bigger 66:16
bill 74:4
bit 31:14
block 65:2
blurry 42:20
boat 55:1
bomb 38:8
book 1:13 75:6
bottom 7:14 14:14
bought 9:24
bow 35:20
bowing 27:15 31:3
  35:20 39:7
box 2:3
break 47:21
brenda 11:17,23
  11:23 13:6 40:18
brian 2:5
bring 6:12 8:15
brought 8:17,18
  65:13
building 31:16

buildings 42:9,10
  42:11,14 50:25
built 10:19 11:2
  18:10 40:13,16
  42:24 54:18,20
  65:2
bulge 34:8
bulged 11:9
bullet 48:19
buried 69:9
business 40:25
  41:4

**c**

c 1:1,1,1
call 9:20 39:25
  44:24 66:16 67:6
called 5:1 19:11
  44:25 52:9 73:5
calling 72:20,25
calls 72:11
capable 34:23
card 11:1 12:5
  42:25
carefully 15:24
  51:5
carl 48:12,13
case 6:1 13:21
  16:22 35:18 65:22
  70:4,7
cases 58:12 71:1
cause 32:22 75:17
caused 24:11,11
  31:23
causes 24:4 31:13
causing 28:17 52:8
caved 62:6
caving 47:11
cementitious 49:5
certain 55:18
  60:17

EXHIBIT 13

certainly 34:15 53:3,5 56:16 57:3 57:7 69:25
certificate 75:1
certify 75:4,10,15
changed 71:12 72:14 73:4
changes 31:11
chapter 49:19,22 49:25
charge 7:20
chemical 28:16,19
chemist 71:20
children 60:14
chimney 66:7,8,9
chunks 20:21
cianci 4:10 47:16 48:7,10,11,13 49:13 55:12
circulate 73:24
claim 42:2 67:24 70:10,19
claims 66:15,16,17 67:5,10,12 68:4
clarify 17:6
client 7:6
clients 12:12 22:22 24:23 25:11 26:10 26:11 38:18 41:16 60:5
close 31:19
closest 55:3 58:1
clue 26:22
code 49:14,20,24
collapse 35:21 39:23
collapsed 35:2,6
color 16:15 21:13
combination 61:10

come 21:7 41:18 45:18 50:24 65:23
comfort 59:12
commencing 1:16 75:8
commercial 42:9
commission 75:24 75:24
common 27:12
commonwealth 1:14 75:4
companies 59:11 69:16 71:12
company 1:6,12 5:17 48:14 66:6 66:18 67:18 68:5 69:18,23
compile 6:12
complained 65:7
completely 20:22 29:19,24 30:7
complex 37:9 44:21
compound 61:19
concentrated 28:9 42:14
concern 15:12 29:16 31:22 50:10
concerned 54:2,6 72:21,22,24
concerning 72:12
concerns 41:19 44:23
concluded 74:8
concrete 7:13 15:13,20,23 16:2,7 16:10 18:1 20:21 20:25 22:11 23:14 23:22 24:15 25:14 26:13 28:2,22 30:4,7 31:3 33:11

34:7 36:18,22 39:18 42:7 46:3,6 49:4 50:18,24 51:2 52:11 53:17 53:22 54:5,8,17,24 54:25 55:19,22 56:18 57:20 58:4 61:19 65:2 72:13
concrete's 38:12
condemn 63:24
condemned 63:23 64:1
condensation 29:8
condition 25:5,14 30:9,15,17 32:3 40:8 52:8,12 59:21 60:23 61:12 61:17 62:2
conditions 26:12 61:22
condominium 42:9
conduct 33:4 71:22
conducted 72:9
conducting 10:11 17:25
confused 57:24
connecticut 1:13 1:14 42:15 75:3,6
connection 3:5 45:25 59:16 65:10 68:14
constructed 27:24 48:20
construction 40:22 68:25
contact 13:6 41:20 45:17
content 31:12 61:21

continually 72:14
continue 34:7,8 35:20 36:18 41:11 44:20
continuing 29:17
contractor 7:13 11:21
contractors 11:25 45:20
conversation 18:9
conversations 8:16
copies 6:17 21:13
copy 6:6,8 8:20 12:3 13:8 14:2 16:15,17 27:6 74:3,5
corner 29:18,21 30:6,8,16 31:2,20 39:8,9
correct 5:23 6:4 7:10,16 8:24 9:24 10:2,19 11:5,10 12:16 13:9,11 14:21,25 16:18,25 18:1,12,22 19:18 20:6,9,14 22:25 26:10 27:16 28:4 28:10 29:22 30:23 32:1,24 34:4,5,10 36:5,10 39:3,14,20 40:10,11,14,19,22 43:22,23 45:4 48:22 49:7,23 50:5,11,15 55:20 56:6 62:18 72:2,6 73:15
correction 46:17
correctly 50:8
cost 41:20 60:3

EXHIBIT 13

[counsel - e]                                                                    Page 4

**counsel** 3:4 8:11
  8:16 52:13 75:12
  75:16
**county** 37:24
  53:14 59:7 63:13
**couple** 60:2
**court** 1:3,22 60:8
  67:10,10,12 74:1
**cover** 48:18
**covered** 70:10,15
  70:17
**covering** 20:25
  21:3
**crack** 21:20 23:10
  23:15,16 26:1,6,16
  26:17 38:14,15,16
  38:16 53:24 61:3
  61:9,10 72:23
**cracked** 23:16
  28:10,14 29:1,2,19
  29:24 50:18 56:10
  56:11,12 61:16
**cracking** 25:7,22
  30:17 31:24 32:6
  38:3 46:6 55:4
  56:2,9,15,22 57:13
  58:5 60:20 62:7
  63:3,14 64:5,9
  72:22,24
**cracks** 11:5 18:20
  19:9,10 20:13,16
  20:17,19,22 21:18
  21:25 22:7,20
  23:6,9,20 24:8,11
  24:12,24 25:2,6,16
  25:17,19,24 26:3
  26:18,18,24 27:3
  31:17 38:1 41:12
  41:24 43:16 45:3
  50:4,9,11 51:9
  54:10,12,13,14

55:16 58:10,13,17
  60:16 61:7 62:4
  64:18
**crawl** 65:1 66:1,1
**credit** 12:5
**cs2580523** 1:21
**ct** 1:15 2:4,8 75:7
  75:24
**current** 52:7,12
**currently** 49:13,19
**cv16-6010066s** 1:3

**d**

**d** 2:5 4:1
**damage** 56:9
**damaged** 66:10
**danforth** 2:2,5
  5:10 9:15 46:17
  47:22 73:19,25
  74:1,4
**danger** 47:8,10,14
**database** 69:9
**date** 12:13 15:3,7
  16:3,25 19:4,6
  57:11 64:1,2
**dated** 6:7 16:17
**dates** 16:3
**day** 75:18
**days** 60:15
**december** 19:1
**decide** 70:2
**decisions** 71:16
**defect** 28:21
**defective** 16:2,7
  52:11 54:7,17
  65:23
**defend** 66:19
**defendant** 1:11
  2:7 5:2
**defendant's** 4:6
  5:6 6:22 7:2 8:3
  13:23 48:1

**define** 23:18
**defined** 20:22
  49:15
**definitely** 36:2
**definition** 34:20
**definitively** 46:2
**dehumidifier**
  51:18
**demonstrates** 30:2
**denied** 70:19
**depending** 13:2
**depends** 34:20
**deposition** 1:9 3:5
  3:15,20 4:7,8 5:18
  5:22 6:7 8:21
  13:21 14:19 28:7
  61:25 74:8 75:5
**described** 25:16
  25:21,25 26:6
**description** 4:6
**design** 64:7,19,20
  64:24
**designed** 34:24
**details** 12:25
**deteriorate** 34:7
**deteriorated** 39:1
**deterioration**
  44:19
**determinations**
  51:15
**determine** 44:17
  52:10
**diagnosed** 57:9
**difference** 15:8
  60:23
**different** 9:1 28:16
  31:12 39:10,10
  60:9 67:25
**differently** 57:6,9
**difficult** 34:19

**direct** 4:4 5:12
  71:13
**directions** 20:18
**discarded** 42:20
**disclosed** 13:14
**disclosure** 4:9
  13:18 14:3,11
**disclosures** 13:19
**discussing** 28:17
**discussion** 14:8
  47:24 73:21
**disparity** 61:6
**disposed** 67:4
**distress** 32:22
**divide** 20:19
**docket** 1:3
**document** 6:11
  12:21 14:4 48:7
**documented** 23:6
**documents** 4:7
  6:12,14 8:8 9:17
  12:4 13:5 16:12
  23:4
**doing** 17:7 34:23
**don** 48:13
**doors** 31:18
**downspout** 52:25
**dozens** 42:2
**draghi** 11:23
  40:19,24
**drainage** 45:13
  52:3,16,24 61:22
**drama** 26:4
**drywall** 31:17,24
  32:6
**due** 23:8 38:9
**duly** 1:14 5:2

**e**

**e** 1:1,1 4:1 11:20
  15:14 69:13,14

EXHIBIT 13

[earliest - floor]                                                                    Page 5

earliest 57:18 58:3
early 38:15 54:21
  61:9
earth 24:16
earthquake 23:23
  23:23 24:5,11
easier 10:24
edge 20:23
education 14:16
  14:21,24 15:4
effect 23:2
effects 31:15
efflorescence 28:1
  28:6,13,20,22,24
  29:11,14 63:20
eight 17:10,20
  61:14,16,17 63:3,4
  72:15
either 67:11
element 49:14
eliminate 37:22
ellington 2:4
email 7:6 12:18,20
emails 13:5 23:4
engineer 14:17
  15:5 19:14 59:8
engineering 4:10
  7:5 12:15 13:9
  50:3,13 59:16
  65:11 68:17 69:1
  69:10,12
engineers 45:20
entered 35:22 36:1
entitled 1:12 49:20
entity 65:14 66:21
especially 28:9
esquire 2:5,10
essentially 7:6
estate 58:22
estimate 15:10
  42:8 44:14 45:24

59:24
et 1:13
evaluate 52:12
evaluation 52:7
evaluations 59:3
  59:16
event 23:8,11,15
  23:16 24:11 25:17
  25:23 26:15,20
  60:9
events 24:18 25:25
  26:5,7 75:17
eventually 10:1
everybody 54:13
everyone's 47:20
evidence 19:24
  20:4 58:25
exactly 61:19
examination 4:4
  5:12 17:25 33:2,7
  34:3 71:23 72:9
examinations
  33:10
examined 5:3
  75:12
excavate 37:3
excavated 36:12
  36:19
excessive 51:24
exercise 9:3
exhibit 4:7,7,8,9
  4:10 5:6 6:20,22
  7:2 8:3,20 9:18
  13:23 16:2,13
  25:22 28:7 37:25
  48:1,6 57:12
exhibited 25:6
  30:15
exhibiting 38:2
  54:10,12 56:8

exhibits 4:6,12
  58:4 64:8 73:23
exist 26:12
existing 65:3
expand 31:4
experience 14:17
  14:21,24 15:4
  50:4 70:18
expert 4:9 13:14
  13:18,19 69:17,25
expires 75:24,24
explanations 51:8
explode 38:8
exponential 25:23
exposed 49:4 56:5
exposure 37:18
  38:11 63:19
extend 37:7 53:6,9
extensions 52:25
exterior 20:12,25
  21:5,17 56:9
extremely 60:20
  61:15
eyewitness 60:8

**f**

f 1:1,9 4:3 5:1 75:5
fact 15:6 34:21
  38:6,9 54:5
factor 60:12
factors 29:4 61:18
  61:23
fail 34:9 35:1
failed 34:13,17,21
  35:4
failing 34:16
failure 34:21
fair 34:13
fall 20:20
fallen 46:9,11,13
  46:15

falling 47:8,14
far 41:21 55:2
fashion 25:1
fast 61:7,9
features 21:5
february 75:24,24
fee 7:20 41:17
feel 70:1
fell 62:10,13
field 9:20 10:5
  22:17 41:14
figure 69:8
file 4:8 8:8,15
  69:12,13,14 70:19
filled 43:16
financial 59:10
find 53:21 58:24
finding 59:10
fine 17:11 69:8
finish 36:24 54:5
finished 19:21
  20:2,5 31:24 32:7
finishing 55:8
fire 1:6,12 5:17
firmly 35:13
first 5:2 7:4 9:22
  9:23 11:19 12:20
  17:2,15,18 20:11
  56:20,24 75:10
five 47:21 60:15
  60:22 67:1
fix 52:20 53:9
  65:24
flat 7:20
flip 6:10 48:17
  49:12
floating 71:14
flood 51:12
flooding 45:9
floor 55:9,10,11
  55:13,16,19 56:15

EXHIBIT 13

[floor - house]    Page 6

56:17 66:2

**floors** 31:24 32:7

**folder** 71:8

**followed** 22:23

**following** 48:17

**follows** 5:4

**footing** 49:15

**footings** 73:9,15

**force** 23:25

**form** 3:11 7:7 14:11

**formalities** 3:4

**forward** 7:23 13:8

**found** 38:14

**foundation** 7:21 11:5 15:18 18:1 18:20 19:12,17,20 20:12 21:7 22:11 26:24 27:2,10,14 28:25 29:2,19 30:1,16,22 31:3,4 31:10,13 32:8,11 32:22 34:22 35:3 35:6 37:3,8,17 38:7,19 39:1,11 40:9 41:9 45:7,14 46:9 49:4,16 50:4 50:11,13,14,18 51:16 52:4,12,24 53:7,10,12,23 54:11 55:9 56:2,9 58:23 59:21 60:24 61:16 62:1 64:4,8 65:3 70:18 71:1 71:10

**foundations** 15:7 15:9 16:1,4 22:3 24:6 38:14,15 42:5 46:5 49:20 50:1 72:12

**four** 60:14,22 66:22 67:1

**fourth** 12:9

**frame** 29:20 31:20

**framing** 31:21 39:9

**fran** 13:1

**freezing** 31:13

**friction** 23:25 24:2

**front** 6:14 29:18 30:22 60:15

**further** 3:10,14,18 73:18 75:10,15

**g**

**gangbusters** 38:17

**garage** 21:15

**general** 71:7

**generally** 66:16

**getting** 19:10 53:12 57:24

**give** 9:5 36:22 52:7

**given** 35:3 70:14

**gives** 60:17

**go** 9:2,17 14:5 16:12 17:9 18:6 20:17 21:10 24:2 24:7 28:8 30:20 48:15 52:19 53:22 60:13,19 66:14 71:24

**goes** 58:23

**going** 6:6 9:7 10:23 11:24 12:13 22:8 28:8 36:18 38:12 41:20 44:20 44:20 47:19 52:19 52:21 53:5,6,23 55:24 59:13 64:10 64:25 67:1 70:12 70:19 72:2

**good** 5:14,15 66:25

**gotten** 38:7 72:12

**grading** 61:22

**greater** 24:1

**greatest** 50:7

**ground** 21:8 23:24 31:13

**grounds** 14:15

**groundwater** 29:6 29:7

**guarantee** 17:17

**guess** 67:6

**guessing** 51:1 55:6 66:13 67:21 69:24 72:18

**gutters** 52:25

**guy** 47:16

**h**

**h** 11:20

**half** 18:25 19:4,6,9 21:23 22:1 62:4

**hand** 75:18

**happen** 10:17

**happened** 15:2 26:20 30:16 50:22

**happening** 24:6 31:2 35:3 38:21 52:18 61:5

**happens** 25:23 26:12 29:4 41:19 44:23

**hartford** 1:15 2:8 75:7

**hear** 15:16

**heard** 41:21 71:3,5

**heavily** 28:9,14 29:1,2

**heavy** 28:1,24

**held** 1:15 14:8 47:24 73:21

**help** 36:13 53:5

**hereinbefore** 1:12 75:14

**hereto** 75:16

**high** 29:8

**highly** 72:4

**hilary** 1:13,22 75:2,21

**hired** 65:23 69:17

**hl** 2:9

**hold** 9:12 35:12

**holding** 35:5,15,17 36:4

**home** 6:3 16:24 18:11 24:12 27:6 32:7,10,14 37:14 39:12 40:9 42:24 44:11,15 45:25 46:3,13,15 47:2,13 53:16 55:3,5 56:21,24 57:2 58:17,19 59:2,5 62:5,9,12 63:1 65:16 68:14

**homeowner** 66:7

**homeowners** 44:5 44:8 69:20 72:11

**homes** 54:20

**honest** 37:12

**horizontal** 20:18

**horrible** 61:17

**hour** 18:18 47:20

**house** 17:9,13,16 17:18,20 18:10,17 21:14,17 22:5,7 23:21 24:8,25 29:20 31:5,17,20 31:25 34:23 35:1 35:3,5,12,13,16,17 35:18 39:8,9,23 41:19 44:24 52:13

Veritext Legal Solutions

800-567-8658                                                    973-410-4040

EXHIBIT 13

53:20 60:13 61:12 64:17 65:1 66:3,5 73:1
**houses** 17:8 42:8 54:18 57:5,9 60:21,25 61:7
**howd** 1:15 2:7 75:7
**huh** 7:3,19 8:23 9:25 11:6 33:18
**humidity** 29:8,8 38:13
**hundreds** 25:10
**hyphen** 11:17

**i**

**idea** 37:15 46:16 49:17
**identification** 5:7 6:23 8:4 9:22 13:24 48:2
**identified** 28:15 33:22 54:24 57:6
**immediate** 39:2,19 39:24 40:2,3
**imminent** 47:8,10 47:13
**impact** 71:13
**impossible** 44:17 44:18
**improved** 52:16
**improving** 37:16 52:3
**inch** 21:23 22:1,1
**inches** 11:9 27:15 39:7
**includes** 49:22
**including** 3:6
**increased** 59:17
**indicate** 58:9
**indicating** 12:2,22 50:2

**indication** 52:11 73:3
**individual** 20:21
**individuals** 12:3
**industry** 50:3,13
**information** 9:9 10:1,5,13,21 11:7 11:12 13:6 43:2 57:4
**inside** 40:13 65:2
**insignificant** 31:7
**inspect** 27:10 32:13 59:8
**inspected** 42:5 62:20
**inspection** 7:23 10:11 12:10,12,19 13:9 16:1 19:8 27:7 52:2 58:19
**inspections** 7:21 15:19 32:18 59:2 65:17 66:13 68:14
**inspector** 59:5
**instantaneous** 23:19
**instantaneously** 24:3
**institutions** 59:10
**insurance** 1:6,12 5:17 59:11 66:6 66:17 67:17 68:5 69:16,18,23 70:10 70:22 71:11,12
**insuring** 59:13
**intake** 7:7
**integrity** 39:12
**interest** 65:15 66:21
**interested** 75:17
**interesting** 63:12

**interior** 19:17 20:13 55:22 56:3
**internal** 51:10
**intrusion** 45:7
**involved** 61:18 63:5 64:3
**involvement** 59:15
**inward** 27:15 34:8
**iron** 9:10 28:19 29:12 33:14
**issue** 16:21
**issues** 27:10

**j**

**j.d.** 1:4
**j.j.** 46:3 63:6
**january** 8:24 15:3 15:7,10 19:1 46:12,18
**job** 1:21
**jobs** 69:11,12
**john** 7:10,12 45:18 51:3
**judgment** 67:4,6,8 67:15 68:6,7,8
**june** 7:23 10:8 16:18 18:4,24 19:8 23:3 27:19 32:14 34:12 45:3 46:19,20 47:1

**k**

**k** 28:18
**keep** 35:12 61:4 69:12 73:23
**kieran** 2:10 5:16
**kind** 31:9 59:11,12 60:7,11
**kleary** 2:9
**knew** 53:18
**know** 12:13 13:20 16:5,6 17:6 18:14

19:3,20 20:1,24 21:6 22:6,10,13,19 22:21,22,24 23:15 23:19,21 25:11 26:3,18,19,20 27:2 27:4 29:4 30:8 31:3,21 33:1,22,24 34:1 35:2,15,22 37:2 38:22 40:5,7 40:16,24 41:2,5,8 41:21,23 43:8,21 44:8,19 45:2,6,17 45:20 46:2,24 47:1 48:12 49:2 49:24 50:21 51:3 51:12,20,21 53:3,4 53:6,7 54:1,9,23 55:14,15 56:19,20 57:2 59:25 60:13 61:2,15,18 62:1 63:2,3,9,22,24,24 64:12,19,19 65:4 66:12 67:1,6,17 69:5,7,9 70:16,17 70:18,21 71:8,10 71:11,15,22 72:1 73:2,3,9
**knowing** 27:5 30:19 51:23
**knowledge** 10:9 17:21 23:5 30:13 43:11 44:1 51:6 71:8 72:4
**known** 41:1 57:7,8 59:18

**l**

**l** 3:1 28:18,18
**labeled** 48:18
**lady** 60:14 63:6
**language** 71:11,12

[lapsed - movement]                                                        Page 8

| | | | |
|---|---|---|---|
| **lapsed** 22:2 | **little** 16:16 18:18 | **m** | **memorized** 49:25 |
| **largest** 67:15 68:8 | 18:18 19:23 31:14 | | **memory** 67:21 |
| **late** 16:10 61:10 | 57:24 61:4,5 | **m** 15:14 | **met** 5:18 10:7 |
| **lateral** 37:4 | 71:13 | **ma** 75:24 | 47:16 |
| **latest** 57:11 | **live** 53:14 | **machine** 60:15 | **middle** 11:15 |
| **law.com** 2:9 | **living** 32:13 62:12 | **main** 2:3 | 29:17 33:24 34:6 |
| **lawsuit** 65:13 | **llc** 2:2 4:10 7:5 | **major** 52:10 | 36:7 |
| 67:16 | **located** 6:3 | **manager** 13:3 | **mile** 55:7 |
| **lawsuits** 65:19 | **locations** 27:15 | **manual** 69:13 | **mineral** 51:10 |
| 66:20 67:3,9 | **locked** 23:25 | **map** 55:4 | **miniscule** 67:13 |
| **lead** 61:1 | **long** 17:7 18:14 | **march** 1:6,16 6:7 | **minute** 14:6 47:21 |
| **leak** 29:9 38:13 | 30:8,11 59:20 | 75:8 | **mirror** 14:24 |
| **leaking** 66:1,4 | 62:1 66:23,23,24 | **mark** 6:20 8:1 | **missing** 30:1 |
| **leary** 2:10 4:4,12 | 71:25 73:7 | **marked** 5:6 6:22 | **mixed** 61:21 |
| 5:9,13,16 6:20 7:1 | **longer** 34:23 35:6 | 7:2 8:3,19 13:23 | **moisture** 28:22 |
| 8:1,6 9:14,16 14:1 | 35:19 | 16:13 28:7 48:1,6 | 56:13 |
| 14:10 15:14,17 | **longest** 61:25 | **market** 58:23 73:1 | **monday** 25:1 |
| 46:22 47:19 48:4 | **look** 13:2,10 19:14 | **massachusetts** | **money** 41:21 53:9 |
| 63:11 73:17,23 | 19:22 32:4 48:18 | 1:15 42:12 75:4 | 53:12 60:3 |
| **left** 7:14 29:18 | 49:3,10 53:23 | **material** 49:6 | **monitor** 41:11,23 |
| 30:6 | 66:1 | **materials** 37:17 | **month** 5:18 15:19 |
| **legal** 59:9 | **looked** 15:6,9,22 | **matter** 5:19 14:3 | 53:22 60:16 |
| **letter** 12:10,19,23 | 15:25,25 17:7 | **mcallister** 1:4 5:25 | **months** 53:7 60:22 |
| 12:24 | 19:12 22:3 30:11 | 7:9 9:21 10:6,7,11 | 60:24 72:17 |
| **level** 59:12 | 42:3 56:21 57:8 | 10:14,24 13:8 | **morning** 5:14,15 |
| **liberty** 1:6,11 5:16 | 58:23 | **mcallister's** 6:3 | **mortgaging** 59:13 |
| 8:21 14:20 70:3,6 | **looking** 45:16 57:5 | 17:3 22:7 37:14 | **mottes** 15:12,20 |
| **license** 75:2 | **looks** 12:10,14 | **mean** 11:18 23:12 | 15:23 16:9 25:13 |
| **licensed** 1:22 59:5 | 16:24 | 23:17 29:24 30:25 | 33:11 42:6 46:3,7 |
| **life** 37:7 53:6,9 | **loose** 30:7 | 35:8 39:5,24 40:3 | 50:18,19,24 51:4 |
| **lifted** 30:5 | **lot** 26:19 38:2 | 64:15 | 53:17 54:3,7,17,24 |
| **likelihood** 22:18 | 56:18 60:3,4 | **meaning** 18:19 | 57:19 58:2 63:6 |
| **likewise** 45:21 | 63:12 64:25 71:9 | 48:21 | 72:13 |
| **limit** 21:6 | 72:4 | **means** 23:18 35:9 | **move** 23:24 24:1 |
| **linda** 63:8 | **loud** 23:21 24:7,18 | 39:10,25 40:4 | 31:14 44:2,6 |
| **line** 9:23 11:15 | **lsr** 75:21 | **meant** 46:19 | **moved** 43:25 66:2 |
| 27:14 | **ludorf** 1:15 2:7 | **measured** 22:6 | **movement** 24:3 |
| **links** 50:17 | 75:7 | **measurement** | 30:22 31:1,6,8,9 |
| **literature** 60:1 | | 11:14 | 31:10,15,15,20 |
| **litigation** 5:17 | | **membrane** 37:25 | 39:11 |
| 13:16 | | 38:10 | |

[moves - particular]                                                    Page 9

moves  24:3 31:10
  31:10,11
moving  35:13
multiple  6:17
mustiness  51:24
mutual  1:6,12
  5:17 8:22 14:20
  70:3,6

**n**

n  1:1,1 3:1 4:1
  11:20
name  7:6
named  47:16
names  11:25 44:9
  63:12
nature  43:9
neal  1:9 4:3,9 5:1
  5:14 8:7,19 13:1
  14:2 48:5 75:5
nearly  56:12
necessary  39:3
need  19:13 41:18
  41:18,20 44:23
  70:23
needed  66:7
neighbors  54:16
  54:23
never  23:18 60:19
  73:4
new  66:11
news  59:18
noise  24:7
nope  51:17 73:16
normal  18:16
  31:14 56:25
normally  10:17
  18:16 21:5 22:21
northeastern
  42:15
notary  1:14 3:19
  5:3 75:3,21

note  17:22 28:1,8
  36:2,7 49:1
noted  55:18
notes  9:20,20 10:5
  17:23 22:17 23:2
  41:15 45:11 49:13
notice  3:6 4:7 6:6
  43:5,16
noticeable  60:23
noticed  11:4 18:20
  19:9 26:23 57:12
  58:10 62:4
nuisance  66:17
number  5:22
  15:25,25 22:3
  50:22 52:9 60:21
numerous  20:13
  24:23

**o**

o  1:1,1,13,22 3:1
  15:14 75:2,21
oath  5:3
objections  3:11
obscure  21:6,8
obscured  20:25
obscuring  21:4
observations
  32:21 50:10
observed  21:21
  26:7 49:5 51:9
  55:4 63:15
obviously  31:22
occasion  58:16
occupied  18:11
  47:2,5
occur  26:4 28:20
occurrences  31:14
occurring  28:16
  36:17
occurs  23:23,23

offer  37:2
offered  70:9
offhand  57:3
officer  3:7 13:3
oh  24:13 55:12
  59:19
oil  66:1,2,3
okay  5:21,25 6:17
  7:14 8:14,18 10:7
  10:13,16,18,24
  11:15,17,22 12:4
  12:14,23 13:4,13
  14:2,14 15:2
  16:12,14 17:5,15
  17:24 18:3,19
  19:7,15 20:1
  21:10,16 22:6
  23:12,17 24:10,14
  24:17 25:13,21
  26:5,14,23 27:2,13
  30:8 31:23 33:24
  34:17,25 35:25
  36:24 37:1,16
  38:25 40:5 44:5
  46:13,23 47:18,22
  48:15 49:3,12,22
  52:2 53:19 57:22
  57:24 61:24,25
  62:5,22 63:1,5
  64:11,22,24 65:8
  67:15,19 68:1,13
  68:24 69:15 70:20
  72:14
old  6:3 53:20
once  38:16 70:1
ones  42:2,21 71:5
open  31:19
opinion  14:15
  59:20 68:19 70:9
  70:14,24

opinions  69:1
opposed  31:7 42:2
original  48:20
outcome  33:13
outlier  61:14
outside  36:5
overall  72:15
owned  17:18
owner  58:21
ownership  65:14
  66:21
oxidation  9:11
  33:14

**p**

p  3:1
p.e.  1:9 4:3 5:1
  75:5
p.m.  74:9
p.o.  2:3
packet  4:7
page  4:2,6 6:10
  7:4 9:18,23 11:16
  12:4,9 14:15
  38:25 48:17,18,18
  49:4,12
pages  12:15
paid  38:18 66:6
paint  43:16
paper  50:17,23
paragraph  20:11
  29:18 30:21 32:17
  32:20 34:6 36:8
  38:25 49:3
parameters  37:10
pardon  53:13
parged  49:5,11
part  21:7,8 29:2
  49:15 52:2 72:9
particular  22:5
  64:20 70:10

[particularly - provided]                                    Page 10

particularly  45:15
parties  3:4 75:16
partition  55:22
patching  43:9
paul  47:16 48:6,9
  48:12,13
pay  66:9,18,19
paying  61:2
payment  12:7
pending  66:20
people  17:9 39:10
  44:23 50:23 51:1
  52:13,19,19 53:2
  58:12 60:8,13,18
  60:25 61:4 65:25
  70:2,16 72:20,25
percentage  72:11
  72:16
perfect  25:5
permission  12:2
person  70:22
personal  40:25
  51:6 55:2
personally  27:4
  62:17,25
pertain  8:15
pertaining  15:20
  16:21
pertinent  43:15
  71:6
petrographic  33:1
  33:6,9 34:3 71:22
  72:8
phone  39:25
phonetic  52:25
photograph  21:14
  21:22 30:2,4,14,16
photographs
  12:16 21:11 22:11
  23:7 32:3,5 42:17
  49:10

photos  19:22,24
  55:13
phrased  50:7
pick  39:25
piece  30:4,7
pieces  30:1
pile  6:14
place  3:6 35:13
placed  37:5
plaintiff  2:2
plans  18:6
plate  49:15
please  6:10 8:1
  49:12
plumbing  29:9
  38:13
point  28:15 39:1
  46:17 48:19 63:6
policies  71:11
policy  70:3,6,11
popping  44:10
portion  7:14 14:14
  32:13
possibility  56:16
possible  25:4,8
potential  39:23
  64:7
potentially  37:7
poured  16:4,7
  38:1 50:18 57:12
  57:20 58:7
pouring  16:9
powder  28:2
practice  1:13
  27:12 65:11 75:6
predict  61:23
predictions  44:22
prepared  16:20
  48:6,9,11,14
presence  28:13,20

present  10:10 28:2
  28:23 63:21
pressure  35:14,19
  37:4
prevaricate  37:12
prevent  38:20
  39:22,23 52:18
previously  17:14
prior  22:11,25
  26:25 27:18 28:6
  45:22 48:20 57:4
  59:8 62:2
pristine  25:5
probably  15:6,11
  16:16 25:25 27:8
  35:24 55:17,25
  57:5 71:19
problem  15:13,20
  15:23 16:6 18:17
  25:14 26:19 28:17
  28:21 29:12,16
  32:8,11 33:11,14
  33:20,23 36:13
  37:18 38:11,21
  42:7,16 52:20,24
  53:20 54:7 57:7
  59:1,14,17,25 60:4
  62:6,16 64:17,20
  64:23 70:18 72:13
  73:4,5
problems  45:6,9
  45:13
process  25:18
  34:15 36:9,19,23
  37:9,21 52:17,18
  64:4 66:10 72:3
produced  16:13
  16:17 25:25
producing  36:20
professional  14:17
  15:4

professionals
  45:21
progress  41:12
  61:7
progressed  30:18
  63:2
progression  22:20
  36:14 45:3 63:14
progressive  25:14
  25:18
prompted  45:17
pronounced  63:2
proof  3:18 56:19
proper  70:13
properly  31:19
properties  9:1
  24:19 27:9 29:12
  33:10 37:23 38:2
  52:3 54:16 56:1
  58:9 62:15
property  10:14,18
  16:21 17:3 18:4,7
  18:15 21:21,25
  25:24 26:21 27:18
  33:2 34:4 38:23
  43:5,19,25 45:18
  45:22 48:21,25
  50:21 51:9,12
  54:2,7,10 57:17,19
  57:23 58:2,4 59:8
  59:13,17 69:5,6
  73:10
property's  63:22
prove  50:23
provide  22:14
provided  8:8 9:18
  10:21 11:7,12
  12:5 13:5 14:2
  19:4 43:2 45:25
  46:3,7 48:5 50:19

EXHIBIT 13

**[providing - right]**                                                    Page 11

| | | | |
|---|---|---|---|
| **providing** 10:4 21:13 23:4 | **r** | 47:24 55:24 61:5 61:24 73:21 74:2 | **replacement** 44:15 64:4 |
| **public** 1:14 3:19 75:3 | **racking** 31:25 32:10 | **recorded** 19:6 43:12 | **report** 4:10 10:2 12:3,15,18 16:16 |
| **pull** 11:1 42:24 69:10 | **rainwater** 29:6,7 | **records** 44:9 | 16:17 20:8 21:11 |
| **pulled** 31:21 | **range** 67:19 | **recover** 57:3 | 23:7 24:23 26:23 |
| **pulling** 29:20 39:9 | **ranges** 16:3 | **reevaluate** 44:24 | 27:7,13 29:17 |
| **purchased** 27:3 40:9 | **rapid** 60:20 | **refer** 10:23 | 33:19 40:12 42:18 |
| **purchasing** 48:21 | **rarely** 56:17 | **referenced** 69:4 | 42:22 43:12 45:9 |
| **purpose** 17:25 52:6,10 | **reached** 41:5 | **referencing** 63:1 | 48:6 55:12 |
| **purposes** 9:22 13:16 | **reaction** 28:18,18 32:23 36:17 51:10 | **referred** 7:9 40:18 40:21 | **reported** 75:13 |
| **pursuant** 1:12 75:6 | **reactions** 28:16,19 | **referring** 9:23 29:6 30:3 43:8 | **reporter** 1:22 74:1 |
| **push** 31:5 | **reactive** 37:24 | **refers** 47:1 | **reports** 16:20 48:9 48:11,14 49:18 |
| **pushed** 30:6 39:8 | **read** 11:16,16 71:3 | **reflected** 22:16 41:14 42:18 | 59:18 |
| **put** 10:1 18:25 53:8 60:11 69:5 73:1 | **reading** 3:15 | **reflection** 20:7 | **represent** 5:16 |
| **putnam** 1:5 | **real** 58:22 | **regular** 58:19 | **requesting** 19:8 |
| **puts** 49:18 | **really** 19:25 20:21 22:3 43:15 55:13 | **related** 31:1,2 75:15 | **requests** 6:11 |
| **putting** 53:11 | 60:2 63:2 71:6 | **relation** 21:14 | **require** 28:20 72:4 |
| **pyrrhotite** 28:19 29:12 33:15 37:24 | **reason** 56:14 | **relationship** 28:12 | **requirement** 59:7 59:9 |
| | **reasons** 44:3,6 52:9 | **remainder** 13:4 | **requiring** 59:11 |
| **q** | **recall** 19:10 43:17 49:9 51:20 64:16 64:17 68:3 | **remediation** 64:8 | **reserved** 3:11 |
| **qualifications** 3:19 | **recalling** 52:1 | **remember** 17:11 45:8 65:21 69:18 | **residence** 9:8,21 48:20 55:3 |
| **qualified** 1:14 | **receive** 6:7 10:13 | **remembering** 53:13 | **residential** 7:5 49:14,20 |
| **quarter** 21:23,25 | **recollection** 10:12 10:15 11:24 17:4 21:24 22:4,15 27:21 | **remove** 8:14 | **resist** 35:14,19 |
| **question** 15:16 19:23,25 34:19 36:25 37:11 54:6 70:13 | **recommend** 22:21 39:13 40:12 52:3 52:15,16 53:1 | **repair** 19:12,13 39:17 40:2,14 64:3 65:4 | **respective** 3:4 |
| **questions** 9:4 14:23 | **recommendations** 69:2 | **repaired** 66:7,8,9 | **result** 26:6,15,17 26:18 60:4 |
| **quickly** 44:19 | **recommended** 39:19 | **repairs** 39:2,19 40:5 43:5,8 45:24 68:21,23 | **results** 24:5,7 25:23 33:9 |
| **quite** 15:15 | **record** 14:5,8 18:5 21:9 22:8 35:25 36:25 41:25 43:7 | **repeat** 15:18 50:6 | **retained** 4:12 42:21 |
| | | **repeatedly** 20:20 | **reviewed** 70:3,6 |
| | | **replaced** 39:14 41:8 53:12 | **right** 6:1 7:18,24 8:14,19 9:17 10:4 13:4 17:9,12 21:18 22:17 26:9 26:25 27:1,22 |

EXHIBIT 13

40:2,4 44:11,25
46:20,20 47:20
50:9,9 52:23
55:11 56:4 58:1
58:20 59:2,15
60:6 62:24 65:8
67:7 68:1,11,14
69:14,21 71:16
72:19,25 73:6
road  6:4
rocks  23:24 24:1
roof  66:10,11
67:23,25 68:1,3
rough  15:10
roughly  72:18
73:8
ruling  71:9
rulings  70:25 71:2
71:10
run  63:13

**s**

s  1:1 3:1,1 11:20
15:14
safely  47:5
safety  44:2,6
sake  36:25
sale  12:5 59:8,16
saves  9:14
saw  21:25 24:24
56:24 57:5 58:14
saying  12:24 51:7
64:13
says  7:9,15,18
9:23 10:18 11:4,4
11:9 12:9 14:15
14:15 17:24 18:9
18:19 19:15 29:18
31:23 33:19 34:6
39:1 48:19,23
49:4,8 60:14

scenario  25:21
schedule  6:11
scheduled  7:15
scheduling  8:12
school  71:24 72:2
second  9:18 20:11
27:14 29:18 30:20
48:19 69:4,5
section  1:13
see  19:24 20:4
27:23 29:11,14
30:5 31:19 32:5
41:12 42:16 43:9
45:13 52:23,23
55:13,22 56:15,17
58:25 60:9
seeing  49:9
seen  13:18,19,20
14:3,11 32:6,10
33:9,13,16,17,19
43:13 46:5 48:7,9
48:11 50:17,25
51:6 56:1,7 60:22
sell  58:21
send  12:2,11,12
sense  23:9 34:22
35:2 60:17,19
66:25
sent  13:5
sentence  20:11
30:20
septic  65:22,22
seq  1:13
services  7:5 12:7
set  61:24
settled  67:4 68:6
settlement  54:14
68:7 72:23
seven  16:5 72:15
sh  11:16

shane  11:20,20
13:6 40:21 41:2,6
shape  31:5 35:18
shore  42:16
shored  43:18,21
shortly  61:12
show  6:6 51:1
53:21
showing  8:19
shrinkage  54:14
72:23
sic  19:1,20 46:12
side  56:5
siding  20:24 21:3
21:7 30:5
significant  30:21
30:25 31:7,9,15
39:11 53:10
significantly  73:4
signing  3:15
silica  9:10 28:18
28:18 29:13 32:23
sill  49:15
similar  24:6,11
situation  44:22
six  72:17
slab  55:11,16,19
56:15
slash  11:17
slightly  31:10
slow  36:19 37:21
52:17 60:21 61:9
slows  61:8
small  66:14 67:5
67:10,12 68:4
72:16
smaller  66:14
soil  35:14,19,22,25
36:4,12,20 37:3
56:5 61:21

solely  26:9 32:18
32:21 52:7
somebody  40:1
70:23
someplace  69:10
sorry  15:15 34:1
38:20 54:6 70:1,5
sort  25:7 26:15
55:8 56:8,21
57:12 67:23
sorts  25:2 55:15
soucy  7:10,12
19:11 45:18,22
51:3
sound  23:21 35:7
35:8
sounds  24:18
source  29:10
space  65:1 66:1
span  37:8
specialized  72:4
specific  17:25 19:4
19:6 22:4
specifically  18:16
speculate  45:19
speeds  61:8
spell  63:10
spider  20:13,16
55:16 56:2,21
57:13 58:4 62:6
64:5,8 72:24
split  20:19
stand  60:14
star  10:21,23 11:7
11:12 12:19 17:19
18:15,20 22:10
23:3 30:11 40:5,9
40:18 41:5,11
43:3,25 44:25
45:6,17 48:21,24
62:3

EXHIBIT 13

star's   24:12,24 26:21 34:3 45:25 46:3,9 50:4 51:9 55:8,23 73:9
starlean   1:4
start   32:20 53:24 61:7
started   61:3
starting   31:4 42:16
starts   20:12 30:21 31:16 61:8
state   1:14 32:17 60:1 75:3
statement   26:14
statements   32:15 56:19
stenographically   75:13
steps   21:6
stick   71:7
stinson   11:20 13:6 40:21 41:2,6
stipulate   49:21
stipulated   3:3,10 3:14,18
stipulations   5:9
stop   52:17
stops   24:4 61:8
story   60:10
street   2:3
stresses   24:15,16
strike   21:19 30:14 32:18 33:25 43:24 57:17 58:2
strongly   40:12 57:4
structural   31:22 34:21 40:13 59:3
structurally   34:9 34:13,17,22 35:1,4

35:7,8 39:2,5
structure   29:20 31:16 44:21
stud   40:13
studies   60:2
study   33:22
subsequently   75:14
substantial   46:6 53:8
substantive   8:12
successful   65:4
sudden   23:25 25:5 25:6,17,23 26:20
sued   63:6 65:8,10 65:24 66:3,11,13 68:16,21 69:2
sufficiency   3:6
suggested   68:22
suite   2:3
suits   65:16 66:14 67:5
sulfide   9:10 33:14
summer   31:12
superior   1:3 37:25 38:10
supplied   57:19
supplier   54:24
supposed   35:9,11 35:12,14
sure   13:11 15:18 21:12 50:7,8 55:25
surface   29:6,7
surprised   73:12
suspected   57:4
sworn   5:2 75:11
symptoms   16:2
system   65:22,23

t

t   1:1,1,1,1 3:1,1 15:14,14
table   51:16
take   19:22 32:5 42:17
taken   1:11 3:7,20 5:22 22:10 75:5
takes   38:17
talk   50:1 70:23
talked   23:3
talking   24:17 50:10 71:16
tanddlaw.com   2:5
tank   66:2,3
television   51:7
tell   17:10 30:11 41:11,16,17 44:22 48:24 52:19 53:2 55:18,25 56:23 60:2,5,13,25 61:2 61:11 65:6 67:18 75:11
telling   25:11 29:1 53:8
temperatures   31:12
temporary   40:14
ten   18:11 66:13
term   67:7
testified   5:3
testimony   24:21 25:10 26:10,11 60:8 75:13
thank   21:13 73:18 73:19
thick   49:25
thing   22:4 24:23 38:17
things   21:6 24:6 25:12 39:10 43:9

50:2 56:18,24 61:1,10 66:14
think   28:12 30:14 30:15,17 32:12 37:10,16 38:5 40:2 42:1 46:18 47:13 53:11 56:14 61:24 66:15 67:21 70:12,16 72:16 73:7 74:2
third   32:17,20 34:6 36:7
thoughts   56:18
three   60:22 66:22 67:1
thursday   1:16 75:8
time   3:6,12 9:14 9:21 10:10 12:13 16:1 17:2,7,15,18 18:7,8,10 21:4 22:2,20 25:19,20 27:3 30:18 31:4 33:21 38:1,8 40:9 41:17 43:18 44:4 44:12 53:10 54:19 56:20 59:22 66:23 66:23,24,25 68:11 69:22 71:25 73:2 73:7
times   5:22 50:22 58:12 66:13 69:17
titan   40:22
titled   7:4
today   5:21 6:12 8:9,15 9:3,8,12 13:14 14:24 50:10 53:24 57:6,10
today's   15:3
tofolowski   63:7,8

EXHIBIT 13

**[told - windows]**                                                    Page 14

told   60:10,11
  65:22 66:6
tolisano   2:2
tolland   37:23
  53:14 59:7 63:13
total   53:10
touch   12:1,1
town   6:4
track   22:20
trail   50:17,23
training   14:16
  72:5
transcribed   75:14
transcript   4:8
  8:20
tremendous   38:3
trial   3:12
tried   64:7
true   9:12 13:11
truth   75:11,11,12
try   60:11 61:4
trying   16:6 23:24
  23:25 37:11,12
  65:21
tuesday   25:1
turned   72:12
twist   31:16
twisted   30:5 31:18
twisting   29:20
  35:18
two   26:18 28:15
  66:15
type   22:4 26:4
  68:25
types   25:11 50:2

**u**

u   1:1 3:1
uconn   33:22
uh   7:3,19 8:23
  9:25 11:6 33:18

unaware   34:5 40:8
unbalanced   36:21
uncracked   23:14
understand   9:1
  16:6 66:8
understanding
  9:10 26:12 60:4
  70:23
understood   37:13
  60:1
unfinished   19:16
  20:9
unfortunately   9:2
  58:18,25
uniform   63:14
unintelligible
  11:19
unique   42:1,4
unsafe   44:12,15
unstable   39:2,6,10
unusual   31:17
  64:18
useful   42:21
usual   5:9

**v**

v   1:5 8:21 14:20
validate   42:23
variant   52:25
various   50:1 66:14
verify   11:2
verifying   12:12
vertical   20:18
  49:14,23
vibration   23:21
  24:4,8
visible   20:12 32:21
  52:11
visit   21:4 22:12,25
  26:25 32:14 34:12
  41:24 43:6 44:4
  45:3,22 46:11,23

46:25 47:3,8
  52:10 59:22 62:2
  64:1,2
visited   9:21 16:24
  18:24 43:19 44:12
visits   52:7
visual   17:25 19:16
  32:18
visualize   23:22

**w**

w   2:10
wait   53:24
waiting   38:8
waived   3:8,16,20
wall   25:2 30:22
  36:13 40:13,13
  56:3 63:15 65:2
  69:4,5
walls   21:1 22:11
  25:5,22 27:14,23
  29:11 34:8,13,21
  35:2,20 36:4,20
  37:3,8,17 39:7,13
  43:18 44:16 46:9
  47:7 49:23 50:14
  50:14 55:4,23
  56:2,8,9,10,11
  57:11 62:9
want   13:2 15:24
  17:6 42:19 50:8
  51:5 52:20 53:5
  66:19 73:1,2,25
  74:2,4
wanted   13:10
wants   58:21
washing   60:15
waste   53:11
water   28:20 29:3,5
  29:6,8,9 31:12
  36:23 37:18 38:7
  38:11,12,16 45:7

51:16 56:13 61:21
  61:22 63:19
waterproof   38:22
waterproofed
  38:19
waterproofing
  37:14,17,25 38:10
  52:15
way   19:25 20:22
  23:22 27:4 30:19
  36:8 39:17 44:21
  51:23 52:1 53:8
  56:25 61:11 70:13
  75:17
we've   28:7 38:14
  47:19 65:16 66:12
weather   31:11
web   20:13,16
  55:16 56:2,21
  57:13 58:4 62:6
  64:5,8 72:24
wednesday   7:15
week   60:15,16
weigh   60:10
weird   64:12
went   7:23 14:20
  17:24 28:6 43:2
wethersfield   1:15
  2:8 75:7
whack   56:25
when's   69:22
white   28:1
wide   21:18,20,23
  22:1
widest   21:20
wife   13:3
william   1:9 4:3 5:1
  75:5
windham   1:4
windows   31:18,25
  32:10

EXHIBIT 13

| | |
|---|---|
| **winslow** 1:13,22 75:2,21 | 26:24 41:1,3 53:7 53:20,21,24 57:15 |
| **winter** 31:13 | 57:16,21,23 58:6,7 |
| **wish** 53:18 | 58:11 61:3,14,16 |
| **witness** 3:15 4:2 5:1 14:5 15:15 46:20 63:9 74:6 75:10,18 | 61:17 63:3,4 64:16,25 67:1,2 69:25 72:15 |
| **witnessed** 24:18 59:22 72:8 | **yep** 12:6,8 13:7,17 19:2 |

**z**

**zone** 51:13

**won** 66:15
**wood** 49:15
**woods** 53:25
**word** 11:19 17:9 40:3
**words** 31:7
**work** 51:3 65:24 68:25 69:15,20
**worked** 41:3 69:22
**works** 10:25 73:24
**worse** 19:11 25:19 25:20 61:4 63:16 63:17
**write** 27:13
**wrong** 65:20
**wwm** 1:3

**x**

**x** 4:1

**y**

**yeah** 5:10 13:10 13:12 15:11 24:8 46:25 49:17,24 53:25 54:15 57:24 58:8 63:12 68:12 69:8 71:19
**year** 18:25 19:3,3 19:5,9,9 61:3 62:4 71:18 72:17
**years** 11:5 16:5 17:10,20 18:11,21

EXHIBIT 13

Connecticut Procedure in Civil Matters

Chapter 13, Discovery and Depositions

Section 13-30

(D) If requested by the deponent or any party, when the testimony is fully transcribed the deposition shall be submitted to the deponent for examination and shall be read to or by the deponent. Any changes in form or substance which the deponent desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the deponent for making them. The deposition shall then be signed by the deponent certifying that the deposition is a true record of the deponent's testimony, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the deponent within thirty days after its submission to the deponent, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the deponent or the fact of the refusal or failure to sign, together with the reason, if any, given therefore; and the deposition may then be used as fully as though signed unless, on a motion

EXHIBIT 13

to suppress under Section 13-31 (c) (4), the judicial authority holds that the reasons given for the refusal or failure to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 13

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 13

EXHIBIT 13