UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CHRISTOPHER D. LESTER AND                    3:16-cv-00909-JAM
MONICA G. LESTER                        :

v.                                      :

LIBERTY MUTUAL FIRE INSURANCE
COMPANY                                 :        DECEMBER 15, 2017

## LOCAL RULE 56(a)1 STATEMENT OF MATERIAL FACTS
## OBJECTING TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a)1 of the Local Rules of Civil Procedure, the Plaintiffs,

**CHRISTOPHER D. LESTER** and **MONICA G. LESTER**, respectfully submit the

following responses to the statement of material facts by the Defendant:

1. Liberty insured the plaintiffs' property at 24 Laurel Drive, Willington, CT

06279 ("Property") under Policy Number H32-218-074339-70 (hereinafter the "Policy").

(A certified copy of the Policy is attached as **Exhibit 1**).  **ADMITTED**

2. Liberty first insured the Property on June 1, 2007 (See affidavit of Chataigner

Red, attached as **Exhibit 2**, ¶5). **ADMITTED**

3. The claim was reported to Liberty on October 16, 2015.  **Ex. 2**, ¶6.

**ADMITTED**

4.  The plaintiffs submitted an October 5, 2015 foundation evaluation report by William Neal, P.E. in connection with their claim (See report by Mr. Neal, attached as **Exhibit 3**, p. 1).  **ADMITTED**

5.  In response to the claim, Liberty retained Paul Cianci, P.E. to conduct a structural evaluation. **Ex. 2**, ¶7.  **ADMITTED**

6.  Mr. Cianci inspected the property on November 19, 2015 and prepared a report detailing his findings. (See report by Mr. Cianci, attached as Exhibit 4; **Ex. 2**, ¶8). **ADMITTED**

7.  Mr. Cianci opined that the property had not suffered a substantial impairment to the structural integrity of a building. **Ex. 4**, p. 6. **ADMITTED THAT THIS IS MR. CIANCI'S OPINION**

8.  Mr. Cianci opined that the property was not in any imminent danger of collapsing. **Ex. 4**, p. 6. **ADMITTED THAT THIS IS MR. CIANCI'S OPINION**

9.  Liberty denied the claim via April 12, 2016 correspondence wherein it relied on Mr. Cianci's structural evaluation (See denial letter, attached as **Exhibit 5**, p. 1; **Ex. 4**, p. 6; **Ex. 2**, ¶8). **ADMITTED CLAIM DENIED**

10.  In the denial letter, Liberty cited exclusions which are directly applicable to the claim presented, including, but not limited to, faulty materials and cracking. **Ex. 5**, pp. 2-3. **ADMITTED PURPORTED EXCLUSIONS CITED, DENIED THAT THEY APPLY**

11.   The basement has never been finished (See deposition transcript of Mr. Lester, attached as **Exhibit 6**, pp. 17-18).  **ADMITTED**

12.   There has never been any siding or obstruction over the exterior concrete foundation.  **Ex. 6**, p. 18.  **ADMITTED**

13.   William Neal first visited the Property on October 5, 2015 (See deposition transcript of Mr. Neal, attached as **Exhibit 7**, p. 5).  **ADMITTED**

14.   The plaintiffs first noticed cracks in their foundation in September or October of 2015 after neighbors informed them of foundation problems in the area. **Ex. 6**, pp. 32-33, 35. **ADMITTED**

15.   Mr. Neal observed "three hairline cracks visible on the exterior of the foundation." **Ex. 7**, p. 7.  **ADMITTED**

16.   Mr. Neal believes "spider web cracks" are the type of cracks that are typically found when concrete is defective.  **Ex. 7**, p. 19. **ADMITTED**

17.   Mr. Neal admits that he is "not a concrete expert" (See deposition transcript of Mr. Neal in *Gladysz v. Liberty Insurance Corporation*, attached as **Exhibit 8**, p. 35). **ADMITTED THAT THE STATEMENT WAS MADE**

18.   Mr. Neal did not note any "spider web cracks" on the exterior foundation. **Ex. 7**, p. 20.  **ADMITTED**

19.   Mr. Neal does not know if these hairline cracks have gotten worse since 2015. **Ex. 7**, p. 21.  **ADMITTED**

20.  Mr. Neal observed hairline spider web cracks on the interior foundation. **Ex. 7**, p. 19. **ADMITTED**

21.  "Hairline" is the least significant term that Mr. Neal would use to describe cracking.  **Ex. 7**, pp. 19-20.  **ADMITTED STATEMENT WAS MADE**

22.  Mr. Neal did not measure any of the cracks, but guessed that they would be a thirty-second of an inch or less. **Ex. 7**, p. 20.  **ADMITTED STATEMENT MADE**

23.  Mr. Neal has not been back to the Property since October 5, 2015.  **Ex. 7**, p. 16.  **ADMITTED**

24.  Mr. Neal has no plans to return to the Property. **Ex. 7**, p. 17.  **ADMITTED STATEMENT MADE**

25.  The Lesters do not know if the cracks have gotten any worse since 2015 (See deposition transcript of Mrs. Lester, attached as **Exhibit 9**, p. 17; **Ex. 6**, p. 37). **ADMITTED**

26.  Mr. Neal testified that there is no bowing in any of the foundation walls.  **Ex. 7**, p. 22.  **ADMITTED**

27.  Mr. Neal did not inspect the living space.  **Ex. 7**, pp. 30-31.  **ADMITTED**

28.  The foundation was holding up the above structure and retaining soil on the exterior at the time of Mr. Neal's visit.  **Ex. 7**, pp. 33. **ADMITTED**

29.  The home is safe to live in.  **Ex. 7**, p. 38. **ADMITTED**

30.  The plaintiffs still live in the home. **Ex. 6**, p. 40. **ADMITTED**

31.   The Property has not been condemned by a building inspector and Mr. Neal does not believe that it should be condemned. **Ex.9**, p. 20; **Ex. 7**, p. 32). **ADMITTED**

32.   Nobody has told the plaintiffs to relocate for safety reasons.  **Ex. 6**, pp. 38-39.  **ADMITTED**

33.   The foundation walls are not in imminent danger of falling down.  **Ex. 7**, p. 38.  **DENIED- NO EXPERT HAS OFFERED AN OPINION ON THIS ISSUE AS OF THE DATE OF THE MOTION FOR SUMMARY JUDGMENT**

34.   No part of the home is in imminent danger of falling down.  **Ex. 7**, p. 38. **DENIED- NO EXPERT HAS OFFERED AN OPINION ON THIS ISSUE AS OF THE DATE OF THE MOTION FOR SUMMARY JUDGMENT**

35.   The walls do not need to be shored.  **Ex. 7**, p. 32   **DENIED- NO EXPERT HAS OFFERED AN OPINION ON THIS ISSUE AS OF THE DATE OF THE MOTION FOR SUMMARY JUDGMENT**

36.   Mr. Neal does not have an opinion as to when the foundation walls will fall down or become unsafe absent their replacement. **Ex. 7**, p. 41.  **ADMITTED**

37.   Mr. Neal cannot testify to a reasonable degree of engineering probability that the foundation walls will become structurally dangerous within the next one thousand years. **Ex. 7**, p. 28. **ADMITTED STATEMENT MADE**

38.   Mr. Neal expects that the foundation may become structurally dangerous sometime between the next one thousand and one million years.  **Ex. 7**, p. 28. **DENIED**

39.   Mr. Neal is uncertain whether the foundation will ever structurally fail.  **Ex. 7**, p. 24.  **ADMITTED STATEMENT MADE**

40.   There are properties that Mr. Neal has inspected that have foundations which are bowing by as much as five inches.  **Ex. 7**, p. 23.  **ADMITTED**

41.   Even at those properties the walls have not fallen down and the homeowners are still living there.  **Ex. 7**, p. 23.  **ADMITTED STATEMENT MADE**

42.   Mr. Neal has inspected around 800 properties with cracked foundations. **Ex. 7**, p. 34.  **ADMITTED**

43.   Mr. Neal is unaware of a single foundation at any cracked foundation property which has fallen down.  **Ex. 7**, pp. 34-35.  **ADMITTED**

44.   Mr. Neal testified that the phrase "substantial impairment of structural integrity" is not an engineering term of art.  **Ex. 7**, p. 34. **ADMITTED**

45.   Mr. Neal does not utilize this phrase (See deposition transcript of Mr. Neal in *Vera v. Liberty Mutual Fire Insurance Company*, attached as **Ex. 10**, p. 35). **ADMITTED STATEMENT MADE**

46.   Mr. Neal testified that his inclination is that "substantial impairment of structural integrity" means that the "structure's ability to carry the loads it was intended

6

to carry has been reduced" in a substantial manner (See deposition transcript of Mr. Neal in *Bienkowski v. Liberty Mutual Fire Insurance Company*, attached as **Exhibit 11** p. 39).  **ADMITTED  STATEMENT MADE**

47.   According to Mr. Neal, indicia of a substantial impairment of structural integrity would be walls which are bowing inward and movement and damage to the above structure.  **Ex. 11**, p. 39.  **ADMITTED STATEMENT MADE AS AN EXAMPLE OF IMPAIRMENT**

48.  Mr. Neal is no chemist.  **Ex. 7**, p. 22  **ADMITTED**

49.   Mr. Neal has no scientific background relevant to the identification of chemical processes in concrete.  **Ex. 7**, p. 31.  **ADMITTED**

50.  Mr. Neal admits that he is not an expert in chemical reactions in concrete.  **Ex. 7**, p. 25.  **ADMITTED STATEMENT MADE**

51.  Mr. Neal has never conducted a petrographic examination and admits that he is unqualified to perform one.  **Ex. 7**, p. 27.  **ADMITTED**

52.   Mr. Neal cannot testify that this cracking progressed by a measurable variable each month or year.  **Ex. 7**, pp. 21.  **ADMITTED STATEMENT MADE**

53.  Mr. Neal's knowledge of chemical reactions in concrete is limited to Google searches.  **Ex. 7**, p. 25. **DENIED**

54.  Mr. Neal admits that that the reports he read concerning chemical reactions "were so technical, I had absolutely no idea what they were talking about." **Ex. 8**, p. 35.  **ADMITTED STATEMENT MADE**

55.  Mr. Neal has seen no literature—engineering or otherwise—that says that the oxidation process cannot be arrested.  **Ex. 8**, p. 31.  **ADMITTED STATEMENT MADE**

56.  Mr. Neal has seen no literature—engineering or otherwise—that says that the alkali-silica reaction cannot be arrested.  **Ex. 10**, p. 19.  **ADMITTED STATEMENT MADE**

57.   Nick Scaglione—a petrographer who studies concrete for a living and studied *this* concrete—says that the oxidation process can be arrested (See report of Mr. Scaglione, attached as **Exhibit 12**, p. 9).  **ADMITTED STATEMENT MADE**

58.  Mr. Scaglione notes that there is no evidence of alkali-silica reaction in the concrete.  **Ex. 12**, p. 8; **Ex. 3**, p. 1.  **ADMITTED STATEMENT MADE**

59.   Mr. Neal lives in Tolland County and is concerned that he may have a similarly-afflicted foundation that is currently asymptomatic (See deposition transcript of Mr. Neal in *McAllister v. Liberty Mutual Fire Insurance Company*, attached as **Exhibit 13**, p. 53; **Ex. 8**, p. 61).  **ADMITTED**

60.  Mr. Neal is so concerned about his foundation that he conducts monthly inspections of it.  **Ex. 13**, p. 53.  **ADMITTED**

61.    Mr. Neal testified that the foundation was exposed to "groundwater", "surface water", and "rain water." **Ex. 7**, p. 30. **ADMITTED**

62.    Mr. Neal observed no problems with the floor slab.   **Ex. 7**, p. 40. **ADMITTED**

63.  Mr. Neal believes that the reduced exposure to exterior water accounted for the difference in the cracking in the foundation walls and floor slab.   **Ex. 7**, p. 40. **ADMITTED STATEMENT MADE**

64.    Mr. Scaglione agrees that reduced exposure to exterior water accounts for the difference in the cracking in the foundation walls and floor slab.   **Ex. 12**, p. 8. **ADMITTED STATEMENT MADE**

65.  The blueprints for the Property refer to the concrete walls as the foundation (See Property blueprints, attached as **Exhibit 14**).   **ADMITTED DOCUMENT SPEAKS FOR ITSELF**

66.    The plaintiffs received the blueprints for the Property in 2005.   **Ex. 6**, pp. 14-16.  **ADMITTED**

67.    Mr. Lester refers to the concrete basement walls as the foundation. **Ex. 6**, pp. 22, 27.  **ADMITTED STATEMENT MADE**

68.    Mrs. Lester refers to the concrete basement walls as the foundation. **Ex. 9**, p. 19.  **ADMITTED STATEMENT MADE**

69.    The plaintiffs referred to their concrete walls as the foundation in the November 6, 2005 State of Connecticut Department of Consumer Protection ("DCP") Residential Property Disclosure Report ("Disclosure Report") they prepared concerning their prior property (See Disclosure Report, attached as **Exhibit 15**, p. 3; **Ex. 6**, pp. 18-19).  **ADMITTED DOCUMENT SPEAKS FOR ITESELF**

70.    The October 27, 2005 Uniform Residential Appraisal Report ("Appraisal") concerning the Property refers to the concrete basement walls as the foundation (See Appraisal, attached as **Exhibit 16**, p. 1; **Ex. 6**, pp. 19-20).  **ADMITTED DOCUMENT SPEAKS FOR ITSELF**

71.    The plaintiffs received a Disclosure Report in connection with their purchase of the Property which referred to the concrete basement walls as the foundation (See Disclosure Report, attached as **Exhibit 17**, p. 2; **Ex. 6**, pp. 20-21).  **ADMITTED DOCUMENT SPEAKS FOR ITSELF**

72.    The plaintiffs received Mr. Neal's report which repeatedly refers to the basement walls as the foundation.  **Ex. 3**, p. 1; **Ex. 6**, p. 21.  **ADMITTED THAT THE PLAINTIFFS RECEIVED A COPY OF A REPORT FROM MR. NEAL**

73.    The plaintiffs received a foundation replacement estimate from Don Childree which refers to the basement walls as the foundation and repeatedly differentiates between the foundation and footings (See Mr. Childree's estimated,

attached as **Exhibit 18**, pp. 1-2; **Ex. 6**, pp. 22-23). **ADMITTED THAT THE PLAINTIFFS RECEIVED A COPY OF AN ESTIMATE FROM MR. CHILDREE**

74.    The plaintiffs received a November 1, 2005 home inspection report prepared by Mr. Neal prior to purchasing the Property which repeatedly refers to the concrete basement walls as the foundation (See home inspection report, attached as **Exhibit 19**, pp. 6, 8, 29, 53; **Ex. 6**, p. 24). **ADMITTED DOCUMENT SPEAKS FOR ITSELF**

75.    Mr. Neal testified that the residential building code defines the concrete basement walls as the foundation.    **Ex. 10**, p. 29.    **ADMITTED THAT THE STATEMENT WAS MADE**

76.    Mr. Neal refers to the basement walls as the foundation.    **Ex. 7**, p. 17; **Ex. 3**, p. 1.    **ADMITTED STATEMENT MADE**

77.    Mr. Neal testified that the concrete basement walls are considered the foundation in the engineering industry.    **Ex. 10**, p. 29.    **ADMITTED STATEMENT MADE**

78.    The Office of the Attorney General's ("OAG") report refers to the map cracking condition of which the plaintiffs complain as concerning foundations (See OAG report, attached as **Exhibit 20**, p. 1). **ADMITTED STATEMENT MADE**

79. The Department of Consumer Protection ("DCP") refers to the map cracking issue of which the plaintiffs complain as concerning concrete foundations (See DCP website page, attached as **Exhibit 21**).  **ADMITTED STATEMENT MADE**

80. Public Act No. 16-45 repeatedly refers to the cracks of which the plaintiffs complain as concerning the foundation and was titled "An Act Concerning Concrete Foundations." (See Public Act No. 16-45, attached as **Exhibit 22**, pp. 1-2). **ADMITTED THAT THIS IS THE TITLE**

81. The Department of Insurance's ("DOI") issued a notice regarding foundations (See DOI notice, attached as **Exhibit 23**). **ADMITTED DOI ISSUED A NOTICE**

82. A December 30, 2016 Report on Deteriorating Concrete in Residential Foundations prepared by the DCP and OAG to the Connecticut General Assembly noted that "[a] foundation for a residential structure consists of three essential parts. The footing provides the base which supports the foundation walls and the slab forms the floor." (See DCP and OAG report, attached as **Exhibit 24**, p. 2, fn. 1).  **ADMITTED NOTICE MAKES STATEMENT**

83. The plaintiffs have never looked up foundation or retaining wall in a dictionary. **Ex. 6**, p. 39; **Ex. 9**, p. 18.  **ADMITTED**

84. The plaintiffs do not know if their Property has footings.  **Ex. 6**, pp. 39-40; **Ex. 9**, p. 16. **ADMITTED**

85.  The concrete foundation walls are partially below grade and retain soil on the exterior.  **Ex. 7**, pp. 33-34.  **ADMITTED**

86.  The Liberty Policy, as modified by its endorsements, states in part:

---

### SECTION I—PERILS INSURED AGAINST

**COVERAGE    A—DWELLING    and    COVERAGE    B—OTHER STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do not insure, however, for loss:

**1.**      Involving collapse, other than as provided in Additional Coverage 8.;

**2.**      Caused by:
   . . . .
   **b.**      Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:
      . . . .
      (2)      Foundation, retaining wall, or bulkhead; or
      . . . .
      (4)      Footing(s)
      . . . .
   **e.**      Any of the following:

      (1)       Wear and tear, marring, deterioration;
      (2)      Inherent vice, latent defect, mechanical breakdown;
      (3)      Smog, rust or other corrosion;
         . . . .
      (6)      Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

(**Ex. 1**, pp. 11, 26).
. . . .

**ADDITIONAL COVERAGES**

. . . .

**8**.    **Collapse.**  We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

    a.       Perils Insured Against in COVERAGE C—PERSONAL PROPERTY.  These perils apply to covered buildings and personal property for loss insured by this additional coverage:
    b.       Hidden decay;
    c.       Hidden insect or vermin damage;
    d.       Weight of contents, equipment, animals or people;
    e.       Weight of rain which collects on a roof; or
    f.       Use of defective material or methods in construction, remodeling or renovation;

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

(**Ex. 1**, pp. 10, 31).

. . . .

## SECTION I—EXCLUSIONS

**1.**    We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

. . . .

    **b.**       **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting;  . . .

    **c.**       **Water Damage,** meaning:

14

       (1)    Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

       (2)    Water which backs up through sewers or drains or which overflows from a sump; or

       (3)    Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

. . . .

**2.**    We do not insure for loss to property described in Coverages A and B caused by any of the following…

. . . .

    **c.**    **Faulty, inadequate or defective:**

       (1)    Planning, zoning, development, surveying, siting;

       (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

       (3)    Materials used in repair, construction, renovation or remodeling; or

       (4)    Maintenance;

of part or all of any property whether on or off the "residence premises."

(**Ex. 1**, pp. 12-13, 32-33).

. . . .

---

### SECTIONS I AND II—CONDITIONS

---

**1.**    **Policy Period.**  This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

(**Ex. 1**, p. 20).

**ADMITTED**

## DISPUTED ISSUES OF MATERIAL FACTS

Pursuant to Rule 56(a) 2 of the Local Rules of Civil Procedure, the Plaintiffs submit to following statement of disputed facts and/or additional facts with respect to their Objection to Motion for Summary Judgment dated October 25, 2017.

87.  The Plaintiff, CHRISTOPHER LESTER, is not an engineer and the Plaintiff, MONICA LESTER, is not a general contractor, does not have a residential construction background, and does not have an engineering background.  See Defendant's Motion for Summary Judgment, Document 19-6, p. 38 and Document 19-9, p. 13.

88.  The Defendant's denial letter dated April 12, 2016 does not mention the reasonable repairs provision of the Defendant's policy or that chemical reactions are not excluded.  See Defendant's Motion for Summary Judgment, Document 19-5.

89.  The Defendant's expert, Nick Scaglione, noted that there was an oxidation to the sulfides in the concrete and that 36% of the aggregate was susceptible to this issue.  See Defendant's Motion for Summary Judgment, Document 19-12, p. 7.

90.  The Defendant's Policy provides under Section I - Property Coverages, Additional Coverages:

16

> **"Reasonable Repairs**. In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is   covered under this policy and the damage to that property is caused by an applicable Peril Insured Against."

See Defendant's Motion for Summary Judgment, Document 19-1, p. 8-9.

91.  Exclusions within the Defendant's Policy do not specifically exclude chemical reactions.  See Defendant's Motion for Summary Judgment, Document 19-1, p. 11-13.

92.  The estimate to repair the Plaintiffs' concrete is $237,470.00.  See Defendant's Motion for Summary Judgment, Document 19-18.

93.  The Defendant's Expert, Paul Cianci, noted that there was an expansive reaction in the concrete due to exposure of water and oxygen in the concrete.  See Defendant's Motion for Summary Judgment, Document 19-4, p. 6.

94.  William E. Neal, P.E., noted that the Plaintiffs "very recently" noticed the cracking.  See Defendant's Motion for Summary Judgment, Document 19-3.

95. William E. Neal, P.E. visited the Property on or about October 5, 2015 and noted that a chemical reaction was occurring and that the concrete needed to be replaced.  See Defendant's Motion for Summary Judgment, Document 19-3.

96.  William E. Neal, P.E. has testified that this type of condition of the concrete shows that it is in the process of structural failure and there is no way to stop it, only slow it down.  See Defendant's Motion of Summary Judgment, Document 19-11, p. 32-33.

97.  William E. Neal, P.E., has testified that, based on this condition, the ability for the structure to carry a load has been reduced.  See Defendant's Motion of Summary Judgment, Document 19-11, p. 39.

PLAINTIFFS
CHRISTOPHER D. LESTER and
MONICA G. LESTER


By_CT 19476_____
   Brian D. Danforth, Esq.
   Tolisano & Danforth, LLC
   P.O. Box 676
   Ellington, CT  06029
   **860 871-2422**
   **bdanforth@tanddlaw.com**

18

## **CERTIFICATION**

This is to certify that on December 15, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Kieran W. Leary (ct29484)
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT  06114-1121
(860) 249-1361
(860) 249-7665 (Fax)
E-Mail:  kleary@hl-law.com

        __/s/ ct19476_____
        Brian D. Danforth, Esq.