## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BARRY AGOSTI, and
ROBIN AGOSTI,
    Plaintiffs,

    v.

MERRIMACK MUT. FIRE INS. CO., and
ALLSTATE INS. CO.,
    Defendants.

No. 3:16-cv-01686 (SRU)

### RULING AND ORDER

In the present insurance dispute, Allstate Insurance Co. ("Allstate") has moved to dismiss the claims filed against it by Barry and Robin Agosti. The Agostis' complaint alleges in Counts Four, Five, and Six that (1) Allstate breached its contract with the Agostis by denying coverage under their homeowner's insurance policy (the "Allstate Policy") for damage to their basement walls; (2) Allstate breached the implied covenant of good faith and fair dealing by baselessly denying coverage; and (3) Allstate committed unfair and deceptive practices proscribed by the Connecticut Unfair Insurance Practices Act ("CUIPA"), as enforced through the Connecticut Unfair Trade Practices Act ("CUTPA"). Because the Allstate Policy provides coverage only for an "entire collapse," and the Agostis have alleged no facts to suggest such a collapse occurred here, I grant the motion and dismiss the pertinent counts of the complaint.

### I.    Standard of Review

A motion to dismiss for failure to state a claim is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). When deciding a

motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.   Background

Plaintiffs Barry and Robin Agosti own and reside at a house in Tolland, Connecticut, which is protected by a homeowner's insurance policy underwritten by defendant Allstate. Compl., Doc. No. 1, at Count 1, ¶¶ 1, 3. Prior to September 2015, the Agostis gradually "observed visible cracking in the concrete of their home." *Id.* at ¶ 5. On September 15, 2015, the Agostis "had their basement inspected by a professional structural engineer" because they were concerned about the "visible cracking patterns in the basement walls" and were "aware[] . . . [of]

2

deteriorating concrete issues [from] recent media reports." *Id.* at ¶ 6. The engineer's inspection "indicated the concrete deterioration and cracking were caused by a chemical reaction in the concrete," which he concluded "would continue to progressively deteriorate the basement walls, rendering the structure unusable." *Id.* at ¶ 7. As a result, the engineer "recommended replacement of the concrete basement walls." *Id.*

Following the inspection, on November 10, 2015, the Agostis "made a timely formal claim for coverage under [their] homeowner's insurance policy" with Allstate. *Id.* at Count 4, ¶ 8. They asserted that the loss to their basement walls was covered as a "collapse" due to "hidden decay and/or defective materials." *Id.* at ¶ 10. Although the Allstate Policy provides that Allstate generally "do[es] not cover loss to the property . . . consisting of or caused by: . . . 12. Collapse . . . [or] 15. . . . (g) settling, cracking, shrinking, bulging or expansion of . . . foundations [or] walls," Allstate Policy, Ex. C to Allstate's Mot. Dismiss, Doc. No. 17-4, at 31–33, it does offer coverage pursuant to an "Additional Protection," which reads as follows:

> Collapse
> [Allstate] will cover:
>     a) the entire collapse of a covered building structure;
>     b) the entire collapse of part of a covered building structure; and
>     c) direct physical loss to covered property caused by (a) or (b) above.
>
> For coverage to apply, the collapse of a building structure specified in (a) or (b) above must be a sudden and accidental direct physical loss caused by one or more of the following:
>     a) a loss we cover under Section I, Coverage C—Personal Property Protection;
>     b) hidden decay of the building structure;
>     c) hidden damage to the building structure caused by insects or vermin;
>     d) weight of persons, animals, equipment or contents;
>     e) weight of rain or snow which collects on a roof;
>     f) defective methods or materials used in construction, repair, remodeling or renovation.
>
> Collapse does not include settling, cracking, shrinking, bulging or expansion.

*Id.* at 40 (emphasis removed).

3

Allstate denied the Agostis' claim on April 19, 2016. Compl., Doc. No. 1, at Count 4, ¶ 11. The Agostis characterize that denial as based on "interpretations of policy provisions [that] are contrary to the [Collapse] provisions of the policy." *Id.* ¶ 12.

On October 7, 2016, the Agostis filed a complaint against Allstate in Connecticut Superior Court, Judicial District of Tolland at Rockville. *See* Notice of Removal, Doc. No. 1, at 1. The Agostis allege that Allstate breached the insurance contract (Count Four), breached the implied covenant of good faith and fair dealing (Count Five), and violated CUTPA/CUIPA (Count Six). Allstate removed the Agostis' complaint to this court on October 10, 2016. *See id.* On November 30, 2016, Allstate moved to dismiss the counts of the complaint against it pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Doc. No. 17. I heard argument on the motion on January 30, 2017. *See* Doc. No. 28.

## III.    Discussion

Allstate moves to dismiss the Agostis' claim for breach of contract (Count Four) "on the grounds that the alleged damage is not covered under the plain language of the Allstate Policy." Allstate's Mot. Dismiss, Doc. No. 17, at 1. Allstate asserts that if I dismiss the claim for breach of contract, I also must dismiss the claims for breach of the implied covenant of good faith and fair dealing (Count Five) and for violation of CUTPA/CUIPA (Count Six), because "neither can be maintained in the absence of a breach of contract." *Id.* at 2. Alternatively, even if I decline to dismiss the breach of contract claim, Allstate asks that I dismiss the remaining claims "on the separate and independent grounds that . . . Allstate's denial of coverage was not in bad faith, and its . . . coverage position here [was] reasonable and fairly debatable." *Id.*

The Agostis respond that they have "stated a sufficient cause of action under the [Allstate] Policy" because the policy "fail[s] to exclude losses from a chemical reaction." Pls.'

4

Mem. Opp'n Mot. Dismiss, Doc. No. 22, at 4. They argue that the exceptions to the Additional Protection for Collapse cited by Allstate do not preclude coverage, *id.* at 6–7, and that their allegations of bad faith and violation of CUTPA/CUIPA are likewise sufficient. *Id.* at 9–13.

A. Count Four: Beach of Contract

Allstate asserts that I must dismiss the Agostis' claim for breach of contract because "the alleged damage is not covered under the plain language of the Allstate Policy." Allstate's Mot. Dismiss, Doc. No. 17, at 1. Accordingly, I first must determine whether coverage exists under the policy for the deterioration of the Agostis' basement walls.

"[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006). An insurance contract is interpreted by the court according to "the same general rules that govern the construction of any written contract." *Johnson v. Conn. Ins. Guar. Ass'n*, 302 Conn. 639, 643 (2011). Thus, "the determinative question is the intent of the parties, that is, what coverage the . . . insured expected to receive and what the insurer was to provide, as disclosed by the provisions of the policy." *Lexington Ins. Co. v. Lexington Healthcare Grp.*, 311 Conn. 29, 37–38 (2014) (internal alterations omitted). If the policy's terms are "clear and unambiguous," then that language "must be accorded its natural and ordinary meaning." *Johnson*, 302 Conn. at 643. If the terms of the insurance policy are "ambiguous," however, meaning "reasonably susceptible to more than one reading," then then ambiguity "must be construed in favor of the insured because the insurance company drafted the policy." *Id.*

1. *Does coverage exist under Coverage A (Dwelling Protection)?*

The Agostis argue that their loss is covered under Coverage A (Dwelling Protection) because the Allstate Policy does not specifically "exclu[de] . . . losses due to a chemical

5

reaction." *See* Pls.' Mem. Opp'n Mot. Dismiss, Doc. No. 22, at 4. I disagree, and conclude that the loss to the Agostis' walls is excluded under Coverage A.

Coverage A of the Allstate Policy appear to provide "all-risk" coverage, meaning that "losses caused by *any* fortuitous peril not specifically excluded . . . will be covered." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006); *Costabile v. Metro. Prop. & Cas. Ins. Co.*, 193 F. Supp. 2d 465, 474 (D. Conn. 2002) (holding that identically worded provisions "provide[d] 'all-risk' coverage"). An "all-risk" policy is contrasted with a "named perils" policy, which "covers only losses suffered from an enumerated peril." *Parks Real Estate*, 472 F.3d at 41. "All-risk" policies are not "all-loss" policies, however. *Costabile*, 193 F. Supp. 2d at 477. Rather, such policies "contain express written exclusions and implied exceptions." *Id.* Thus, recovery will not be allowed under an "all-risk" policy if "the policy contains a specific provision expressly excluding the loss from coverage." *Id.*

Although the Agostis' insurance policy does not exclude by name losses that are caused by chemical reactions, it does expressly exclude "loss consisting of or caused by . . . settling, cracking, shrinking, bulging or expansion of . . . foundations [or] walls." *Id.*; Allstate Policy, Doc. No. 17-4, at 33. That "specific and unambiguous provision . . . expressly exclude[s] the plaintiffs' loss" in the present case. *See Costabile*, 193 F. Supp. 2d at 477. Under the facts alleged by the Agostis, their loss—if not considered an imminent collapse—clearly "consist[s] of . . . settling, cracking, shrinking, bulging or expansion of . . . foundations [or] walls." *See* Compl., Doc. No. 1, at Count 1, ¶ 5; Allstate Policy, Doc. No. 17-4, at 33. The technical cause of the cracking or bulging is irrelevant. Therefore, I hold that the Agostis' loss is excluded from coverage under Coverage A.

6

2. *Does coverage exist under the Additional Protection for Collapse?*

The Agostis also contend that their loss may be covered as a "collapse." *See* Pls.' Mem.

Opp'n Mot. Dismiss, Doc. No. 22, at 8. The Allstate Policy's Additional Protection for Collapse

applies to "collapse of a building structure" or a part thereof, "caused by . . . hidden decay of the

building structure" or "defective methods or materials used in construction, repair, remodeling or

renovation." Allstate Policy, Doc. No. 17-4, at 40. For the reasons stated by the Connecticut

Supreme Court in *Beach v. Middlesex Mutual Assurance Co.*, and subsequently followed by

many judges of this court, I conclude that the term "collapse," standing alone, "is sufficiently

ambiguous to include coverage for any substantial impairment of the structural integrity of a

building." *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987); *see, e.g.,*

*Roberge v. Amica Mut. Ins. Co.*, 2015 WL 9480008 (D. Conn. Dec. 29, 2015) (Eginton, J.);

*Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016 (D. Conn. Sept. 30, 2015) (Bryant, J.);

*Gabriel v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5684063 (D. Conn. Sept. 28, 2015) (Bolden, J.);

*Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157 (D. Conn. 2014) (Hall, C.J.); *Karas v. Liberty Ins.*

*Corp.*, 33 F. Supp. 3d 110 (D. Conn. 2014) (Underhill, J.). Other things being equal, such a

definition of "collapse" might cover the damage claimed by the Agostis.

The Allstate Policy's Additional Protection includes a number of qualifiers, however,

which operate to reduce the scope of coverage. First, "[c]ollapse does not include *settling,*

*cracking, shrinking, bulging or expansion.*" *Id.* (emphasis added) Second, "the collapse . . . must

be a *sudden and accidental* direct physical loss." *Id.* (emphasis added) Third, the collapse must

be an "*entire collapse* of a covered building structure" or a part thereof. *Id.* (emphasis added)

Although the first and second conditions do not necessarily bar coverage for the alleged collapse

of the Agostis' basement walls, the third condition does. Therefore, I grant Allstate's motion to

dismiss the Agostis' claim for breach of contract.

7

a. Is the alleged collapse excluded as "cracking, shrinking, bulging, or expansion"?

Allstate asserts that the Agostis' claim for breach of contract must be dismissed because "the Allstate Policy provides that '[c]ollapse does not include settling, cracking, shrinking, bulging or expansion.'" Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 12–13. Relying heavily on my decision from the bench in *Alexander v. General Insurance Co. of America*, No. 3:16-cv-00059 (SRU), Allstate argues that, under the terms of the policy, "a building could not be considered in a state of collapse even if it showed evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking, or expansion." *Id.* at 11. In response, the Agostis contend that the cracking is merely "the manifestation of the chemical reaction" that caused their walls to deteriorate. Pls.' Mem. Opp'n Mot. Dismiss, Doc. No. 22, at 6. The exception for cracking, they argue, "is in place in order to prevent the homeowner from seeking compensation for every day occurrences," not to bar coverage for a "catastrophic event" such as "the chemical reaction" in the present case. *Id.* at 7.

I agree with the Agostis. In *Beach*, the Connecticut Supreme Court held that an identically worded exclusion could "reasonably be read to exclude loss related to 'settling, cracking, shrinkage, bulging or expansion,' only so long as 'collapse' d[id] not ensue." *Beach*, 205 Conn. at 251. The court reasoned that the policy in that case did not "express a clear unambiguous intent to exclude coverage for a catastrophe that subsequently develop[ed] out of a loss that appeared, at its inception, to fall within the rubric of 'settling, cracking, shrinkage, bulging or expansion.'" *Id.* Other courts have agreed that the language of the "cracking" exclusion "is fairly susceptible to being interpreted as not including *mere* settling or cracking, but including settling or cracking that results in substantial impairment of a home's structural integrity." *See, e.g., Am. Concept Ins. Co. v. Jones*, 935 F. Supp. 1220, 1227–28 (D. Utah 1996) (internal quotations omitted); *Schray v. Fireman's Fund Ins. Co.*, 402 F. Supp. 2d 1212, 1218

8

(D. Or. 2005) ("[T]he policy's use of the term collapse is fairly susceptible to being interpreted as including settling or cracking that results in substantial impairment of [] structural integrity, as opposed to mere settling or cracking."); *130 Slade Condo. Ass'n v. Millers Capital Ins. Co.*, 2008 WL 2331048, at \*5 (D. Md. June 2, 2008) (The "building was not . . . merely showing evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."). Thus, the Agostis' claim does not fail merely because the impairment initially manifests itself as cracking.

My decision in *Alexander* is not to the contrary. In *Alexander*, the policy "define[d] 'collapse' to mean an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." Mot. Hr'g Tr., Doc. No. 22, at 22, *Alexander*, No. 3:16-cv-0059 (D. Conn. July 7, 2016). The policy also explicitly noted that "[a] building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, leaning, settling, shrinkage or expansion." *Id.* In other words, the *Alexander* policy explicitly disavowed any interpretation that it might "includ[e] settling or cracking that result[ed] in substantial impairment of a home's structural integrity" when the building was still standing. *Cf. Jones*, 935 F. Supp. at 1227–28. The language of the "cracking" exclusion in the present case is much less clear. Indeed, the language of the Allstate Policy is identical in that respect to that of the policy in *Beach*, which the Connecticut Supreme Court held could "reasonably be read" to provide coverage. *See Beach*, 205 Conn. at 251.

"Language in an insurance contract . . . must be construed in the circumstances of a particular case, and cannot be found to be ambiguous or unambiguous in the abstract." *Lexington Ins. Co.*, 311 Conn. at 42 (internal quotation marks, alterations, and emphasis omitted). "[O]ne court's determination that [a] term [] was unambiguous, in the specific context of the case that

9

was before it, is not dispositive of whether the term is clear in the context of a wholly different matter." *Id.* Here, in the context of the Allstate Policy, I do not read the language of the "cracking" exclusion unambiguously to bar coverage of the Agostis' claim. *See Beach*, 205 Conn. at 251. Under such circumstances, "any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Johnson*, 302 Conn. at 643. Therefore, I hold the "cracking" exclusion alone does not require me to dismiss the Agostis' claims against Allstate.

> b.  Was the alleged collapse "sudden and accidental"?

Allstate also asserts that the policy does not provide coverage because it requires a collapse to be "sudden and accidental," which excludes conditions that result from "progressive deterioration." Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 10. It cites to *Buell Industries v. Greater New York Mutual Insurance Co.*, 259 Conn. 527 (2002), in which the Connecticut Supreme Court "defined the term 'sudden[,]' as . . . used in the sudden and accidental discharge exceptions to the pollution exclusion clauses contained in various insurance policies," to require "a temporally abrupt release of pollutants." *See Schilberg Integrated Metals Corp. v. Cont'l Cas. Co.*, 263 Conn. 245, 276 (2003) (quoting *Buell*, 259 Conn. at 540); Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 10 (discussing *Buell*). Allstate also analogizes its policy's requirement that a collapse be "sudden and accidental" to the *Alexander* policy's definition of collapse to mean an "abrupt falling down or caving in." Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 11. Because "[n]othing in [the Agostis'] [c]omplaint can plausibly be interpreted as an allegation of a 'sudden' collapse," Allstate reasons, the Agostis' loss is excluded under the terms of the policy. *Id.* at 13.

10

The Agostis' respond that the cause of the loss—the "chemical reaction"—*was* "sudden and accidental." Pls.' Mem. Opp'n Mot. Dismiss, Doc. No. 22, at 4. They note that, according to both their own expert and Allstate's, "there is no way to arrest the process and there is no way to repair the existing damage. . . . [T]he only solution is replacement of the concrete." *Id.* at 5. Because the eventual collapse is merely "an ostentatious manifestation of th[e] chemical reaction," the Agostis appear to argue that the chemical reaction itself constitutes the "physical loss" that should be covered under the policy. *Id.* at 6.

I do not agree with the Agostis' unorthodox interpretations of causation and loss. Crucially, it is clear from the language of the policy that it is the *loss*, not the *cause* of the loss, that must be "sudden and accidental." In *Alexander*, I illustrated the distinction using the example of "insect damage":

> There's termites in the house. No collapse. They're eating away; every day they're eating away. No collapse. They keep eating away. Finally, they eat enough that the beam fails. . . . Now there's coverage. Now you have a collapse or falling in. The fact that it was caused by termites and it was a slow process doesn't mean you didn't have an abrupt collapse. You did, when the beam failed and there was literally a falling of the beam, a failure of the beam.

Mot. Hr'g Tr., Doc. No. 22, at 13–14, *Alexander*, No. 3:16-cv-0059. Thus, in the present case, the Agostis' loss would only be covered if the collapse itself were "sudden and accidental."

The "'sudden and accidental' language" used in insurance policies "has generated an enormous amount of litigation," and "it would be virtually impossible to gauge with precision whether more courts have found 'sudden' . . . to mean 'abrupt,'" as Allstate urges, or "unexpected," as claimed by the Agostis. *See EDO Corp. v. Newark Ins. Co.*, 878 F. Supp. 366, 373–74 (D. Conn. 1995). I need not wade into that swamp of conflicting case law, however, because even assuming—*arguendo*—that the Agostis have plausibly alleged that the claimed

11

"collapse" was "sudden and accidental," they cannot evade the third limitation in the Allstate Policy. As explained in the next section, the "collapse" in this case was not an "entire" collapse.

        c.   Was the alleged collapse an "entire collapse"?

Allstate next contends that the Agostis' breach of contract claim must be dismissed because the policy only covers an "entire collapse." Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 6. The Agostis' complaint, Allstate notes, "does not allege that the house or part thereof has entirely collapsed." *Id.* at 7. Hence, Allstate argues that the Agostis "have failed to allege a plausible breach of contract claim." *Id.* The Agostis essentially do not address that portion of Allstate's argument. *See* Pls.' Mem. Opp'n Mot. Dismiss, Doc. No. 22, at 6 ("[I]f the concrete has crumbled resulting in the entire structure imploding, [that] really has nothing to do with the physical loss that is already occurring."). I agree with Allstate that the gradual deterioration of the basement walls cannot yet be characterized as an "entire collapse," and so I dismiss the Agostis' breach of contract claim against Allstate on that ground.

The definition of "collapse" as "substantial impairment of [] structural integrity" in *Beach* is a default rule, not a mandate of public policy. *See Beach*, 205 Conn. at 251–52. The parties can, if they choose, "modif[y] . . . by contract" the meaning of "collapse." *See Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency*, 644 F.3d 166, 172 (2d Cir. 2011); *City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 50 (2d Cir. 2003) (Calabresi, J.) ("[W]e would be inclined to read [the policy] as opting out of this interpretive default . . . ."). Thus, in *Alexander*, I stated that although "[i]n other cases with different policy language I have found the term 'collapse' to be ambiguous," in that case "the term ha[d] been expressly defined in a way that eliminate[d] coverage under the allegations of the complaint." Mot. Hr'g Tr., Doc. No. 22, at 22–

12

23, *Alexander*, No. 3:16-cv-0059. I conclude that the Allstate Policy's use of the words "entire collapse" similarly eliminates coverage here.

Interpreting a policy with identical language from the same insurer, California's Second District Court of Appeal deemed it "self-evident that the policy's use of the term 'entire' collapse necessarily must refer to an actual, not an imminent collapse." *Jordan v. Allstate Insurance Co.*, 116 Cal. App. 4th 1206, 1221, 11 Cal. Rptr. 169 (2004). "For a building or a portion thereof to sustain an 'entire collapse,'" the court reasoned, "must mean that it has *entirely* collapsed, that is 'wholly,' 'completely,' or 'fully.'" *Id.* (citing *Webster's Third New International Dictionary*). "It would make no sense to apply such a description to a collapse that was merely 'imminent.'" *Id.* "Whether a potential collapse that is properly described as 'imminent' will result in an entire or total collapse or something less, or no collapse at all," the court concluded, "is a matter of pure speculation unless and until such collapse *actually* occurs." *Id.*

Under the present policy, I agree that "the term 'entire collapse' is susceptible of only one reasonable interpretation," namely, an "actual collapse."[1] *Id.* at 1222. The language "'entire collapse' . . . was drafted specifically to limit coverage to actual collapses," and to exclude "imminent collapse" or "structural impairment." *See Ass'n of Unit Owners of Nestani—A Grecian Villa v. State Farm Fire & Cas. Ins. Co.*, 434 F. App'x 579, 579 (9th Cir. 2011) (mem.); *see also Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 70 P.3d 351, 353 (2003) ("entire collapse . . . means *actually fallen down or fallen into pieces*"). Such "explicit language . . .

---

[1] On their own, the words "entire collapse" could perhaps be read to mean that the *entire structure* must be substantially impaired. In the present case, however, the Allstate Policy contains additional language providing that Allstate "will cover . . . the entire collapse of *part* of a covered building structure," Allstate Policy, Ex. C to Allstate's Mot. Dismiss, Doc. No. 17-4, at 40 (emphasis added), which confirms that an "actual collapse" was meant. *See Jordan v. Allstate Insurance Co.*, 116 Cal. App. 4th 1206, 1221, 11 Cal. Rptr. 169 (2004).

13

narrow[ing] the scope of collapse coverage"—the meaning of which is obvious even to a layperson—"renders the collapse clause unambiguous." *See Grebow v. Mercury Ins. Co.*, 241 Cal. App. 4th 564, 573, 194 Cal. Rptr. 3d 259 (2015) (other alterations omitted). Because the term "entire collapse" is unambiguous, I need not construe it against the insurer or consult the contract's drafting history. *See Buell*, 259 Conn. at 544–45.

The plain language of the Allstate Policy limits coverage to "entire collapse[s]." Allstate Policy, Doc. No. 17-4, at 40. The Agostis have not alleged that their house or any portion thereof has "entire[ly] collapse[d]." *See* Compl., Doc. No. 1. "[I]f and when the walls fall in" and an "entire collapse" occurs, the Agostis may have a viable claim against Allstate (should the insurer fail to honor the policy). *See* Mot. Hr'g Tr., Doc. No. 22, at 6, *Alexander*, No. 3:16-cv-0059. At present, however, the Agostis fail to state a plausible claim against Allstate for breach of contract, and I dismiss Count Four pursuant to Rule 12(b)(6).

B. Count Five: Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count Five of the complaint, the Agostis assert that Allstate violated the implied duty of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 210 Conn. 150, 154 (1989). A breach of that implied covenant involves a defendant dishonestly "imped[ing] the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract." *De La Concha of Hartford v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004)). "[B]ad faith is not actionable apart from a wrongful denial of a benefit under the policy," however. *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013). If a plaintiff's breach of contract claim fails, "so too does his [or her] claim of bad faith denial of coverage." *Chorches v. Stewart Title Guar. Co.*, 48 F. Supp. 3d 151, 157 (D. Conn. 2014).

14

Allstate asserts that if I dismiss the Agostis' breach of contract claim against Allstate, then I "should also dismiss Count Five . . . alleging a breach of the implied covenant of good faith and fair dealing." Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 15. The Agostis likewise imply in their memorandum (and agreed at oral argument) that Count Five succeeds or fails along with Count Four. *See* Pls.' Mem. Opp'n Mot. Dismiss, Doc. No. 22, at 10.

Because I conclude that I must dismiss the Agostis' claim for breach of contract—and thereby hold that Allstate did not wrongfully "den[y] . . . a contractually mandated benefit" under the policy—I also dismiss the Agostis' claim for breach of the implied covenant of good faith and fair dealing pursuant to Rule 12(b)(6). *See id.* at 796.

### C. Count Six: Violation of CUTPA/CUIPA

In Count Six, the Agostis allege that Allstate engaged in unfair trade practices in violation of CUTPA and CUIPA by "deny[ing] coverage for claims such as the [Agostis'] based on other purported exclusions despite a provision[] within the policy that provide[d] coverage for the chemical reaction that occurred and collapse." *See* Compl., Doc. No. 1, at Count 6, ¶ 21. Allstate argues that, like the Agostis' claim for breach of the implied covenant of good faith and fair dealing, the Agostis' CUTPA/CUIPA claim must fail in the absence of a viable breach of contract claim. *See* Mem. Supp. Allstate's Mot. Dismiss, Doc. No. 17-1, at 15.

To succeed on a CUTPA/CUIPA claim, "a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." *Belz*, 46 F. Supp. 3d at 165 (citing Conn. Gen. Stat. § 38a-816(6)). The pertinent CUIPA provision is "the prohibition of unfair settlement practices." *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 2016 WL 6246300 at *3 (D. Conn. Oct. 25, 2016). "A claim of unfair settlement practice under CUIPA/CUTPA requires the plaintiff to allege that the defendant

15

has committed the alleged proscribed act with sufficient frequency to indicate a general business practice." *Karas*, 33 F. Supp. 3d at 117. Unfair claim settlement practices include "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Conn. Gen. Stat. § 38a-816(6)(F)).

"The requirement that the insurer settle when the insured's liability is 'reasonably clear' means that the existence of liability has to be substantially certain." *Tucker v. AIG*, 2015 WL 403195, at *27 n.48 (D. Conn. Jan. 28, 2015) (quoting 2 *Insurance Claims and Disputes* § 9:35 (6th ed. updated March 2014)). "Logically speaking, liability cannot be substantially certain where it plainly does not exist on the explicit . . . terms of the contract." *Id.* Hence, if "the defendant's interpretation of the policy's coverage limitation was correct," then the "application of that interpretation" cannot have constituted "oppressive, unethical or unscrupulous conduct in violation of the statutes." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008).

The Agostis' CUTPA/CUIPA claim challenges Allstate's denial of coverage under the insurance policy. "Having no obligation to pay under the policy," however, Allstate "could not have violated CUIPA or CUTPA." *Wright v. State Farm Mut. Auto. Ins. Co.*, 1997 WL 746434, at *4 (Conn. Super. Ct. Nov. 18, 1997); *see Rancourt v. Allstate Ins. Co.*, 2008 WL 5255560, at *3 (Conn. Super. Ct. Dec. 1, 2008). Because I dismiss the Agostis' claim against Allstate for breach of contract, I also dismiss the Agostis' claim for violation of CUTPA and CUIPA pursuant to Rule 12(b)(6).

## IV.   Conclusion

For the reasons set forth above, I grant Allstate's motion and dismiss Counts Four, Five, and Six of the Agostis' Complaint. The Clerk shall terminate Allstate as a party to this case.

16

So ordered.

Dated at Bridgeport, Connecticut, this 28th day of August 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

17

**STATE OF CONNECTICUT**

DOCKET NO. CV-15-6009410-S                    SUPERIOR COURT

DAVID R. ROY                                  JUDICIAL DISTRICT
                                              OF TOLLAND

V.

LIBERTY MUTUAL FIRE
INSURANCE CO.                                 FEBRUARY 22, 2017

**MEMORANDUM OF DECISION: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#126)**

This is one of many cases in Tolland County involving claims of extensive pattern cracking to basement walls caused by a chemical compound in the concrete provided by the J.J. Mottes Concrete Company that was used to construct the basement walls of numerous homes, including the plaintiff's.[1] This case arises out of an insurance policy coverage dispute between the plaintiff homeowner, David R. Roy, and the defendant insurer, Liberty Mutual Fire Insurance Company, regarding whether the plaintiff's 2014 insurance policy, issued by the defendant, provides coverage for damage to the plaintiff's basement walls that he claims resulted in a covered loss - that is a "collapse." The defendant claims that the policy does not cover the plaintiff's loss because he has not sustained a covered "collapse" under the policy, among other arguments.

The plaintiff's complaint is in two counts; breach of contract, and violation of the Connecticut Unfair Insurance Practice Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA). The defendant has moved for summary judgment on both counts of the complaint claiming, as to count one, the breach of contract claim, that the plaintiff's loss is

---

[1] The judicial district of Tolland presently has over forty such cases pending. There are also numerous cases pending in federal court, including a class action.

The decision was mailed 2-22-17 to:
Howd + Ludorf LLC
Atty Jeffrey Richard Lindequist

not covered under the policy, and, therefore, there is no breach of contract. Furthermore, the defendant contends that, as to count two, the CUTPA/CUIPA claim, the plaintiff has failed to plead and prove that it relied on other similar crumbling foundation claims to deny the plaintiff's claim as part of a general business practice, and, therefore, there is no genuine issue of material fact.

The plaintiff opposes the defendant's motion for summary judgment arguing that his home has sustained a covered loss under the policy and that the record establishes that the defendant wrongfully denied his claim as part of a general business practice to wrongfully deny similar claims. The plaintiff argues that both claims involve disputed issues of material fact that must be determined by the jury.

Having considered the parties written submissions and oral arguments, the court concludes that as to count one, disputed issues of material fact exist that must be determined by the jury. As to count two, the defendant has not established that the plaintiff's allegations are insufficient and has not met its burden to establish that it is entitled to summary judgment. Accordingly, summary judgment is denied as to both counts.

The court finds that the following material facts are undisputed:

The plaintiff built his home at 18 Gulf Road in Stafford Springs in 1998. The concrete used to construct the basement walls was supplied by the J.J. Mottes Company.

The plaintiff insured the home with the defendant from 1998 to August 29, 2014; afterwards, the home was insured by the Covenant Insurance Company.[2] The 2014 policy, provided by the defendant and at issue here, is an "occurrence" policy and provided coverage for covered losses up to $476,200.

---

[2] The plaintiff has also sued Covenant Insurance Company. That case is also pending in this court and has been consolidated with this case. See *Roy* v. *Covenant Ins. Co.*, Docket No. TTD-CV16-6011084-S.

2

For purposes of this motion, the defendant relies on two sections of the policy. Section I of the policy, entitled "PERILS INSURED AGAINST," in "COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES," provides in pertinent part:

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

1. Involving collapse, other than as provided in Additional Coverage 8;

2. Caused by:

. . . .

(6) Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings; . . . .

The second section relied upon by the defendant is contained in the section entitled "ADDITIONAL COVERAGE," identified above, and provides in pertinent part:

8. Collapse. We ensure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . .

b. Hidden decay; . . .

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation;

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

The terms "collapse," "foundation," and "retaining wall" are not defined in the policy.

The plaintiff discovered the damage to his basement walls when he was moving Tupperware bins in the unfinished storage area of his basement, which had been there for

3

some time and had obscured the view of the walls. The plaintiff observed horizontal and vertical cracks in the concrete walls of the basement, which were jagged, in a spider web pattern. Concerned about these cracks, the plaintiff consulted with his brothers, who had helped him build the home and were familiar with persons in Tolland County who had similar problems with their basement walls. Although the plaintiff reported the claim to the defendant on September 22, 2014, it is disputed whether the plaintiff discovered the pattern of cracking in his home in August or September of 2014.

When the plaintiff reported his claim to the defendant he said: "I've got cracks," "my basement wall collapsed," and it was caused by "bad concrete that's deteriorating."

The defendant investigated the plaintiff's claim by sending a structural engineer to evaluate the plaintiff's basement walls. In his report, the defendant's engineer stated that the damage to the plaintiff's basement walls was the result of "shrinkage and settlement cracks" that are typical, not structural, or "lateral earth pressures." As a result of its expert report, the defendant denied the plaintiff's claim; asserting in the denial letter that the loss was not covered due to the policy exclusion for "faulty workmanship or materials," as well as other exclusions under the policy.

The plaintiff's basement walls were also inspected by the plaintiff's expert witness, David Grandpré, P.E., on September 12, 2014, who found that the structural integrity of the plaintiff's basement walls was "substantially impaired." Grandpré opined that the extensive pattern of horizontal and vertical cracking and deterioration throughout the basement wall structure suggested one of two possible chemical reactions; an alkali-silica reaction or the oxidation of iron sulfide in the aggregate used to make the concrete. Both reactions occur within the concrete on a microscopic level and cause the concrete to break down internally.

4

Grandpré opines that the concrete was so impaired that the plaintiff's basement walls are unreliable to perform their intended function of supporting the wooden portion of the home, and that the chemical reaction cannot be stopped.    This chemical reaction cannot be stopped and will worsen over time such that they will eventually lose their strength and stop performing their intended function.  The only viable remedy according the Grandpre is the complete removal of the basement walls and to replace them with new walls.

## DISCUSSION

The defendant moves for summary judgment as to count one of the complaint, the breach of contract claim, asserting that the policy does not cover the plaintiff's loss because his basement walls have not suffered a "collapse," and the loss is not covered because of the exclusion for damage to the "foundation" or "retaining walls." As to count two of the complaint, the CUTPA/CUIPA claim, the defendant asserts that the plaintiff has failed to plead and prove that it engaged in an unfair business practice by denying the plaintiff's claim. The plaintiff has objected to the defendant's summary judgment motion asserting that there is a genuine issue of material fact as to whether there has been a "collapse" of his home that is covered by the policy, and that the foundation or retaining wall provision does not exclude his loss. As to the CUTPA/CUIPA claim, the plaintiff responds that there is a factual dispute as to whether the defendant's denial of coverage was wrongful, and that there is adequate factual support to establish that the defendant's denial of the claims derived from J.J. Mottes concrete is a general business practice.

### A.    Summary Judgment Standards

The standards for considering motions for summary judgment are well established. Practice Book § 17-49 provides that summary judgment "shall be rendered forthwith if the

5

pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Our Supreme Court has recently set forth the burden on each party: "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book [§ 17-45] . . . ." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co.* v. *Tully*, 322 Conn. 566, 573, 142 A.3d 1079 (2016); see *Stuart* v. *Freiberg*, 316 Conn. 809, 820-21, 116 A.3d 1195 (2015).

"[S]ummary judgment is appropriate only if a fair and reasonable person could conclude only one way. . . . [A] summary disposition . . . should be on evidence which a jury

6

would not be at liberty to disbelieve and which would require a directed verdict for the moving party. . . . [A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Dugan* v. *Mobile Medical Testing Services, Inc.*, 265 Conn. 791, 815, 830 A.2d 752 (2003); see *Farrell* v. *Twenty-First Century Ins. Co.*, 301 Conn. 657, 662, 21 A.3d 816 (2011).

"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist. . . . Because [l]itigants have a constitutional right to have factual issues resolved by the jury . . . motion[s] for summary judgment [are] designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Citations omitted; internal quotation marks omitted.) *Maltas* v. *Maltas*, 298 Conn. 354, 365-66, 2 A.3d 902 (2010); see *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 534-35, 51 A.3d 367 (2012).

B.      Count One - Breach of Contract

1.      Interpreting Insurance Policies - Standards

"[A]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . ." (Internal quotation marks omitted.) *Shenkman-Tyler* v. *Central Mutual Ins. Co.*, 126 Conn. App 733, 742, 12 A.3d 613 (2011); see *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 784-85, 902 A.2d 18 (2006). "[P]rovisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of

7

view." (Internal quotation marks omitted.) *Vermont Mutual Ins. Co. v. Walukiewicz*, 290 Conn. 582, 592, 966 A.2d 672 (2009). Where policy terms are unambiguous, they should be accorded their natural and ordinary meaning and "the courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." (Internal quotation marks omitted.) *Jacaruso v. Lebski*, 118 Conn. App. 216, 233, 983 A.2d 45 (2009). "Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." (Internal quotation marks omitted.) *Isham v. Isham*, 292 Conn. 170, 181, 972 A.2d 228 (2009).

Where a policy term is susceptible to more than one meaning, the term should be construed against the insurance company. See *New London County Mutual Ins. Co. v. Zachem*, 145 Conn. App. 160, 165, 74 A.3d 525 (2013). Ambiguous policy terms are construed in favor of coverage. See *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.* 311 Conn. 29, 66, 84 A.3d 1167 (2014); *Johnson v. Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 642, 31 A.3d 1004 (2011). Where an insurance policy is ambiguous, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact. *Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co.*, 284 Conn. 744, 762-63, 936 A.2d 224 (2007).

### 2.    Collapse

The defendant first asserts that the plaintiff's loss is not covered under the policy because there has not been a "collapse." The term "collapse" is not defined in the policy. The plaintiff contends that this court should follow *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246, 532 A.2d 1297 (1987), in which our Supreme Court found the undefined term

8

"collapse" as used in a similar homeowner's policy, to be ambiguous and then defined it to mean "any substantial impairment of the structural integrity of a building." Applying this definition, and based on the plaintiff's expert's opinion, the plaintiff argues that there is a genuine issue of material fact as to whether the standard for collapse annunciated in *Beach* has been met. The defendant acknowledges *Beach*, but urges this court to adopt nonbinding out-of-state case law further defining "collapse," to mean "a substantial impairment of the structural integrity of a building or part of a building that renders such building unfit for its function or unsafe in a manner that is more than mere settling, cracking, shrinkage, bulging, or expansion." *Queen Anne Park Homeowners Assn* v. *State Farm Fire & Casualty Co.*, 183 Wash. 2d 485, 492, 352 P.3d 790 (2015). The court agrees with the plaintiff that this court is bound by the definition of collapse set forth by the Connecticut Supreme Court in *Beach*.

The issue in *Beach* was whether the undefined term "collapse" in a homeowner's insurance policy was ambiguous. There, the homeowners noticed a crack in the foundation wall of their home, which included "a separation between the top of the foundation wall and the 'plate' or bottom of the building wall." *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 247. The plaintiffs claimed that the loss was covered under the "collapse" provision of their policy. The defendant denied the homeowners' claim asserting that the damage to their home was due to "settlement" and that the policy excluded coverage for damages arising from "settling, cracking, shrinkage, bulging or expansion." Id.

A few months later, the crack continued to widen to a width of nine inches, and the beams on top of the foundation had pulled apart. When the defendant continued to deny coverage, the homeowners began to arrange for the reconstruction of their home. By the time of trial in *Beach*, the homeowners' engineer testified that the "foundation wall had tipped over

9

into the basement from the top and was no longer supporting the house." Id., 248. The homeowners continued to occupy the house during the repairs. The trial referee found that "given the state of the structure, eventually the house would have fallen into the cellar" and "the foundation failed structurally, and that the function of the foundation, both as a support structure for the house and a retaining wall, had become materially impaired, constituting a collapse." Id., 249.

The defendant in *Beach* argued that word "collapse" in the policy required a "catastrophic" event and that the policy term "unambiguously contemplates a sudden and complete falling in of a structure." The Supreme Court rejected this interpretation of "collapse" and opted instead to follow the majority and "more persuasive" authorities nationwide that held that the term "collapse" "is sufficiently ambiguous to include coverage for *any substantial impairment of the structural integrity of a building*." (Emphasis added) Id., 252.[3] The Supreme Court in *Beach* did not provide any further specificity as to what it meant by "any substantial impairment of the structural integrity of a building."

The defendant urges this court to go further than the *Beach* court and apply the definition of collapse adopted by the Supreme Court of Washington, under a certification from the Ninth Circuit. In *Queen Anne Park Homeowners Assn v. State Farm Fire & Casualty Co.*, supra, 183 Wash.2d 485, the Washington Supreme Court interpreted policy language similar,

---

[3]On January 12, 2017, the defendant filed supplemental authority in which it notes that District Court Judge Stefan Underhill invited the parties in a similar case, involving this defendant and this policy language, to submit briefs as to whether the court should certify to the Supreme Court the issue of what constitutes "substantial impairment of structural integrity." The parties have done so, but the court is not aware as of the date of this opinion that Judge Underhill has issued any ruling on certification. The defendant in this case filed a motion to stay this court's decision on summary judgment pending action by Judge Underhill. The plaintiff objected to the defendant's motion for certification in federal court and the motion to stay this decision. This court denied the defendant's motion for a stay without prejudice as premature, because Judge Underhill had not yet certified any questions to the Supreme Court. In addition, a trial in this case is not scheduled until next year. Should Judge Underhill certify any questions to the Supreme Court that are relevant to the trial in this matter, the defendant may renew its motion for a stay and the court will reconsider the issue.

10

but not identical, to the language of the policy in this case and adopted a more limited definition of "collapse," as to compared to *Beach*. The *Queen Anne* court concluded that "'collapse' in the [p]olicy means the substantial impairment of structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe in a manner that is more than mere settling, cracking, shrinkage, bulging or expansion." Id., 492. The defendant here urges this court to adopt the Ninth Circuit's conclusions in that case, applying and interpreting the Washington State's definition that under that policy, it is "simply implausible" that walls had "'collapsed' over seventeen years ago, given that the [building is] still standing today." *Queen Anne Park Homeowners Assn* v. *State Farm Fire & Casualty Co.*, 633 Fed. Appx. 415 (9th Cir. 2016).

The court declines to adopt and apply the Washington Supreme Court's definition of collapse, or the Ninth Circuit's application of that decision, because it is bound by the Connecticut Supreme Court's long standing definition of "collapse" that includes "*any* substantial impairment of the structural integrity of the building." (Emphasis added.) *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 252. "[I]t is manifest to our hierarchical judicial system that [the Supreme Court] has the final say on matters of Connecticut law and that the Appellate Court and Superior Court are bound by [its] precedent." (Internal quotation marks omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, 137 Conn. App. 307, 324, 48 A.3d 694 (2012), aff'd, 312 Conn. 513, 93 A.3d 1142 (2014). "A trial court is required to follow the prior decisions of an appellate court . . . and [it] may not overturn or disregard binding precedent." *Potvin* v. *Lincoln Service & Equipment Co.*, 298 Conn. 620, 650, 6 A.3d 60 (2010).

11

In *Beach*, the Supreme Court conducted an extensive review of the courts around the country that had addressed this issue of what the word "collapse" means and specifically rejected what it termed the minority view of "collapse" that required a catastrophic event or "sudden falling in, loss of shape or flattening into a mass of rubble." Although the *Queen Anne* case may not go so far as to require the home to fall into itself before there is coverage under the policy, it is different, and more limited, than our Supreme Court's broader definition of collapse set forth in *Beach*, because *Queen Anne* requires that the building be unfit for its function and unsafe. The Washington courts appeared to conclude that no collapse could have occurred because the home was still standing and occupied. The *Beach* court's definition of collapse does not require that the home be uninhabitable as demonstrated by the fact that the plaintiff in *Beach* remained living in the home. Additionally, in *Beach*, the plaintiff's expert indicated that the home would "eventually" fall as the basement walls would be unable to hold up the structure. Here, the plaintiff remains living in the home and the plaintiff's expert has opined that the home has suffered a substantial impairment of its structural integrity and that the condition cannot be stopped and will worsen over time to the point of the walls falling in. The defendant's expert disputes that contention.

This court's view of the applicability of *Beach* in cases where the policy does not define "collapse" is supported by a recent Connecticut Federal District Court decision that has also rejected the defendant's argument urging adoption of Washington State's definition of "collapse," rather than applying the *Beach* definition. *Belz* v. *Peerless Ins. Co.*, United States District Court, Docket No. 3:13-cv-01315 (VAB) (D. Conn. September 2, 2016) ("the Connecticut Supreme Court has already held that a 'collapse' for home insurance purposes may include 'substantial impairment to the structural integrity of a building'").

12

Applying the test in *Beach*, the issue then is whether the defendant has established that there is no disputed issue as to whether there has been "any substantial impairment of the structural integrity" of the plaintiff's home. This is an issue of disputed fact, about which the parties' experts disagree. Because this issue involves a genuine issue of material fact, it must be decided by the jury. See *Straw Pond Associates, LLC* v. *Fitzpatrick, Mariano & Santos, P.C.*, 167 Conn. App. 691, 710, 145 A.3d 292 (2016) ("[w]hen a court, in ruling on a motion for summary judgment, is confronted with conflicting facts, resolution and interpretation of which would require determinations of credibility, summary judgment is not appropriate"); see also *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 107, 639 A.2d 507 (1994).[4]

### 3.    Exclusion for "foundation" and "retaining walls"

The defendant next claims that the plaintiff's loss is excluded by language in the policy in the "Additional Coverage" section, which it claims is unambiguous, that excludes coverage for foundations and retaining walls. The defendant claims that the damage to the plaintiff's basement walls constitutes damage to the "foundation or retaining wall" of the home and, therefore, is not covered under the policy.[5] The plaintiff asserts that basement walls

---

[4]Because the policy in this case is an occurrence policy, coverage does not depend necessarily on when the plaintiff made his claim but rather when and if there has been a collapse under the terms of the policy on or before August 29, 2014. As discussed above, whether there has been a collapse and when it occurred, are disputed issues of fact that must be decided by the jury.

[5]The defendant appears to include an argument in its original memorandum of law in support, that the plaintiff's loss is also not covered under the policy exclusion that provides: "Collapse does not include settling, cracking, shrinking, bulging or expansion." However, this argument is not flushed out in the defendant's brief in any detailed way. See *Connecticut Light & Power* v. *Gilmore*, 289 Conn. 88, 124, 956 A.2d 1145 (2008). ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . ." [Internal quotation marks omitted]). Regardless of the inadequate briefing, the court finds that the defendant has failed to prove that there is no genuine issue of material fact as to this particular exclusion. See *Bacewicz* v. *NGM Ins. Co.*, United States District Court, Docket No. 3:08-CV-1530 (JCH) (D. Conn. August 2, 2010) ("[t]hat cracking and bulging may have been symptomatic of chemical decomposition occurring within the concrete of the basement walls of the . . . house would not, in the court's view, preclude a reasonable jury from concluding that [the insurer] is liable for failing to cover any substantial impairment to structural integrity caused by such decomposition").

13

are part of the building and are not part of the foundation or a retaining wall, and in any event these terms are ambiguous.

The specific language of the policy is as follows:

"ADDITIONAL COVERAGE"

. . .

8. Collapse. We ensure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . .

b. Hidden decay; ...

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

**Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank,** *foundation, retaining wall,* **bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.**

Collapse does not include settling, cracking, shrinking, bulging or expansion.

(Emphasis added.)

The language of this section of the policy is circular, providing that the policy specifically covers losses due to the collapse of a building or part of a building from "hidden decay" or "defective material." This exclusion for foundation and retaining walls does not apply in the event of a "collapse of a building." The court has previously found above that there exist questions of fact as to whether, and when, there has been a "collapse" under the policy.

In addition, this section of the policy appears to exclude items that would be found outside of a building, and not inside a building, such as an awning, fence, patio, pavement, pool, septic tank. This list of outside items suggests that what was intended by this exclusion

14

language includes only items found outside of the home or at a minimum renders it ambiguous.

Even taking the terms "foundation" and "retaining wall" outside of the list of other terms, they remain ambiguous. The Connecticut Federal District Court has consistently decided this issue against this particular defendant. See *Belz* v. *Peerless Ins. Co.*, 46 F. Supp. 3d 157 (D. Conn. 2014) (finding both terms "foundation" and "retaining wall," as used in a similar Liberty Mutual insurance policy, to be ambiguous); *Karas* v. *Liberty Ins. Corp.*, 33 F. Supp. 3d 110 (D. Conn. 2014) (same); *Metsack* v. *Liberty Mutual Fire Ins. Co.*, United States District Court, Docket No. 3:14-CV-1150 (VLB) (D. Conn. September 30, 2015) (same); *Gabriel* v. *Liberty Mutual Fire Ins. Co.*, United States District Court, Docket No. 3:14-CV-1435 (VAB) (D. Conn. September 28, 2015) (same); see also *Bacewicz* v. *NGM Ins. Co.*, United States District Court, Docket No. 3:08-CV-1530 (JCH) (D. Conn. August 2, 2010) (determining that the term "foundation" is ambiguous because "a person of ordinary intelligence could reasonably conclude . . . that the term 'foundation' refers to the piece of concrete at the base of the wall, rather than a concrete basement wall itself" [Internal quotation marks omitted]); *Roberge* v. *Amica Mutual Ins. Co.*, United States District Court, Docket No. 3:15-CV-1262 (WWE) (D. Conn. December 29, 2015) (determining that the term "foundation" is ambiguous).[6] As a result, it is apparent that "any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company

---

[6] In its notice of supplemental authority provided in support of its argument concerning the word "foundation," the defendant cites to a December 30, 2016 report by the Department of Consumer Protection on deteriorating concrete in residential foundations, and in particular a sentence in a footnote of the report which addresses "foundation." The notation states that "[a] foundation for a residential structure consists of three essential parts. The footing provides the base which supports the foundation walls and the slab forms the floor." The defendant provides no legal authority that would allow the court to consider this report as legal authority for interpreting the word foundation that is found in the insurance policy at issue in this case, and the court is aware of none. Thus the court does not give this report any weight in interpreting "foundation."

drafted the policy." (Internal quotation marks omitted.) *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.*, supra, 311 Conn. 38; see *Johnson v. Connecticut Ins. Guaranty Assn.*, supra, 302 Conn. 643.

Thus, the court concludes that the defendant has not met its burden to establish that it is entitled to summary judgment on the plaintiff's breach of contract claim.[7]

### C.    *Count Two - CUTPA/CUIPA*

The defendant argues that it is entitled to summary judgment on count two of the plaintiff's complaint, which asserts that it violated CUTPA/CUIPA, because the plaintiff failed to "plead" and "prove" that the defendant engaged in a general business practice of unfair claim handling. By this compound assertion, the defendant challenges (1) the legal sufficiency of the plaintiff's CUTPA/CUIPA claim, which is generally an issue for a motion to strike, and (2) the plaintiff's failure to prove this claim, which is the ultimate issue in this case and is not the standard on summary judgment.

The summary judgment standards and burden are well established and set forth infra. Although a motion for summary judgment may be used to challenge the legal sufficiency of a complaint, "when the complaint fails to set forth a cause of action and the defendant can establish that the defect could not be cured by repleading;" *Ferri v. Powell-Ferri*, 317 Conn. 223, 236-37, 116 A.3d 297 (2015); that is not the case here, and the defendant has not actually argued that this principle applies in the present action. The court finds that the plaintiff's allegations are sufficient.

---

[7] To the extent that the defendant continues to claim that the plaintiff's claim is not within the policy period because he did not discover the damage to the basement walls or notify the defendant of the damage until after the expiration of the policy, the court concludes that this issue involves disputed issues of fact that must be decided by the jury.

16

In the present case, the plaintiff alleges that the defendant engaged in an industry wide practice of denying coverage for concrete decay claims as part of its general business practice. The plaintiff asserts that the defendant's conduct violates General Statutes § 38a-816 (6) (F), which provides that it is a violation for an insurance company to not attempt "in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." See *Lees* v. *Middlesex Ins. Co.*, 229 Conn. 842, 847-49, 643 A.2d 1282 (1994).

This court has had occasion to address the sufficiency of allegations in the context of motions to strike in other similar cases involving coverage for claims in similar basement foundation cases, and has consistently found such allegations sufficient. See *Lincoln* v. *USAA*, Docket No. CV-14-6008330, Superior Court, judicial district of Tolland; *Cote* v. *Travelers*, Docket No. CV-15-6008838, Superior Court, judicial district of Tolland. In reaching these conclusions, the court has adopted the more liberal pleading standard for CUTPA/CUIPA claims articulated in *Active Ventilation Products, Inc.* v. *Property & Causality Ins. Co. of Hartford*, Superior Court, judicial district of Hartford, Docket No. X09-CV-08-5023757, (July 15, 2009, *Shortall, J.*), and the reasoning of *Smith* v. *United States Automobile Assn.*, Superior Court, judicial district of Tolland, Docket No. CV-14-6007862-S (August 31, 2015, *Bright, J.*), in denying a motion to strike. Although not binding, this court also found persuasive the reasoning of two Connecticut Federal District Court cases denying motions to dismiss similar claims. See *Panciera* v. *Kemper Independence Ins.Co.*, United States District Court, Docket No. 3:13-CV-1009 (JBA) (D. Conn. April 29, 2014); *Gabriel* v. *Liberty Mutual Fire Ins. Co.*, supra, United States District Court, Docket No. 3:14-CV-01435 (VAB). The court sees no reason to depart from this analysis in the present case.

17

Even if the court were to find that the allegations were insufficient, the defendant has not even argued that repleading could not cure the defect; any assertion or supporting evidence regarding the ability of the plaintiff to cure the insufficiency by repleading is absent from the defendant's submissions to this court. Therefore, the court concludes that the plaintiff's CUTPA/CUIPA claim is legally sufficient.

The defendant's other contention -- that the plaintiff has failed to "prove" this claim-- prematurely and wrongly places the summary judgment burden of proof on the plaintiff. It is the movant's, in this case the defendant's, burden to establish that there is no genuine issue of material fact, and then and only then, the burden shifts to the plaintiff to submit evidence to establish that there is a genuine issue of material fact. "[I]t is only [o]nce [the] defendant's burden in establishing his entitlement to summary judgment is met [that] the burden shifts to [the] plaintiff to show that a genuine issue of fact exists justifying a trial. . . . Summary judgment should be denied where the affidavits of the moving party do not affirmatively show that there is no genuine issue of fact as to all of the relevant issues of the case. . . . Accordingly, the rule that the party opposing summary judgment must provide evidentiary support for its opposition applies only when the moving party has first made out a prima facie case for summary judgment. . . . [I]f the party moving for summary judgment fails to show that there are no genuine issues of material fact, the nonmoving party may rest on mere allegations or denials contained in his pleadings." (Citations omitted; internal quotation marks omitted.) *Romprey* v. *Safeco Ins. Co. of America*, 310 Conn. 304, 320-21, 77 A.3d 726 (2013); see *Stuart* v. *Freiberg*, supra, 316 Conn. 820-21, 116 A.3d 1195 (2015).

In this case, the defendant has presented no evidence to establish that there is no genuine issue of material fact that it did not engage in a general business practice of denying

18

these types of concrete claims. In its memorandum in support, the defendant relies on the notes of the claims adjuster as evidence that it did not engage in the alleged general business practice. Specifically, the defendant avers that the absence of a reference to the other concrete basement cases in the claim notes, or the court cases relating to these claims, establishes that it did not deny the plaintiff's claim as part of a general business practice. The absence of this discussion in the claims notes does not establish that there is no genuine issue of material fact as to the denial of the plaintiff's claim as part of its general business practice. In addition, in response to the court's inquiry at oral argument, the defendant proffered the report of its expert engineer, as well as the motion to dismiss hearing transcript in the case *Alexander* v. *General Ins. Co. of America*, United States District Court, Docket No. 3:16-CV-0059 (SRU) to establish that it is entitled to judgment as a matter of law on this count. None of these documents establish that there is no genuine issue of material fact that the defendant was not engaged in a general business practice. The defendant could have easily produced any affirmative evidence, such as affidavits, to establish no genuine issue of material fact as to this count, yet it failed to do so.

Thus, because the defendant has not met its burden to establish no genuine issue of material fact, the plaintiff may rely on his allegations in the CUTPA/CUIPA count, which the court has found to be sufficient. The court concludes, therefore, that the defendant has not met its burden to establish that it is entitled to summary judgment on the plaintiff's CUTPA/CUIPA claim.

19

CONCLUSION

For all of the forgoing reasons, the defendant's motion for summary judgment is denied as to both counts of the complaint. So ordered.

Cobb, J.

20

STEPHEN A. METSACK AND GAIL D. METSACK, Plaintiffs,

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY AND ALLSTATE INSURANCE COMPANY, Defendants.

Civil Action No. 3:14-CV-01150 (VLB)

United States District Court, D. Connecticut

February 21, 2017

MEMORANDUM OF DECISION DENYING LIBERTY MUTUAL'S MOTION FOR SUMMARY JUDGMENT [DKT. 59] AND GRANTING ALLSTATE'S MOTION FOR SUMMARY JUDGMENT [DKT. 65]

Hon. Vanessa L. Bryant United States District Judge.

I. *Introduction*

This action arises out of an insurance dispute between the Plaintiffs. Stephen A. Metsack and Gail D. Metsack (the "Metsacks") and Defendants Liberty Mutual Fire Insurance Company ("Liberty Mutual"), and Allstate Insurance Company ("Allstate"). The Metsacks allege breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and Unfair Trade Practices Act ("CUTPA"), stemming from Defendants' decision to decline coverage for damage to the basement walls of Plaintiffs' home under their homeowners insurance policies (the "Policies"). Liberty Mutual and Allstate separately have moved for summary judgment with respect to these claims. For the reasons that follow, Liberty Mutual's Motion for Summary Judgment [Dkt. 59] is DENIED, and Allstate's Motion for Summary Judgment [Dkt. 65] is GRANTED.

II. *Factual Background*

The Metsacks have lived at 148 Laurel Lane. Ashford, Connecticut ("the Property") since 1992. [Dkt. 30 ("Compl.") ¶¶ 5-6]. The Property was insured by Allstate under separate policies of insurance, each with one-year terms, beginning on June 27, 1991 and ending on September 9, 2009 [Compl. ¶ 55; Dkt. 67-9 ("P. Torres Aff.") ¶ 3]. From September 2009 until the present, Plaintiffs have been insured by Liberty Mutual. [Compl. ¶ 6]. Mr. Metsack acted as his own general contractor when the house was originally constructed in 1992. [Dkt. 74-1 (S. Metsack Dep. at 13]. The concrete used to construct the basement walls of the home was supplied by the JJ Mottes Company. [S. Metsack Dep. at 71; Dkt. 74-3 ("G. Metsack Dep.") at 4-5].

In the years following the home's construction, the Metsacks noticed what they believed to be "minor cracking" in the basement walls. [S. Metsack Dep. at 75-76; G. Metsack Dep. at 19; Dkt. 74-4 at 10-11]. Stephen Metsack recalled first noticing this cracking prior to 2008, but Gail Metsack did not recall observing cracking prior to 2009. [S. Metsack Dep. at 47; G. Metsack Dep. at 11-12]. Despite noticing minor cracking, the Metsacks perceived no problems with the basement walls of their home until April of 2014, when a friend observed exterior cracking and suggested that the Metsacks speak with a contractor about it. *Id.* This contactor inspected the property and suggested for the first time that the cracks might be associated with defective concrete. [S. Metsack Dep. at 78]. On April 15, 2014, the Metsacks noticed water infiltrating the basement for the first time since the home was constructed, leading them to believe that their basement walls were in fact affected by defective concrete. [S. Metsack Dep. at 84-87; G. Metsack Dep. at 19; Dkt 74-4 at 10-11].

The Metsacks, Liberty Mutual, and Allstate each retained experts to investigate the causes of the cracking in the Metsacks' basement walls. All agree that a chemical reaction involving the oxidation of iron sulfide materials in defective concrete provided by the JJ Mottes Company caused the concrete to expand and crack. The Metsacks' expert, David Grandpré, P.E., opined in an October 30, 2015 report that "the severity of deterioration of the concrete basement walls compromised the[ir] structural integrity and will continue to weaken until they are no longer competent to perform their intended function of supporting the weight of the floors, walls, and roof." [Dkt. 67-5, Exh. A at 4]. He further stated that "the concrete walls can no longer be relied on to continue to perform their intended function of resisting the lateral pressures exerted on them by soil and water in the ground and for supporting the vertical loads of the wood-framed house." *Id.* Grandpré conceded that the house was "still safe to live in, " but that because the basement walls cannot be counted on to continue to support the weight of the rest of the house in the future, they were substantially impaired. [Dkt. 74-6 ("Grandpré Dep." at 50-51]. He also stated that the point of substantial impairment is when horizontal cracks begin to appear in the concrete, which typically occurs between ten and eighteen years after the concrete is poured. [Grandpre Dep. at 54-55, 100-103].

A. *Liberty Mutual Claim*

On April 18, 2014, the Metsacks submitted a claim to Liberty Mutual, which mentioned water infiltration, but did not inform Liberty that they had spoken to a contractor about their basement walls or that the concrete in the basement walls was supplied by JJ Mottes. [G. Metsack Dep. at 58-59]. On April 25, 2014, Liberty Mutual sent an independent adjuster to inspect the Property. [Dkt. 61-8]. The adjuster's report noted cracks in all four basement walls, some as wide as a quarter of an inch, and possible structural displacement. *Id.* As possible causes of the damage, the adjuster listed "hydrostatic pressure, improper concrete mix, [and] freeze thaw, " and she recommended consulting an engineer to determine whether the damage was structural. *Id.* Liberty Mutual did not consult an engineer, and by letter dated May 12, 2014, denied the Metsacks' claim on the grounds that the damage was caused by "settling/earth movement and ground water intrusion." [Dkt. 61-9].

The Liberty Mutual Policy provides coverage under Section 8 of the Policy for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following . . . (b) Hidden decay . . . or (f) Use of defective material or methods in construction, remodeling or renovation." [Dkt. 30-1 ¶ 8]. The Liberty Mutual Policy does not include a definition for "collapse, " but excludes loss to a "foundation . . . unless the loss is a direct result of the collapse of a building, " and excludes "settling, cracking, shrinking, bulging or expansion." *Id.*

The Metsacks identify numerous lawsuits against Liberty Mutual or its affiliates that involve the denial of coverage for losses resulting from defective JJ Mottes Company concrete. [*See* Dkt. 72 ¶¶ 23-26].[1] They also submit five denial of coverage letters from Liberty Mutual and related entities from the Liberty Mutual Group. The letters date from September 2012 to August 2015, and blame the basement wall cracking reported on "settling or earth movement" (August 11, 2015), "settling, expansion" (September 19, 2012), "long term moisture infiltration" and "original construction methods" (April 21, 2015), "faulty construction" (January 10, 2013), and "faulty workmanship or materials" (October 15, 2014). [Dkt. 72-9].

B. *Allstate Claim*

The Metsacks notified Allstate of the condition of their walls and submitted an insurance claim on March 3, 2015. [Compl. ¶¶ 66; Dkt. 67-8 "Erskine Aff." ¶¶ 4- 5]. Plaintiffs state that they had attempted to notify Allstate earlier by way of their independent agent, who refused to submit the claim on their behalf. [G. Metsack Dep. at 15-18]. The claim referenced the April 15, 2014 water intrusion and the fact that while the Metsacks no longer had an active policy with Allstate, the loss may have occurred during the time that Allstate covered the property. [G. Metsack Dep. at 21-22, 25-26]. Allstate orally denied the claim on March 10, 2015, and sent the Metsacks a letter dated March 27, 2015 memorializing the denial. [G. Metsack Dep. at 26-27; Dkt. 74-5 ¶ 3].

The Metsacks were insured under two separate Allstate policies: one covering the period between 1991 and 1994 ("First Allstate Policy"), and a second covering the period between 1994 and 2009 ("Second Allstate Policy") (collectively, "Allstate Policies"). [Torres Aff., Exh. 1 at 4, Exh. 2 at 3; Exh. 3 at 15]. The Allstate Policies cover "the entire collapse of a covered building structure" and the "entire collapse of part of a building structure, " so long as the collapse is "a sudden and accidental direct physical loss caused by . . . hidden decay of the building structure" or "defective methods or materials used in construction, repair, remodeling or renovation." [Dkt. 30-3 at 15]. The Allstate Policy does not contain a specific definition for "collapse, " but defines "building structure" as "a structure with walls and a roof." *Id.* at 3. Like the Liberty Mutual Policy, the Allstate Policies exclude "settling, cracking, shrinking, bulging or expansion." *Id.*

The Metsacks also offer evidence that other than the claim advanced in the instant lawsuit, Allstate has encountered and denied at least eight separate claims for coverage with respect to homes constructed with concrete supplied by the JJ Mottes Company. [Dkt. 74 ¶ 53].[2] Plaintiffs offer two letters they claim deny coverage on the ground that the insured failed to provide prompt notice [Dkt. 74 ¶ 54].[3] The denial letters state that the basement wall cracking was examined by the structural engineer Leonard Morse-Fortier. *Valls v. Allstate Insurance Co.,* Dkt. 24-5, No. 3:16-cv-1310 (VAB) ("Valls Letter"); *Carney v. Allstate Insurance Co.,* Dkt. 30-2, No. 3:16-cv-592 (VLB) ("Carney Letter"). The Valls Letter suggested that the loss "may not have occurred during the Allstate policy term, " and stated that coverage would be denied on the grounds that the cracking was not a "sudden and accidental direct physical loss, " and that the cracking was not an "entire collapse" because the "house remains occupied, the foundation walls appear plumb, there is very little visible damage to the walls themselves, the walls support the house structure above, and the walls retain the soil that surrounds the house." *Id.* at 3-4. The Carney Letter similarly stated that the cracking was not a "sudden and accidental direct physical loss, " adding that "Allstate does not know how long you have known about cracking in your foundational concrete. However, the loss in question is one that has occurred over time and may have been evident for an extended period." *Id.* at 4.

III. *Standard of Review*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations: allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

IV. *Discussion*

A. *Breach of Contract*

Plaintiffs argue first that Liberty Mutual and Allstate are liable for breach of contract, because they failed to cover losses as set forth in the Policies. An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372-73 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7-8 (2011) (quoting *Remillard v. Remillard*, 297 Conn. 345, 355 (2010));

*Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734-35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so . . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

I. *Liberty Mutual*

Liberty Mutual raises three primary arguments in support of its position that the damage to the Metsacks' basement walls is not a covered loss. First, Liberty Mutual argues that the damage to the Metsacks' basement walls does not constitute a collapse under the terms of the policy, because Liberty Mutual's "collapse" provision excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the collapse of the building. Second, Liberty Mutual argues that Connecticut law has not provided sufficient guidance regarding the meaning of "collapse" and asks the Court to certify that question to the Connecticut Supreme Court before issuing its summary judgment ruling. As a corollary, Liberty Mutual suggests that the damage to the Metsacks' basement walls is not extensive enough to constitute a "collapse" under the terms of the Liberty Mutual Policy. Third, it argues that the claimed substantial impairment of the Metsacks' basement walls did not occur

during a Liberty Mutual policy period. The Court finds each of these arguments unpersuasive.

### a. *"Foundation" and "Retaining Wall" Exclusions*

The facts presented in the instant case with respect to Liberty Mutual are substantially equivalent to those presented in *Belz v. Peerless Ins. Co.*, No. 3:13-CV-01315 (VAB), 2016 WL 4599892 (D. Conn. Sept. 2, 2016), *reconsideration denied*, 2016 WL 6542828 (D. Conn. Nov. 3, 2016). In *Belz*, the plaintiffs also alleged breach of contract for failure to cover losses caused by deteriorating JJ Mottes Company concrete. *Id.* at *2. The relevant policy provisions in the *Belz* case are identical to the relevant provisions of the Metsaks' Liberty Mutual policy. *Id.* Additionally, the plaintiffs in both cases believed the cracks to be cosmetic when they first appeared. *Id.* at *1. Finally, the same engineering expert determined that the plaintiffs' basement walls were substantially structurally impaired, such that the walls would need to be replaced to prevent the home from completely collapsing in the future. *Id.* at *2.

The similarities are not limited to the facts of each case, but also to the defendants' arguments. As in this case, Peerless argued that the terms "foundation" and "retaining wall" are unambiguous and include basement walls, justifying the denial of coverage for basement walls under an exclusion in the "collapse" provision of the policy. *Id.* at *4. Liberty Mutual and Peerless raised this argument at both the motion to dismiss and the summary judgment stages of their respective cases, and as in *Belz*, this Court has already rejected their argument at the motion to dismiss stage. *See Id.* (rejecting the argument that "foundation" and "retaining wall" are unambiguous, and stating that "the ambiguity of the contract terms at issue in this case has already been determined by this Court in a previous ruling on this matter"); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01150 (VLB), 2015 WL 5797016, at *7-8 (D. Conn. Sept. 30, 2015) (finding the terms "foundation" and "retaining wall" ambiguous, and observing that "[t]he arguments raised by Liberty Mutual here have been persuasively rejected three times by courts in this District").

The law-of-the-case doctrine states that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009). Reconsideration of an earlier decision may be justified in "compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Id.* None of these conditions is present here. As at the motion to dismiss stage, this Court noted that other courts in this District had found "foundation" and "retaining wall" ambiguous. *Metsack*, 2015 WL 579016, at *7-8. Since then, more decisions within this District have

reaffirmed this position. *See, e.g., Belz*, 2016 WL 4599892, at *4; *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01435-VAB, 2015 WL 5684063, at *4 (D. Conn. Sept. 28, 2015). Liberty Mutual has similarly failed to present any new evidence that would compel a new interpretation or that the Court's prior decision was clear error. Because this Court must rely on its prior ruling to guide its analysis on summary judgment, the Court again holds that the terms "foundation" and "retaining wall," are ambiguous as used in the policy, and must be construed against Liberty Mutual.

### b. *The Definition of Collapse*

Like Peerless, Liberty Mutual believes that the definition of "collapse" set forth in *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 253, 532 A.2d 1297 (1987)-a "substantial impairment to structural integrity"-is itself insufficiently defined, and asks the Court to certify a question to the Connecticut Supreme Court to resolve the resulting ambiguity. [Dkt. 60 at 23]. Liberty Mutual further argues that Connecticut should define "substantial impairment" so that it is consistent with the definition set forth in *Queen Ann Park Homeowners Ass'n v. State Farm Fire and Cas. Co.*, 352 P.3d 790, 791 (Wash. 2015). In *Belz*, the court rejected this argument, stating unequivocally that, "The Court finds no reason to adopt Washington state law when the standard in Connecticut is relatively clear, nor is there a need for certifying this issue to the Connecticut Supreme Court." *Belz*, 2016 WL 4599892, at *5. This Court sees no reason to deviate from this approach.

In *Queen Ann*, the Washington Supreme Court held that a "collapse" in the insurance context was a "substantial impairment to the structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe." *Id.* And it stated that the "substantial impairment" must be "so severe as to materially impair a building's ability to remain upright." *Id.* at 794. By contrast, *Beach* held that a collapse could occur "even though no actual caving-in occurred and the structure was not rendered completely uninhabitable." This conflicts with Liberty Mutual's argument that a "collapse" should render a building "unfit for its function or unsafe." [Dkt. 60 at 23 (quoting *Queen Ann*, 352 P.3d at 791)].

Further, *Beach* supports finding certification inappropriate, because it treats the question of whether a house was "substantially impaired" as one of fact, not one of law. *See Beach*, 205 Conn. at 253 (stating that "the trial referee found, *as a matter of fact*, that the plaintiffs had proven such impairment of their house" (emphasis added)). Consistent with this interpretation, the *Belz* court held that because the plaintiffs presented evidence that the cracks in their basement walls "compromised the structural integrity of their home," "there is a material dispute as to whether

the damage amounts to a 'collapse' under the Peerless policy.'" *Belz.* 2016 WL 4599892, at *5. The same is true in this case- the Metsacks have offered evidence that the damage to their basement walls compromises the structural integrity of their home, and a material dispute exists regarding whether this damage is sufficiently "substantial" to constitute a "collapse" under the Liberty Mutual Policy's terms.

Liberty Mutual also asked the Court to certify "whether the undefined policy terms 'foundation' and 'retaining walls' are ambiguous" and "Whether a basement or crawlspace is part of the 'building.'" [Dkt. 60 at 24]. Given the weight of case law in this District holding that "foundation" and "retaining walls" are ambiguous, *see* Section IV.A.1.a., *supra,* and the fact that Liberty Mutual offered no real argument regarding why it believes a crawlspace or basement is not part of a "building, " the Court similarly declines to certify these questions of fact to the Connecticut Supreme Court.

#### c. *Timeliness*

Grandpr&eacute; has acted as an engineering expert in several cases about defective JJ Mottes Company concrete. In connection with two of these other cases, Grandpr&eacute; calculated that substantial impairment to a home built in 1992 would occur somewhere between 2002 and 2006. [Dkt. 60 at 21; Grandpr&eacute; Dep. at 100-103]. Citing this testimony, Liberty Mutual concludes that summary judgment is warranted, because the Metsacks' home was not insured by Liberty Mutual until 2009. However, Grandpr&eacute; also testified that substantial impairment occurs when horizontal cracks appear in the basement walls, and Ms. Metsack testified that she did not notice cracks until 2009. [Grandpr&eacute; Dep. at 54-55; G. Metsack Dep. at 11-12]. Viewed in the light most favorable to the Plaintiffs, a material issue of fact exists as to whether a covered collapse occurred before or during the period covered by the Liberty Mutual Policy.

#### 1. *Allstate*

Like Liberty Mutual, Allstate argues that "substantial impairment of structural integrity" should be defined as occurring where a structure is (1) "unfit for its function or unsafe"; or (2) "the structure is in imminent danger of falling down." [Dkt. 66 at 18]. As set forth in Section IV.A.1.b., *supra,* the "unfit for its function or unsafe" standard is taken from a Washington case that is inconsistent with *Beach*'s holding that a home need not be "completely uninhabitable" to have "collapsed." While the "imminent danger of falling down" language is taken directly from *Beach,* is not a part of the case's holding, and was not held to be a prerequisite for a "collapse." In context, the relevant section reads:

The [trial] court articulated its reasons as follows: 'It [the referee's report] was accepted because we found it to be sound, comprehensive and logical both factually and legally, including the recommendations: (i) that a 'collapse' in the sense of a material impairment of the basic structure of a building was included within the coverage of the insurance policy involved in this action; and (ii) that the structure in question was in imminent danger of falling over, both of which are adopted by the undersigned.'"

*Beach,* 205 Conn. at 249. The "imminent danger of falling down" language is quoted from the trial court's decision, and does not represent the Connecticut Supreme Court's own definition of "collapse." *Id.* Moreover, *Beach* states that the trial court's recommendations are logical "both factually and legally, " suggesting that its conclusion about the structure's condition was factual, rather than legal. The court reinforces this suggestion later in its decision, when it states, "Having determined that the trial court was correct in its conclusion that ["collapse"] includes a substantial impairment of the structural integrity of a building, we need only note that the trial referee found, *as a matter of fact,* that the plaintiffs had proven such impairment of their house." *Beach v. Middlesex Mut. Assur. Co.,* 205 Conn. 246, 253 (1987) (emphasis added). Because the question of whether damage to a home constitutes a "substantial impairment of the structural integrity of a building" is factual under Connecticut law, this Court cannot grant summary judgment.

Unlike Liberty Mutual, however, the "collapse" provision of the Allstate Policy requires that a covered collapse be "a sudden and accidental direct physical loss." [Dkt. 30-3 at 15]. While *Beach* and the numerous JJ Mottes concrete cases that have been heard in this district have held that a collapse need not be "sudden" to be covered, none of the policies evaluated included the word "sudden" within their "collapse" provisions. *See, e.g., Belz,* 2016 WL 4599892, at *2; *Karas,* 33 F.Supp.3d at 114; *Bacewicz v. NGM Ins. Co.,* No. 3:08-CV-1530 (JCH), 2010 WL 3023882, at *3 (D. Conn. Aug. 2, 2010); *Beach,* 205 Conn. 246, 251 (1987) ("Although 'collapse' encompasses a catastrophic breakdown, as the defendant argues, it also includes a breakdown or loss of structural strength, as the plaintiffs maintain. If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended.").

Plaintiff cites *Dalton v. Harleysville Worcester Mut. Ins. Co.,* 557 F.3d 88, 92 (2d Cir. 2009) and *Kelly v. Balboa Ins. Co.,* 897 F.Supp.2d 1262 (M.D. Fla. 2012) for the proposition that "sudden" in their policy is ambiguous, as each of these cases held that where collapse was caused by "hidden decay" or "hidden insect infestation, " it could not occur suddenly. However, the policy language at issue in

*Dalton* did not qualify "collapse" with "sudden." *Dalton,* 557 F.3d at 90. While the collapse provision at issue *Kelly* is very similar to the collapse provision in the Allstate Policy, this Court does not agree that "the inclusion of [the term] 'sudden' in the definition of LOSS for a policy that covers insect damage creates an ambiguous policy provision, " *Kelly,* 897 F.Supp.2d at 1268. "Hidden decay" and "hidden damage to the building structure caused by insects or vermin" can cause a collapse that an insured would perceive as "sudden, " if the decay or infestation were truly hidden from the insured's view.

Because the parties do not dispute that the Metsacks' basement walls deteriorated over time, rather than "suddenly, " and that the effects of the condition which has compromised the structure was observable to the homeowners many years before the basement walls were opined to be substantially impaired, the Allstate Policy excludes coverage for their loss irrespective of the definition of the term "collapse." Summary judgment on the Breach of Contract claim with respect to Allstate is therefore GRANTED. Because the Court finds that no material issue of fact precludes summary judgment that the Allstate Policy did not cover the Metsacks' claimed loss, summary judgment on their bad faith and CUIPA/CUTPA claims with respect to Allstate must also be GRANTED.

### B. *Breach of Covenant of Good Faith and Fair Dealing*

Plaintiffs argue that in denying coverage for their claim, Liberty Mutual breached the implied covenant of good faith and fair dealing. The duty of good faith and fair dealing "is a covenant implied into a contract or a contractual relationship, " and every contract "carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement . . . ." *Renaissance Mgmt. Co., Inc. v. Conn. Hous. Fin. Auth.,* 281 Conn. 227, 240 (Conn. 2007) (*quoting De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 432-33 (Conn. 2004)). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.; accord Capstone Bldg. Corp. v. Am. Motorists Ins. Co.,* 308 Conn. 760, 795 (2013). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . [b]ad faith means more than mere negligence: it involves a dishonest purpose." *De La Concha,* 269 Conn. at 433; *accord Capstone Bldg. Corp.,* 308 Conn. at 795; *TD Bank, N.A. v. J & M Holdings, LLC,* 143 Conn.App. 340, 348 (Conn. App. Ct. 2013).

In the context of an insurance policy, "[a] bad faith action must allege denial of the receipt of an express benefit under the policy." *Capstone Bldg. Corp.,* 308 Conn. at 794. Any cause of action for bad faith "not tied to duties under the insurance policy must therefore fail as a matter of law." *Id.* at 797. Because Plaintiffs have raised a material dispute regarding whether an express benefit exists under the Liberty Mutual Policy, the question becomes whether the record supports finding that Liberty Mutual acted with "actual or constructive fraud, " a "design to mislead, " or have acted with "neglect or refusal to fulfill" its duties. *See De La Concha,* 269 Conn. at 433.

In support of their claims, Plaintiffs argue that Liberty Mutual intentionally relied on inapplicable policy provisions to deny their claims, despite their knowledge that the damage may have been covered under the policy as a "collapse." The Metsacks offer evidence that before they submitted their claim, Liberty Mutual had been a party to five separate lawsuits involving the same type of damage and the same policy language. While none of these cases reached resolution following a full trial on the merits, several decisions on motions to dismiss had held that crumbling concrete basement walls could be covered as collapses.

There is also evidence that Liberty Mutual may have exercised bad faith in the investigation of the Metsacks' claim. Although Liberty Mutual's independent adjuster identified "hydrostatic pressure, " "freeze thaw, " and "improper concrete mix" as causes of the cracking. [Dkt. 61-8], Liberty Mutual denied the Metsacks' claim as resulting from "settling/earth movement" and "ground water intrusion." [Dkt. 61-9]. It is reasonable to conclude that "ground water intrusion" could be at the root of damage caused by "freeze thaw" or "hydrostatic pressure." However, the adjuster's report lacks any reference to settling/earth movement, and the denial letter does not offer any basis for this conclusion other than a general claim that "a careful investigation" was conducted. *Id.* Moreover, a reasonable juror could conclude that Liberty Mutual acted in bad faith by failing to consult an engineer as recommended by its independent adjuster, especially knowing that the adjuster identified "improper concrete mix" as a possible cause of the structural impairment. Viewed in the light most favorable to the Plaintiffs, these facts raise material issues of fact with respect to the Plaintiffs' bad faith claim.

### C. *CUIPA and CUTPA Claims*

CUIPA does not provide a private right of action, but the Connecticut Supreme Court has recognized "the existence of a private cause of action under CUTPA to enforce alleged CUIPA violations." *Mead v. Burns,* 199 Conn. 651, 663, 509 A.2d 11 (Conn. 1986). However, "conduct by an

insurance broker or insurance company that is related to the business of providing insurance can violate CUTPA only if it violates CUIPA, " because "the legislative determinations as to unfair insurance practices embodied in CUIPA are the exclusive and comprehensive source of public policy in this area." *State v. Acordia, Inc.*, 310 Conn. 1, 9-12, 73 A.3d 711 (Conn. 2013).

Section 38a-816 of CUIPA proscribes "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance, " including "unfair claim settlement practices." Conn. Gen. Stat. § 38a-816. Plaintiffs claim that the Defendants violated these unfair claim settlement practices provisions. *See* Conn. Gen.Stat. § 38a-816(6)(C) (failure "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies"); Conn. Gen. Stat. § 38a-816(6)(D) (refusal "to pay claims without conducting a reasonable investigation based upon all available information"). Unfair claim settlement practices constitute a CUIPA violation when they are "[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general business practice." Conn. Gen. Stat. § 38a-816(6).

In addition to offering evidence that Liberty Mutual did not sufficiently investigate their claim, Plaintiffs have offered evidence that Liberty Mutual and its affiliates have been involved in 19 separate lawsuits (including the instant case) involving the denial of claims arising from defective JJ Mottes concrete. Although most of these lawsuits post-date the Metsacks' claim, their existence, along with Plaintiffs' submission of five claim denial letters that deny coverage for homeowners experiencing the same damage under the same claim language, is sufficient to preclude summary judgment on this issue. *See Belz*, 2016 WL 4599892, at *9 (holding the defendant's refusal to cover similar claims in "three separate matters" could show that the defendant "has a general business practice of unfairly settling disputes" on summary judgment, where the defendant offered no alternative explanation for the proliferation of lawsuits).

The Court recognizes that the insurance policy language is ambiguous and that an insurer does not violate CUIPA by asserting a reasonable interpretation of its policy language. *See McCulloch v. Hartford Life & Acc. Ins. Co.*, 363 F.Supp.2d 169, 177 (D. Conn. 2005). However, Liberty Mutual's refusal to hire an engineer as its independent adjuster recommended and its reliance on reasons for its denial of coverage which were unsupported by its adjuster's report are sufficient to overcome summary judgment on this issue.

V. *Conclusion*

For the foregoing reasons, Liberty Mutual's Motion for Summary Judgment is DENIED, and Allstate's Motion for

Summary Judgment is GRANTED.

IT IS SO ORDERED.

---------

Notes:

[1] They list *Karas v. Liberty Ins. Corp.*, No. 3:13-cv-186 (SRU) (D. Conn.); *Belz v. Peerless Ins. Co.*, No. 3:13-cv-1315 (JCH) (D. Conn.); *Roberts v. Liberty Mut. Fire Ins. Co.*, No. 3:13-cv-435 (SRU) (D. Conn.); *Matthews v. Peerless Ins. Co.*, No. 3:12-cv-1506 (WWE) (D. Conn.): *Waters v. Liberty Mutual Group, Inc.*, No. 06-131 (Mass. Sup. Ct.)]; *Celentano v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-15-6009018-S (Conn. Sup. Ct.); *Constantino v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-16-6010670-S (Conn. Sup. Ct.); *Gabriel v. Liberty Mut. Fire Ins. Co.*. No. 3:14-CV-01435 (SRU) (D. Conn.); *Jang v. Liberty Mut. Fire Ins. Co.*, No. 3:15-CV-01243 (JBA) (D. Conn.): *Mensher v. Liberty Mut. Fire Ins. Co.*, 3:15-CV-01007 (WWE) (D. Conn.); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01150 (VLB) (D. Conn.); *Roy v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-15-6009410-S (Conn. Sup. Ct.); *Wojtyna v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-16-6010342-S (Conn. Sup. Ct.); *Dino v. Safeco Ins. Co. of America*, No. TTD-CV-16-6010428-S (Conn. Sup. Ct.): *Jenkins v. Liberty Ins. Corp.*, No. 3:16-cv-00090 (AVC) (D. Conn.); *Kowalyshyn v. Excelsior Ins. Co.*, No. 3:16-cv-00148 (JAM) (D. Conn.); *Piacentini v. Kemper Independence Ins. Co.*, No. TTD-CV-16-6010341-S (Conn. Sup. Ct.); *Soderburg v. Peerless Indemnity Ins. Co.*, No. TTD-CV-16- 6010893-S (Conn. Sup. Ct.); *Willenborg v. Unitrin Preferred Ins. Co.*, No. TTD-CV-16-6010936-S (Conn. Sup. Ct.).

[2] Plaintiffs cite *Carlson v. Allstate Ins. Co.*. No. 3:15-cv-1045 (MPS) (D. Conn.); *Lees v. Allstate Ins. Co.*, No. 3:15-cv-1050 (VAB) (D. Conn.); *Carney v. Allstate Ins. Co.*, No. 3:16-cv-592 (VLB) (D. Conn.); *Lajeunesse v. Allstate Ins. Co.*, No. 3:16-cv-937 (AVC) (D. Conn.); *Manseau v. Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS) (D. Conn.); *Valls v. Allstate Ins. Co.*, No. 3:16-cv-1310 (VAB) (D. Conn.); *Pearse v. Allstate Ins. Co.*, No. 3:16-cv-1337 (SRU) (D. Conn.); *Adams v. Allstate Ins. Co.*, No. 3:16-cv-1337 (JBA) (D. Conn.)].

[3] Plaintiff failed to submit these letters on the record, apparently accidentally. [*See* Dkt. 74-5]. The letters are publicly available as part of the record in *Valls v. Allstate Insurance Co.*, Dkt. 24-5, No. 3:16-cv-1310 (VAB) and *Carney v. Allstate Insurance Co.*, Dkt. 30-2, No. 3:16-cv-592 (VLB). Defendants discussed the content of these letters in their briefing, suggesting that they were unaware that the letters were not filed on the docket in this case. Any objections to the Court considering the versions

of the letters docketed in *Valls* and *Carney* should be raised within seven days of the date of this Order.

---------

Page 822

910 N.Y.S.2d 822

78 A.D.3d 1496

Susan C. KHUNS, Plaintiff-Respondent,

v.

BAY STATE INSURANCE COMPANY, Defendant-Appellant.

2010-08156

Supreme Court of New York, Fourth Department

November 12, 2010

Page 823

Hiscock & Barclay, LLP, Albany (John R. Casey of Counsel), for Defendant-Appellant.

Panzarella & Coia, P.C., Rochester (Chad Hummel of Counsel), for Plaintiff-Respondent.

PRESENT: FAHEY, J.P., CARNI, GREEN, AND GORSKI, JJ.

MEMORANDUM:

[78 A.D.3d 1497]   Plaintiff commenced this breach of contract action seeking insurance coverage resulting from damage to a structural foundation wall in her home. According to plaintiff, the damage was the "collapse" of the structural foundation wall, while defendant contended that the loss did not come within the definition of "collapse" set forth in the homeowners' insurance policy issued by defendant to plaintiff. In its letter informing plaintiff that there was no coverage, defendant set forth that the loss did not constitute a "collapse" within the meaning of the policy. In addition, defendant relied on the policy exclusions for water damage, loss caused by earth movement, and inadequate construction or design. Supreme Court denied both defendant's motion for summary judgment dismissing the complaint and plaintiff's cross motion for partial summary judgment on liability. Defendant appeals, and we affirm.

With respect to the issue whether the loss constitutes a "collapse" as defined by the policy, i.e., whether the claim is covered by the policy, we conclude that defendant failed to meet its initial burden of establishing as a matter of law that the loss did not involve a "collapse" within the meaning of the policy ( see generally Zuckerman v. City of New York, 49 N.Y.2d 557, 562, 427 N.Y.S.2d 595, 404 N.E.2d 718). In support of its motion, defendant submitted the deposition testimony of plaintiff, who twice described the loss as a "cave in." Plaintiff also testified that there was a crack below the middle of the wall where light was visible from outside the wall and, more importantly, that the wall "fell in to the point that [one] could see the outside in one portion," requiring immediate repair and replacement. In view of both plaintiff's deposition [78 A.D.3d 1498] testimony and the policy language defining a collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose," we conclude that the submissions

Page 824

of defendant are insufficient to establish its entitlement to summary judgment on the issue whether the loss was a "collapse" within the meaning of the policy ( see generally id. ). Contrary to the view of our dissenting colleague, the facts in Rector St. Food Enters., Ltd. v. Fire & Cas. Ins. Co. of Conn., 35 A.D.3d 177, 827 N.Y.S.2d 18 are inapposite to the facts under consideration here. The building at issue in that case, although cracked, sinking and leaning, was not caving in.

We further conclude that there is an issue of fact whether the loss is covered in view of policy language concerning water damage, a policy provision that defendant characterizes as an "exclusion." We note that, "to 'negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case' " ( Bell Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 383, 763 N.Y.S.2d 790, 795 N.E.2d 15; see Chautauqua Patrons Ins. Assn. v. Ross, 38 A.D.3d 1190, 1191, 831 N.Y.S.2d 808).

Defendant contends that there is no coverage for the instant loss because the policy provides that there is no coverage for loss caused by water pressure to a foundation. The subject provision states that defendant does "not insure ... for loss ... [c]aused by ... [f]reezing, thawing, pressure or weight of water or ice ... to a ... [f]oundation." In view of that unambiguous policy language and the opinion of defendant's expert that hydrostatic groundwater contributed to the damage to the wall, we conclude that defendant met its initial burden of establishing that the loss caused by water pressure to a foundation is not covered by the policy ( see generally Zuckerman, 49 N.Y.2d at 562, 427 N.Y.S.2d 595, 404 N.E.2d 718).

Nevertheless, we conclude that plaintiff raised a triable issue of fact whether she is entitled to coverage for the loss in light of the policy language in question. Initially, we reject defendant's characterization of that language as a policy exclusion inasmuch as it appears in the section of the policy concerning the " perils insured against," i.e., that portion that defines the initial specification of coverage, and is not included within that portion of the policy that sets forth the policy exclusions. To the extent that the subject language conflicts with other policy language providing coverage for loss caused by decay, that conflict is to be resolved against defendant, which drafted the [78 A.D.3d 1499] policy ( see State of New York v. Home Indem. Co., 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 486 N.E.2d 827; Topor v. Erie Ins. Co., 28 A.D.3d 1199, 1200, 816 N.Y.S.2d 631). In view of the opinion of plaintiff's expert that the loss was caused by " decay" concealed by the finished interior wall of the basement of plaintiff's home, we conclude that defendant is not entitled to summary judgment determining that there is no coverage for plaintiff by virtue of the application of the policy language in question ( see generally Zuckerman, 49 N.Y.2d at 562, 427 N.Y.S.2d 595, 404 N.E.2d 718).

The policy also contains an exclusion for loss caused by " water damage," including " water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure." Defendant further contends that the water damage exclusion defeats coverage for plaintiff. We again conclude on the record before us that there is an issue of fact with respect thereto ( see id. ). Although defendant's expert attributed the loss to hydrostatic ground forces, plaintiff's expert determined that the damage was caused by structural weakening, in which event the

Page 825

water damage exclusion would be inapplicable. Defendant's further contention that the policy's earth movement exclusion defeats coverage for plaintiff was raised in defendant's letter informing plaintiff that there was no coverage but was not raised by defendant in support of its motion, and thus that contention is not properly before us ( see Ciesinski v. Town of Aurora, 202 A.D.2d 984, 985, 609 N.Y.S.2d 745). There is also an issue of fact with respect to the applicability of the final exclusion upon which defendant relies, i.e., the exclusion for loss caused by inadequate construction or design. Even assuming, arguendo, that defendant met its burden on that part of the motion, we conclude that plaintiff raised an issue of fact concerning the applicability of the exclusion by submitting the affidavit of her expert, who concluded that ambient soil pressure, rather than inadequate construction or design methods, caused the loss ( see generally Zuckerman, 49

N.Y.2d at 562, 427 N.Y.S.2d 595, 404 N.E.2d 718).

Finally, we agree with defendant that the court erred in concluding that defendant's letter to plaintiff concerning the absence of coverage did not meet " the specific and clear requirements under the law," although we note that defendant is not thereby entitled to summary judgment dismissing the complaint. Inasmuch as " this action involves a property insurance claim, it is not controlled by the high degree of specificity required ... for a disclaimer of liability for death or bodily injury" ( Smith v. General Acc. Ins. Co., 295 A.D.2d 738, 739-740, 744 N.Y.S.2d 59; see Insurance Law § 3420[d] [2] ). Here, defendant's letter adequately [78 A.D.3d 1500] sets forth the policy provisions on which defendant relied and, indeed, there is no indication that there was any confusion on plaintiff's part with respect to the policy provisions upon which defendant relied and thus that plaintiff was thereby prejudiced by any alleged lack of specificity ( cf. Vecchiarelli v. Continental Ins. Co., 277 A.D.3d 992, 993, 716 N.Y.S.2d 524).

It is hereby ORDERED that the order so appealed from is affirmed without costs.

All concur except CARNI, J., who dissents and votes to reverse in accordance with the following Memorandum:

I respectfully dissent, inasmuch as I disagree with my colleagues that defendant is not entitled to summary judgment dismissing the complaint.

With respect to the issue whether the damage to plaintiff's foundation wall constituted a " collapse" within the meaning of the homeowners' insurance policy in question, I conclude that defendant established as a matter of law that there was no collapse within the meaning of the homeowners' insurance policy in question. The policy specifically defines its coverage for collapse with respect to buildings as " an abrupt falling down or caving in" and provides that " [a] building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." Here, it is undisputed that plaintiff's home, and all component parts thereof, remained standing and had not abruptly fallen down or caved in. In my view, the nature of the damage was best described by plaintiff in her deposition testimony, wherein she stated that one of the foundation walls " moved in" and had not fallen in completely. The policy language concerning collapse is unambiguous and does not cover a condition that can at best be described as presenting a danger of imminent collapse rather than the actual and abrupt collapse or caving in covered by the policy ( see

Page 826

*Rector St. Food Enters., Ltd. v. Fire & Cas. Ins. Co. of Conn.*, 35 A.D.3d 177, 178, 827 N.Y.S.2d 18).

I further disagree that what the majority refers to as "structural weakening" is a peril insured under the policy. "Structural weakening" is a *result* rather than a *cause* of a loss, and plaintiff's own expert opined that the "structural weakening" resulted from "ground frost during the 2003-2004 winter season." There is thus no coverage under the unambiguous language of the policy, which provides that defendant does not insure for loss "[c]aused by ... [f]reezing, thawing, pressure or weight of water or ice ... to a ... [f]oundation, retaining wall, or bulkhead." "Ground frost" is the non-covered cause and "structural weakening" is the result.

I further disagree with the majority that plaintiff raised an issue [78 A.D.3d 1501] of fact with respect to the policy exclusion for inadequate construction or design. The majority cites only to the conclusion of plaintiff's expert that the loss was caused by "ambient soil pressure," and thereby ignores that part of the opinion of the expert that the "ambient soil pressure exerted against the basement wall in its *weakened state* result[ed] in structural failure" (emphasis added). In my view, the "weakened state" is the same result, i.e., the structural weakening, caused by the "ground frost" discussed by the expert earlier in his affidavit. Thus, the opinion of plaintiff's own expert expressly establishes that the loss was caused by freezing water, a peril not covered under the policy. It is noteworthy that plaintiff's expert fails to explain how "ambient soil pressure" in the absence of the "weakened state" resulting from "ground frost" is a covered peril, rather than merely an expected or ordinary condition encountered by all foundations, "weakened" or not.

I therefore would reverse the order and grant defendant's motion for summary judgment dismissing the complaint.

Page 177

823 A.2d 177 (Pa.Super. 2003)

401 FOURTH STREET, INC., Appellant

v.

INVESTORS INSURANCE GROUP, Appellee.

Superior Court of Pennsylvania

April 22, 2003.

Argued Oct. 1, 2002.

Page 178

Derek Braslow, Pennsauken, N.J., for appellant.

Andrew M. Schwartz, Philadelphia, for appellee.

Before: DEL SOLE, P.J., ORIE MELVIN and BECK, JJ.

DEL SOLE, P.J.

¶ 1 401 Fourth Street, Inc. appeals from the grant of summary judgment in favor of Investors Insurance Group. We reverse.

¶ 2 The facts of this case are not in dispute. Appellant is the owner of a building in Montgomery County which is insured by means of a policy issued by Appellee. Appellant paid an additional premium to include an endorsement providing coverage for collapse. Specifically, the policy provided:

D. ADDITIONAL COVERAGE--COLLAPSE

We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

...

2. Hidden decay;

...

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

Amended Complaint, Exhibit A (emphasis added). With the exception of the last statement defining what collapse is not, the term collapse is not otherwise defined in the policy.

¶ 3 During the policy's coverage period, a parapet wall in Appellant's building began to bow and lean inward. Appellant made a claim for coverage and both Appellant and Appellee hired engineers to inspect the building. Both experts concluded that the wall was in danger of completely collapsing and needed immediate repairs. Appellee refused to provide coverage on the ground that the wall had not actually fallen to the ground. Appellant then filed this breach of contract claim. After discovery was completed, both parties filed motions for summary judgment. The court below denied Appellant's motion and granted Appellee's motion, dismissing the complaint with prejudice.

¶ 4 Appellant sets forth two issues in its Statement of Questions:

1. Whether the trial court erred in finding that 401 did not suffer "risks of direct physical loss involving collapse"?

2. Whether the trial court erred in finding the language "...risks of direct physical loss involving collapse..." unambiguous, requiring an actual collapse?

Appellant's Brief at 4.

¶ 5 Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions of record and affidavits on file support the conclusion that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Peffer v. Penn 21 Assoc.*, 406 Pa.Super. 460, 594 A.2d 711 (1991). This Court may reverse the grant of summary judgment if there has been an error of law or a clear abuse of discretion. *Id.* The interpretation of a contract is a question of law over which this court need not defer to the finding of the trial court. *United Services Auto.*

Page 179

*Asso. v. Elitzky*, 358 Pa.Super. 362, 517 A.2d 982 (1986) .

¶ 6 Presently, the trial court, in determining that the policy did not apply unless the building or a part of it actually fell to the ground, relied on *Dominick v. Statesman Ins. Co.*, 692 A.2d 188 (Pa.Super.1997), and the two Supreme Court cases cited therein. [1] In *Dominick*, the homeowners' policy covered "direct physical loss to covered property involving collapse of a building or any part of a building...." *Id.* at 191. When the first floor of the home moved approximately one inch downward and the floor separated from the interior walls, the homeowners filed a claim under

the policy which the insurer denied. A panel of this Court determined that the homeowners' claim was not within the policy's coverage because the home did not collapse.

¶ 7 *Dominick*, however, did not involve the same language as the policy in question in the present case. Here, the policy does not insure only against "collapse" but also against "risks of direct physical loss involving collapse." This additional language distinguishes the present case from *Dominick* and the Supreme Court cases on which it relies and compels a different result. The use of the terms "risks" and "involving" clearly broaden the policy's coverage to include something less than a structure completely falling to the ground.

¶ 8 We do not share the trial court's concern that this interpretation would unfairly subject the insurer to liability based on "potentially infinitesimal risks" or "the existence of some small or vague possibility" of collapse. First, the situation presented in this case is not one of an infinitesimal risk or vague possibility of collapse; both experts agreed that if repairs were not undertaken immediately, the parapet wall would completely collapse. Second, it is not the trial court's responsibility to rewrite the policy to protect the insurer. If Appellee wanted to limit its risk to actual and complete collapse to the ground, it could easily have done so.

¶ 9 We conclude, therefore, that the trial court committed an error of law in granting Appellee's motion for summary judgment. Accordingly, we reverse the grant of summary judgment and remand for further proceedings. Jurisdiction relinquished.

¶ 10 ORIE MELVIN, J. files a dissenting opinion.

DISSENTING OPINION BY ORIE MELVIN, J.

¶ 1 The majority distinguishes *Dominick v. Statesman Ins. Co.*, 692 A.2d 188 (Pa.Super.1997) and finds that the policy here insures not only against "collapse," but also against "risks of direct physical loss involving collapse." Yet, the majority also recognizes that the more specific language in the contract clearly defines collapse as not including "settling, cracking, shrinkage, bulging or expansion." Amended Complaint, Exhibit A (emphasis added). As the parapet wall in question has not collapsed and the "risk of direct physical loss involving collapse" is defined

Page 180

as not including bulging, I must respectfully dissent.

¶ 2 I begin by recognizing that it is undisputed that the parapet wall in Appellant's building is beginning to bow and lean inward. However, despite the majority's statement to the contrary both experts do not agree that immediate repair

is necessary, and neither expert testified that collapse is imminent. Accordingly, I believe the trial court correctly denied Appellant's motion and granted Appellee's motion dismissing the complaint with prejudice.

¶ 3 I find the trial court correctly relied on *Dominick v. Statesman Ins. Co.*, 692 A.2d 188 (Pa.Super.1997). The homeowners' policy in *Dominick* covered "direct physical loss to covered property involving collapse of a building or any part of a building...." *Id.* at 191. The majority concedes that this Court determined that the homeowners' claim was not within the policy's coverage because the home did not collapse, and there is no direct physical loss involving collapse until there is an actual collapse. Presently, the only difference in the policy language is the addition of the term "risk." The policy here reads "risks of direct physical loss involving collapse." All insurance is meant to cover risks. I do not believe that the addition of the term "risks" to the language of this policy broadens the coverage.

¶ 4 Finally, the trial court's concern that this interpretation would unfairly subject the insurer to liability based on "potentially infinitesimal risks" or "the existence of some small or vague possibility" of collapse should not be so summarily dismissed. Surely the majority's holding will open a flood gate for claims seeking recovery for every bulging, bowed and leaning wall out there regardless of how imminent the danger it presents.

¶ 5 Because the facts of this case are not in dispute and the use of the term "risks" is superfluous language and does not broaden the policy's coverage, I would affirm.

----------

Notes:

[1] In *Skelly v. Fidelity & Casualty Co.*, 313 Pa. 202, 169 A. 78 (1933), the insured was in a hotel when a railroad car jumped the track and crashed into the hotel. The insured was killed when portions of the outside wall that was carried through by the railroad car struck him. In *Kattelman v. National Union Fire Ins. Co.*, 415 Pa. 61, 202 A.2d 66 (1964), one of the concrete mats that supported the policyholders' home dropped from its position and twisted the foundation of the policyholders' home, causing the building to break away from the party wall of the adjoining building. In both of these cases, the Supreme Court held that a policy which insured against "collapse" did not cover either of these events.

----------

RAYMOND G. GABRIEL and KIMBERLY A. GABRIEL, Plaintiffs,

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY

No. 3:14-cv-01435-VAB

United States District Court, D. Connecticut.

September 28, 2015

### RULING ON MOTION TO DISMISS

VICTOR A. BOLDEN, District Judge.

#### I. INTRODUCTION

Plaintiffs, Raymond G. Gabriel and Kimberly A. Gabriel (the "Gabriels"), filed this action against their homeowner's insurance provider, Liberty Mutual Fire Insurance Company ("Liberty Mutual"), for its alleged failure to pay for damage to the basement walls of their home. The Complaint contains three counts. Count One alleges breach of contract, Count Two alleges breach of the implied covenant of good faith and fair dealing, and Count Three alleges violations of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815, *et seq.* ("CUIPA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA"). Liberty Mutual moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted. For the following reasons, the motion is DENIED.

#### II. FACTUAL ALLEGATIONS

The Complaint sets forth the following allegations, which the Court must accept as true at this stage. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

The Gabriels bought a house in 2006 and insured it with a homeowner's policy (hereinafter "the policy") issued by Liberty Mutual. Compl. ¶¶ 4-5, ECF No. 1. The house was built in 1986. *Id.* ¶ 4. The Gabriels noticed horizontal and vertical cracks throughout their concrete basement walls. *Id.* ¶ 8. A contractor told the Gabriels that the cracking was due to a chemical compound in the concrete that, when mixed with water, sand, and cement, oxidizes and expands, breaking the bonds of the concrete and "reducing it to rubble." *Id.* ¶¶ 10-11. The compound was used in basement walls constructed in the late 1980s and early 1990s, and the concrete most likely came from the J.J.

Mottes Concrete Company. *Id.* ¶ 10. At some point between when the walls were poured and when the Gabriels discovered the cracks, the walls suffered a substantial impairment to their structural integrity. *Id.* ¶ 13.

The Gabriels first discovered the cracks in May of 2014 and notified Liberty Mutual on June 13, 2014. *Id.* ¶ 16. Liberty Mutual denied coverage in a letter dated July 22, 2015, contending that the policy does not cover "inherent vice or latent defect." *Id.* ¶ 18.

The Gabriels allege that Liberty Mutual has a general practice of convincing insureds that the collapse of basement walls caused by hidden decay or defective materials or methods of construction is not covered, and has joined an industry-wide practice of denying coverage for claims based on concrete defects. *Id.* ¶¶ 33, 45, 47-50.

The Gabriels also allege that Liberty Mutual participates in the Insurance Services Office, Inc. ("ISO"), a cooperative that collects data regarding insurance claims, drafts policy provisions, and interprets those provisions. *Id.* ¶¶ 38-39. Through its participation in the ISO, Liberty Mutual allegedly knows of insurance claims in northeastern Connecticut involving hidden decay in concrete basement walls, knows that most insurers deny those claims on the ground that the condition is caused by excluded causes, and knows of precedents where plaintiffs prevailed against insurers on defective concrete claims involving identical policy language. *Id.* ¶¶ 41-43.

The Gabriels claim that Liberty Mutual breached the policy by denying coverage, and as a result, the Gabriels suffered financial loss. *Id.* ¶ 21. The Gabriels have not made any repairs to their basement walls. *See id.* ¶ 22. However, they allege that "[i]t is only a question of time" until their basement walls, and in turn their entire home, "fall in." *Id.* ¶¶ 14-15. Based on estimates from contractors, they expect to pay at least $225,000.00 to repair the basement walls, and perform related restoration work on the deck, landscaping, driveway and walks. *Id.* ¶ 22.

#### III. STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions, " or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]"

devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). "The plausibility standard is not akin to a probability requirement, ' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

In determining whether the plaintiff has met this standard, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the non-moving party. *In re NYSE Specialists Sec. Litig.*, 503 F.3d at 95, and generally may consider only "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## IV. DISCUSSION

### A. Count One: Breach of Contract

The elements of a breach of contract claim are (1) formation of an agreement, (2) performance by one party, (3) breach by the other party, and (4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014).

There is no dispute that the first, second, and fourth elements are alleged plausibly. The Gabriels allege that they entered into, and performed under, the policy. Compl. ¶¶ 5-6. They further allege that they suffered financial loss as a result of Liberty Mutual denying coverage, and that repairs will cost at least $250,000. *Id.* ¶¶ 21-22.

Liberty Mutual contends that the third element, however, is not satisfied. Specifically, Liberty Mutual argues that the alleged damage to the basement walls is not covered, and therefore its refusal to pay for that damage is not a breach. *See* Def.'s Mem. Supp. Mot. Dismiss at 6, ECF No. 13-1. The Gabriels counter that the relevant policy language is ambiguous and that dismissal is therefore inappropriate. *See* Pls.' Mem. Opp. Def.'s Mot. Dismiss at 3, ECF No. 16. The Court agrees with the Gabriels.

An insurance policy is interpreted under the same rules that govern the construction of any written contract. *Zulick v. Patrons Mut. Ins. Co.*, 949 A.2d 1084, 1088 (Conn. 2008). The Court must determine the intent of the parties as expressed by the language of the policy. *Id.* Provisions of an insurance policy "must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and... the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Vermont Mut. Ins. Co. v. Walukiewicz*, 966 A.2d

672, 678 (Conn. 2009) (quoting *Conn. Med. Ins. Co. v. Kulikowski*, 942 A.2d 334, 344 (Conn. 2008)).

Where the language of an insurance policy is unambiguous, the Court gives the language its natural and ordinary meaning. *Zulick*, 949 A.2d at 1088. "[L]anguage is unambiguous when it has a definite and precise meaning... concerning which there is no reasonable basis for a difference of opinion." *Poole v. City of Waterbury*, 831 A.2d 211, 224 (Conn. 2003). Language is ambiguous, however, if it is "susceptible to more than one reasonable interpretation." *Id.* "[A]ny ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167, 1173 (Conn. 2014) (quoting *Johnson v. Conn. Ins. Guar. Ass'n*, 31 A.3d 1004, 1007 (Conn. 2011)).

The policy language at issue states that Liberty Mutual will "insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:... Hidden decay:... Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation." Compl., Ex. A at 5 of 16. It further states that "[l]oss to... foundation, retaining wall... is not included... unless the loss is a direct result of the collapse of a building. Collapse does not include settling, cracking, shrinking, bulging or expansion." *Id.*

Liberty Mutual argues that the basement walls are part of the "foundation" or are "retaining wall[s]," and therefore there is no coverage because the cracks were not a direct result of the collapse of the Gabriels' house. Def.'s Mem. Supp. Mot. Dismiss at 6, ECF No. 13-1. The Gabriels counter that the terms "foundation" and "retaining wall" are ambiguous. Pls.' Mem. Opp. Def.'s Mot. Dismiss at 3, ECF No. 16.

This Court has held several times in recent cases involving nearly identical facts and policy language that the terms "foundation" and "retaining wall" are ambiguous. *Bacewicz v. NGM Ins. Co.*, No. 3:08-cv-1530 (JCH), 2010 WL 3023882, at *1-4 (D. Conn. Aug. 2, 2010) (in case involving cracks in concrete basement walls caused by chemical compound within concrete, court held that the term "foundation" in identical policy language was "reasonably susceptible to more than one reading"); *Karas v. Liberty Ins. Corp.*, 33 F.Supp.3d 110, 115-16 (D. Conn. 2014) (in case involving nearly identical facts, policy language, and arguments, court held that the terms "foundation" and "retaining wall" were ambiguous, and denied motion to dismiss breach of contract claim); *Belz v. Peerless Ins. Co.*, 46 F.Supp.3d 157, 164 (D. Conn. 2014)

(same).[1]

The same conclusion is appropriate here. The term "foundation" is ambiguous because it is reasonably susceptible to the Gabriels' interpretation to mean footings under the basement walls that support the entire structure or the lowest-load bearing part of the building. ECF No. 16 at 7, and to Liberty Mutual's interpretation to mean a concrete structure including basement walls, that supports a building from underneath. ECF No. 13-1 at 6, 8-9. *Belz*, 46 F.Supp at 163-64 (holding that "foundation" was reasonably susceptible to same two interpretations advanced here and therefore ambiguous).

Likewise, the term "retaining wall" is ambiguous because it is reasonably susceptible to the Gabriels' interpretation to mean a freestanding wall that holds in place a mass of earth, ECF No. 16 at 11, and to Liberty Mutual's interpretation to mean a wall built to resist lateral pressure or prevent an earth slide, ECF No. 13-1 at 12. *Belz*, 46 F.Supp.3d at 163-64 (holding that "retaining wall" was reasonably susceptible to same two interpretations advanced here and therefore ambiguous). Because these terms are ambiguous, the Court construes them in the Gabriels' favor, *Lexington Ins. Co.*, 84 A.3d at 1173, and concludes that the Gabriels have alleged plausibly that coverage exists for the damage to their basement walls and that Liberty Mutual breached the policy by denying coverage. *See* Compl. ¶¶ 19-21.

Liberty Mutual also argues that the breach of contract claim fails because the Gabriels do not allege sufficiently when the loss occurred. ECF No. 13-1 at 13-14. But the Complaint alleges that the substantial impairment to the walls' structural integrity occurred "[a]t some point between the date on which the basement walls were poured and the month of May, 2014." Compl. ¶ 13. The period covered by the policy is within that span. Thus, the Gabriels have raised their right to relief above the speculative level on the question of whether the loss occurred during the period covered by the policy. *Karas*, 33 F.Supp.3d at 116 (where plaintiffs alleged that substantial impairment occurred at some point between time pouring of basement walls and discovery of cracks, and period covered by insurance policy was within that span, plaintiffs plausibly alleged breach of insurance policy); *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Finally, the Court declines Liberty Mutual's request to certify to the Connecticut Supreme Court the question, "Are the terms 'foundation' and 'retaining wall' as used in a homeowners insurance policy ambiguous?" ECF No. 13-1 at 18. Connecticut law grants the Connecticut Supreme Court authority to answer a question of law certified to it by this Court if the answer may be determinative of an issue

and there is no controlling state authority, but does not require this Court to certify such a question. *See* Conn. Gen. Stat. § 51-199b(d). This Court is satisfied that it is capable of making a sound decision, in light of the applicable authorities, that the terms "foundation" and "retaining wall" are ambiguous in the context of the policy language at issue in this case. *Belz*, 46 F.Supp.3d at 164 (declining to certify to Connecticut Supreme Court question whether term foundation' is ambiguous on same grounds).

Liberty Mutual's motion to dismiss Count One is denied.

B. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 553 A.2d 1138, 1140 (Conn. 1989). The duty requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004) (internal quotation marks and citation omitted). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.* "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.*

The Gabriels allege that Liberty Mutual, when it denied coverage, ignored state and federal case law concluding that the term "foundation" is ambiguous, and intentionally cited inapplicable policy language to mislead the Gabriels into thinking that their claim was not covered in order to preserve Liberty Mutual's assets. *See* Compl. ¶¶ 26-30.

Read in the light most favorable to the Gabriels, these allegations state a claim for breach of the implied covenant of good faith and fair dealing because they give rise to a plausible inference that Liberty Mutual acted to mislead the Gabriels, or neglected to fulfill a duty to provide coverage out of a self-interested motive. Substantially similar allegations survived motions to dismiss in *Belz*, 46 F.Supp.3d at 165 and *Karas*, 33 F.Supp.3d at 116-17. Liberty Mutual's motion to dismiss Count Two is denied.

C. Count Three: Violation of CUIPA and CUTPA

In Count Three, the Gabriels allege that Liberty Mutual is engaged in a general practice of denying claims arising out of concrete decay, and that that practice violates CUIPA and therefore violates CUTPA. Compl. ¶¶ 49-53.

A plaintiff may assert a CUTPA claim based on a violation of CUIPA. *Karas*, 33 F.Supp.3d at 117 (citing *McCulloch v. Hartford Life & Acc. Ins. Co.*, 363 F.Supp.2d 169, 181 (D. Conn. 2005) and *Mead v. Burns*, 199 Conn. 651, 663 (1986)). To prevail on such a claim, the plaintiff must show that the defendant engaged in an act prohibited by CUIPA and the act proximately caused the plaintiff's harm. *Belz*, 46 F.Supp.3d at 165 (citing *McCulloch*, 363 F.Supp.2d at 181). "A claim of unfair settlement practice under CUIPA/CUTPA requires the plaintiff to allege that the defendant has committed the alleged proscribed act with sufficient frequency to indicate a general business practice.... The plaintiff must show more than a single act of insurance misconduct...." *Karas*, 33 F.Supp.3d at 117.

The Gabriels allege that Liberty Mutual gave them a false and misleading reason for denying coverage by citing inapplicable policy language, and failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of their claim. Compl. ¶¶ 44-46. They further allege that this alleged misconduct caused them to lose money. *Id.* ¶ 53. These allegations satisfy the requirements to allege that the defendant engaged in an act prohibited by CUIPA, *see* Conn. Gen. Stat. § 38a-816(6), and that the act proximately caused the plaintiff's harm. Furthermore, the Gabriels allege that Liberty Mutual and related entities have denied coverage in at least four other cases involving similar facts and identical policy language. These allegations support a plausible inference that Liberty Mutual has engaged in an unfair settlement practice with sufficient frequency to indicate a general business practice. *Karas*, 33 F.Supp.3d at 117 (denying motion to dismiss CUIPA/CUTPA claim where plaintiffs alleged that Liberty Mutual denied coverage in three similar instances); *Belz*, 46 F.Supp.3d at 167 (same).

### V. CONCLUSION

For the foregoing reasons, Liberty Mutual's motion to dismiss (ECF No. 13) is DENIED.

SO ORDERED.

----------

Notes:

[1] Liberty Mutual argues that *Bacewicz* and its progeny were wrongly decided. *See* Def.'s Mem. Supp. Mot. Dismiss at 7-9, ECF No. 13-1. First, it argues that "[t]he sole authority cited by Judge Hall in her decision in the *Bacewicz* litigation was the Alabama Supreme Court decision of *Turner v. State Farm Fire and Casualty Cos.*, 614 So.2d 1029 (Ala. 1993)." *Id.* at 7. That is incorrect. *See generally Bacewicz*, 2010 WL 3023882. Second, Liberty Mutual argues that the Court's reliance on *Turner* was misplaced because *Turner* was factually distinguishable. ECF No. 13-1 at 7. This Court's decision in *Bacewicz* did not hinge on *Turner*. The Court merely noted that "at least one other court considering a similar question" had held that a reasonable juror could find that foundation means only the piece of concrete beneath a wall and not the concrete basement wall itself. *Bacewicz*, 2010 WL 3023882, at *4. The Court went on to reach its own conclusion about the ambiguity of the term "foundation" in light of a witness's deposition testimony and the conclusion that footings could "collapse." *Id.* Moreover, the factual distinction that Liberty Mutual draws (the basement walls in *Turner* were free standing when constructed and were subsequently surrounded by dirt to make a basement, whereas the basement walls in this case existed since the original construction of the Gabriels' house) does not undercut *Turner's* persuasiveness. The *Turner* court's decision did not turn on the fact highlighted by Liberty Mutual, and the policy language at issue in *Turner* was nearly identical to that at issue in *Bacewicz*, *Belz*, *Karas*, and this case.

----------

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSEPH BACEWICZ, ET AL.,              :
                                       :      CIVIL ACTION NO.
          Plaintiffs,                  :      3:08-CV-1530 (JCH)
                                       :
     v.                                :
                                       :
NGM INSURANCE CO., ET AL.              :      AUGUST 2, 2010
                                       :
          Defendants.                  :

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 97);
CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 104)**

I.    INTRODUCTION

On September 19, 2008, plaintiffs Joseph and Janice Bacewicz (together, "the

Bacewiczes") filed a state court complaint against defendants NGM Insurance

Company and The Main Street America Group, Inc. ("defendants"). The suit alleged

that the defendants breached an insurance contract by denying coverage for damage to

the basement walls in the Bacewiczes' house in Tolland, Connecticut. The defendants

removed the suit to federal court on October 6, 2008.

On April 13, 2009, the court granted the Bacewiczes' First Motion to Amend their

Complaint. The Amended Complaint (Doc. No. 28) is the operative complaint for

purposes of this Ruling.[1] The Amended Complaint contains four counts, three of which

remain pending. Count One alleges breach of contract, Count Two alleges a breach of

the implied covenant of good faith and fair dealing, and Count Four alleges vicarious

liability against The Main Street America Group. This court dismissed Count Three,

---

[1] While the Bacewiczes again moved to amend their Amended Complaint on July 30, 2009, that Motion was denied by this court on September 17, 2009.

1

which alleged unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practice Act, in a June 30, 2009 Ruling.

On February 19, 2010, the defendants moved for summary judgment. On April 12, 2010, the Bacewiczes' cross-moved for partial summary judgment. The court herein considers both Motions. For the reasons stated below, the defendants' Motion (Doc. No. 97) is granted in part and denied in part, and the plaintiffs' (Doc. No. 104) is denied.

## II.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' " Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine

2

issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## III.   FACTUAL BACKGROUND

The Bacewiczes' home is located in Tolland, Connecticut. L.R. 56(a)(1) at ¶ 1. It is insured by a homeowner's policy that was issued by NGM, which is a subsidiary of The Main Street America Group. Id. at ¶ 2, 3. After Janice Bacewicz first noticed a crack in a corner of the dining room in late spring to early summer of 2006, the Bacewiczes hired a "cement/concrete contractor" to inspect it. L.R. 56(a)(2) at ¶ 5; L.R. 56(a)(1) at ¶ 7. The contractor recommended that an engineer perform further inspection on the house. L.R. 56(a)(1) at ¶ 8. An engineer then examined the crack. Id. at ¶ 9. He informed the Bacewiczes that he was unsure as to its cause and advised them to monitor it. Id.

By December 2007, the Bacewiczes observed the crack to have grown larger. Disputed Issues of Material Fact at ¶ 38 ("D.I.M.F."). In January 2008, they hired a company called Budget Dry to perform repairs on "the cracking in the basement walls." Id. at ¶ 41. In preparation for the work, Joseph Bacewicz removed paneling from such walls and noticed "severe horizontal and vertical cracking." Id. at ¶ 42. Soon after starting work, Budget Dry announced that they would be unable to complete the repairs.

3

Id. at ¶ 43.

On March 11, 2008, the Bacewiczes provided a notice of claim to NGM. L.R. 56(a)(1) at ¶ 14. While the claim was pending, the Bacewiczes hired an engineer, who concluded that the concrete basement walls would be unable to safely support the weight of the house. D.I.M.F. at ¶ 44. In early October 2008, the Bacewiczes began taking steps to replace such walls, in order to "avoid the kind of catastrophic collapse that might have resulted in complete loss of their home, or worse, personal injury or death." Id. at ¶ 50. On February 3, 2009, NGM sent the Bacewiczes a letter, informing them that their insurance claim had been denied. L.R. 56(a)(1) at ¶ 15.

## III.    DISCUSSION

### A.    Count One: Breach of Contract

Count One of the Amended Complaint alleges that, by denying coverage for damage to the basement walls of the Bacewiczes' house, NGM breached the homeowners' insurance policy (hereinafter "the policy" or "the contract") that it had previously entered into with the Bacewiczes. The defendants argue that (a) the damage to the basement walls of the Bacewiczes' house is not a type of loss covered by the contract; (b) the Bacewiczes' breach of contract claim is time-barred; and (c) the Bacewiczes did not "provide prompt notice of the loss" to NGM, as required by contract.

At the outset, it bears noting that the interpretation of an insurance contract is a legal question that " 'involves a determination of the intent of the parties as expressed by the language of the policy' " Connecticut Ins. Guar. Ass'n v. Fontaine, 278 Conn. 779, 784 (2006) (quoting Hartford Casualty Ins. Co. v. Litchfield Mutual Fire Ins. Co., 274 Conn. 457, 462-63 (2005)). Indeed, "[a]n insurance policy is to be interpreted by

4

the same general rules that govern the construction of any written contract." Zulick v. Patrons Mut. Ins. Co., 287 Conn. 367, 372-73 (2008).

The court recognizes that "provisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." Vermont Mut. Ins. Co. v. Walukiewicz, 290 Conn. 582, 592 (2009) (internal quotation marks and citation omitted). If language in an insurance contract is unambiguous, it "must be accorded its natural and ordinary meaning, and the courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." Jacaruso v. Lebski, 118 Conn. App. 216, 233 (2009). "Contract language is unambiguous when it has a definite and precise meaning[,] concerning which there is no reasonable basis for a difference of opinion." Isham v. Isham, 292 Conn. 170, 235-36 (2009) (internal quotation marks, citation, and ellipses omitted).

To the extent the language of an insurance policy is ambiguous, such language must be construed against the insurance company, who was the drafter of the policy. See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co., 247 Conn. 801, 806 (1999). "Where contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact." Taravella v. Town of Wolcott, 599 F.3d 129, 143 (2d Cir. 2010) (citing Barton v. City of Bristol, 291 Conn. 84, 93 (2009)).

5

### 1.    Whether the Loss was Covered by the Contract

The Bacewiczes allege that NGM breached Section 8 of the policy, entitled "Collapse." That section states, in relevant part, that "[w]e insure for direct physical loss to covered property involving the collapse of a building or any part of a building caused only by one or more of the following . . . b. hidden decay." Section 8 also includes two limitations that are applicable to the court's analysis. First, it states that "[l]oss to . . . foundation, . . . is not included . . . unless the loss is a direct result of the collapse of a building." Second, it provides that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." NGM argues that the loss to the Bacewiczes' basement walls is not covered by the contract because (a) such loss was to the "foundation" of the house; (b) the damage claimed consisted only of "swelling, cracking and bulging," and thus a "collapse" did not occur; (c) such loss was not caused by "hidden decay"; and (d) such loss was attributable to water damage. The court will address each argument in turn.

### a.    Damage to Foundation

NGM first argues that Section 8 does not cover the Bacewiczes' loss because that section explicitly excludes from coverage any loss to the foundation of the house, unless such loss was a direct result of the collapse of a building. Here, there is no dispute that the loss to the Bacewiczes' basement walls was not a direct result of the building's collapse. To the contrary, it is the basement walls themselves that are alleged to have "collapsed." NGM argues that the basement walls are part of the "foundation" of the house. The Bacewiczes argue that the foundation consists not of the basement walls, but instead of the house's "footings," which have been described

6

as a "concrete base" atop of which the basement walls rest. See Deposition of Joseph Bacewicz at 17:9-13. There is no dispute that such footings exist.

It is true that much of the evidence in this case indicates that the terms "basement walls" and "foundation walls" are used interchangeably. See, e.g., Deposition of David Grandpre at 45:5-6. However, at least one other court considering a similar question has held that "a person of ordinary intelligence could reasonably conclude . . . that the term 'foundation' refers only to the piece of concrete at the base of the wall," rather than a concrete basement wall itself. Turner v. State Farm Fire and Cas. Cos., 614 So.2d 1029, 1032 (Ala. 1993). Moreover, some of the evidence in this case appears to indicate that there are multiple definitions of the term "foundation." Deposition of David Grandpre at 45:13-16 ("Q. Do you consider the walls at the Bacewicz property which you understand deteriorated to be part of the foundation of the building? A. By some definitions, yes.") (emphasis added). While the defendants argue that the Bacewiczes' construction of the term "foundation" is implausible in the context of Section 8, because "[f]ootings do not collapse," Reply at 5, the court is unpersuaded. As explained below, the term "collapse" does not necessarily mean a sudden and catastrophic falling down. Further, the defendants have cited no evidence indicating that improperly constructed footings cannot "collapse," in the sense of suffering substantial structural impairments. Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246, 252 (1987) ("'[C]ollapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building.").

In sum, the term "foundation," as it is contained in the policy at issue in this case, is reasonably susceptible to more than one reading. The court agrees with the

7

Bacewiczes that a reasonably jury could find that the basement walls of the Bacewiczes' house did not constitute the "foundation" of the house.

    b.  Exclusion for Cracking and Bulging

  NGM argues that, even assuming the Bacewiczes' basement walls are not part of the "foundation" of the house, summary judgment must be granted because the contract does not cover loss caused by "collapse" in the form of "swelling, cracking and bulging." Indeed, it does not appear to be disputed that the basement walls--before they were repaired--cracked and bulged because they were unable to withstand "the lateral pressure of the earth surrounding the basement." Mem. in Opp. at 8. The Bacewiczes maintain, however, that while their basement walls cracked and bulged, such cracks and bulges do not constitute the "collapse" at issue per se. Rather, the Bacewiczes argue that the cracks and bulges that appeared in their basement walls were merely superficial symptoms of a "deterioration and decay in the chemical composition of the concrete" out of which the basement walls were constructed. Mem. in Opp. at 9. Moreover, they contend that the clause excluding from coverage loss caused by "collapse" in the form of swelling, cracking, or bulging cannot be reasonably read in the manner suggested by defendants, because all "collapses," by definition, "involve the separation or cracking of materials" and result in structures "bent or twisted out of their original design configuration." Id. at 8.

  In Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246 (1987), the Connecticut Supreme Court considered a similar question in the context of a homeowner's insurance policy containing the following language:

  This policy does not insure against loss . . . [u]nder Coverages A and B . . . 1. by

8

> . . . settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings . . . unless . . . collapse of a building . . . not otherwise excluded ensues, then this policy shall cover only such ensuing loss.

Id. at 250.  The Beach court rejected the defendant's argument that "the term 'collapse' in this policy unambiguously contemplates a sudden and complete falling in of a structure." Id.  First, the court held that the word "collapse" encompasses both "a catastrophic breakdown" and "a breakdown or loss of structural strength." Id. at 251.  In so holding, the court noted that, "[i]f the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended." Id.  Second, the court rejected the defendant's argument that the portion of the contract excluding liability for loss by " 'settling, cracking, shrinkage, bulging or expansion' . . . narrow[ed] the purview of 'collapse' to casualty of a sudden and cataclysmic nature." Id.

Like the contract language at issue in the Beach case, the Bacewiczes' policy excludes "settling, cracking, shrinking, bulging, or expansion" from its definition of "collapse."  As in Beach, the court concludes that the term "collapse," as that term is used in Section 8 of the Bacewiczes' policy, is reasonably susceptible to a reading that includes the type of damage that occurred to the Bacewiczes' basement walls.

To begin, the court agrees with the Bacewiczes that, even if the contract unambiguously provides that "cracking" and "bulging" do not constitute "collapse" per se, such is not dispositive of the breach of contract claim in this case.  The Bacewiczes argue that the chemical decomposition of the basement walls--rather than the cracking

9

or bulging itself--constitutes the "collapse" that caused the loss. There is evidence in the record indicating that such chemical decomposition occurred. One report, for instance, mentions "oxidation of iron sulfide minerals . . . present within the course aggregate particles" of the concrete, Exh. EE at 6, and David Grandpre, an engineer, testified that the walls had deteriorated as a result of an alkali-silica reaction. Deposition of David Grandpre at 56:8-11. Further, there is evidence that such decomposition led to a "substantial impairment" in the structural integrity of the basement walls. Id. at 56:12-18.

Second, as in Beach, the court agrees that a reasonable jury could find that the term "collapse," as it is contained within the Bacewiczes' policy, is not limited to a situation of sudden and catastrophic loss. The court agrees that the term " 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." Beach, 205 Conn. at 252. Moreover, if NGM had intended to limit collapse coverage to situations involving sudden and catastrophic loss, it presumably could have done so. The Bacewiczes claim that the defendants breached the provision in the policy that expressly provides coverage for collapse caused by "hidden decay." In interpreting a policy containing similar language, the Second Circuit recently noted that, "by [its] very nature, hidden decay . . . occur[s] slowly and not as a sudden destructive force." Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 93 (2d Cir. 2009). While, as the Second Circuit noted, some insurance contracts may be read to mean that the term " 'collapse' . . . requires a sudden destructive force, that is surely not the case where the policy in question defines collapse in a manner which expressly includes conditions that occur only

10

slowly." Id.

In light of the foregoing, the court concludes that the language in Section 8 of the policy, which states that "collapse" does not include, inter alia, cracking and bulging, is susceptible to more than one reasonable interpretation. The court agrees with the Bacewiczes that a reasonable jury could conclude that such language simply indicates that "a crack or bulge, by itself, does not make for a collapse." Id. at 9. That cracking and bulging may have been symptomatic of chemical decomposition occurring within the concrete of the basement walls of the Bacewiczes' house would not, in the court's view, preclude a reasonable jury from concluding that NGM is liable for failing to cover any substantial impairment to structural integrity caused by such decomposition. Indeed, as the Bacewiczes note, it is difficult--if not impossible--to imagine any "collapse" that did not at some point manifest itself in the form of cracks, bulges, or other physical deformities.

> c.    Hidden Decay

NGM next argues that it is not liable for the damage to the Bacewiczes' basement walls because such damage was not caused by "hidden decay." NGM maintains that such damage was not "hidden" and should not be considered to constitute "decay."

The court first concludes that a reasonable jury could find that the damage to the Bacewiczes' basement walls constituted "decay." While the term "decay" is not defined in the policy, Webster's II New College Dictionary defines that term to include "[g]radual deterioration to an inferior state, as of health or mental capability." As noted above, there is evidence in the record indicating that the Bacewiczes' basement walls were

11

weakened due to a chemical reaction, possibly an oxidation of iron sulfide minerals, or an alkali-silica reaction. In the court's view, the term "decay" might reasonably be interpreted by a lay person to encompass damage to concrete caused by such chemical reactions.

In addition, the court concludes that a reasonable jury could find that the damage to the Bacewiczes' basement walls was "hidden." NGM argues that such damage was not "hidden" because Janice Bacewicz first discovered a crack in her house as early as mid-2006. Mem. in Supp. at 13. However, there is evidence in the record that some types of cracks within concrete are "pretty common," Deposition of David Grandpre at 57:7-8, and that the Bacewiczes did not become aware that the walls in their basement had seriously deteriorated until Joseph Bacewicz removed interior paneling from such walls in or about February 2008. See L.R. 56(a)(2) at ¶ 42; Deposition of Joseph Bacewicz at 53:3-16. Accordingly, the court concludes that, even if not every single physical manifestation of the decay in the Bacewiczes' house was concealed from plain view, there is evidence on which a reasonable jury could find that the "decay" that occurred was "hidden," within the meaning of the policy.

d.    Water Damage

NGM next argues that summary judgment must be granted on the breach of contract claim because the policy does not cover loss caused by "[w]ater below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk driveway, foundation . . ." See Mem. in Supp. at 14. NGM contends that the loss to the Bacewiczes' house was caused by water below the surface of the ground. Indeed, there is no dispute that the policy does not cover loss

12

caused by such water,[2] and the record contains ample evidence that the damage to the Bacewiczes' basement walls was indeed caused by water on the surface of the ground.

NGM points to, for example, a report prepared by engineer Douglas Fisher indicating that "[t]he failure to apply a water proofing membrane to the exterior wall surface allowed exterior sources of water to come into contact with and migrate through the concrete." Defs' Exh. I. Both sides also seem to agree that water may be necessary to facilitate an alkali-silica reaction or an oxidation of the sulfides within the concrete comprising the basement walls, chemical reactions which may have led to the deterioration of those walls.

The defendants, however, have raised an issue of material fact that precludes the court from granting summary judgment. While Fisher, the defendants' engineer, indicated that water outside the basement walls would be necessary to facilitate the deterioration of those walls, the plaintiffs' expert, David Grandpre, indicated that "the initial water in the concrete mix would be sufficient for the [alkali-silica reaction] process to begin." Defs' Exh. I.[3] There is no dispute that water contained in the concrete mix itself would not trigger the water damage exception to the coverage provided by the policy. Summary judgment is thus denied on the basis of the water damage exception to the policy.

---

[2] "Water Damage," as that term is used in the policy, is defined fully as:
(1) Flood, surface water, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
(2) Water which backs up through sewers or drains or which overflows from a sump; or
(3) Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure." Defs' Exh. A at 27.

[3] The Bacewiczes have cited pages 73 and 74 of Grandpre's deposition for this proposition. D.I.M.F. at ¶ 62. These pages, however, were apparently never submitted to the court by the plaintiffs.

13

### 2.    Timing Restrictions to Suit

Beyond arguing that the policy does not govern the type of loss suffered by the Bacewiczes, the defendants maintain that the breach of contract claim is time-barred because the claim was not filed "within the required time specified by the policy." Mem. in Supp. at 14.  Paragraph 8 of the "Conditions" section of the policy states that, "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss." Contractually-imposed time limitations to suit have long been recognized as enforceable by both federal and Connecticut courts.  See Air Brake Systems, Inc. v. TUV Rheinland of North America, Inc., --- F. Supp. 2d ----, 2010 WL 1194503, at *6 (D. Conn. 2010) (collecting cases). The Bacewiczes' breach of contract action was originally filed in state court on September 18, 2008.

While the parties dispute when the one-year limitations period began to run, they appear to agree on the standard to be applied.  While there is no Connecticut precedent on point, the First Circuit, in Parker v. Worcester Ins. Co., 247 F.3d 1 (1st Cir. 2001), predicted that the Connecticut Supreme Court would employ the "discovery rule" in circumstances such as these.  Id. at 5 ("Making our best guess, we are inclined to think that the Connecticut Supreme Court would probably take this view, given the protective attitude toward the insured displayed in Beach."). Under such approach, the limitations period begins to run only when "a reasonable person would have learned of the injury or loss." Id. at 4.

Using this rule, the question for the court is whether the limitations period began to run before September 23, 2007, which is one year before the date on which the

14

defendants were served in this action.[4]  The defendants argue that, using the "discovery

rule" approach, the one year limitations period began to run, at the latest, in early 2007.

The Bacewiczes, on the other hand, maintain that the period began to run, at the

earliest, in December 2007, which is when Janice Bacewicz allegedly noticed "the

enlargement of the crack" in her house.  It is undisputed that Janice Bacewicz first

noticed cracking in the house in mid-2006, L.R. 56(a)(1) at ¶ 5, that the Bacewiczes

arranged for a contractor and an engineer to examine the crack during the summer of

2006, id. at ¶ 7, 8, that Janice Bacewicz noticed that the problems had become worse

by winter of 2007, id. at 10-11, and that no action was undertaken to repair the

basement walls until 2008.  Id. at ¶ 13.

Parker involved a similar scenario.  There, the plaintiffs "began to notice hairline,

mostly horizontal cracks in the concrete walls of the basement" almost immediately

after moving into a new house in 1985.  247 F.3d at 2.  By 1996, the cracks had grown

larger, and "the basement wall seemed to be developing a sandy texture, as if it were

disintegrating." Id.  In November 1997, after the insurer refused to cover the damages,

the plaintiffs paid out of pocket to repair them.  Id. at 3.  The plaintiffs brought suit

against the insurer in February of 1998, alleging a breach of the "collapse" portion of

the policy.  The question for the court was when the one-year limitations period, as

provided by the contract, began to run.  The First Circuit first noted that, using the

discovery rule, the period began to run only when the plaintiffs knew or should have

---

[4] "In Connecticut, an action is commenced on the date of service of the writ upon the defendant." Hillman v. Town of Greenwich, 217 Conn. 520, 527 (1991). At oral argument, both parties agreed that September 23, 2007 is the date on which the statute of limitations clock began to run.

15

known that their property had suffered loss covered by the "collapse" provision; that is, when they knew or should have known about a "substantial structural flaw" in the building. Id. at 5. While the court noted that the plaintiff "conceivably . . . should have known by mid-1996" that the structural integrity of the house had been seriously compromised, it held that "a reasonable factfinder could draw varying conclusions as to whether a reasonable person should have known from [the facts known to the plaintifffs at that date] that a substantial structural flaw was present or at least likely." Id.

In this case, the court similarly concludes that a reasonable jury could draw different conclusions as to whether a reasonable person should have known before September 23, 2007, that a substantial structural impairment was present in the Bacewiczes' house. The Bacewiczes were aware of cracking in their house by that date, L.R. 56(a)(2) at ¶ 5, but it is far from clear whether a reasonable person would have known that such cracking was a sign of collapse. "A judgment on undisputed facts that a reasonable person 'should have known' something is (like negligence) a legal conclusion; but it is one of those conclusions that most courts leave to juries where, as here, reasonable juries could differ." Parker, 247 F.3d at 5. On this basis, the court declines to grant summary judgment on the ground that the suit is time-barred.

> 3.  Whether the Bacewiczes Timely Notified NGM of the Damage to their Basement Walls

Lastly, the defendants argue that summary judgment must be granted on the breach of contract claim because the Bacewiczes failed to give NGM "prompt notice" upon "the loss to" their house, as required by the contract. It does not appear to be

16

disputed that the Bacewiczes first provided an "initial notice of a claim" to NGM on March 11, 2008. However, whether such notice was prompt depends on when a reasonable person would have known that the cracking to the Bacewiczes' house was a sign of collapse. As in the discussion of whether this suit was commenced within the limitations period provided by the contract, the court concludes that a reasonable jury could find that the Bacewiczes promptly notified NGM of the loss to their house.

B.   Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count Two, the Bacewiczes allege that the defendants breached the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Warner v. Konover, 210 Conn. 150, 154 (1989) (internal quotation marks and citation omitted). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004) (internal quotations marks omitted).

The Bacewiczes have offered three bases for their claims contained in Count Two. First, they argue that the defendants denied their claim for collapse coverage on

17

the basis of water damage, when in fact no evidence of water damage existed. Second, they argue that the defendants acted unreasonably and in bad faith by "delaying the issuance of a formal denial of coverage until after the expiration of the suit limitation period," presumably to create an "untimely filing" defense. Third, they argue that the defendants accused the Bacewiczes of making fraudulent misrepresentations, without a factual basis to do so.

### 1.    Water Damage

As to the allegation that the defendants were dishonest in their denial of the Bacewiczes' insurance claim on the basis of water damage, the court concludes that the record cannot support a claim for breach of the implied covenant of good faith and fair dealing. The record is devoid of any evidence indicating that the defendants acted dishonestly or in bad faith in citing water damage as the reason for the denial of the Bacewiczes' claim. Moreover, whether or not the damage to the Bacewiczes' house was actually caused by water damage, this court, in its discussion of the breach of contract claim, noted that the record contains evidence on which a reasonable jury could make such a finding. See Section III.A.1.c, supra.

### 2.    Untimely Filing Defense

Similarly, the record cannot support a claim for breach of the implied covenant of good faith and fair dealing on the basis that the defendants waited until February 2009 to deny the Bacewiczes' claim of coverage, in order to create a defense of untimely filing. While it is undisputed that the Bacewiczes' claim was denied on that date, there is nothing in the record that suggests that the defendants made a "decision" to wait until that date to deny coverage, for the purpose of creating such a defense. The record

18

shows that the Bacewiczes notified NGM of their claim in March of 2008, that an NGM engineer prepared a written report in May 2008, and that the Bacewiczes submitted a formal proof of loss in late September 2008.

In support of this claim, the Bacewiczes highlight the defendants' refusal to accommodate their request to extend the contractual suit limitation period. Mem. in Opp. at 28; see also Pls' Exhs. OO; PP. However, the September 18, 2008 letter in which the defendants' lawyer denied that request in no way indicates bad faith. Such letter signals that the defendants, at the time, were still investigating the date on which the Bacewiczes knew or should have known that their basement walls had "collapsed." Pls' Exh. PP. While the letter demonstrates that the defendants thought it possible that the Bacewiczes had already waited too long to sue over the denial of coverage to their basement walls, the letter contains no hint of a dishonest or sinister purpose.

In sum, the record lacks any evidence that supports the Bacewiczes' allegation that the defendants purposefully delayed the investigation into the Bacewiczes' claim for the purpose of creating an untimely filing defense. No reasonable jury, therefore, could find a breach of the implied covenant of good faith and fair dealing on this basis.

3.    Accusations of Fraudulent Misrepresentations

The court reaches the same determination as to the Bacewiczes' claim that defendants accused them of making fraudulent misrepresentations, without a basis to do so. Such accusation appeared in the defendants' letter denying coverage to the Bacewiczes for the damage to their basement walls. That letter stated that, "[b]ased upon our investigation, we have concluded that your clients concealed and misrepresented material facts or circumstances and made false statements during the

19

presentation of their claim." Defs' Exh. A.

The basis for such accusation is as follows: On September 29, 2008, a contractor named Dean Soucy filed a building / zoning permit application with the Town of Tolland, seeking to "replace [the] foundation wall" of the Bacewiczes' home. Defs' Exh. M. On September 30, the Bacewiczes executed a proof of loss with NGM, claiming a recovery of $226,319 on their policy. Defs' Exh. N. On October 1, the Bacewiczes signed an agreement with Dean Soucy, indicating that the repairs to their house would cost $112.000. Defs' Exh. H. Based on their belief that the Bacewicizes knew they would be employing Dean Soucy at the time the proof of loss was executed and, due to the fact that the amount claimed on the proof of loss was more than double that indicated in the October 1 agreement, NGM apparently believed that the Bacewiczes "misrepresented the value of their claim in the September 30, 2008 proof of loss." Mem. in Supp. at 22.

The Bacewiczes maintain that they "have never asserted that they are entitled to any more than the cost of repairing their home," and that "the proof of loss was based upon a cost estimate made by their contractor." Mem. in Opp. at 29. The record contains support for these assertions. See id. (summarizing deposition testimony). However, these facts, even if true, do not indicate that the defendants acted with a dishonest or sinister purpose in accusing the Bacewiczes of making false representations on their proof of loss.[5] The Bacewiczes argue that the defendants

---

[5] While the plaintiffs state that "[i]t was clear that at the time the defendants denied the claim they knew that the proof of loss was based on estimated costs," rather than actual costs, the plaintiffs cite nothing in support of this assertion. Mem. in Opp. at 30; D.I.M.F. at ¶¶ 75-77.

20

lacked any factual basis that would justify an accusation of making false statements. However, the court agrees with the defendants that, based on the timing of the events noted above and the large disparity between the amount stated on the proof of loss and that stated on the contract executed the following day, the defendants had a reasonable basis on which to make such a statement. In sum, the court concludes that no reasonable jury could find that the defendants breached the implied covenant of good faith and fair dealing, on the basis that they accused the Bacewiczes of making false representations on their proof of loss.

### C.   Count Four: Vicarious Liability

Count Four alleges that The Main Street America Group ("MSA"), NGM's parent corporation, is vicariously liable for NGM's conduct in connection with the Bacewiczes' homeowners' insurance policy, because MSA, as the sole shareholder of NGM, exercised control over NGM's operations. See Am. Comp. at ¶ 45-46. The defendants argue that summary judgment must be granted on Count Four because the record is devoid of facts on which a reasonable jury could find that MSA is liable for the actions of NGM. Mem. in Supp. at 22.

Under Connecticut law, "it is a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers." SFA Folio Collections, Inc. v. Bannon, 217 Conn. 220, 232 (1991) (internal quotation marks and citation omitted). Connecticut courts therefore

disregard the corporate structure and pierce the corporate veil only under

21

> exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.

Id. at 230 (internal quotation marks and citation omitted).

Connecticut "recognizes two theories under which it will permit the protection of the corporate structure to be set aside, the instrumentality rule and the identity rule." Labbe v. Carusone, 115 Conn. App. 832, 838 (2009). The Bacewiczes argue that only the "identity rule" is applicable to this case. Mem. in Opp. at 31. Under that rule,

> If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

Id.[6] (quoting Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc., 187 Conn. 544, 553-54 (1982); see also SFA Folio Collections, 217 Conn. at 232 ("[T]he separate corporate entities or personalities of affiliated corporations will be recognized, absent illegitimate purposes, unless: "(a) the business transactions, property, employees, bank and other accounts and records are intermingled; (b) the formalities of separate corporate procedures for each corporation are not observed . . . (c) the corporation is inadequately financed as a separate unit from the point of view of meeting its normal obligations . . . (d) the respective enterprises are not held out to the public as separate

---

[6] In contrast, " '[t]he instrumentality rule requires . . . proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of . . . .' " Labbe, 115 Conn. App. at 838 (quoting Angelo Tomasso, Inc., 187 Conn. at 553-54 (1982)).

22

enterprises; (e) the policies of the corporation are not directed to its own interests primarily but rather to those of the other corporation.") (internal quotation marks and citation omitted).

In support of Count Four, the Bacewiczes have submitted evidence, consisting of deposition testimony, that MSA and NGM are, to some extent, "intertwined." Mem. in Opp. at 31; see also Deposition of Hilda Ortiz at 7:12-14 (describing MSA and NGM as "[o]ne in the same"); Deposition of Judith Banes at 9:13-16 (stating that NGM is "under the umbrella of the Main Street America Group"); Deposition of Ronald Callahan at 17:7-9 ("Q. Does she work for National Grange or does she work for Main Street America Group?  A. We all kind of work for both."); Deposition of Joel Heller at 9:12-14 ("I view [NGM and MSA] as being one in the same since NGM is a subsidiary of Main Street America Group."). However, the record contains no evidence of any exceptional circumstance that would permit the court to pierce the corporate veil. There is no indication, for example, that the business transactions, property, and bank accounts of MSA and NGM are intermingled; that NGM is inadequately financed as a separate entity; or that NGM and MSA are not held out to the public as separate entities. Even if, as the Bacewiczes allege, MSA owns all of the shares in NGM and exercises control over NGM operations, Am. Comp. at ¶ 44-45, "[s]uch control . . . is no more than a normal consequence of controlling share ownership." SFA Folio Collections, Inc., 217 Conn. at 232.

Because there is no evidence in the record that would permit a reasonable jury to "pierce the corporate veil" and find MSA liable for NGM's alleged misconduct, summary judgment is granted to the defendants on Count Four.

23

D.     Plaintiffs' Cross-Motion for Partial Summary Judgment

The plaintiffs have cross-moved for summary judgment on their breach of contract claim.  As stated in section III.A, supra, reasonable juries could differ as to whether NGM breached the insurance contract that is the subject of this case.  Thus, for the reasons stated in the court's discussion of Count One, the Cross-Motion for Partial Summary Judgment is denied.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 97) is **granted in part.**  It is granted as to the claims for breach of the implied covenant of good faith and fair dealing and vicarious liability, and denied as to the claim for breach of contract.  The plaintiffs' Motion for Partial Summary Judgment (Doc. No. 104) is **denied.**

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 2nd day of August, 2010.


                                    /s/ Janet C. Hall
                                    Janet C. Hall
                                    United States District Judge

24

STEPHEN A. METSACK AND GAIL D. METSACK, Plaintiffs

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY AND ALLSTATE INSURANCE COMPANY, Defendants.

Civil Action No. 3:14-CV-01150 (VLB)

United States District Court, D. Connecticut.

September 30, 2015

MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT [Dkt. 14]

VANESSA L. BRYANT, District Judge.

I. Introduction

The Plaintiffs, Stephen A. Metsack and Gail D. Metsack (the "Metsacks"), bring this action against Defendants Liberty Mutual Fire Insurance Company ("Liberty Mutual"), and Allstate Insurance Company ("Allstate"), alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and Unfair Trade Practices Act ("CUTPA"), as a result of Liberty Mutual's decision to decline coverage for damage to the basement walls of Plaintiffs' home (the "Property") under a homeowners insurance policy (the "Policy") issued to the plaintiffs by Liberty Mutual. Liberty Mutual has moved to dismiss the Complaint for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6), arguing that the Policy excludes coverage for the type of damage claimed by defendants to any "foundation" or "retaining wall" and that the basement walls of the Property are a "foundation" or "retaining wall" within the meaning of the Policy exclusion. Plaintiffs argue that those terms are ambiguous as used in the Policy and therefore must be construed in favor of coverage. For the reasons that follow, Defendant Liberty Mutual's Motion to Dismiss is DENIED.

II. Factual Background

The following facts and allegations are taken from Plaintiffs' First Amended Complaint.

Defendant Liberty Mutual is an insurance company incorporated under the laws of the Commonwealth of Massachusetts and has a principal place of business in Massachusetts. [Dkt. 30, Amend. Compl. at ¶ 2]. Defendant Allstate is an insurance company incorporated under the laws of the State of Illinois and has a principal place of business in Illinois. [Id. ¶ 3]. The Metsacks are Connecticut residents who purchased a residential property at 148 Laurel Lane, Ashford, Connecticut in June of 1991. [Id. ¶ 1]. The residence that is the subject of this action was constructed in 1992. [Id. ¶ 5]. The Metsacks insured their home at 148 Laurel Lane between June of 1991 and September of 2009 with a homeowner's policy issued by Allstate. [Id. ¶ 55]. Beginning in 2009, the Metsacks insured the Property with a homeowner's policy issued by Liberty Mutual. [Id. ¶ 6].

In the Spring of 2014, the Metsacks noticed water in their basement and noticed a series of horizontal and vertical cracks throughout most of the basement walls of their home. [Id. ¶¶ 8, 9]. In April of 2014, the Metsacks were advised by their contractor, Dean Soucy, that the form of "pattern cracking" found in the basement walls of their home was due to a chemical compound found in certain basement walls constructed in the late 1980s and the early 1990s with concrete most likely from the J.J. Mottes Concrete Company. [Id. ¶ 11]. This compound "began to oxidize (rust) and expand, breaking the bonds of the concrete internally." [Id. ¶ 12]. Plaintiffs allege that "[a]t some point between the date on which the basement walls were poured and the month of April, 2014 the basement walls suffered a substantial impairment to their structural integrity." [Id. ¶ 14]. The Metsacks notified Liberty Mutual on April 15, 2014 of the condition of their basement walls and made a claim for coverage. [Id. ¶¶ 14, 15].

Liberty Mutual's claims representative denied the Metsacks' claim for coverage in a letter dated May 12, 2014 stating that the Policy does not afford coverage for "settling/earth movement or seepage of ground water...." [Id. ¶ 19]. Plaintiffs allege that Allstate's claims representative also denied the Metsacks' claim orally on March 10, 2015, asserting that the Allstate policy does not afford coverage for losses that occur "over time" and that "too much time has passed since Allstate covered the property." [Id. ¶ 68]. Plaintiff alleges that the cost of replacing the basement walls "is expected to be not less than $125, 000.00." [Id. ¶ 23].

The Liberty Mutual Policy, which is the relevant policy for the purposes of Liberty Mutual's Motion to Dismiss, is attached as an Exhibit to the First Amended Complaint and provides coverage under Section 8 of the Policy for "direct physical loss to covered property involving collapse of a

building or any part of a building caused only by one or more of the following:... (b) Hidden decay;... or (f) Use of defective material or methods in construction, remodeling or renovation." [Dkt. 30, Ex. A, at 5]. Section 8 also includes an exclusionary clause, which excludes coverage for appurtenances, stating that "[l]oss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, *foundation, retaining wall,* bulkhead, pier, wharf or dock is not included *unless the loss is a direct result of the collapse of a building* ." [Id.] (emphasis added).

Plaintiff alleges that Liberty Mutual has "a general business practice of acting intentionally to mislead its insureds into believing that the collapse of the basement walls of a building caused by hidden decay or by the use of faulty or defective materials or methods of construction is not a covered loss." [Id. ¶ 33]. As evidence of a general business practice, Plaintiff points to at five other substantially similar pending or resolved "concrete decay" lawsuits against either Liberty Mutual or companies within the Liberty Mutual Group within the last four years.[1] The Amended Complaint also states that Liberty Mutual and Allstate participate "in the Insurance Services Office, Inc., ("ISO") which is a cooperative organization formed and controlled by its participants for the purpose, among others, of collecting data on the type of claims made, the policy provisions cited for the basis of each claim, the geographic areas in which the claimed damage has occurred, and the actions taken by insurers in response to such claims." [Id. ¶ 38]. By means of their participation in the ISO, Plaintiff claims that Liberty Mutual and Allstate have joined "in an insurance industry wide practice of denying coverage for concrete decay claims." [Id. ¶ 41].

Plaintiff also argues that Defendant Liberty Mutual was aware of an opinion issued by a court in this district concerning a concrete decay claim against another insurer in *Bacewicz v. NGM Ins. Co.*, in which that court denied a summary judgment by an insurer, finding that a policy exclusion cited here by Liberty Mutual was "reasonably susceptible to more than one reading." No. 3:08-CV-1530 (JCH), 2010 WL 3023882, at *3-6 (D. Conn. Aug. 2, 2010). Plaintiff argues that Liberty Mutual thereafter engaged in a practice of "refusing to attempt in good faith to effectuate prompt, fair and equitable settlements of concrete decay claims in which liability has become reasonably clear."

On August 8, 2014, Plaintiffs filed their original Complaint against Defendant Liberty Mutual. On October 30, 2014, Liberty Mutual moved to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6), arguing that it fails to state a claim on which relief can be granted due to the exclusion in the Policy for loss to a "foundation" or "retaining wall." Defendant also argued that Plaintiffs' Complaint was fatally vague for failing to state whether the damage occurred

during the period of the Liberty Mutual Policy or prior to that Policy taking effect in 2009. After the parties briefed the instant Motion, Plaintiffs sought leave of this Court to amend their Complaint in order to add Allstate as a party, and leave was granted. On March 18, 2015, Plaintiffs filed an Amended Complaint and requested issuance of a summons to Allstate. Although counsel for Allstate entered an appearance on April 17, 2015, and was a participant in the parties' Rule 26(f) conference, Allstate has not moved to dismiss the Amended Complaint or otherwise filed a timely Answer, the deadline to respond to the Amended Complaint having long since passed. Plaintiffs have not moved for default judgment as to Allstate and neither Defendant has in any way indicated an intent to rely upon the arguments set forth in Liberty Mutual's Motion to Dismiss the original Complaint. Nonetheless, as discussed below, the Court can resolve the issues presented by Liberty Mutual's motion.

Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers labels and conclusions' or formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders naked assertion[s]' devoid of further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the well-pleaded factual allegations, ' assumed to be true, plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss

pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F.Supp.2d 140, 144 (D. Conn. 2005)(MRK). Here, Plaintiffs attach the homeowners policies issued by Allstate and Liberty to his complaint as exhibits. Therefore, the Court may consider the entirety of these Policies to analyze the pending motion to dismiss.

III. iscussion

The filing of an Amended Complaint typically renders any motions relevant to the original Complaint moot. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation omitted) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."); *Thompson v. Pallito*, 949 F.Supp.2d 558, 582 (D. Vt. 2013) ("motions addressed to the original complaint are generally regarded as moot upon the filing of an amended complaint"). However, "[i]t frequently happens in the district court that a plaintiff amends its complaint while a motion to dismiss is pending... a court then has a variety of ways in which it may deal with the pending motion, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." *In re Colonial Ltd. P'ship Litig.*, 854 F.Supp. 64, 80 (D. Conn. 1994)

In the instant case, the Amended Complaint merely recited the same claims against Liberty Mutual against a new Defendant, Allstate. Otherwise, with one exception, the issues presented by Liberty Mutual's Motion to Dismiss the original complaint, and the factual allegations relevant to those issues, have not changed. Therefore, the Court will consider Defendant Liberty Mutual's Motion to Dismiss the original Complaint and the issues alleged therein in light of the allegations of the Amended Complaint. The sole exception is Defendant's argument that Plaintiffs' claims are fatally vague for failure to identify the policy period in which the damage occurred. That argument has been rendered moot by the Amended Complaint's addition of Allstate as a party, such that the two Defendants are alleged to have provided coverage throughout the entirety of the existence of the Metsack's home. That portion of Defendant's Motion to Dismiss which argues for dismissal of the original Complaint on the grounds of vagueness is DENIED as moot.

*A. Count One: Breach of Contract*

An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372-73, 949 A.2d 1084 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7-8 (2011); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("[i]n ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction").

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe, LLC*, 300 Conn. at 260. A contract is unambiguous when "its language is clear and conveys a definite and precise intent.... The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* (citation omitted); *Murtha*, 303 Conn. at 9 (same). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Harbour Pointe, LLC*, 300 Conn. at 260 (citation omitted).

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *SeeSpringdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806, 724 A.2d 1117 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions... and every provision must be given effect if it is possible to do so.... If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe, LLC*, 300 Conn. at 261 (citation omitted).

The Metsacks allege that Liberty Mutual is obligated to provide coverage for their alleged losses under Section 8 of the Policy. That Section provides:

8. Collapse. We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused by one or more of the following:... (b) Hidden decay:... or (f) Use of defective material or methods in construction, remodeling or renovation." [Dkt. 30, Ex. A,

at 5].

Liberty Mutual argues for the application of an exclusion contained in Section 8 which states that "[l]oss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, *foundation, retaining wall,* bulkhead, pier, wharf or dock is not included *unless the loss is a direct result of the collapse of a building* ." [ *Id.* ] (emphasis added). The parties agree that the damage alleged by Plaintiffs was not a direct result of the collapse of a building. Thus, Liberty Mutual argues that if the damage to the Metsack's "basement walls" is considered damage to a "foundation" or "retaining wall, " Liberty Mutual is not obligated to provide coverage.

The arguments raised by Liberty Mutual here have been persuasively rejected three times by courts in this District. *See Bacewicz,* 2010 WL 3023882, at *3-6 (D. Conn. Aug. 2, 2010) (denying insurer's motion for summary judgment and finding that a "reasonable juror could conclude that the basement walls' did not constitute the foundation' of the house"); *Karas v. Liberty Ins. Corp.,* 33 F.Supp. 3d 110, 115-16 (D. Conn. 2014) (denying Liberty Mutual's motion to dismiss and holding that the terms "foundation" and "retaining walls" were ambiguous and should be construed against Liberty Mutual"); *Belz v. Peerless Insurance Co.,* 46 F.Supp.3d 157, 163-164 (D. Conn. 2014) (finding that the terms "foundation" and "retaining wall" are both ambiguous).

Prior courts have held that the term "foundation" could refer to the "footings" of a structure, citing an Alabama Supreme Court case which described the "footings" as a "three-by-three foot piece of concrete under the basement wall." *Turner v. State Farm Fire and Cas. Co.,* 614, So.2d 1029, 1030 (Ala. 1993). Plaintiff urges that this is a correct statement of the law, arguing that a dictionary definition of "foundation" defines that term as "the lowest load-bearing part of the building." *See* "Foundation, " Oxford American Dictionary and Thesaurus, 2003. In homes with a basement, the Metsacks argue, the lowest load-bearing part of the building would be the footings underneath the basement wall. Defendant urges a different definition, arguing that a "foundation" is "a usually stone or concrete structure that supports a building from underneath... an underlying base or support... the whole masonry substructure of a building." *See* "Foundation, " Merriam Webster, *available at:* http://www.merriamwebster.com/dictionary/foundation.

Defendant also argues that the result of the above-cited prior cases should not be followed, in part because language elsewhere in the policy indicates that the terms "footings" and "foundation" refer to different parts of the structure. Specifically, an amendatory endorsement to the Policy provides:

We do not insure, however, for loss... [c]aused by: b. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a: (1) Fence, pavement, patio or swimming pool; (2) *Foundation, retaining wall, or bulkhead*; or (3) Pier, wharf or dock; (4) *Footings.*

[Id. at] (emphasis added).

However, the separate usage of "footings" and "foundation" elsewhere in the policy is not dispositive here, because a house may or may not have a separate "footing" and "foundation" depending upon its construction. At the time the subject premises were constructed it was a customary building practice in Connecticut to construct a home by first excavating the site, then erecting footings consisting of a concrete footprint of the house, erecting a basement or foundation consisting of a horizontal base or floor and vertical walls on top of the footings which serves as the home's basement, and erect the above-ground floors and walls of the home on top of the basement. Employing that method of construction, the footings beneath the basement could constitute a separate structural component serving as the structural support beneath the basement for the house. In such circumstances, a reasonable trier of fact could conclude the "footings" to be the "foundation." This interpretation would not render either term superfluous, because, there may be circumstances in which a house has foundational walls, supported by footings, without any basement. In such circumstances, the "foundation" and "footings" could refer to different elements of the below-ground masonry structure supporting the house, necessitating that the Policy distinguish between the two terms.

This interpretation is supported by the NCRS Engineering Dictionary definition of footings, which defines the "footings" as a building component "made of concrete and used under chimneys and columns as well as under foundation walls to distribute the weight of the structure over a greater area and thus prevent settling... [f]ootings are placed below the frostline to prevent movement during freezing." *See* "Footings, " NCRS Construction Dictionary, available at: Http://www.engineering-dictionary.org/NCRS-Construction -Dictionary/FOOTING. Notably, the NCRS Engineering Dictionary has no definition for the term "foundation" or the term "basement." *Id* . However, according to the Civil Engineering Dictionary, the purpose of a foundation is "the lowest part of the structure which supports the structure by distributing its load on the soil and keeping it less than the bearing capacity of soil." *See* "Foundation. " Civil Engineering Dictionary, available at: http://www.aboutcivil.org/geo-technical-foundation-engine ering.html. A "foundation" serves to keep "the load on the soil in allowable range by distributing it on a vast calculated

area." *Id.*

In addition, the Policy language prescribing the method of calculating the replacement value of a covered "building" provides further support for the Plaintiffs' position. Section I(3)(b)(3) of the Policy provides:

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(a) Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor; (b) Those supports in (a) above which are below the surface of

(b) Those support in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c), Underground flues, pipes, wiring and drains.

[Ex. A, at 9]. The replacement value calculation language is consistent with a customary construction method used in Connecticut at the time the subject premises were constructed. Further, implicit in the calculation are two key concepts: *first*, that a foundation can exist "below the undersurface of the lowest basement floor, " which implies that a basement wall and a foundation are not *always* one and the same, and *second*, that the policy in at least some capacity differentiates between homes constructed with and without a basement by distinguishing "foundation walls... if there is no basement" from "foundations below the undersurface of the lowest basement floor."

Because both parties have offered reasonable, but differing interpretations of the term "foundation, " each supported by dictionary definitions and language cited elsewhere in the Policy, the Court finds the term "foundation" to be ambiguous.[2]

Similarly, the Court is persuaded that the phrase "retaining wall" is ambiguous. Defendant argues that a dictionary defines "retaining wall" as "a wall built to resist lateral pressure other than wind pressure; esp: one to prevent an earth slide." *See* "Retaining Wall, " Merriam Webster, *available* *at:* http://www.merriamwebster.com/dictionary/retaining%20w all. Plaintiff counters that a "retaining wall" is defined as "a wall for holding in place a mass of earth or the like, as at the edge of a terrace..." *See* "Retaining Wall, " Dictionary.com, *available* *at:* http://dictionary.reference.com/browse/retaining+wall. Although Plaintiff's definition would conform with a more colloquial understanding of the phrase "retaining wall" as typically referring to a free-standing structure, the Court finds either definition to be reasonable. As such, the term

"retaining wall" is also ambiguous. In addition,

The Metsacks have sufficiently pled a cause of action for breach of contract. The allegations of the Complaint more than sufficiently put Liberty on notice of the nature of their claim, fully satisfying the requirements of Rule 8 of the Federal Rules of Civil Procedure. Liberty Mutual's motion to dismiss Count One is DENIED.

*B. Count Two: Breach of Covenant of Good Faith and Fair Dealing*

The duty of good faith and fair dealing "is a covenant implied into a contract or a contractual relationship, " and every contract "carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement...." *Renaissance Mgmt. Co., Inc. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (Conn. 2007) ( *quotingDe La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432-33 (Conn. 2004)). Implicit in every contract is a covenant of good faith and fair dealing. "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.*; *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (Conn. 2013) (same). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive... [b]ad faith means more than mere negligence; it involves a dishonest purpose." *De La Concha*, 269 Conn. at 433; *Capstone Bldg. Corp.*, 308 Conn. at 795 (same); *TD Bank, N.A. v. J & M Holdings, LLC*, 143 Conn.App. 340, 348 (Conn.App. Ct. 2013) (same).

In the context of an insurance policy, "[a] bad faith action must allege denial of the receipt of an express benefit under the policy." *Capstone Bldg. Corp.*, 308 Conn. at 794. Any cause of action for bad faith "not tied to duties under the insurance policy must therefore fail as a matter of law." *Id.* at 797. Because the Court finds that Plaintiffs have stated a plausible claim for an express benefit under the Policy covering the alleged loss, the question becomes whether Plaintiffs have alleged that Liberty Mutual acted with "actual or constructive fraud" or a "design to mislead" or have acted with "neglect or refusal to fulfill" its duties. *De La Concha*, 269 Conn. at 433.

Plaintiffs argue that Liberty Mutual "denied their claim without any investigation" and misled Plaintiffs "into believing that there was no coverage by citing inapplicable policy language." Prior courts in this District have found

these same allegations sufficient to state a claim for breach of the covenant of good faith and fair dealing at the 12(b)(6) stage. See Karas, 33 F.Supp. 3d at 116-117 (rejecting motion to dismiss good faith claim where "denial of coverage was made without the benefit of any inspection of the basement walls at issue in order to verify the damage or its possible causes"); Belz, 46 F.Supp.3d at 164-165 (rejecting motion to dismiss good faith claim where insurer was alleged to have "intentionally referred to irrelevant and misleading portions of the Policy"). The Court notes that this is not the first "concrete decay" claim in which Liberty Mutual or a related insurer within the Liberty Mutual Group has initially denied coverage on one basis - here based upon language excluding "settling" or "seepage" of groundwater - only to later raise arguments that the affected structures were excluded "foundation[s]" or "retaining wall[s]." See Belz, 46 F.Supp.3d at 165 (noting that "the arguments made by Peerless in support of its Motion to Dismiss do not mention the exclusions cited in the denial letter"). The Court also finds that Liberty Mutual could have acted in bad faith by describing a structural wall as a "foundation" without any inspection of the premises. These allegations support a plausible claim for breach of the covenant of good faith and fair dealing. Liberty Mutual's motion to dismiss Count Two is DENIED.

## C. Count Three: CUIPA and CUTPA Claims

CUIPA does not provide a private right of action, but, the Connecticut Supreme Court has recognized "the existence of a private cause of action under CUTPA to enforce alleged CUIPA violations." Mead v. Burns, 199 Conn. 651, 663, 509 A.2d 11 (Conn. 1986). However, "conduct by an insurance broker or insurance company that is related to the business of providing insurance can violate CUTPA only if it violates CUIPA, " because "the legislative determinations as to unfair insurance practices embodied in CUIPA are the exclusive and comprehensive source of public policy in this area." State v. Acordia, Inc., 310 Conn. 1, 9-12, 73 A.3d 711 (Conn. 2013).

Section 38a-816 of CUIPA proscribes "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance, " including "unfair claim settlement practices." Conn. Gen.Stat. § 38a-816. Plaintiffs have alleged that Liberty Mutual violated these unfair claim settlement practices provisions. See Conn. Gen.Stat. § 38a-816(6)(C) (failure "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies"); Conn. Gen.Stat. § 38a-816(6)(D) (refusal "to pay claims without conducting a reasonable investigation based upon all available information"). Unfair claim settlement practices constitute a CUIPA violation when they are "[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general

business practice." Conn. Gen.Stat. § 38a-816(6).

Although Plaintiff has pointed to five other legal actions against Defendant alleging similar "concrete decay" claims, Liberty Mutual argues that these actions were brought against "distinct and separate entities within the Liberty Mutual Group." In rejecting motions to dismiss similar "concrete decay" claims under CUIPA, two prior courts in this District have looked to:

"[t]he degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff; the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; the degree of similarity between claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and the degree to which the defendant is related to other entities engaging in similar practices."

Belz, 46 F.Supp.3d at 166; see also Karas, 33 F.Supp. 3d at 117.

Although Liberty Mutual is entitled to present evidence establishing that its various related entities have approached "concrete decay" claims independently and without a general business practice across related entities at the summary judgment stage of the proceedings, Plaintiff has plausibly alleged a pattern of "concrete decay" claims across related entities at this stage of the proceedings.

Defendant also argues that its mere "participation" in an ISO or "the use of ISO forms in insurance policies" does not support a claim for a violation of CUTPA/CUIPA. One prior court has held that the ISO allegation could plausibly establish "a mechanism" by which Liberty Mutual could have shared information with other insurers regarding denial of "concrete decay" claims and "methods to avoid liability for such cracking." Belz, 46 F.Supp.3d at 166. Although the ISO allegation strikes this Court as failing to cross the line between "possible" and "plausible, " at this stage the number of substantially related claims before courts in this jurisdiction alone supports a plausible allegation of a general business practice within the Liberty Mutual Group. Liberty Mutual's motion to dismiss Count Three is DENIED.

## IV. Certification

Defendant argues that the issues presented in this action are "ripe for adjudication by the Connecticut Supreme Court" and argues for certification to the Connecticut Supreme Court pursuant to Conn. Gen. Stat. § 51-199b(d). Defendant seeks to certify the question of whether the terms "foundation" and "retaining wall" are ambiguous. The

Connecticut Supreme Court, however, has provided the necessary guidance for this Court to determine whether, under Connecticut law, an ambiguity exists in a given contract. *See* Part IIIA, supra. It is presently premature to certify to the Connecticut Supreme Court the question of whether the term "foundation" as used in the Liberty policy is ambiguous. Certification of questions related to these issues could possibly be appropriate at a later stage in this litigation, upon the development of a factual record regarding both the Property and the Policy at issue that would be helpful to an appellate court.

V. Conclusion

For the foregoing reasons, Defendants' [Dkt. 14] Motion to Dismiss the Complaint is DENIED.

IT IS SO ORDERED.

---------

Notes:

[1] *SeeBelz v. Peerless Insurance Company*, Connecticut Federal District Court Civil Action No. 3:13-cv-1315 (JCH); *Karas v. LibertyInsurance Corporation*, Connecticut Federal District Court Civil Action No. 3:13-cv-1836 (SRU); *Matthews v. Peerless Insurance Company*, Connecticut Federal District Court Civil Action No. 3:12-cv-01506 (WWE); *Roberts v. Liberty Mutual Fire Insurance Company*, Connecticut Federal District Court Civil Action No. 3:13-cv-00435 (SRU); *Waters v. Liberty Mutual Group, Inc., et al.*, Massachusetts Superior Court, Hampden Division, Docket No. 06-131.

[2] Given that the term "foundation" is ambiguous, the Court notes that Plaintiff's interpretation is potentially supported by the interpretative principal of *noscitur a sociis*, as "the meanings of particular words may be indicated or controlled by associated words" 11 Williston on Contracts § 32:6 (4th ed.). The Policy exclusion applies to an: "awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock." With the exception of "foundation," all of the terms used in the exclusion reference ancillary structures to the building itself. A reasonable trier of fact could conclude that the other terms used in the exclusion shed light on the term "foundation" and suggest that term to be a reference to a more ancillary structure than the wall of a basement room.

---------