UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTOPHER D. LESTER, *et al.*,
    *Plaintiffs*,

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,
    *Defendant*.

No. 3:16-cv-00909 (JAM)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Christopher and Monica Lester have filed this lawsuit against their home insurance company, Liberty Mutual Fire Insurance Company. The Lesters dispute Liberty Mutual's failure to cover damage from allegedly defective concrete that was used to build their home. The Lesters' claim is one of many such "crumbling foundation" claims that have been filed in this Court by homeowners in northeastern Connecticut. *See also* Lisa W. Foderaro and Kristin Hussey, *Financial Relief Eludes Connecticut Homeowners with Crumbling Foundations*, NEW YORK TIMES, Nov. 14, 2016. Although I regret that the Lesters must live under a shadow of great uncertainty about the stability and value of their home, I conclude that they have not established grounds for coverage under their insurance policy. Accordingly, I will grant Liberty Mutual's motion for summary judgment.

**BACKGROUND**

The Lesters own a home in Willington, Connecticut. Their home was built in 1998, and they bought it in 2005. Liberty Mutual has insured the home since June 2007.

1

The Lesters first noticed cracks in their foundation not earlier than September of 2015 after neighbors told them about foundation problems in the area. They hired a structural engineer, William Neal, to conduct an inspection on October 5, 2015.[1]

According to Neal's inspection report, he saw several vertical hairline cracks in the exterior of the foundation as well as hairline spider-web cracking in the interior of the foundation. Neal stated that "[b]ased solely on my visual observations, the most likely cause of the foundation distress is Alkali-Silica-Reaction (ASR)," that "ASR is a chemical reaction between alkaline Portland cement and silica in the concrete mix," and that "[i]t typically causes this type of distress to be visible 15 to 20 years after the foundation is poured, and I believe the cracks are the first visible signs of this condition." Doc. #19-3 at 1. According to Neal, "[t]he ASR will continue to deteriorate the concrete until it may structurally fail," but "[i]t is not possible to predict how quickly the foundation will deteriorate to the point it is structurally dangerous." *Ibid.*

At Neal's deposition, he noted that the cracks at the time of his inspection "were quite small" and he agreed that these small cracks suggested that the basement walls were in the "infancy period" of deterioration. Doc. #19-7 at 19, 22. He agreed that there was no bowing of the walls, *id.* at 22, and "in this particular case" he was not certain that the foundation would ever structurally fail, *id.* at 24.

Neal said he could not testify with a reasonable degree of engineering probability that the foundation walls would deteriorate to the point that they would be structurally dangerous within

---

[1] The Lesters' complaint alleges damages to the "basement walls" of the house, while the Lesters' expert report alleges cracking in the "foundation" of the house. For purposes of this ruling, the term "foundation" is used in a colloquial sense and is interchangeable with "basement walls." Some cases discuss a significant coverage distinction between "foundation" and "basement walls." *See, e.g.*, *Clark v. Amica Mut. Ins. Co.*, 2018 WL 2725441, at *2–*4 (D. Conn. 2018). Because I decide the motion for summary judgment on alternative grounds, it is unnecessary for me to resolve Liberty Mutual's argument that the damage occurred to the "foundation" and that such damage is excluded under the policy.

2

the next one thousand years. *Id.* at 28. He explained that there "had been no movement in the concrete foundation," and that the walls were neither "structurally unsound" nor "structurally dangerous" at the time of his inspection. *Id.* at 31.

Soon after Neal's inspection, the Lesters filed an insurance claim. Liberty Mutual opted to hire its own engineer, Paul Cianci, who conducted a site inspection on November 19, 2015. Cianci's report states that the cracking in the concrete was evidence of "early stages of an expansive reaction in the concrete resulting from a material defect" in the concrete. Doc. #19-4 at 2. Cianci did not provide a definitive view of the chemical cause of the decay, but noted that the presence of pyrrhotite "has been thought to be the cause of the map cracking observed" in Connecticut homes and that this reaction is dependent on exposure to oxygen and water. *Id.* at 5.

Cianci concluded in his report that "[t]he insured's foundation is not in imminent danger of collapse, or in a state of collapse." *Id.* at 6. He wrote that "[t]he observed condition of the subject foundation is not a substantial impairment to the structural integrity of a building, as it is adequately supporting the structure with no immediate concern of imminent collapse." *Ibid.*

There is no evidence of any worsening of the cracking in the house foundation since Neal's inspection in October 2015. When he was deposed about two years later in September 2017, Neal said he had not returned to the property and did not know if the cracks had gotten any worse since his inspection in 2015. Doc. #19-7 at 16, 21. Likewise, when the Lesters were deposed in September 2017, they were asked if the cracks in their foundation had gotten worse since 2015, and they both responded that they did not know and avoided looking at them. Docs. #19-6 at 37–38; #19-9 at 17.

On April 12, 2016, Liberty Mutual denied the Lesters' claim. Doc. #19-5. The Lesters followed with this lawsuit alleging claims for breach of contract, breach of the duty of good faith

and fair dealing, and violations of the Connecticut Unfair Trade Practices Act (CUTPA) and Connecticut Unfair Insurance Practices Act (CUIPA). Liberty Mutual now moves for summary judgment.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Count One - Breach of Contract*

A court must interpret the terms of an insurance policy as it would a contract to determine if the text of the policy makes the parties' intent unambiguously clear. Only if the text of the policy is ambiguous does a court look to other evidence of the parties' intent and in light of the rule that any ambiguity or exclusion in the policy must be construed in favor of the insured. *See, e.g.*, *Connecticut Ins. Guar. Ass'n v. Drown*, 314 Conn. 161, 187–88 (2014).

1. *Coverage for "Collapse"*

The Lesters contend that their loss is covered under multiple provisions of the Liberty Mutual policy. First and foremost, they argue that they have experienced a "collapse" as that

term is defined in the policy. The Liberty Mutual policy includes a "collapse provision" that covers "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . b. Hidden decay; . . . or f. Use of defective material or methods in construction, remodeling or renovation. . ." Doc. #19-1 at 10. The policy clarifies that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." *Ibid*.

Because the Liberty Mutual policy does not more specifically define the term "collapse," I must resort to the default definition of that term as it is now well-established under Connecticut law. In *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246, 252 (1987), the Connecticut Supreme Court held that the term "collapse" in a homeowners' insurance policy, when otherwise undefined, was "sufficiently ambiguous to include coverage for *any substantial impairment of the structural integrity* of a building." *Id.* at 252 (emphasis added).

But what does it mean for the "structural integrity" of a building to be "substantially impaired"? Courts have come to different conclusions. *See Vera v. Liberty Mut. Fire Ins. Co.*, 2018 WL 3014112, at *3 (D. Conn. 2018) (citing cases). Some courts adopt a restrictive approach to require a policy holder to show that the building has become unsafe or is in imminent danger. *See Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp. 3d 394, 405–06 (D. Conn. 2017) (surveying cases). Others decline to require a showing of present or imminent collapse or danger. *Ibid.*

In *Roberts*, Judge Underhill concluded that the substantial impairment standard as set forth in *Beach* requires "evidence that a building would have caved in had the plaintiffs not acted to repair the damage." *Id.* at 407 (citation and quotation marks omitted). In view of the background rule that ambiguity in an insurance policy should be construed against the insurance

5

company, this interpretation of the substantial impairment standard makes sense to me. It avoids requiring a homeowner to show that the house has already or is just about to fall in on itself. It allows coverage if the homeowner shows that it is just a matter of reasonably foreseeable time before the house will cave in. Absent specific contrary language, a homeowner who buys insurance for the "collapse" of his or her house would reasonably expect an insurance company to protect against foundation damage that is so significant that the house will cave in on itself absent action to replace or repair the foundation.

All that said, the *Roberts* standard does not go too far in favor of the homeowner, because if it were any broader it would essentially require an insurance company to provide "collapse" coverage merely for the fact that there is cracking in the foundation and without any evidence that the cracking will indeed lead to a collapse. That broad a standard would stray too far from any common sense meaning of what it means for there to be a "collapse." And it would also negate the separate and standard exclusion for mere cracking and settling. In short, the *Roberts* application of the *Beach* standard "achieves an appropriate middle ground that avoids either eviscerating catastrophic coverage of collapse, or effectively nullifying the faulty workmanship and settling exclusions." *Ibid.* (citation and quotation marks omitted).[2]

Applying the *Roberts* standard, I conclude that there is no genuine fact issue of a "collapse" in this case. The Lesters' evidence relies on little more than the fact that there are

---

[2] Judges Chatigny and Underhill have recently certified to the Connecticut Supreme Court the question of what constitutes a "substantial impairment of structural integrity" for purposes of applying the "collapse" provision of a homeowners' insurance policy that does not otherwise define the term "collapse." *See Vera v. Liberty Mut. Fire Ins. Co.*, 2018 WL 3014112 (D. Conn. 2018); *Karas v. Liberty Ins. Corp.,* 2018 WL 2002480 (D. Conn. 2018). Because I give the Lesters the benefit of the *Roberts* standard and because it would not be plausible in my view for the Connecticut Supreme Court to adopt an even more generous interpretation of the term "collapse" than the *Roberts* standard, there is no need for me to abstain from resolving Liberty Mutual's motion for summary judgment pending further guidance that may come from the Connecticut Supreme Court. Nor is there any need for me to resolve Liberty Mutual's objection to the qualifications of Neal to serve as an expert or to resolve its arguments that other exclusions bar coverage here.

small but worrying cracks that have developed in the foundation of their home. Plaintiffs and their engineering expert could not attest that the cracks have gotten any worse in the two years since they were discovered. Indeed, the Lesters' expert was unable to conclude that the foundation walls would deteriorate to the point that they would be structurally dangerous within the next millennium. Because the Lesters could not conceivably own their home for so long, it is clear they have not established a genuine fact issue to suggest that their home in the reasonably foreseeable future would cave in unless they take steps to repair the damage. Accordingly, the Lesters' insurance policy does not cover them for a "collapse" of their home.

2. *Coverage for Chemical Reaction Causing "Risk" of Loss*

The Lesters next argue that, because the nature of the damage arises from a chemical reaction, they are covered by the policy's coverage for a "risk" of loss. They cite language from the policy stating that "[w]e insure against *risk of direct loss* to property described in Coverages A and B." Doc. #19-1 at 11 (emphasis added). According to the Lesters, "the use of the term 'risk' essentially expands the policy terms and contemplates not only the chemical reaction itself, but risks associated with the occurrence of the chemical reaction such as a total collapse of the structure." Doc. #22 at 8.

I don't need to decide if coverage for "risk of direct loss" is broader than coverage simply for "loss," because the language at issue here is immediately followed by disclaimer exclusionary language: "[w]e do not insure, however, for loss … 1. Involving collapse, other than as provided in Additional Coverage 8.; … (6) Settling, shrinking, bulging or expansion, including resultant cracking, of … foundations, walls …." Doc. #19-1 at 11. As I have already discussed above, the referenced "collapse" provision of the policy does not apply to this case, especially in light of its proviso that: "Collapse does not include settling, cracking, shrinking,

bulging or expansion." *Id.* at 10. This exclusion would be wholly superfluous if a policy holder could circumvent it by claiming that there is coverage for a chemical reaction that somehow causes a "risk" of loss involving cracking in foundation or basement walls. *See also Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 287 F. Supp. 3d 153, 161 (D. Conn. 2017) (rejecting similar argument on grounds that "[e]ven if it is assumed that the use of the term 'risk' expands the coverage, an exclusion following the coverage for 'risk of direct physical loss' bars recovery for 'settling, shrinking, bulging or expansion, including resultant cracking, of . . . foundations, walls . . .'"); *Zamichiei v. CSAA Fire & Cas. Ins. Co.*, 2018 WL 950116, at *8 (D. Conn. 2018) (same).

More generally, there is no merit to the Lesters' suggestion that the presence of a chemical reaction makes a difference to whether there should be coverage under the policy. As Judge Shea has observed in rejecting a similar argument, it "does not matter whether the originating event behind the cracking and deterioration was a chemical reaction," because "the exclusions in the Polic[y] make no exception for losses for which the cause is itself a product of a chemical reaction." *England v. Amica Mut. Ins. Co.*, 2017 WL 3996394, at *6 (D. Conn. 2017). In other words, because the policy excludes coverage for cracking in the foundation or basement walls, "[t]he technical cause of the cracking . . . is irrelevant." *Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 375 (D. Conn. 2017). Accordingly, I conclude that the policy does not apply here by reason of the policy's application to "risk of direct loss" or by reason of the fact that a chemical reaction may create a risk of loss in this case.

### 3. *Coverage for "Ensuing Loss"*

The Lesters next argue that they are covered under the so-called "ensuing loss" provision of the policy. That provision states: "We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property

8

described in Coverages A and B not excluded or excepted in this policy is covered." Doc. #19-1 at 13. This text makes clear that an "ensuing loss" does not negate an otherwise applicable exclusion under the policy; it allows for coverage only if an exclusion or exception does *not* apply. *See generally Mazzarella v. Amica Mut. Ins. Co.*, 2018 WL 780217, at *6 (D. Conn. 2018) (describing function of an "ensuing loss" provision to allow for coverage of a loss that is "separate and independent" from an exclusion but cautioning that "[w]here a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk") (citation and quotation marks omitted). Because the Lesters do not identify any grounds for loss that are separate and independent from the exclusions that apply in this case, they are not entitled to coverage under the "ensuing loss" provision of the policy.

    *4. Coverage for "Reasonable Repairs"*

  The Lesters further argue that their loss is covered under the "reasonable repairs" provision of the policy. The policy indeed includes a provision titled "Reasonable Repairs" that states: "In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage." Doc. #19-1 at 8. But as the text of this provision makes clear, it applies only if there is a peril for which there is coverage in the first instance. The Lesters have not made this threshold showing that their loss stems from a covered peril. Accordingly, they are not entitled to payment for reasonable repairs that they might make to their house. *See Chernosky v. Amica Mut. Ins. Co.*, 2018 WL 529956, at *5 (D. Conn. 2018) (rejecting same argument); *Liston-Smith*, 2017 WL 6459552, at *6 (same).

9

*Counts Two and Three - Covenant of Good Faith and CUTPA/CUIPA*

Because there is no genuine issue of fact to support the Lesters' breach of contract claim, it follows that their remaining claims for breach of the covenant of good faith and fair dealing as well as for violations of CUTPA and CUIPA must likewise be dismissed. It is well established that "bad faith is not actionable apart from a wrongful denial of a benefit under the policy." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013). Similarly, "a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract." *Roberts*, 264 F. Supp. 3d at 416.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendant's motion for summary judgment (Doc. #17). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 31st day of July, 2018.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge